**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| IN RE: SNOWFLAKE, INC., DATA SECURITY BREACH LITIGATION | **2:24-MD-03126-BMM**<br><br>**ORDER**<br>**RE: POTENTIAL CONFLICT OF INTEREST OF PLAINTIFFS' CO-LEAD COUNSEL** |

## BACKGROUND

The Court addresses an alleged conflict of interest regarding one of Plaintiffs' Co-Lead Counsel, Amy Keller ("Keller"). The potential conflict arises from Keller and her firm, Dicello Levitt, representing clients in this Multidistrict Litigation ("MDL") against Defendant AT&T and representing clients in another MDL, also involving AT&T.

The Judicial Panel on Multidistrict Litigation centralized a data security breach case against AT&T in the Northern District of Texas on June 5, 2024. *See In re: AT&T Inc. Customer Data Security Breach Litigation*, MDL 3114, Dkt. 139 (N.D. Texas) ("*AT&T I*"). A separate data security breach occurred that also affected

1

AT&T's database. The Judicial Panel on Multidistrict Litigation centralized the action arising from the second data breach in the District of Montana–Butte Division on October 8, 2024. (Doc. 1; 2:24-MD-03126-BMM) ("*AT&T II*").

Keller filed a complaint against Defendants in *AT&T II* on September 3, 2024, before the case was centralized in Montana. (Doc. 357-1. Ex. 4 at 26.) Keller appeared before the Court on October 30, 2024, to represent an individual plaintiff against Snowflake Inc. (Doc. 143.) Keller and Timothy Blood ("Blood") filed a motion to be appointed Co-Lead Counsel in this case on November 7, 2024. (Doc. 222.) The Court selected Keller for a position as Co-Lead Counsel in this case on November 27, 2024. (Doc. 253; Doc 255.) The Court did not select Blood.

Keller's potential conflict arises due to her firm's representation of individual clients against AT&T in *AT&T 1* and her firm's separate representation of putative class members in *AT&T II*. (Doc. 357.) Keller's firm, DiCello Levitt, apparently represents approximately 20,000 individual clients who intend to opt-out of the class action against AT&T to pursue arbitration in *AT&T I*. (Doc. 357.) Keller remains Co-Lead Counsel in this MDL class action against AT&T in *AT&T II*.

The Court appointed four other Co-Lead Counsel in *AT&T II*: John Heenan, J. Devlan Geddes, Raphael Graybill, and Jason S. Rathod. (collectively "4 Leads"). (Doc. 253; Doc 255.) The 4 Leads learned for the first time, on February 17, 2025, that Keller's firm, DiCello Levitt, represents this group of individual clients who

intend to opt-out of the class action against AT&T in *AT&T I* to pursue arbitration against AT&T. The 4 Leads oppose Keller's continued representation in *AT&T II* due to the potential conflicts raised during discussions over settlement negotiations.

The 4 Leads argue that a conflict arises where the claims of the individual clients in *AT&T I* and the class members in *AT&T II* would compete for the same settlement funds. The 4 Leads raise concerns that Keller's representation of the interests of both groups of clients would violate Montana Rules of Professional Conduct 1.7, 1.8(g), and 1.10. (Doc. 357.) Keller contends that no conflict exists that would require her to withdraw from representation of the putative class members in this case. (Doc. 357-1, Ex. 4.) The 4 Leads asked Keller to withdraw voluntarily. Keller responded that she effectively could screen herself from DiCello Levitt's representation of the clients in *AT&T I*. Keller argues that such screening would be justified to allow her continued representation of the putative class members in *AT&T II*.

The Judicial Panel on Multidistrict Litigation centralized *AT&T I* in the Northern District of Texas on June 5, 2024. *AT&T I*, Dkt. 139. The record remains unclear when the individual clients in *AT&T I* retained DiCello Levitt. The Court assumes that DiCello Levitt retained these clients in *AT&T I* before Keller filed a complaint in this action on September 3, 2024 (*Miller v. Snowflake, Inc et al*, 2:24-cv-96, Doc. 1) and certainly before the centralization of this action in October 2024.

Keller filed her motion for a leadership application on November 7, 2024. (Doc. 222.) Keller disclosed that she had been appointed to lead eight separate data privacy class actions, "including one of the largest data breach settlements ever achieved in the United States and another data breach that has now been twice-certified to proceed as a class action." (*Id.* at 10, citing *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 139 (D. Md. 2022), *vacated and remanded sub nom. In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023), *reinstated In re Marriott Int'l Customer Data Sec. Breach Litig.*, 345 F.R.D. 137 (D. Md. 2023).) Nowhere in Keller's motion, or during her presentation to the Court for a leadership position, however, did Keller mention that her firm had retained individual clients in a separate MDL against AT&T.

Keller mentioned that another proposed leadership team member had been appointed co-lead in *AT&T I*. (Doc. 222.) Keller failed to mention DiCello Levitt's role in the North Texas MDL in *AT&T I*. Keller contends that no conflict existed that required disclosure before February 17, 2025. Keller allegedly disclosed a potential conflict to the 4 Leads after discussions of a global settlement had been announced in private settlement negotiations in *AT&T II*. The parties scheduled a global mediation with AT&T for March 17, 2025. The global mediation seeks to incorporate all the claims against AT&T in *AT&T I* and *AT&T II*.

The 4 Leads consulted with ethics advisor Betsy Brandborg ("Brandborg"), former General Counsel and Ethics Counsel with the State Bar of Montana, on February 20, 2025, to determine whether an actual conflict exists between Keller's representation of the putative class in *AT&T II* and the individual class members in *AT&T I*. (Doc. 357 at 3.) The 4 Leads notified Keller of Brandborg's adverse opinion on February 24, 2025. Brandborg opined that Keller would be violating the Montana Rules of Professional Conduct by continuing to represent both plaintiff groups against AT&T and could not cure the conflict by screening herself or obtaining conflict waivers. (Doc. 357-1, Ex. 1.) Brandborg thought it not practicable for Keller to obtain waiver from all 20,000 plaintiffs who decided to opt out of the class settlement and pursue arbitration against AT&T in *AT&T I*. (*Id.*) Keller also could not practically screen herself because of her prior involvement in handling the individual plaintiffs' claims and involvement in *AT&T II* settlement negotiations. (*Id.*)

The 4 Leads and Keller convened on March 1, 2025, to discuss the potential conflict and Brandborg's opinion. (Doc. 357 at 6.) Keller attended the meeting with her firm partners, Adam Levitt and Ken Abbarno. (*Id.*) The 4 Leads gave Keller until March 4, 2025, to respond to the conflict allegations and explain why she should not resign and withdraw from the *AT&T II*. After the meeting, the 4 Leads retained Jerry Lynch ("Lynch"), a retired federal magistrate judge for the District of Montana.

5

Lynch reached the same conclusion as Brandborg and urged the 4 Leads to disclose the conflict to the Court.

Keller responded on March 4, 2025. Keller argued that a conflict did not exist before AT&T had proposed a global settlement of claims against it in *AT&T I* and *AT&T II*. As a result, Keller contends that AT&T that "thrust upon" her a conflict and this conflict did not require her to withdraw. The 4 Leads disagreed and gave Keller until March 5, 2025, to resign. Keller declined.

The Court was noticed *ex parte* by the 4 Leads on March 5, 2025, of the potential conflict. The Court gave Keller and the 4 Leads until March 10, 2025, to provide additional responses and authority to the Court. The Court held an *ex parte* hearing on March 11, 2025, to resolve the matter. (Doc. 369.)

## LEGAL STANDARD

A court's power to regulate attorney conduct stems from its inherent authority to supervise the professional conduct of attorneys appearing before it. *See United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996). The American Bar Association's Model Rules of Professional Conduct and the Montana Rules of Professional Conduct ("the Rules") govern attorney conduct in the District of Montana. D. Mont. LR 83.2(a); *see also James Lee Constr., Inc. v. Gov't Emps. Ins. Co.*, 339 F.R.D. 562 (D. Mont. 2021) ("Matters of attorney disqualification are

governed by state law and applicable disciplinary rules") (internal citation omitted).

A court's decision to disqualify counsel is discretionary. *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey*, 722 F.2d 435, 438 (9th Cir. 1983). Disqualification is warranted in a class action if there is a clear violation of the Rules or if "the appearance of divided loyalties of counsel is contrary to class counsel's responsibility to absent class members." *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1046 (N.D. Cal. 2014) (citing *Kayes v. Pac. Lumber CO.*, 51 F.3d 1449, 1465 (9th Cir. 1995)). Disqualification "is generally disfavored and should only be imposed when absolutely necessary." *Sierra v. Costco Wholesale Corp.*, 630 F. Supp. 3d 1199, 1204–05 (N.D. Cal. 2022). A court should conduct a fact-intensive inquiry into the "implication of disqualification" that includes the clients' right to chosen counsel, the attorney's interest in representing the client, the financial burden on the client to replace disqualified counsel, whether the disqualification is tactically motivated, preserving the integrity of legal proceedings, and prevention of unfair prejudice. *Id.* (internal citation omitted); *see also In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022).

## DISCUSSION

The 4 Leads argue Keller has a conflict of interest due to her role in leadership in *AT&T II* and her firm's concurrent representation of individual

7

arbitration claimants in *AT&T I*. (Doc. 357 at 1.) The 4 Leads contend this concurrent representation creates a conflict under the Montana Rules of Professional Conduct 1.7, 1.8(g), and 1.10 because the putative class members in *AT&T II* and the individual claimants in *AT&T I* will compete for the same settlement funds. (*Id.*)

Keller argues that the alleged conflict is not disqualifying. (*In Camera Response from Amy Keller to *In Camera* Notice.*) Keller contends that the alleged conflict of interest raised by the 4 Leads remains speculative and not supported by caselaw or ethical rules. (*Id.*) Keller argues that the differences between *AT&T I* and *AT&T II* prove significant and involve different entities, data, and class members. (*Id.*) Keller asserts that concurrent representation of clients in separate large class actions against the same defendant is common and permissible as long as the interests are not inherently opposed. (*Id.*) The Court first will address the applicable rules of professional conduct and then discuss relevant case law addressing similar issues.

## I.    Whether Keller Should be Disqualified as Co-Lead Counsel

Mont. R. Prof. Conduct 1.7 generally prohibits lawyers from representing clients if the representation involves a concurrent conflict of interest. A conflict of interest exists if a representation of one client will be directly adverse to another client or there exists a significant risk that the lawyer's responsibilities materially

will limit the representation of one or more clients to another client. Mont. R. Prof. Conduct 1.7 (a) (1-2). A lawyer may seek to mitigate that conflict by getting informed consent from clients confirmed in writing. *Id*. (b) (1, 4). In the alternate, if the lawyer reasonably believes the lawyer will be able to provide competent and diligent representation to each affected client, the lawyer may proceed with representation. *Id*.

Mont. R. Prof. Conduct 1.8(g) requires obtaining written informed consent from clients before concurrently representing two adverse interests. 1.8(g) states:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims . . . involved and of the participation of each person in the settlement.

The ABA Model Rules of Professional Conduct comments to 1.8 regarding aggregate settlements note that "[l]awyers representing a class of plaintiffs . . . may not have a full client-lawyer relationship with each member of the class; nevertheless, such lawyers must comply with applicable rules regulating notification of class members and other procedural requirements designed to ensure adequate protection of the entire class." Model R. Prof. Conduct 1.8 Cmt. 16.

Fed. R. Civ. P. 23 generally governs the rules regarding conflicts in class actions. Rule 23 instructs courts on whether a lawyer is adequate to serve as class counsel. Conflicts of interest between counsel and claimants typically arise at class

certification and settlement. *See e.g.*, *Mehl v. Canadian Pacific Railway Ltd*., 227 F.R.D. 505, 515 (D.N.D. 2005). The *Mehl* court noted that "[m]ost courts have held that class counsel may represent more than one class against the same set of defendants in large part because of the procedural safeguards in place to protect the proposed class; i.e., the court must approve any proposed settlement." *Id.* Courts may look to the professional conduct rules in making a Rule 23 determination, but those rules are not tailored to the complexity and messiness of class actions. *See e.g., In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 102 (2d Cir. 2003) As noted by the Second Circuit, "the traditional rules concerning conflict-free representation, applicable in nonclass suits, 'should not be mechanically applied to the problems that arise in the settlement of class action litigation.'" *Id.*

Lawyers representing classes in class actions also generally may not represent class members with different interests. *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1046 (N.D. Cal. 2014) "The 'appearance' of divided loyalties refers to differing and potentially conflicting interests and is not limited to instances manifesting such conflict." *Id.* (citing *Kayes v. Pac. Lumber Co*., 51 F.3d 1449, 1465 (9th Cir.1995) (quotations in original)). If the conflicts are illusory or speculative, the class has been untainted by the conflict, there were waivers of conflict in place, and there were processes in place for court approval of class settlement, then class counsel may be

able to provide competent and diligent representation of conflicting classes. *Id.* (citing *Sheftelman v. Jones*, 667 F. Supp. 859, 865–66 (N.D.Ga.1987)).

The 4 Leads base their analysis of the alleged conflict on several cases that are not directly on point to the present issue. Those cases prove distinguishable. Counsel in *In re Marra* took on representation of two clients who were directly adverse to one another and failed to ask the clients if they consented to Marra's dual representation. 87 P.3d 384, 386 (Mont. 2004). One counsel in Marra's firm represented a plaintiff in a wrongful death action, while another counsel in Marra's firm represented the potential tortfeasor from the wrongful death action in other business transactions. *Id*. The Montana Supreme Court concluded that Marra violated a firm's duty of loyalty required by Mont. R. Prof. Conduct Rule 1.7 and Rule 1.10 when representing clients on opposite sides without informed consent. *Id*. at 388.

*Marra*'s reasoning proves distinguishable. The conflict in *Marra* was clear and direct. The attorney represented a client in a wrongful death action against another client of the firm thereby creating an undeniable conflict of interest. 87 P.3d at 386. The issue before the Court arises from the potential competition for settlement funds between two groups of clients represented by the same firm against a common defendant. The attorney in *Marra* failed to obtain informed consent from

11

the clients involved. This failure proved to be a critical factor in the Montana Supreme Court's decision. *Id.*

Keller has represented to the Court that she has screened herself from DiCello Levitt's representation of the opt-out arbitration clients in *AT&T I.* (Declaration of Amy Keller, ¶ 27.) Keller represents further that DiCello Levitt will not be participating in the settlement discussions with AT&T on behalf of the opt-out arbitration clients. (*Id.*) The Court further notes that strict application of the Model Rules of Professional Conduct is not always appropriate in class actions. *See In re Austrian*, 317 F.3d at 102. A Rule 23 analysis is more appropriate when evaluating whether a conflict exists. *See Mehl* 227 F.R.D. at 515. The Court also notes that procedural safeguards exist in the present case to protect Plaintiffs' interests that did not exist in *Marra*. *Mehl* 227 F.R.D. at 515.

*In the Matter of Linda Deola* also proves distinguishable. No. PR 16-0714 (Mont. Nov. 29, 2019). *Deola* addressed the issue of simultaneous representation of clients competing for a limited pool of funds. *Id.* at 1. Deola represented a plaintiff in a lawsuit against the plaintiff's accounting firm. *Id.* The plaintiff relied on the accountant to invest in a company that went bankrupt shortly after the plaintiff made the investment. *Id.* Deola later retained five other clients whose claims against the same accountant were like those of the original plaintiff. *Id.* Deola's prospective

contingent fee was higher for the five newer clients than her original client. *Id.* The parties reached a global settlement for all claims in the amount of $4.65 million. *Id.*

The Office of Disciplinary Counsel accused Deola of violating, among others, Mont. R. Prof. Conduct Rule 1.7, 1.8(g), 1.4. *Id.* at 2. The Montana Supreme Court agreed that Deola violated Rule 1.7 "because there was a significant risk that her simultaneous representation of these six clients would be materially limited by her responsibilities to each client and by her personal interests." *Id.* Deola violated Rule 1.8(g) because she failed "to obtain informed consent in a signed writing from each client prior to participating in the aggregate settlement of the claims." *Id.* Deola violated Rule 1.4 because she failed "to timely and adequately inform [her original plaintiff] about Deola's representation of the other five claimants, the conflict of interest in this representation, and the ramifications of the global settlement and allocation of the proceeds." *Id.*

The present case involves Keller's representation of individual arbitration claimants in *AT&T I* and putative class members in *AT&T II*. The data breaches in these cases occurred years apart and involved different circumstances and parties. Unlike *Deola*, where the conflict arose from a single settlement negotiation of a limited fund, the alleged conflict here arises from AT&T's proposal for a global settlement in *AT&T I* and *AT&T II*. No facts indicate that individual arbitration claimants in *AT&T I* and putative class members in *AT&T II* will compete at

13

settlement from a limited pool of funds. Keller also has implemented an ethical screen to address any potential conflict, another measure not present in *Deola*. (Declaration of Amy Keller, ¶ 27.)

The 4 Leads partially rely on *Sandoval* to support their assertion that Keller has a conflict. (*See* Doc. 357.) The 4 Leads incorrectly apply *Sandoval's* reasoning. The plaintiffs in *Sandoval* filed a lawsuit on behalf of themselves and a putative class against Syed Ali and other defendants, alleging violations of the Fair Labor Standards Act, California labor law, and California unfair competition law. 34 F. Supp. 3d at 1035–36. The defendants moved to disqualify the plaintiffs' counsel. *Id.* The court declined the motion. *Id.*

The defendants argued that the plaintiffs' counsel should be disqualified due to potential conflicts of interest, as they represented plaintiffs in both the federal case and a related state court case. *Id.* at 1044–48. The court rejected as speculative the defendants' concerns about conflicts of interest. *Id.* at 1047. The court noted that no clear evidence existed of inconsistent positions or failure to litigate vigorously. *Id.* The court emphasized that class counsel would not be disqualified merely for representing another class against the same defendants if the conflicts were "illusory and speculative the class has co-counsel untainted by the conflict, and there were procedural safeguards protecting the class's interests." *Id.* at 1046 (citing *Sheftelman v. Jones,* 667 F.Supp. 859, 865–66 (N. D. Ga. 1987)). The court ultimately denied

14

the request to disqualify the plaintiffs' counsel without prejudice, allowing the issue to be revisited if the case reached the class certification stage. *Id.* at 1046, 48. Two other cases prove instructive.

*Sheftelman* involved a securities fraud action related to the financing of a life care facility for the elderly known as the Royal Regency project. 667 F.Supp. at 862. The plaintiffs filed the suit seeking to represent a class of individuals who purchased the bonds between October 1, 1982, and December 1, 1983, and sustained damages. *Id.* The court examined the adequacy of plaintiffs' counsel under Rule 23(a)(4), addressing concerns about conflicts of interest and a local rule violation. *Id.* at 864–65. The defendants argued that plaintiffs' counsel had conflicts of interest due to representing competing classes against common defendants and alleged violations of a local rule restricting communication with potential class members. *Id.* at 865–66. The court concluded that the alleged conflicts did not render plaintiffs' counsel inadequate, as the conflicts were speculative and procedural safeguards were in place. *Id.* The court noted that "plaintiffs are represented by co-counsel untainted by this alleged conflict . . . [that] the court must approve any proposed settlement of this action . . . [and that] the court can and will require that the notice to the class members disclose the alleged conflict." *Id.* (internal citations omitted).

*Ruderman ex rel. Schwartz v. Washington Nat. Ins. Co.* involved a putative class action filed by former insureds against Washington National Insurance

Company, alleging improper calculation of lifetime maximum and per occurrence benefit amounts under a limited benefit home health care coverage policy. 263 F.R.D. 670 (2010). The plaintiffs moved for class certification. *Id.* The defendant challenged the adequacy of the plaintiffs' class counsel. *Id.* at 677. The defendant argued that the proposed class counsel was inadequate due to conflicts of interest arising from representing individual plaintiffs in separate actions against the defendant. *Id.* The court reasoned that because only one member of the class counsel had brought individual cases against the defendant, it was presumed that "the other class counsel would not allow their colleague to put the interests of his individual cases before the interests of the class." *Id.* at 685. The court concluded that class counsel was adequate as there was no demonstrated actual conflict affecting the class representation because the defendant "has not alleged that the proposed class members and individual plaintiffs seek recovery from a single pool of assets." *Id.* at 685.

The procedural postures of the above cases differ from the present issue. The defendants sought to disqualify plaintiff counsel in *Sandoval*. 34 F. Supp.3d. at 1044–45. The defendants objected to the adequacy of plaintiff counsel at class certification in *Scheftelman* and *Ruderman*. 667 F.Supp. at 864–65; 263 F.R.D. at 684–85. The reasoning used by the courts to analyze the potential conflicts still applies to the present issue.

The 4 Leads premise the alleged conflict on the fact that AT&T will offer a single-limited pot of money at the global mediation. (Doc. 357 at 9.) Such a premise remains speculative and hypothetical. *See Sandoval*, 34 F. Supp.3d. at 1046; *see also* Newberg & Rubenstein on Class Actions, s.19:24 (6th ed. 2024) ("[T]he prevailing approach to this conflicts concern is that courts will warrant it only in the presence of a real, not speculative, conflict and are most concerned in cases involving potentially limited funds."). It is unknown how AT&T intends to resolve the claims at settlement for *AT&T I* and *AT&T II*. No reason exists to speculate that AT&T has insolvency issues that would result in a limited fund settlement where a conflict issue might arise. *See e.g.*, *Ortiz v. Fibreboard*, 527 U.S. 815 (1999); *Jackshaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.D. 183, 192 (N.D. Ohio 1984) (finding counsel inadequate under Rule 23 in part because of conflict created by representation of two separate classes against a single, defunct entity with finite resources.). The Court further notes that Plaintiffs are represented by four other Co-Lead Counsel who remain untainted by this alleged conflict. *See Scheftelman*, 667 F.Supp. at 865–66. Finally, any proposed settlement in this action must also be approved by this Court. *Id.*

The Court already has addressed a similar issue when it determined how to incorporate Financial Institution claims. (*See* Doc. 350.) Co-Lead Counsel argued that no inherent conflict arose in having a financial institution spoke under the same

overall supervision as the consumer spokes in this MDL. (Doc. 344 at 4.) Co-Lead Counsel recognized that a potential conflict issue could arise if there was a limited fund, but no evidence suggested such an issue would arise. (*Id.* at 5.) Co-Lead Counsel argued that if a limited fund issue arose, "Plaintiffs have case management tools under the existing structure to promote Co-Lead Counsel's ongoing obligation to "maximize the common and collective interests of all plaintiffs in negotiating a global settlement consistent with appointment.'" (*Id.* citing *Best Practices for Large and Mass-Tort MDLs* at 57, *Bolch Judicial Institute*, Duke Law School (2d ed.) ("Bolch Best Practices").

Co-Lead Counsel further stated "Plaintiffs could seek the involvement of an experienced mediator . . . to ensure that any advanced-stage settlement negotiations are arms-length and fair." (*Id.* at 5.) In anticipating a limited fund issue "Plaintiffs would also seek the involvement of an independent third party who has not represented consumers to the extent necessary to ensure a fair distribution of proceeds." (*Id.*) Co-Lead Counsel noted that such an "arrangement is common in complex litigation . . . because the normal strictures of Rule 1.7 do not apply to the judicially-created relationship between court-appointed leadership and class members. (*Id.* citing *Bolch Best Practices* at 51.) The Court agreed with Co-Lead Counsel in recognizing that such structure is common in MDLs. (*See* Doc. 350 at 2–3.)

The Court remains concerned that Keller failed to disclose the potential conflict until definitive settlement discussions with AT&T were commenced. As an experienced attorney, Keller, at the minimum, should have identified that a potential conflict may arise given her firm's representation of individuals involved in *AT&T I*. The Court recognizes, however, that no actual conflict exists unless AT&T proposes a limited fund settlement to resolve the claims of *AT&T I* and *AT&T II*. *Sandoval*, 34 F. Supp.3d. at 1046.

Keller has represented to the Court that she has screened herself from DiCello Levitt's representation of the opt-out arbitration clients in *AT&T I*. (Declaration of Amy Keller, ¶ 27.) Keller represents further that DiCello Levitt will not be participating in the settlement discussions with AT&T on behalf of the opt-out arbitration clients. (*Id.*) These measures prove adequate as initial safeguards.

The Court will impose further safeguards to protect Plaintiffs' interest and to resolve any such potential conflict going forward. Keller will be prohibited from attending the global mediation with AT&T. Keller also will be prohibited from participating in any discussions regarding the allocation of any proposed settlement funds from AT&T. These actions prove appropriate in MDLs. *See Bolch Best Practices* at 51, 57. The Court also determines that other procedural safeguards exist to protect Plaintiffs' interests. Four other Co-Lead Counsel untainted by the alleged conflict also represent Plaintiffs. *Sandoval*, 34 F. Supp. at 1046. The Court will

19

have to approve the terms of any proposed settlement. *Sheftelman*, 667 F.Supp. at 865–66.

## CONCLUSION

The Court has considered carefully the potential conflict presented by the 4 Co-Leads and agrees that the 4 Co-Leads had an ethical duty to raise this issue. The Court reminds Counsel that this MDL is a first of its kind in the District of Montana. The Court appointed a diverse leadership that it thought would be well-equipped to run this MDL. The leadership team consisted of local counsel who often practice before the Court but lack extensive experience in MDLs and out-of-state counsel with extensive experience in MDLs around the country.

This leadership structure sought to avoid the balkanization of leadership and equip Plaintiffs with a lead counsel group that would advocate vigorously on their behalf. *See Bolch Best Practice* at 53. It was also the goal of the leadership structure to have those with less experience in MDLs learn from those with more experience in MDLs to promote efficiency within the MDL. *Id.* at 31. The Court reminds Counsel of these facts moving forward.

The Court admonishes Counsel that they are attorneys, and the Rule of Professional Conduct applies to just that – *conduct* – including when interacting with one another. *See e.g.* Mont. R. Prof. Conduct Preamble (14). Counsel's compliance with these Rules and the tools prescribed by Rule 23, will ensure the

fairness of the proceedings and a fair outcome to all parties. The Court takes seriously its responsibility to use Rule 23 to ensure a fair and just resolution to claims presented by the millions of class members. The Court trusts that Counsel will take seriously its responsibility to provide competent and conflict-free representation to all class members.

The Court concludes that Keller's conflict does not warrant disqualification. Rule 23 provides procedural safeguards in class actions to protect the interests of Plaintiffs. To protect Plaintiffs' interests and avoid any appearance of a conflict, the Court will prohibit Keller from attending the global mediation with AT&T. The Court also will prohibit Keller from participating in any discussions regarding the allocation of any proposed settlement funds from AT&T. This Order does not exclude Keller from receiving her share of any attorney's fees from an AT&T settlement. It is also the Court's understanding that Keller's firm has represented that it will not attend the global mediation and will not advise its arbitration clients in *AT&T I* whether they should accept any proposed settlement put forth by AT&T.

Accordingly, it is hereby **ORDERED**:

1) Amy Keller of DiCello Levitt will remain as Co-Lead Counsel.

DATED this 12th day of March, 2025.

Brian Morris, Chief District Judge
United States District Court