# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| IN RE: SNOWFLAKE, INC. DATA SECURITY BREACH LITIGATION | **Case No. 2:24-MD-03126-BMM** |

## **PLAINTIFFS' FOURTH AMENDED REPRESENTATIVE CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

PARTIES ..........................................................................................5

I.    Defendants.................................................................................5

II.   Plaintiffs ...................................................................................9

      A.    Ticketmaster Plaintiffs ...................................................10

      B.    Advance Auto Plaintiffs..................................................28

      C.    LendingTree Plaintiffs ...................................................37

      D.    AT&T Plaintiffs ............................................................42

      E.    LAUSD Vendor Plaintiffs...............................................51

      JURISDICTION AND VENUE...........................................58

      FACTUAL ALLEGATIONS ...............................................59

      PART ONE: THE DATA BREACH ........................................59

I.    Multiple, basic cybersecurity failures led to the Data Breach. ..............61

II.   Relevant industry standards and regulations for data security were
      not followed by Defendants. ....................................................68

      A.    The Federal Trade Commission's straightforward guidelines
            were not followed.........................................................68

      B.    Payment Card Industry Data Security Standards were not
            followed.....................................................................74

      C.    Other standards applicable to cloud storage were not
            followed.....................................................................77

III.  The Data Breach harmed Plaintiffs and Class Members. ......................79

      A.    Snowflake information was sold on the dark web and to
            other criminals.............................................................83

i

B.    There are long-lasting impacts of the Data Breach.......................86

C.    The Data Breach forces Plaintiffs and Class Members to take additional steps to mitigate harm.............................................95

D.    Defendants failed to protect consumers or compensate victims appropriately........................................................................99

E.    Damages can compensate victims for the harm caused by the attack. .......................................................................................102

IV.    Alternative forms of dispute resolution that would delay resolution of cases which Defendants sought to consolidate are unconscionable and unenforceable. ......................................................105

PART TWO: SNOWFLAKE ....................................................................110

I.    Snowflake had a duty to safeguard Plaintiffs' and Class Members' information. ...........................................................................................114

II.    Snowflake's own actions were a substantial factor in the Data Breach....................................................................................................115

III.    Snowflake's negligence as a sophisticated cloud-storage services provider. .................................................................................................120

IV.    Snowflake breached its duty and engaged in unfair trade practices. ....122

V.    Snowflake's actions injured Plaintiffs and Class Members.................126

VI.    Class action allegations as to Snowflake. ............................................127

VII.    Causes of action as to Snowflake..........................................................131

PART THREE: TICKETMASTER AND LIVE NATION ........................148

I.    Ticketmaster's business and data security promises.............................148

II.    Ticketmaster employs its significant market power to deprive consumers of meaningful choice...........................................................155

III.    Ticketmaster makes billions of dollars every year off of junk fees......158

IV.    Ticketmaster owed a duty of care to Plaintiffs and Class Members. ...................................................................161

V.     The Ticketmaster Defendants breached their duty to protect Personal Information and engaged in unfair trade practices. ...............166

VI.    Personal Information stolen about Ticketmaster Plaintiffs and Class Members. ...................................................176

VII.   Ticketmaster Plaintiffs and Class Members suffered injuries as a result of the Data Breach. ........................................180

VIII.  Class action allegations as to the Ticketmaster Defendants. ...............182

IX.    Causes of action as to the Ticketmaster Defendants. ...........................187

       PART FOUR: ADVANCE AUTO PARTS  AND ADVANCE STORES COMPANY ...........................................................211

I.     The Advance Auto Defendants collect and store Personal Information of job applicants. ...............................................211

II.    The Advance Auto Defendants owed a duty of care to Plaintiffs and Class Members. ...................................................213

III.   The Advance Auto Defendants breached their duty to protect Plaintiffs' and Class Members' Personal Information. ........................216

IV.    Personal Information stolen about Advance Auto Plaintiffs and Class Members. ...................................................219

V.     Plaintiffs and Class Members suffered injuries as a result of the Data Breach. ...........................................................221

VI.    Class action allegations as to the Advance Auto Defendants. ..............223

VII.   Causes of action as to the Advance Auto Defendants. .........................230

       PART FIVE: LENDINGTREE AND QUOTEWIZARD ...........................240

I.     The LendingTree Defendants' business and data security promises. ...................................................................240

II.      The LendingTree Defendants owed a duty of care to Plaintiffs and
         Class Members. ......................................................................................248

III.     The LendingTree Defendants breached their duty to protect
         Personal Information and engaged in unfair trade practices................252

IV.      Personal Information stolen about LendingTree Customers. ...............255

V.       Plaintiffs and Class Members suffered injuries as a result of the
         Data Breach. ..........................................................................................257

VI.      Class action allegations as to the LendingTree Defendants. ...............259

VII.     Causes of action as to the LendingTree Defendants. ...........................263

         PART SIX: AT&T DEFENDANTS ..........................................................272

I.       The AT&T Defendants' business and data security promises.............272

II.      The AT&T Defendants breached their duty to protect Personal
         Information and engaged in unfair trade practices. .............................278

III.     Personal Information stolen about AT&T Plaintiffs and Class
         Members..................................................................................................281

IV.      Plaintiffs and Class Members suffered injuries as a result of the
         Data Breach. ..........................................................................................288

V.       Class action allegations as to the AT&T Defendants. .........................290

VI.      Causes of action against the AT&T Defendants...................................294

         PART SEVEN: LOS ANGELES UNIFIED SCHOOL DISTRICT
         VENDOR DEFENDANTS .......................................................................307

I.       LAUSD collects, manages, and stores massive amounts of
         Personal Information to serve half a million students. ........................307

II.      The amount of data and the extreme sensitivity of children's
         Personal Information that LAUSD and its vendors collect,
         manage, and store on the Snowflake cloud make them a prime and
         lucrative target for threat actors. .........................................................309

III.    The sensitivity of school children's Personal Information requires heightened vigilance and use of the comprehensive security measures. ..................................................................313

IV.    Identity of Defendant Innive and the Doe Defendants 1-50. ...............322

V.    Defendant Innive and the Doe Defendants 1-50 owed a duty of care to LAUSD Vendor Plaintiffs and Class Members. ......................323

VI.    Defendant Innive and the Doe Defendants breached their duty to protect Personal Information. ..................................................328

VII.    Personal Information stolen about LAUSD students and families. ......330

VIII.    The LAUSD Vendor Plaintiffs and Class Members suffered injuries as a result of the Data Breach. ..................................332

IX.    Class action allegations as to the Defendant Innive and the Doe Defendants ...............................................................333

X.    Causes of action as to the Spoke/Doe Defendants. ...............................338

PRAYER FOR RELIEF ...............................................................352

DEMAND FOR JURY TRIAL ..................................................353

# INTRODUCTION

1.      Data companies are acutely aware of the critical importance of cybersecurity in an increasingly interconnected world. With the exponential growth of cloud storage, companies are entrusted with sensitive information, ranging from personal details to financial records.

2.      This is a "hub-and-spoke" data breach case. The "hub" in this case is Defendant Snowflake, which is a company that specializes in cloud-storage technologies to warehouse and secure sensitive data, and in selling data storage and analytics products. Snowflake sells its data storage services to numerous companies, or "spokes," who store information on Snowflake's data cloud. These spokes included Defendants[1] Ticketmaster, Advance Auto Parts, LendingTree, AT&T, and one or more vendors of the Los Angeles Unified School District ("LAUSD"), including Innive, Inc., and additional vendors, the names of which are not yet known but are included as Doe Defendants 1-50. All allegations regarding

---

[1]      The Defendants in this consolidated MDL are Snowflake, Inc. ("Snowflake"); Ticketmaster, LLC and Live Nation Entertainment, Inc. (collectively, "Ticketmaster"); Advance Auto Parts, Inc. and Advance Stores Company, Inc. (collectively, "Advance Auto"); LendingTree, LLC, and Quotewizard.com, LLC (collectively, "LendingTree"); AT&T, Inc. and AT&T Mobility, LLC (collectively, "AT&T"), Innive, Inc., and certain "Doe" Defendants associated with the Los Angeles Unified School District. The non-Snowflake Defendants are referred to collectively as the "Spoke Defendants."

Defendants generally and "Spoke Defendants" include and apply to each and every one of the Spoke/Doe Defendants.

3.    Stressing to investors that it built its data-storage product "with security as a core tenet,"[2] Snowflake has long understood and acknowledged the importance of robust cybersecurity to protect consumer data.

4.    Similarly, the Spoke Defendants have also long understood the importance of robust cybersecurity, as discussed herein, to protect the data of their own customers, employees, and subscribers—information from which Defendants themselves extract a handsome profit. The Spoke Defendants include Fortune 500 corporations and have a collective market capitalization totaling hundreds of billions of dollars.

5.    Information security policies and practices are imperative to ensure that sensitive information is not exposed to unauthorized third parties. These exposures, commonly referred to as "data breaches," can cause significant harm to individuals—exposing them to fraud and attempted fraud, identity theft, reputational harm, and the continuing risk of harm that results from criminals having their sensitive information.

---

[2]    Snowflake Inc. 2024 Annual Report (Form 10-K) at 15 (Mar. 26, 2024) ("Snowflake 2024 10-K"), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001640147/264ea0e0-8e73-4f07-9f54-78ab341a2c79.pdf

6.      A single data breach can result in catastrophic consequences for individuals. As a result, and based upon legal and industry-standard requirements, companies must prioritize robust cybersecurity measures.

7.      In this case, however, none of the Defendants implemented three of the most basic and industry-standard cybersecurity policies to protect Personal Information,[3] including most prominently, multifactor authentication (MFA). The foreseeable result: a massive data breach (the "Data Breach"). The cybercriminal group known by codename UNC5537 used compromised login credentials for Defendants, plugged them in to Spoke Defendants' Snowflake accounts, and successfully exfiltrated Personal Information belonging to hundreds of millions of consumers.

8.      UNC5537's success was made possible by basic data security failings on the part of Snowflake and the Spoke Defendants. These companies collectively flouted relevant governmental guidance, regulations, statutes, and industry standards.

---

[3]      "Personal Information," as used herein, refers to that information which was exposed to cybercriminals through the Data Breach. While the information exposed varies from each Spoke Defendant, each protected that information behind credentials (i.e., a username and password), intending that it would not be exposed to unauthorized third parties. As alleged herein, inadequate, negligent, and reckless cybersecurity practices resulted in that information being exposed.

9.      The Data Breach's foreseeable consequences are neither imaginary nor hypothetical: shortly after the Data Breach, sensitive information previously stored with Snowflake began appearing for sale on the dark web.[4]

10.     Plaintiffs and Class Members[5] now face the real and actual harm that the Data Breach has caused them and will continue to cause them. Not only have cybercriminals obtained valuable and sensitive Personal Information about them, but that information has been obtained by other criminals and offered for resale to still more criminals. As a result, Plaintiffs and Class Members have already experienced fraud or attempted fraud, an invasion of their privacy, and time and expenses spent mitigating the imminent and substantial risk of data misuse, and they are at significant risk of identity theft, reputational harm, and other injuries.

11.     Each Defendant bears responsibility for its role in the Data Breach. Despite their experience and sophistication, Defendants were negligent and reckless for failing to implement basic and routinely required cybersecurity practices to protect Plaintiffs' and Class Members' Personal Information.

---

[4]     Snowflake Breach Threat Actor Offers Data of Cloud Company's Customers, SOCRadar, https://socradar.io/overview-of-the-snowflake-breach/ (last visited Jan. 13, 2025).

[5]     "Class Members" refers to those individuals who were impacted by the Data Breach. Specific class definitions for each Defendant are provided in the relevant sections.

## PARTIES

### I.    Defendants

12.    **Snowflake Inc.** is a cloud-based data storage company incorporated under Delaware law, with its principal place of business located at 106 E. Babcock Street, Suite 3A, Bozeman, Montana.[6]

13.    **AT&T, Inc.** is a telecommunications company incorporated under Delaware law, with its principal place of business located at 208 S. Akard Street, Dallas, Texas.[7] Cricket Wireless is a wholly owned subsidiary of AT&T.[8] AT&T has agreements with Mobile Virtual Network Operators (MVNOs) such as Boost Mobile and Consumer Cellular under which the MVNOs pay to use AT&T's network infrastructure.

14.    **AT&T Mobility, LLC** is a telecommunications company, which is a wholly owned subsidiary of AT&T, Inc.[9] AT&T Mobility, LLC is a Delaware

---

[6]    Snowflake Inc. 2024 10-K at 1.

[7]    AT&T Inc. Annual Report (Form 10-K) (Feb. 23, 2024) ("AT&T 2023 10-K"), https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/annual-reports/2023/2023-complete-annual-report.pdf.

[8]    Chris Welch, *FCC approves AT&T's purchase of Leap Wireless, says 'it's in the public interest,'* The Verge (Mar. 13, 2014), https://www.theverge.com/2014/3/13/5505798/fcc-approves-att-purchase-of-leap-wireless. Cricket Wireless nevertheless has a separate brand identity, including separate marketing, logo, brand assets, as well as an independent retail presence from AT&T. The average consumer does not know of any relationship between Cricket and AT&T.

[9]    AT&T 2023 10-K at 1.

limited liability company, with its principal place of business located at 1025 Lenox Park Blvd. NE, Atlanta, Georgia.[10]

15.     **Live Nation Entertainment, Inc.** is an entertainment company incorporated under Delaware law, with its principal place of business located at 9348 Civic Center Drive, Beverly Hills, California.[11]

16.     **Ticketmaster, LLC** is a ticket distribution company for entertainment events, and is a wholly owned subsidiary of Live Nation.[12] Ticketmaster is a Virginia limited liability company, with its principal place of business located at 9348 Civic Center Drive, Beverly Hills, California.[13]

17.     **Advance Auto Parts, Inc.** is a provider of automotive aftermarket parts incorporated under Delaware law, with its principal place of business located at 4200 Six Forks Road, Raleigh, North Carolina.[14]

---

[10]     AT&T Mobility, LLC, *Annual Registration*, Ga. Corps. Div., https://ecorp.sos.ga.gov/BusinessSearch/DownloadFile?filingNo=26582594.

[11]     Live Nation Entertainment, Inc., Annual Report (Form 10-K) (Feb. 22, 2024) ("Live Nation 2023 10-K"), https://www.sec.gov/Archives/edgar/data/1335258/000133525824000017/lyv-20231231.htm.

[12]     Live Nation 2023 10-K at 54.

[13]     Ticketmaster, LLC, *Statement of Information*, Cal. Sec'y of State (Sept. 25, 2024), https://bizfileonline.sos.ca.gov/api/report/GetImageByNum/253133124121113249074045085047228112143236158047.

[14]     Advance Auto Parts, Inc. Annual Report *amendment* (Form 10-K/A) (May 29, 2024) ("Advance Auto 2023 10-K"), https://www.sec.gov/ix?doc=/Archives/edgar/data/1158449/000115844924000128/aap-20231230.htm.

18.    **Advance Stores Company, Inc.** is a wholly owned subsidiary of Advance Auto Parts.[15] Advance Stores Company is incorporated under Virginia law, with its principal place of business located at 4200 Six Forks Road, Raleigh, North Carolina.[16]

19.    **LendingTree, LLC** is an online lending company incorporated under Delaware law, with its principal place of business located at 1415 Vantage Park Drive, Suite 700, Charlotte, North Carolina.[17] LendingTree, Inc. is the parent of LT Intermediate Company, LLC, which holds all the outstanding ownership interests of LendingTree, LLC.[18]

20.    **QuoteWizard.com, LLC** is an insurance comparison company, and a wholly owned subsidiary of LendingTree.[19] QuoteWizard is a Delaware limited

---

[15]    *Id.* at 15.

[16]    Advance Stores Company, Inc. 2023 Annual Report, N.C. Sec'y of State (Jan. 8, 2024), https://www.sosnc.gov/online_services/business_registration/flow_annual_report/4978817.

[17]    LendingTree, LLC 2023 Annual Report, N.C. Sec'y of State (Mar. 20, 2024), https://www.sosnc.gov/online_services/business_registration/flow_annual_report/7314197.

[18]    LendingTree 2023 10-K at 7.

[19]    LendingTree, Inc. Form 8-K/A Exhibit 2.1 (Oct. 12, 2018), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001434621/000143462124000006/tree-20231231.htm.

liability company, with its principal place of business located at 1415 Vantage Park Drive, Suite 700, Charlotte, North Carolina.[20]

21.    **Innive Inc.** is a vendor of LAUSD. When Plaintiffs filed their Third Amended Complaint, the identity of the LAUSD vendor(s) implicated in the Data Breach was previously unknown, and it/they were included in the LAUSD Vendor Defendant Does 1-50. Information provided in discovery by Snowflake demonstrates that Innive is a managed service provider that contracted with Snowflake in connection with LAUSD as an authorized managed service customer. On February 13, 2021, Snowflake and Innive entered into a "Master SaaS Agreement—Managed Service Provider Edition" (the "MSA") that identifies the "Authorized Managed Service Customer Name/Address" as Los Angeles Unified School District, 333 South Beaudry Avenue, Los Angeles, CA 90017. Accordingly, based on publicly available information, as well as information provided thus far in the litigation, Plaintiffs understand that Innive likely played a role in storing, managing, or processing their Personal Information, or assisted in creating the practices, policies, or procedures used in storing, managing, or processing their Personal Information, and thus were a part of the enterprise of informational

---

[20]    QuoteWizard.com, LLC 2023 Annual Report, N.C. Sec'y of State (Jan. 8, 2024), https://www.sosnc.gov/online_services/business_registration/ flow_annual_report/15286870.

security for LAUSD. According to the Florida Department of State's Division of Corporations, Innive is a Florida corporation with its principal place of business located at 8875 Hidden River Parkway, Suite 300, Tampa, FL 33637.

22. **LAUSD Vendor Defendants Does 1-50** ("Doe Defendants"). Plaintiffs do not know the true names and capacities of the remaining Vendor Doe Defendants and therefore sue them by fictitious names. When their true names and capacities are discovered, Plaintiffs will seek leave to amend this complaint by inserting those true names and capacities. On information and belief, Doe Defendants may include, but do not necessarily include, individuals, businesses, corporations, partnerships, associations, joint ventures, defendants that are government in nature, as well as product manufacturers, professionals, contractors, and/or all other types of entities and/or individuals as discovery in the matter may reveal. Regardless, Plaintiffs allege that each of the Doe Defendants is legally responsible for the Data Breach and legally caused and was a substantial factor in the injury and damages to Plaintiffs.

## II.    Plaintiffs

23. Each Plaintiff brings causes of action against Defendant Snowflake as well as an individual Spoke or Doe Defendant, as outlined herein.

### A.    Ticketmaster Plaintiffs

24.    **Plaintiff Eric Anderson** is a citizen of New York residing in Jamestown. Plaintiff Anderson received a data breach notice letter, via U.S. mail, directly from Ticketmaster, in around July 2024. Plaintiff Anderson is a customer of Ticketmaster, and has been since at least 2011. Plaintiff Anderson has maintained an account on Ticketmaster's website to purchase event tickets, and in doing so, provided Ticketmaster with at least his name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff Anderson's transactions with Ticketmaster, Plaintiff Anderson paid a transaction fee to Ticketmaster that he understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting his Personal Information.

25.    In December 2024, after the Data Breach began, Plaintiff Anderson experienced fraudulent payment card activity. Plaintiff Anderson had several unauthorized charges, prompting the bank to close his card and issue a replacement.

26.    In December 2024, Plaintiff Anderson was informed by his credit card company that his personal information was found on the dark web. Since the Data Breach, Plaintiff Anderson has experienced an increase in spam calls and spam texts. Since the Data Breach, Plaintiff Anderson has spent approximately 10-15 hours investigating and mitigating against the substantial risks presented by the

theft of his Personal Information. These mitigation efforts have included, but are not limited to, addressing fraudulent activity on his payment cards; continuing to pay for his identity/credit protection services; and actively monitoring his financial accounts and reports in order to detect and attempt to prevent any fraudulent activity.

27.    As a result of the Data Breach, Plaintiff Anderson has suffered injury and damages, including but not limited to, overpayment for services he did not receive; the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

28.    Plaintiff Anderson is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Anderson is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts. Had Plaintiff Anderson known that Ticketmaster would not adequately protect and instead

release his Personal Information, Plaintiff Anderson would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

29.    **Plaintiff Charles Fitzgerald** is a citizen of New York residing in Buffalo. Plaintiff Fitzgerald is a current customer of Ticketmaster, last purchased a ticket in or around fall of 2022, and, in doing so, provided Ticketmaster with at least his name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff Fitzgerald's transactions with Ticketmaster, Plaintiff Fitzgerald paid a transaction fee to Ticketmaster that he understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting his Personal Information. Plaintiff Fitzgerald became aware of the Ticketmaster Data Breach in late May or early June 2024 via social media.

30.    After the Data Breach began, in approximately fall of 2024, Plaintiff Fitzgerald received a notice that an unknown party had attempted to make unauthorized charges. He spent time and resources responding to the fraud alert and taking appropriate preventative measures, including having the card reissued.

31.    After the Data Breach, Plaintiff Fitzgerald was informed via a credit monitoring service that his Personal Information was found on the dark web, including, at a minimum, his name, address, phone number, and email address. Since the Data Breach, Plaintiff Fitzgerald has spent approximately 5 hours

investigating and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included, but are not limited to, spending time and effort monitoring his financial accounts in order to detect and attempt to prevent any fraudulent activity; contacting his financial institution regarding the Data Breach to cancel and replace his payment card; taking steps to check his credit score; changing passwords; and reviewing and investigating dark web alerts.

32.    As a result of the Data Breach, Plaintiff Fitzgerald has suffered injury and damages, including but not limited to, overpayment for services he did not receive; the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

33.    Plaintiff Fitzgerald is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Fitzgerald is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts. Had Plaintiff

Fitzgerald known that Ticketmaster would not adequately protect and instead release his Personal Information, Plaintiff Fitzgerald would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

34.    **Plaintiff Susie Garcia-Nixon** is a citizen of California residing in Riverside. Plaintiff Garcia-Nixon has been a customer of Ticketmaster for over 10 years and last purchased a ticket in April 2023, when she provided Ticketmaster with her name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff Garcia-Nixon's transactions with Ticketmaster, Plaintiff Garcia-Nixon paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information. She does not remember logging in to her Ticketmaster account after this date.

35.    In approximately late 2024 or early 2025, Plaintiff Garcia-Nixon suffered multiple fraudulent charges on her payment card. Plaintiff Garcia-Nixon disputed the charges and had to replace her payment card.

36.    Since the Data Breach, Plaintiff Garcia-Nixon has spent approximately 2-3 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, freezing her credit with credit agencies; spending time and effort monitoring her financial accounts in order to detect and attempt to prevent any

fraudulent activity; changing her passwords; continuing to pay for her identity/credit protection service; and researching the breach.

37.    As a result of the Data Breach, Plaintiff Garcia-Nixon has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and addressing the identity theft.

38.    Plaintiff Garcia-Nixon is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Garcia-Nixon is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff Garcia-Nixon known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff Garcia-Nixon would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

39.    **Plaintiff Valerie Lozoya** is a citizen of California residing in Hawthorne. Plaintiff Lozoya received a data breach notice letter, via U.S. mail, directly from Ticketmaster, dated July 17, 2024. Plaintiff Lozoya is a current customer of Ticketmaster and has regularly purchased tickets. In doing so, she provided Ticketmaster with at least her name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff Lozoya's transactions with Ticketmaster, Plaintiff Lozoya paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

40.    In December 2024, Plaintiff Lozoya recalls experiencing suspicious activity related to her payment card. Her credit union shut her payment card down and she received a new one.

41.    Since the Data Breach, Plaintiff Lozoya has experienced an increase in spam and receives approximately 3-4 spam calls and 1-2 spam texts a day. Since the Data Breach, Plaintiff Lozoya has spent approximately 5-6 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. She continues to monitor her accounts for any fraudulent activity. These mitigation efforts have included, but are not limited to, contacting her credit union; closing her debit card and receiving a new card; setting up new auto billing

accounts; and spending time and effort monitoring her financial accounts in order to detect and attempt to prevent any fraudulent activity.

42.    As a result of the Data Breach, Plaintiff Lozoya has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

43.    Plaintiff Lozoya is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Lozoya is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff Lozoya known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff Lozoya would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

44.    **Plaintiff LaVonne Madden** is a citizen of Montana residing in Billings. Plaintiff Madden received a data breach notice letter, via U.S. mail, directly from Ticketmaster dated July 17, 2024. Plaintiff Madden is a former customer of Ticketmaster, and believes she last purchased a ticket in 2014 and in doing so, provided Ticketmaster with at least her name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff Madden's transactions with Ticketmaster, Plaintiff Madden paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

45.    After receiving the data breach notice letter, Plaintiff Madden spent at least four hours of time investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, spending time and effort monitoring her financial accounts in order to detect and attempt to prevent any fraudulent activity; continuing to pay for her identity/credit protection service; and enrolling in the identity/credit protection service offered by Ticketmaster.

46.    As a result of the Data Breach, Plaintiff Madden has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk

of identity theft and reasonable mitigation efforts spent to protect against such risks, including time spent obtaining credit freezes and reviewing financial accounts for fraudulent activity; loss of property and value of property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

47.    Plaintiff Madden is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Madden is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff Madden known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff Madden would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

48.    **Plaintiff Jolinda Murphy** is a citizen of Montana residing in Missoula. Plaintiff Murphy received a data breach notice letter, via U.S. mail, directly from Ticketmaster, dated July 17, 2024. Plaintiff Murphy is a customer of Ticketmaster, but she cannot recall the last time she purchased tickets. She does recall that, when she did purchase tickets, she provided Ticketmaster with at least her name, address, email, phone number, payment card information and transaction

information. As part of Plaintiff Murphy's transactions with Ticketmaster, Plaintiff Murphy paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

49.    After the data breach in May 2024, Plaintiff Murphy experienced an increase in spam and receives approximately 3-4 spam calls and 1-2 spam texts a day, along with several spam emails. Many of the texts include fraudulent links claiming she and her husband owe fines or are missing packages and request them to click a link. Since the Data Breach, Plaintiff Murphy has spent increased time investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, blocking, scrutinizing, and deleting the spam texts and emails she and her husband receive; monitoring her financial accounts in order to detect and attempt to prevent any fraudulent activity; continuing to enroll in her identity/credit protection service; and continuing to have credit freezes in place with credit agencies.

50.    As a result of the Data Breach, Plaintiff Murphy has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit

monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information.

51.    Plaintiff Murphy is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Murphy is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff Murphy known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff Murphy would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

52.    **Plaintiff Lauren Neve** is a citizen of California residing in San Juan Capistrano. Plaintiff Neve is a former customer of Ticketmaster, where she last purchased a ticket in 2022 and in doing so, provided Ticketmaster with at least her name, address, email, payment card information, and transaction information. As part of Plaintiff Neve's transactions with Ticketmaster, Plaintiff Neve paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

53.     Since the Data Breach, Plaintiff Neve has experienced an increase in spam and receives approximately 3-4 spam calls and 1-2 spam texts a day. Since the Data Breach, Plaintiff Neve has spent approximately 6-7 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, freezing her credit with credit agencies; continuing to enroll in her identity/credit protection services; and monitoring her financial accounts for fraudulent activity.

54.     As a result of the Data Breach, Plaintiff Neve has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

55.     Plaintiff Neve is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Neve is diligent about keeping hard copy documents containing Personal Information

secure, and is diligent about the online security of her accounts. Had Plaintiff Neve known that Ticketmaster would release her Personal Information, Plaintiff Neve would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

56.    **Plaintiff Molly O'Hara** is a citizen of Massachusetts residing in Revere. Plaintiff O'Hara received a data breach notice letter, via U.S. mail, directly from Ticketmaster, dated July 9, 2024. Plaintiff O'Hara is a current customer of Ticketmaster who has regularly purchased tickets. In doing so, she provided Ticketmaster with at least her name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff O'Hara's transactions with Ticketmaster, Plaintiff O'Hara paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

57.    After the Data Breach in 2024, Plaintiff O'Hara was informed by her credit monitoring program that her personal information was found on the dark web. Since the Data Breach, Plaintiff O'Hara has experienced an increase in spam emails, texts and calls and receives approximately 3-4 spam calls and 3-4 spam texts a day. Since the Data Breach, Plaintiff O'Hara has spent approximately 6-7 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not

23

limited to, spending time and effort monitoring her financial accounts in order to detect and attempt to prevent any fraudulent activity; continuing to pay for her identity/credit protection service; resetting passwords; and resetting auto billing payments.

58.    As a result of the Data Breach, Plaintiff O'Hara has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

59.    Plaintiff O'Hara is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff O'Hara is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff O'Hara known that Ticketmaster would not adequately protect and instead release

her Personal Information, Plaintiff O'Hara would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

60.    **Plaintiff Dekima Thomas** is a citizen and resident of the District of Columbia. Plaintiff D. Thomas received a data breach notice letter, via U.S. mail, directly from Ticketmaster in or around July 2024. Plaintiff D. Thomas is a customer of Ticketmaster.

61.    Since at least 2013, Plaintiff D. Thomas has maintained an account on Ticketmaster's website to purchase event tickets, and in doing so, provided Ticketmaster with at least her name, address, email, phone number, payment card information, and transaction information. As part of Plaintiff D. Thomas's transactions with Ticketmaster, Plaintiff D. Thomas paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

62.    Since the Data Breach, she has experienced a significant increase in spam, receiving an additional 4-5 spam messages per day since April. Since the Data Breach, Plaintiff D. Thomas has dedicated approximately 8 to 10 hours to investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, spending time and effort monitoring her financial accounts and

attempting to prevent any fraudulent activity, and continuing to pay for her identity/credit protection service.

63.    As a result of the Data Breach, Plaintiff D. Thomas has suffered injury and damages, including but not limited to, overpayment for services she did not receive; the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

64.    Plaintiff D. Thomas is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff D. Thomas is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff D. Thomas known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff D. Thomas would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

65.     **Plaintiff Christina Xian** is a citizen of California residing in Millbrae. Plaintiff Xian received a data breach notice letter, via U.S. mail, directly from Ticketmaster, but does not recall the date of the notice or when she received it. Plaintiff Xian is a former customer of Ticketmaster, where she last purchased a ticket in 2024 and in doing so, provided Ticketmaster with at least her name, address, email, phone number, account information for payment, and transaction information. As part of Plaintiff Xian's transactions with Ticketmaster, Plaintiff Xian paid a transaction fee to Ticketmaster that she understood Ticketmaster would use to provide a safe and secure ticket-buying experience, which included protecting her Personal Information.

66.     After the Data Breach began, in approximately May 2024, Plaintiff Xian recalls experiencing suspicious activity related to her financial accounts.

67.     Since the Data Breach, Plaintiff Xian has spent approximately 3 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included, but are not limited to, spending time and effort monitoring her financial accounts and attempting to prevent any fraudulent activity; changing passwords to financial accounts; and removing automated payments from her financial account.

68.     As a result of the Data Breach, Plaintiff Xian has suffered injury and damages, including but not limited to, overpayment for services she did not receive;

27

the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining a password monitoring service and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; and invasion of her privacy from the theft of her Personal Information and responding to identity theft.

69.    Plaintiff Xian is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Xian is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts. Had Plaintiff Xian known that Ticketmaster would not adequately protect and instead release her Personal Information, Plaintiff Xian would either have sought to purchase tickets elsewhere or avoided purchasing tickets altogether.

## B.    Advance Auto Plaintiffs

70.    **Plaintiff Emmanuel Chaidez** is a citizen of Illinois residing in Normal. Plaintiff Chaidez received a data breach notice letter, via U.S. mail, directly from Advance Auto, dated July 10, 2024. Plaintiff Chaidez previously applied for and accepted an offer of employment with Advance Auto. In the course of this

employment process, Plaintiff Chaidez provided Advance Auto with his Personal Information, including, at least, his Social Security number, full name, address, date of birth, phone number, email address, and work history.

71.    Since the Data Breach, Plaintiff Chaidez has experienced an increase in spam and receives approximately 25 spam calls per day. Since the Data Breach, Plaintiff Chaidez has spent approximately 40 hours investigating and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included closely monitoring his financial accounts, resetting automatic billing instructions tied to compromised accounts, driving to his bank branch to address incidences of identity theft, and time spent on the phone with his bank and credit card companies.

72.    As a result of the Data Breach, Plaintiff Chaidez has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

29

73.    Plaintiff Chaidez is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Chaidez is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

74.    **Plaintiff Stefondra Monroe** is a citizen of Florida residing in Clewiston. Plaintiff Monroe received a data breach notice letter, via U.S. mail, directly from Advance Auto dated July 10, 2024. Plaintiff Monroe submitted an application for employment with Advance Auto several years ago, which required that she provide Advance Auto with her personal details including her full name, address, email address, date of birth, employment information/work history, and Social Security number. Plaintiff Monroe never ultimately accepted an offer of employment with Advance Auto.

75.    Since the Data Breach, Plaintiff Monroe has spent approximately 3-4 hours investigating the Data Breach and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included monitoring her financial accounts and reviewing notices to investigate unauthorized charges.

76.    As a result of the Data Breach, Plaintiff Monroe has suffered injury and damages, including but not limited to, the unauthorized use of her stolen

Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress, anxiety, and annoyance resulting from the theft of her Personal Information and responding to identity theft.

77.    Plaintiff Monroe is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Monroe is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

78.    **Plaintiff Raymond Moule** is a citizen of Connecticut residing in Enfield. Plaintiff Moule received a data breach notice letter, via U.S. mail, directly from Advance Auto, dated July 10, 2024. Plaintiff Moule applied for and accepted employment with Advance Auto in 2017. In the course of this employment process, Plaintiff Moule provided Advance Auto with his Personal Information, including, at least, his Social Security number, driver's license, full name, address, date of birth, phone number, email address, and work history.

79.    After the Data Breach, Plaintiff Moule has received notice that multiple individuals have attempted to fraudulently open credit cards in his name.

31

Plaintiff Moule has spent significant time and resources responding to the fraud, and this fraud has caused significant financial and emotional strain.

80.     Since the Data Breach, Plaintiff Moule has experienced an increase in spam calls, emails, and text messages. Since the Data Breach, Plaintiff Moule has spent many hours investigating and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included closely monitoring his financial accounts, changing his passwords, calling banks regarding the alerts of fraudulent attempts to open credit cards in his name, and signing up for credit monitoring services.

81.     As a result of the Data Breach, Plaintiff Moule has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

82.     Plaintiff Moule is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal

32

Information over the internet or any other unsecured source. Plaintiff Moule is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

83.    **Plaintiff Raven Richardson** is a citizen of Mississippi residing in South Haven. Plaintiff Richardson received a data breach notice letter, via U.S. mail, directly from Advance Auto dated July 10, 2024. Plaintiff Richardson submitted an application for employment with Advance Auto in or about 2023, which required that she provide Advance Auto with her personal details including her full name, address, email address, phone number, date of birth, employment information/work history, and Social Security number. Plaintiff Richardson never ultimately accepted an offer of employment with Advance Auto.

84.    Since the Data Breach, Plaintiff Richardson has spent approximately 1 hour investigating the Data Breach and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included changing passwords on several of her online accounts.

85.    As a result of the Data Breach, Plaintiff Richardson has suffered injury and damages, including but not limited to, the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of

that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress, anxiety, and annoyance resulting from the theft of her Personal Information and responding to identity theft.

86.    Plaintiff Richardson is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Richardson is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

87.    **Plaintiff Don Smith** is a citizen of Illinois residing in Hanover Park. Plaintiff Smith received a data breach notice letter, via U.S. mail, directly from Advance Auto, dated July 10, 2024. Plaintiff Smith applied for and accepted an offer of employment with Advance Auto. In the course of this employment process, Plaintiff Smith provided Advance Auto with his Personal Information, including, at least, his Social Security number, full name, address, date of birth, phone number, email address, and work history.

88.    Since the Data Breach, Plaintiff Smith has experienced an increase in spam and phishing calls, emails, and text messages. Since the Data Breach, Plaintiff Smith has spent numerous hours investigating and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included closely monitoring his financial accounts, changing his account

passwords, reviewing transaction histories and credit statements, and researching online the best practices for protecting himself from identity theft and fraud.

89.    As a result of the Data Breach, Plaintiff Smith has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

90.    Plaintiff Smith is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Smith is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

91.    **Plaintiff Raymond Swain** is a citizen of California residing in Bakersfield. Plaintiff Swain received a data breach notice letter, via U.S. mail, directly from Advance Auto, dated July 10, 2024. Plaintiff Swain applied for employment with Advance Auto. In the course of this application process, Plaintiff Swain provided Advance Auto with his Personal Information, including, among

other things, his Social Security number, full name, address, date of birth, phone number, email address, and work history

92.    Since the Data Breach, Plaintiff Swain has experienced an increase in spam calls and text messages. Since the Data Breach, Plaintiff Swain has spent significant time investigating and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included time spent verifying the legitimacy of the Data Breach notice letter and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.

93.    As a result of the Data Breach, Plaintiff Swain has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

94.    Plaintiff Swain is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Swain is

diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

### C.    LendingTree Plaintiffs

95.    **Plaintiff Aaron Macom** is a citizen of Washington State residing in Allyn. Plaintiff Macom received a data breach notice letter, via U.S. mail, directly from QuoteWizard, dated July 30, 2024. Plaintiff Macom is a former customer of one or more LendingTree entities, and provided one or more LendingTree entities with his Personal Information, demonstrated by the fact that he received a data breach notice letter from QuoteWizard.

96.    Plaintiff Macom has experienced an increase in spam and receives constant spam and phishing communications by phone calls and texts. Since the Data Breach, Plaintiff Macom has spent numerous hours investigating the Data Breach and mitigating against the substantial risks presented by the theft of his Personal Information. These mitigation efforts have included vigilantly monitoring his credit accounts and reports and calling his credit card company.

97.    As a result of the Data Breach, Plaintiff Macom has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for

fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress, anxiety, and annoyance resulting from the theft of his Personal Information and responding to identity theft.

98.     Plaintiff Macom is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Macom is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

99.     **Plaintiff Antoun Nader** is a citizen of Washington residing in Everett. Plaintiff Nader received a data breach notice letter, via U.S. mail, directly from LendingTree in July 2024. Plaintiff Nader has submitted his information to LendingTree for purposes of obtaining insurance quotes, and as such provided LendingTree with at least his name, address, phone number, email, gender, marital status, income status and date of birth.

100.    After receiving the data breach notice letter, Plaintiff Nader spent at least four hours of time and resources responding to the fraud including checking his credit reports, watching his accounts, notifying his banks, notifying his credit card providers, calling Social Security, and calling various customer service support centers.

101.   As a result of the Data Breach, Plaintiff Nader has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time spent reviewing financial accounts for fraudulent activity and contacting banks and credit card issuers; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

102.   Plaintiff Nader is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Nader is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

103.   **Plaintiff Linda Pierce** is a citizen of Texas residing in Jacksonville. Plaintiff Pierce received a data breach notice letter, via U.S. mail, directly from QuoteWizard, dated July 30, 2024. Plaintiff Pierce recalls applying for services through a LendingTree entity web-based application in the past 1-2 years and in so doing, provided LendingTree with her Personal Information.

104.   Since the Data Breach, Plaintiff Pierce has received multiple emails from a credit monitoring service that her Personal Information was found on the dark web. Since the Data Breach, Plaintiff Pierce has experienced an increase in spam and receives numerous spam calls and multiple spam texts a day. Since the Data Breach, Plaintiff Pierce has spent approximately 30 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included freezing her credit with Experian, registering for credit monitoring services, monitoring her credit accounts and reports, and changing her passwords regularly.

105.   As a result of the Data Breach, Plaintiff Pierce has suffered injury and damages, including but not limited to, the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and worry resulting from the theft of her Personal Information and responding to identity theft.

106.   Plaintiff Pierce is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal

Information over the internet or any other unsecured source. Plaintiff Pierce is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

107.   **Plaintiff Nathan Thomas** is a citizen of Washington residing in Bellingham, Washington. Plaintiff N. Thomas is a frequent user of LendingTree's products and received a notice letter of the Data Breach dated July 30, 2024. In order to utilize services from LendingTree, Plaintiff N. Thomas provided LendingTree with his name, address, email address, phone number, and date of birth.

108.   As a result of the Data Breach, Plaintiff N. Thomas has suffered injury and damages, including but not limited to, the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

109.   Plaintiff N. Thomas is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff N. Thomas is

diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

### D.    AT&T Plaintiffs

110.    **Plaintiff Latosha Austin** is a citizen of California residing in Fresno. Plaintiff Austin is a current AT&T customer and has been a customer since 2000. Plaintiff Austin was also a customer of Cricket Wireless in or around 1999-2000. Plaintiff Austin received correspondence from AT&T in or around June 2024.

111.    In October of 2024, Plaintiff Austin received a phone call from a number she recognized, which used to belong to her father, who recently had his number changed after receiving an onslaught of spam and phishing calls. The caller left a voicemail asking for money. Her father had not placed the call, nor left the voicemail.

112.    In April, September, and November of 2024, Plaintiff Austin was informed that her information was found on the dark web. Since the Data Breach, Plaintiff Austin has experienced an increase in spam and receives approximately 1-2 spam texts a day.

113.    Since the Data Breach, Plaintiff Austin has spent numerous hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. Without much guidance from AT&T, Plaintiff Austin performed reasonable security mitigation efforts, including freezing her credit with

credit agencies, researching the breach, and monitoring her credit accounts and reports.

114.   As a result of the Data Breach, Plaintiff Austin has suffered injury and damages, including but not limited to, the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

115.   Plaintiff Austin is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Austin is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

116.   **Plaintiff Gilbert Criswell** is a citizen of California residing in San Francisco. Plaintiff Criswell is a current customer of AT&T and has been using its services for approximately 10 years.

117.   In or around September 2024, Plaintiff Criswell received a

notification from Google Security that his account information and password were compromised by AT&T, prompting him to change his password.

118.   In December 2024, Plaintiff Criswell received a phone call from a trusted number. However, Plaintiff Criswell was notified by AT&T's security application Active Armor that the call originated from Russia. Therefore, Plaintiff did not engage with the caller and marked the call as spam. Around the same time, Active Armor also notified him that he was affected by a malicious malware attack, prompting him to reset his mobile phone and backup the data contained in his phone.

119.   In or around December 2024, Plaintiff Criswell was informed by Google Security that his information was found on the dark web. Since the Data Breach, Plaintiff Criswell has experienced an increase in spam and receives approximately 50 phishing emails and spam text messages a day. Since the Data Breach, Plaintiff Criswell spends approximately 4-5 hours a week investigating and mitigating against the substantial risks presented by the theft of his Personal Information. Without guidance from AT&T, Plaintiff Criswell engaged in reasonable mitigation efforts, including blocking spam calls, monitoring for phishing attempts, changing passwords, freezing his credit with credit agencies, researching the breach, and monitoring his credit accounts and reports.

44

120.   As a result of the Data Breach, Plaintiff Criswell has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

121.   Plaintiff Criswell is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Criswell is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

122.   **Plaintiff David Hornthal** is a citizen of Illinois residing in Deerfield. Plaintiff Hornthal is and during all times concerned herein was a user on his father's AT&T account. In connection with receiving phone services from AT&T, his father provided AT&T with at least Plaintiff Hornthal's payment card information.

123.   After the Data Breach began, AT&T sent a data breach notice via email dated July 15, 2024, to the main contact for Plaintiff Hornthal's AT&T account, his

45

father. The notice email listed Plaintiff Hornthal's phone number among those whose data was accessed in the Data Breach.

124.   On or about November 17, 2024, an unauthorized party made a fraudulent charge on the credit card Plaintiff Hornthal used to pay for AT&T's services. Plaintiff Hornthal spent time and resources responding to the fraud, including investigating the fraudulent charge, contacting his bank, and closing and reopening the affected account. Plaintiff Hornthal also spent approximately 2-3 hours resetting automatic billing instructions tied to the affected credit card and addressing fees incurred from failed automatic billing attempts on the closed card.

125.   Since the Data Breach, Plaintiff Hornthal has experienced a significant increase in the number of spam calls and texts he receives. Plaintiff Hornthal has spent approximately 1-2 hours of additional time investigating and mitigating against the substantial risks presented by the theft of his Personal Information. Without guidance from AT&T, Plaintiff Hornthal engaged in reasonable mitigation efforts, including researching the details of the Data Breach and monitoring his financial accounts and credit score.

126.   As a result of the Data Breach, Plaintiff Hornthal has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; actual fraud in the form of unauthorized charges on his credit card; the substantial risk of identity theft and reasonable mitigation efforts spent to

protect against such risks, including time and expenses spent reviewing financial accounts and his credit report for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

127.  Plaintiff Hornthal is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Hornthal is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

128.  **Plaintiff Traci Lively** is a citizen and resident of the District of Columbia. Plaintiff Lively has been a Cricket Wireless customer since approximately 2022. Cricket's customers, like Plaintiff Lively, suffered from the Data Breach in part as a result of Cricket Wireless's use of AT&T's network.

129.  Plaintiff Lively received a notice letter from Cricket Wireless dated July 16, 2024. In the fall of 2024, Plaintiff Lively was informed that there had been approximately ten inquiries into his credit, relating to opening unauthorized accounts and loans.

130.  Since the Data Breach, Plaintiff Lively has spent countless hours investigating and mitigating against the substantial risks presented by the theft of

his Personal Information. Without guidance from AT&T or Cricket, Plaintiff Lively performed reasonable mitigation efforts, including monitoring his credit accounts and reports, researching the breach, and addressing attempts of unauthorized use of his Personal Information.

131.    As a result of the Data Breach, Plaintiff Lively has suffered injury and damages, including but not limited to, the unauthorized use of his stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of his Personal Information; invasion of his privacy; and emotional distress and anxiety resulting from the theft of his Personal Information and responding to identity theft.

132.    Plaintiff Lively is very careful about sharing his own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Lively is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of his accounts.

133.    **Plaintiff Natasha McIntosh** is a citizen of Alabama residing in Brockton. Plaintiff McIntosh was a customer of Boost Mobile from 2002 to 2022 and was an employee of Boost Mobile for a year, starting around 2003. She

provided Boost Mobile with at least her name, SSN, email, and payment card information.

134.   After the Data Breach began, in the spring of 2024, Plaintiff McIntosh received a notice that an unauthorized party had opened an account with a furniture store using her name and phone number. She started to receive calls and texts about repossessions of furniture that she never bought.

135.   Plaintiff McIntosh has been informed that her personal information was found on the dark web. Since the Data Breach, Plaintiff McIntosh has experienced an increase in spam and receives approximately 50 spam calls or messages a day. Since the Data Breach, Plaintiff McIntosh has spent countless hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. These mitigation efforts have included freezing her credit with credit agencies, registering for credit monitoring services, and monitoring her credit accounts and reports.

136.   As a result of the Data Breach, Plaintiff McIntosh has suffered injury and damages, including but not limited to, the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent obtaining credit monitoring services and reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the

49

inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

137. Plaintiff McIntosh is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff McIntosh is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

138. **Plaintiff Debby Worley** is a citizen of New Jersey residing in Clifton. Plaintiff Worley has been a Boost Mobile customer for approximately two to three years. Boost Mobile is an MVNO of AT&T and its customers, like Plaintiff Worley, suffered from the Data Breach in part as a result of Boost Mobile's use of AT&T's network.

139. Plaintiff Worley received a notice letter from Boost Mobile dated November 18, 2024. Since the Data Breach, Plaintiff Worley has experienced an increase in spam and scam phone calls probing her for information. Since the Data Breach, Plaintiff Worley has spent approximately 10 hours investigating and mitigating against the substantial risks presented by the theft of her Personal Information. Without guidance from AT&T or Boost Mobile, her mitigation efforts

have been reasonable, including monitoring her credit accounts and reports, changing her passwords, and researching the breach.

140.   As a result of the Data Breach, Plaintiff Worley has suffered injury and damages, including but not limited to, the unauthorized use of her stolen Personal Information; the substantial risk of identity theft and reasonable mitigation efforts spent to protect against such risks, including time and expenses spent reviewing financial accounts for fraudulent activity; loss of property and value of that property with respect to the inability to control use of her Personal Information; invasion of her privacy; and emotional distress and anxiety resulting from the theft of her Personal Information and responding to identity theft.

141.   Plaintiff Worley is very careful about sharing her own Personal Information and has never knowingly transmitted unencrypted Personal Information over the internet or any other unsecured source. Plaintiff Worley is diligent about keeping hard copy documents containing Personal Information secure, and is diligent about the online security of her accounts.

### E.    LAUSD Vendor Plaintiffs

142.   **Plaintiff Timothy Rundle** is a citizen of California residing in Los Angeles. Plaintiff Rundle is the parent and legal guardian of a minor student, **Plaintiff Z.R.**, who is also a citizen of California, and is currently enrolled in an elementary school in the Los Angeles Unified School District and has been enrolled

there since 2019. Plaintiff Rundle proceeds in this lawsuit on his own behalf as well as on behalf of his minor child.

143.    Both Plaintiff Rundle's and Plaintiff Z.R.'s Personal Information was maintained by LAUSD and, on information and belief, stored in databases hosted or managed through Innive, the Doe Defendants, and Snowflake. They were thereby consumers of services provided by Innive, the Doe Defendants, and Snowflake. Plaintiff Rundle learned through public news reports and word of mouth from fellow parents that LAUSD was among the organizations whose student data had been exfiltrated during the Data Breach. Neither Plaintiff Rundle nor Plaintiff Z.R. has received a data breach notice from LAUSD, Snowflake, Innive, or any other entity notifying them of the breach or confirming whether Plaintiff Rundle or Plaintiff Z.R.'s information was compromised.

144.    The absence of any meaningful guidance or notification from LAUSD, Snowflake, Innive, or the Doe Defendants has significantly hampered Plaintiff Rundle's ability to respond effectively to the Data Breach on behalf of himself and his minor child. Left to navigate the situation on his own, he has spent significant time independently researching public news reports and available resources to educate himself on what data may have been compromised. He has learned that the Data Breach may have included student names, addresses, and dates of birth; academic records; discipline histories; disability and health-related records; and

52

parent and guardian contact details; as well as family financial, demographic, and citizenship or immigration information. Without knowing whether his or his child's information was among the data exfiltrated, he remains unable to take targeted steps to protect his family. His research efforts have been time-consuming and distressing, and it has disrupted his peace of mind as a parent—especially because his child is only in elementary school and already faces an elevated risk of identity theft. Plaintiff Rundle is particularly concerned that the data may include his child's academic, disability, and health-related records. Although he and his wife already had credit freezes in place for themselves before the Data Breach, he has since devoted further time and effort to researching credit monitoring and freezing services that are available for his minor child. Yet without knowing what data was actually exfiltrated, he cannot take focused, preventative steps to safeguard his family's Personal Information.

145. **Plaintiff Lucia Singer** is a citizen of California residing in Santa Monica. Plaintiff Singer is the parent and legal guardian of a minor student, **Plaintiff G.M.**, who is a citizen of California and is currently enrolled in an elementary school in the Los Angeles Unified School District and has been enrolled there since 2021. Plaintiff Singer proceeds in this lawsuit on her own behalf as well as on behalf of her minor child.

146.    Plaintiff Singer's and Plaintiff G.M.'s Personal Information was maintained by LAUSD and, on information and belief, stored in databases hosted or managed through Innive, the Doe Defendants, and Snowflake. They were thereby consumers of services provided by Innive, the Doe Defendants, and Snowflake. Plaintiff Singer learned from friends and fellow parents that LAUSD was among the organizations whose student data had been exfiltrated during the Data Breach. Neither Plaintiff Singer nor Plaintiff G.M. has received a data breach notice from Innive, LAUSD, Snowflake, or any other entity notifying them of the breach or confirming whether Plaintiff Singer or Plaintiff G.M.'s information was compromised.

147.    The absence of any meaningful guidance or notification from Innive, LAUSD, Snowflake, or the Doe Defendants has left Plaintiff Singer without the information she needs to respond effectively to the Data Breach. She did not learn of the breach through any official source, but instead heard about it through word of mouth among friends and fellow parents in her community. She understands from other parents and public reporting that the Data Breach may have included student names, addresses, and dates of birth; academic records; discipline histories; disability and health-related records; parent and guardian contact information; and family financial, demographic, and citizenship or immigration details. She is alarmed by the thought that her young child's academic records could follow

him/her through the public sphere for years to come, even though he/she is only in elementary school. The uncertainty and fear of what could be done with this information has caused her ongoing distress and undermined her peace of mind as a parent. Without a clear understanding of what data was exposed, Plaintiff Singer remains unable to take informed or protective measures to safeguard her family. However, she has spent time telling other LAUSD parents about the Data Breach in an effort to educate them so they can conduct their own research and take whatever measures they think appropriate to protect their and their children's Personal Information.

148. **Plaintiff Tamara Harrison** is a citizen of California residing in Palmdale. Plaintiff Harrison is the parent and legal guardian of two minor students, **Plaintiffs T.T. (F)** and **T.T. (M)**, who are citizens of California and are currently enrolled in high school in the Los Angeles Unified School District and have been enrolled there since prior to the Data Breach. Plaintiff Harrison proceeds in this lawsuit on her own behalf as well as on behalf of her minor children.

149. Plaintiff Harrison's and Plaintiffs T.T. (F) and T.T. (M)'s Personal Information was maintained by LAUSD and, on information and belief, stored in databases hosted or managed through Innive, the Doe Defendants and Snowflake. They were thereby consumers of services provided by Innive, the Doe Defendants and Snowflake. Plaintiff Harrison learned from social media that LAUSD was

among the organizations whose student data had been exfiltrated during the Data Breach. Neither Plaintiff Harrison nor Plaintiffs T.T. (F) and T.T. (M) has received a data breach notice from Innive, LAUSD, Snowflake, or any other entity notifying them of the breach or confirming whether Plaintiff Harrison or her children's information was compromised.

150.    The absence of any meaningful guidance or notification from Innive, LAUSD, Snowflake, or the Doe Defendants has left Plaintiff Harrison without the information she needs to respond effectively to the Data Breach. She did not learn of the breach through any official source, but instead heard about it through social media. She understands from public reporting that the Data Breach may have included student names, addresses, and dates of birth; academic records; discipline histories; disability and health-related records; parent and guardian contact information; and family financial, demographic, and citizenship or immigration details. The possibility that her children's medical and mental health records, including counseling information, may now be in the hands of unknown bad actors is frightening to her. She is equally alarmed by the thought that their disciplinary records could follow them through the public sphere for years to come, even though they are still in high school. The uncertainty and fear of what could be done with this information has caused her ongoing distress and undermined her peace of mind as a parent. Without a clear understanding of what data was exposed, Plaintiff

Harrison remains unable to take informed or protective measures to safeguard her family.

151.  **Plaintiff Tiffany Price** is a citizen of California residing in Los Angeles. Plaintiff Price is the parent and legal guardian of four minor students, **Plaintiffs E.J.**, **B.J.**, **M.C.**, and **E.C.**, who are citizens of California and are currently enrolled in schools in the Los Angeles Unified School District and have been enrolled there since prior to the Data Breach.  Plaintiff Price proceeds in this lawsuit on her own behalf as well as on behalf of her minor children.

152.  Plaintiff Price's and Plaintiffs E.J., B.J., M.C., and E.C.'s Personal Information was maintained by LAUSD and, on information and belief, stored in databases hosted or managed through Innive, the Doe Defendants, and Snowflake. They were thereby consumers of services provided by Innive, the Doe Defendants, and Snowflake. Plaintiff Price learned from social media that LAUSD was among the organizations whose student data had been exfiltrated during the Data Breach. Neither Plaintiff Price nor Plaintiffs E.J., B.J., M.C., and E.C. have received a data breach notice from Innive, LAUSD, Snowflake, or any other entity notifying them of the breach or confirming whether Plaintiff Price or her children's information was compromised.

153.  The absence of any meaningful guidance or notification from Innive, LAUSD, Snowflake, or the Doe Defendants has left Plaintiff Price without the

information she needs to respond effectively to the Data Breach. She did not learn of the breach through any official source, but instead heard about it through social media. She understands from public reporting that the Data Breach may have included student names, addresses, and dates of birth; academic records; discipline histories; disability and health-related records; parent and guardian contact information; and family financial, demographic, and citizenship or immigration details. The possibility that her children's academic, health, and disability records may now be in the hands of unknown bad actors is deeply distressing to her. She is especially concerned that such private information could follow her children into adulthood and impact their educational or professional opportunities. The uncertainty and fear of what could be done with this information has caused her ongoing distress and undermined her peace of mind as a parent. Without a clear understanding of what data was exposed, Plaintiff Price remains unable to take informed or protective measures to safeguard her family. However, she has spent time telling other LAUSD parents about the Data Breach in an effort to educate them so they can conduct their own research and take whatever measures they think appropriate to protect their and their children's Personal Information.

## JURISDICTION AND VENUE

154.   This Representative Class Action Complaint is filed pursuant to the Court's Case Management Order Regarding Form of the Complaint, Order of Preliminary Motions, and Initial Disclosures (Doc No. 285).

155.   The transferor courts have subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Defendants are citizens of states different from that of at least one class member. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

156.   Venue is proper in this District for pretrial purposes consistent with the process for multidistrict litigation for the reasons set out in the Judicial Panel on Multidistrict Litigation's Transfer Order centralizing actions consolidated in this MDL to the District of Montana. *In re: Snowflake, Inc. Data Sec. Breach Litig.*, MDL No. 3126, 2024 WL 4429233 (J.P.M.L. 2024). Venue is appropriate in the transferor courts for the reasons stated in Plaintiffs' underlying complaints.

157.   Each individual Plaintiff in this action has filed an underlying action which has already either been transferred to this Court for pretrial treatment, or will soon be transferred to this Court for pretrial treatment.

## FACTUAL ALLEGATIONS

## PART ONE: THE DATA BREACH

158.    Snowflake is one of the largest data storage providers in the United States and it contracts with thousands of organizations around the world to securely store their consumer and employee data on its "Data Cloud" platform.[21] Snowflake's platform is a product and a service that provides companies the ability to store, process, and analyze large volumes of consumer and employee data.[22]

159.    Snowflake's product is typically referred to as "Software as a Service" (SaaS), which refers to the fact that Snowflake's software allows its customers to connect to cloud-based applications over the internet.

160.    Each of the Spoke Defendants is a Snowflake customer and stores consumer and/or employee Personal Information on the Data Cloud. On information and belief, each of the Doe Defendants is a Snowflake customer or vendor and, *inter alia*, collects, manages, analyzes, and stores LAUSD student, parent, faculty, and staff Personal Information on the Data Cloud.[23]

---

[21]    Snowflake, *How It All Started*, https://www.snowflake.com/en/company/overview/about-snowflake/ (last visited Jan. 6, 2025).

[22]    Snowflake, *The Snowflake Platform*, https://www.snowflake.com/en/data-cloud/platform/ (last visited Jan. 6, 2025).

[23]    Sergiu Gatlan, *Los Angeles Unified School District investigates data theft claims*, Bleeping Computer (June 6, 2024), https://www.bleepingcomputer.com/author/sergiugatlan/.

I.      **Multiple, basic cybersecurity failures led to the Data Breach.**[24]

161.    The events leading up to the Data Breach and its fallout are summarized in a June 10, 2024 report published by Mandiant (the "Mandiant Report"), a cybersecurity firm that assisted Snowflake in its investigation of the Data Breach.[25]

162.    Beginning on or around April 2024, a cybercriminal group named UNC5537 carried out a successful cyberattack on Snowflake, exfiltrating the data of hundreds of Snowflake customers, including the Spoke Defendants.

163.    UNC5537 is a known cybercriminal group likely comprised of hackers in North America. A financially motivated threat actor, UNC5537 employs information-stealing malware to infiltrate systems, collect user data, exfiltrate that

---

[24]    Additional details regarding the breach will be revealed through discovery, including information related to a report prepared by another, reputable cybersecurity company, which was demanded to be taken off the internet by Snowflake. *See* Part Two, *infra*.

[25]    Mandiant, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, Google Cloud (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (cited to hereinafter as "*Mandiant Report*"). Since Snowflake had a hand in the *Mandiant Report*, the events are likely worse than presented, and will be clarified in discovery.

data, and then sell it on underground cybercrime forums or sell the information to other hackers.[26]

164.    UNC5537's successful cyberattack on Snowflake and the Spoke Defendants was simple and easily prevented. As the Mandiant Report put it, the cyberattack was "not the result of any particularly novel or sophisticated tool, technique, or procedure" but was the consequence of "missed opportunities" on the part of Snowflake and the Spoke Defendants to properly secure their credentials.[27]

165.    UNC5537's cyberattack boiled down to two basic steps. First, UNC5537 gained access to a customer's Snowflake credentials—i.e., their username and password. Stolen credentials are common and represent a well-known and easily anticipated risk by cybersecurity companies.[28] According to the Mandiant Report, UNC5537 was also "likely able to aggregate credentials" for a large number of Snowflake customers by simply perusing various sources of

---

[26]    UNC5537    Summary,    Mphasis    (June    17,    2024), https://www.mphasis.com/content/dam/mphasis-com/global/en/home/services/cybersecurity/june-17-19-unc5537.pdf.

[27]    *Mandiant Report*, *supra* n. 25.

[28]    *See* TJ Alldridge, *Stolen Credentials Make You Question Who Really Has Access*, Mandiant (Feb. 13, 2024), https://cloud.google.com/blog/products/identity-security/stolen-credentials-make-you-question-who-really-has-access    ("stolen credentials are the third most used infection vector behind exploits and phishing").

previously stolen credentials, as "large lists of stolen credentials exist both for free and for purchase inside and outside of the dark web."[29]

166.    Next, UNC5537 simply used the stolen credentials to login to a Snowflake customer's account and exfiltrate customer data.[30]

167.    According to the Mandiant Report, the success of UNC5537's straightforward cyberattack was made possible by "three primary factors" on the part of Snowflake and the Spoke Defendants.[31]

168.    **First**, the affected customers did not have MFA enabled, nor did Snowflake require them to have it enabled. MFA is a basic and industry-standard cybersecurity measure, available for nearly three decades,[32] that requires a user to, in addition to providing their username and password, further authenticate their identity through another source, such as through a passcode sent by text message or

---

[29]    *Mandiant Report*, *supra* n. 25.

[30]    *Id.*

[31]    *See also* Brad Jones, Detecting and Preventing Unauthorized User Access, Snowflake (June 2, 2024), Detecting and Preventing Unauthorized User Access - Cybersecurity - Snowflake (Snowflake recommending MFA, trusted locations, and resetting credentials).

[32]    Bojan Šimić, *Identity in the Digital Age and the Rise of Multi-Factor Verification*, Forbes (Oct. 10, 2024), https://www.forbes.com/councils/forbestechcouncil/2024/10/10/identity-in-the-digital-age-and-the-rise-of-multi-factor-verification/ (MFA was developed by AT&T as a system to exchange codes on two-way pagers).

email.[33] Without MFA, a valid username and password was all UNC5537 needed to access a Snowflake customer's data—similar to a key placed under a doormat.

169.    Strikingly, even though the federal government has urged companies to use MFA to secure data since 2016,[34] and Snowflake offered "free and available" MFA to customers since June 2015,[35] at the time of the Data Breach, Snowflake's default setting turned off MFA. Moreover, Snowflake customers did not have the ability to require their users to use MFA.

170.    Snowflake later changed these policies, but not until after the Data Breach. On July 9, 2024, Snowflake announced that customers could now enforce MFA for its users and monitor MFA compliance.[36] And on September 13, 2024, Snowflake announced a new policy which, for the first time, established a default

---

[33]    Rose de Fremery, *Tracing the Evolution of Multi-Factor Authentication*, LastPass (Oct. 16, 2023), https://blog.lastpass.com/posts/tracing-the-evolution-of-multi-factor-authentication.

[34]    *Fact Sheet:* Cybersecurity National Action Plan, The White House (Feb. 9, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/02/09/fact-sheet-cybersecurity-national-action-plan.

[35]    Snowflake Advances Cybersecurity Excellence by Joining CISA Secure by Design Pledge (July 29, 2024), https://www.snowflake.com/en/blog/snowflake-cybersecurity-cisa-secure-by-design/. Snowflake has also used MFA to protect its own systems. Mihir Bagwe, *The Snowballing of the Snowflake Breach: All About the Massive Snowflake Data Breach*, CyberExpress (June 17, 2024), https://thecyberexpress.com/all-about-massive-snowflake-breach/.

[36]    Brad Jones & Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Snowflake (July 9, 2024), https://www.snowflake.com/en/blog/snowflake-admins-enforce-mandatory-mfa/.

setting *requiring* MFA for users of Snowflake accounts created as of October 2024.[37]

171. **Second,** most, if not all Defendants did not have policies and procedures in place to rotate or disable stale credentials. Notably, many of the credentials stolen by UNC5537 through malware were old, and were originally stolen through various malware attacks dating as far back as 2020. Some credentials were newer, but were not rotated after being stolen. But without policies in place to rotate or disable such stale credentials, the years-old credentials remained valid and allowed UNC5537 to exfiltrate Snowflake customers' data.

172. Addressing the issue of stolen credentials, Snowflake now advertises that it automatically disables leaked passwords detected on the dark web.[38] This technology is also available to any of the Defendants.

173. **Third,** the affected customers—including the Spoke Defendants—did not restrict access to Snowflake cloud-based storage based upon certain trusted locations. Conditional Access Policies allow companies to fine-tune access to control from which devices and locations users can access resources. Again,

---

[37]    Anoosh Saboori & Brad Jones, *Snowflake Strengthens Security with Default Multi-Factor Authentication and Stronger Password Policies*, Snowflake (Sept. 13, 2024), https://www.snowflake.com/en/blog/multi-factor-identification-default/.

[38]    Snowflake Will Automatically Disable Leaked Passwords Detected on the Dark Web, Snowflake (Nov. 14, 2024), https://www.snowflake.com/en/blog/leaked-password-protection/.

without such protection, a valid username and password entered was all UNC5537 needed to access a Snowflake customer's data from anywhere at any time.

174. On May 30, 2024, Snowflake publicly disclosed the Data Breach for the first time through a blog post authored by CISO Brad Jones, which explained that Snowflake "became aware of potentially unauthorized access to certain customer accounts on May 23, 2024" and was "investigating an increase in cyber threat activity targeting some of our customers' accounts."[39]

175. The Mandiant Report documented the timeline of the Data Breach, which shows a concerning lag in Snowflake's response. As shown in the Mandiant Report timeline provided below, Snowflake did not make a public statement regarding the Data Breach until May 30, 2024. Snowflake's public disclosure came over a month and a half after Mandiant identified evidence of improper access to Snowflake customer data on April 14—but only a week after advertisements for the sale of stolen Snowflake customer data started showing up on cybercrime forums on May 24.[40]

---

[39] Brad Jones, *Detecting and Preventing Unauthorized User Access*, Snowflake (May 30, 2024), https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-user-access/8967.

[40] *Mandiant Report*, *supra* n. 25.



176.   The Mandiant Report further found that UNC5537 was operating "with the intent of data theft and extortion" and was "advertising victim data for sale on cybercrime forums and attempting to extort many of the [customer] victims."[41]

177.   As set out in more detail herein, Plaintiffs' and Class Members' Personal Information has already been sold and exchanged on the dark web between UNC5537 and various other cybercriminal threat actors such as Scattered Spider.[42]

178.   The Mandiant Report concluded that UNC5537's cyberattack "underscores the urgent need for credential monitoring, the universal enforcement of MFA and secure authentication, limiting traffic to trusted locations for crown

---

[41]    *Id.*

[42]    SC Staff, *Ransom demands issued to Snowflake hack victims*, SC Media (June 18, 2024), https://www.scworld.com/brief/ransom-demands-issued-to-snowflake-hack-victims.

jewels, and alerting on abnormal access attempts."[43] Credential monitoring, MFA, limiting access, and alerts are all ubiquitous cybersecurity practices that have been standard for years.

## II.     Relevant industry standards and regulations for data security were not followed by Defendants.[44]

### A. The Federal Trade Commission's straightforward guidelines were not followed.

179.   The Federal Trade Commission (FTC) has issued guidance and taken enforcement actions that together illustrate the data security industry standards applicable to Snowflake and the Spoke Defendants.

180.   Indeed, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of consumer Personal Information violates the FTC Act's prohibition on "unfair or deceptive acts."[45]

---

[43]     *Mandiant Report*, *supra* n. 25.

[44]     The below recitation of information security standards only provides an introduction as to applicable guidance. *See, e.g.,* NIST Update: Multi-Factor Authentication and SP 800-63 Digital Identity Guidelines, Federal Cybersecurity and Privacy Forum (Feb. 15, 2022), https://csrc.nist.gov/csrc/media/Presentations/2022/multi-factor-authentication-and-sp-800-63-digital/images-media/Federal_Cybersecurity_and_Privacy_Forum_15Feb2022_NIST_Update_Multi-Factor_Authentication_and_SP800-63_Digital_Identity_%20Guidelines.pdf.

[45]     *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244-47 (3d Cir. 2015); Isabella Wright and Maia Hamin, *"Reasonable" Cybersecurity in Forty-Seven Cases: The Federal Trade Commission's Enforcement Actions Against*

181.    In 2016, the FTC published guidance titled, *Protecting Personal Information: A Guide for Business* (the "FTC 2016 Guidance").[46] The FTC 2016 Guidance:

- Stresses the importance of "[c]ontrol[ling] access to sensitive information" and expressly encourages businesses to "[c]onsider using multi-factor authentication, such as requiring the use of a password and a code sent by different methods."[47]

- Emphasizes that companies should respond appropriately when credentials are compromised, providing that businesses should "[r]equire password changes when appropriate—for example, following a breach."[48]

- Instructs companies to restrict data access privileges by "[s]cal[ing] down access to data" and ensuring that "each employee should have access only to those resources needed to do their particular job."[49]

- Warns companies that their data security practices depend on their personnel, which "includ[e] contractors" and encourages companies to "investigate [contractor] data security practices and compare their standards" and "verify compliance" with written security expectations.[50]

---

*Unfair and Deceptive Cyber Practices*, DFR Lab (June 12, 2024), https://dfrlab.org/2024/06/12/forty-seven-cases-ftc-cyber/.

[46]    *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business ("The FTC 2016 Guidance").

[47]    *Id.* at 13.

[48]    *Id.*

[49]    *Id.* at 7.

[50]    *Id.* at 27.

- Recommends companies encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems and respond to security incidents.[51]

- Advises companies not to maintain Personal Information longer than necessary, not to collect more Personal Information than necessary, to use industry-tested methods for data security, and monitor and respond to suspicious activity.[52]

182.    In 2021, the FTC amended its "Safeguards Rule" that applies to financial institutions, including retailers that issue their own credit card to consumers and companies that bring together buyers and sellers of products and services.[53] The Safeguard Rule requires covered businesses to "[i]mplement multi-factor authentication for anyone accessing customer information on [the business's] system," to "[i]mplement and periodically review access controls [to] [d]etermine who has access to customer information and reconsider on a regular basis whether they still have a legitimate business need for it," and to "[i]mplement procedures and controls to monitor when authorized users are accessing customer information on your system and detect unauthorized access."[54]

---

[51]    *Id.* at 9-11.

[52]    *Id.* at 6-22.

[53]    FTC Safeguards Rule, 86 Fed. Reg. 707272-01, 70305-06 (Dec. 9, 2021) (to be codified at 16 C.F.R. § 314.2(h)(2)(i), (xiii)).

[54]    *FTC Safeguards Rule: What Your Business Needs to Know*, Fed. Trade Comm'n,    https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last visited Jan. 7, 2025).

183.    In February 2023, the FTC published an article titled, *Security Principles: Addressing underlying causes of risk in complex systems.* The article highlighted the importance of MFA, stating: "Multi-factor authentication is widely regarded as a critical security practice because it means a compromised password alone is not enough to take over someone's account."[55]

184.    The FTC's enforcement actions over the past five years further emphasize the critical and fundamental role MFA plays in an effective data security system, where the FTC has repeatedly obtained MFA as a form of injunctive relief in data security enforcement actions.[56]

185.    The FTC has also issued guidance for businesses regarding how to respond to data breaches, titled *Data Breach Response: A Guide for Business* (the "FTC Response Guidance"). The FTC Response Guidance stresses the importance of providing individuals affected by a data breach with notice, explaining: "If you quickly notify people that their personal information has been compromised, they

---

[55]    Alex Gaynor, *Security Principles: Addressing underlying causes of risk in complex systems*, Fed. Trade Comm'n (Feb. 1, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/02/security-principles-addressing-underlying-causes-risk-complex-systems.

[56]    *FTC v. Equifax, Inc.*, No. 1:19-CV-03297, 15 (N.D. Ga. July 23, 2019) (Stipulated Order); *In re Chegg, Inc.*, 2023151 FTC C-4782, 5 (Jan. 25, 2023) (Order); *In re Drizly, LLC*, 2023185 FTC C-4780, 6 (Jan. 9, 2023) (Order).

can take steps to reduce the chance that their information will be misused."[57] The guidance emphasizes that businesses should "[c]learly describe what you know about the compromise" and include "what information was taken." Notifying individuals as to the type of information that was compromised in the breach provides key information that allows them to "take steps to limit the damage."[58]

186.   Specific to cloud-storage applications, in June 2020, the FTC published an article titled, *Six steps toward more secure cloud computing.* The article warned, "[a]s cloud computing has become business as usual for many businesses, frequent news reports about data breaches and other missteps should make companies think carefully about how they secure their data." The article expressly highlights the importance of MFA in protecting consumer data stored on cloud services, recommending that businesses: "Require multi-factor authentication and strong passwords to protect against the risk of unauthorized access."[59]

---

[57]    *Data Breach Response: A Guide for Business*, Fed. Trade Comm'n (Feb. 2021),    https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business ("FTC Response Guidance").

[58]    *Id.*

[59]    Elisa Jillson & Andy Hasty, *Six steps toward more secure cloud computing*, Fed. Trade Comm'n (June 15, 2020), https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing.

187. In March 2023, the FTC issued a Request for Information seeking public comment on "Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security."[60] After reviewing over 100 public comments on the issue, the FTC published a report in November 2023 titled, *Cloud Computing RFI: What we heard and learned.*[61] The report expressly flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the 'shared responsibility' model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[62]

---

[60] *Solicitation for Public Comments on the Business Practices of Cloud Computing Providers*, Fed. Trade Comm'n (Mar. 22, 2023), https://www.regulations.gov/docket/FTC-2023-0028/document.

[61] Nick Jones, *Cloud Computing RFI: What we heard and learned*, Fed. Trade Comm'n (Nov. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned.

[62] *Id.* Snowflake used this "shared responsibility" model. *What We Know So Far about the Snowflake "Breach,"* Symmetry Systems (Nov. 6, 2024), https://www.symmetry-systems.com/blog/what-we-know-so-far-about-the-snowflake-breach/ ("Despite the high-profile nature of the breaches and potential reputational risk, Snowflake has not deviated from the shared responsibility model.").

**B.    Payment Card Industry Data Security Standards were not followed.**

188.    The Payment Card Industry Data Security Standards ("PCI DSS") is an information security standard applicable to the storage of payment card information whose use is mandated by major credit card brands. The PCI DSS is developed and issued by the Payment Card Industry Security Standards Council, which describes itself as a "global forum for the ongoing development, enhancement, storage, dissemination and implementation of security standards for account."[63]

189.    The PCI DSS applies to companies like Snowflake and the Spoke Defendants that accept, process, or store credit card information.

190.    The PCI DSS reiterates many of the recommendations provided by FTC guidance.

191.    As to multifactor authentication, PCI DSS Requirement 8.3 requires: "Secure all non-console administrative access and remote access to the cardholder data environment using multi-factor authentication."[64]

---

[63]    PCI, *Who We Are*, https://www.pcisecuritystandards.org/about_us/ (last visited Jan. 7, 2025).

[64]    PCI, *PCI DSS Quick Reference Guide*, 19 (July 2018), https://listings.pcisecuritystandards.org/documents/PCI_DSS-QRG-v3_2_1.pdf. *See also* Frederik Mennes, *PCI DSS 4.0: New multi-factor authentication requirements*, OneSpan (May 23, 2024), https://www.onespan.com/blog/new-mfa-

192.    The PCI Security Standards Council has issued an April 2018 supplement to the PCI DSS titled, *PCI SSC Cloud Computing Guidelines.*[65] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication."[66]

193.    PCI DSS Requirements 7.1 and 7.2 stress the need to restrict data access privileges, requiring businesses to "[l]imit access to system components and cardholder data to only those individuals whose job requires such access" and "[e]stablish an access control system(s) for systems components that restricts access based on a user's need to know, and is set to 'deny all' unless specifically allowed."[67]

194.    The PCI SSC Cloud Computing Guidelines includes a section titled *Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS)*, which

---

requirements-in-PCI-DSS-4.0 (noting in requirements 8.4.2 and 8.5 additional configuration for MFA).

[65]    PCI Security Standards Council & Cloud Special Interest Group, *PCI SSC Cloud Computing Guidelines* (April 2018), https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf.

[66]    *Id.* at 77.

[67]    PCI, *PCI DSS Quick Reference Guide*, *supra* n. 64 at 18-19.

provides: "As the Customer's access to network level data can be severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has sufficient privileges to do this across the underlying infrastructure."[68] The guidelines go on to note that for SaaS providers such as Snowflake: "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[69]

195. The PCI DSS includes the following requirements and recommendations that mirror the FTC's guidance on data retention, data encryption, monitoring data access, and implementing data security policies.[70]

- **Requirement 1.2.** "Build firewall and router configurations that restrict all traffic, inbound and outbound, from "untrusted" networks (including wireless) and hosts, and specifically deny all other traffic expect for protocols necessary for the cardholder data environment."

- **Requirement 3.1.** "Limit cardholder data storage and retention time to that which is required for business, legal, and/or regulatory purposes, as documented in your data retention policy. Purge unnecessary stored data at least quarterly."

- **Requirement 4.** "Encrypt transmission of cardholder data across open, public networks."

---

[68] PCI, *PCI SSC Cloud Computing Guidelines*, *supra* n. 65 at 63.

[69] *Id.*

[70] PCI, *PCI DSS Quick Reference Guide*, *supra* n. 64 at 12-16, 21-25.

- **Requirement 10.** "Regularly Monitor and Test Networks . . . To prevent exploitation, organizations must regularly monitor and test networks to find and fix vulnerabilities"

- **Requirement 10.6.** "Review [audit] logs and security events for all system components to identify anomalies or suspicious activity. Perform critical log reviews at least daily."

- **Requirement 12.1.** "Establish, publish, maintain, and disseminate a security policy; review the security policy at least annually and update when the environment changes.

- **Requirement 12.2.** "Implement a risk assessment process that is performed annually and upon significant changes to the environment that identifies critical assets, threats, and vulnerabilities, and results in a formal assessment."

- **Requirement 12.10.** "Implement an incident response plan. Be prepared to respond immediately to a system breach."

**C.    Other standards applicable to cloud storage were not followed.**

196.   In addition to the general data security standards described above, several authorities have issued guidance specific to cloud data storage, defining the roles and responsibilities of cloud service providers (like Snowflake) and customers (like the Spoke Defendants).

197.   The Center for Internet Security ("CIS") is a non-profit organization that develops globally recognized best practices for securing IT systems and data. In March 2022, CIS issued a publication titled, *CIS Controls Cloud Companion Guide* that provided guidance as on security best practices for customers using

cloud services.[71] The guidance made the following recommendations emphasizing the importance of MFA and revoking access to stale credentials:

- **Disable Dormant Accounts.** Delete or disable any dormant accounts after a period of 45 days of inactivity, where supported.[72]

- **Establish an Access Revoking Process.** Establish and follow a process, preferably automated, for revoking access to enterprise assets, through disabling accounts immediately upon termination, rights revocation, or role change of a user. Disabling accounts, instead of deleting accounts, may be necessary to preserve audit trails.[73]

- **Require MFA for Administrative Access.** Require MFA for all administrative access accounts, where supported, on all enterprise assets, whether managed on-site or through a third-party provider.[74]

198. ISO/IEC 27017 is an international standard that "provides controls and implementation guidance for both cloud service providers and cloud service customers."[75] Control 9.2.3 specifically highlights that cloud service customers

---

[71]    Center for Internet Security, *CIS Controls Cloud Companion Guide* (Mar. 2022),         https://www.cisecurity.org/insights/white-papers/cis-controls-v8-cloud-companion-guide.

[72]    *Id.* at 18.

[73]    *Id.* at 20.

[74]    *Id.*

[75]    Telecommunication Standardization Sector, *International Standard ISO/IEC 27017*, Int'l Telecomms. Union, 1 (Dec. 15, 2015), https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf.

(like the Spoke Defendants) should use MFA, and cloud service providers (like Snowflake) should provide MFA capabilities as follows[76]:

| Cloud service customer | Cloud service provider |
| --- | --- |
| The cloud service customer should use sufficient authentication techniques (e.g., multi-factor authentication) for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service according to the identified risks. | The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service, according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms. |

## III.    The Data Breach harmed Plaintiffs and Class Members.

199.    The effects of the Data Breach were felt immediately—not only by Snowflake and the Spoke Defendants—but by individual consumers. Personal Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America.[77]

---

[76]    *Id.* at 9.

[77]    Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion. $160.7 billion of this revenue derived from its Google business, which is driven almost exclusively by leveraging the Personal Information it collects about users of its various free products and services. Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

200.    Criminal law also recognizes the value of Personal Information and the serious nature of the theft of Personal Information by imposing prison sentences for its theft. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Personal Information. Once a cybercriminal has unlawfully acquired Personal Information, the criminal can use the Personal Information to commit fraud or identity theft or sell the Personal Information to other cybercriminals on the black market.

201.    Information protected by credentials—usernames and passwords—is intended to stay private, and not to be disclosed to third parties (otherwise, why password-protect the information, at all?). But because of Defendants' failure to follow basic cybersecurity guidelines, the information stored on Snowflake's cloud-based servers was accessible to cybercriminals, who exfiltrated the data for nefarious purposes.

202.    Each of the Spoke Defendants has disclosed that certain types of Personal Information were exposed in the Data Breach. They include, at a minimum:

- **Advance Auto**: Information collected from individuals as part of the employment application process, including Social Security

numbers, driver's license or other government issued identification numbers, and dates of birth.[78]

- **Ticketmaster**: consumer name, contact information, and encrypted credit card information.[79] Passport numbers may have been impacted for a limited number of individuals.[80] Transaction information, including ticket sales, event information, and order details were also reportedly included.[81]

- **LendingTree**: customer contact information (names and addresses), driver's license number.[82]

- **AT&T**: records of calls and text of nearly all of AT&T's cellular customers, customers of other companies using AT&T's wireless network, and AT&T's landline customers who interacted with cellular numbers between May 1, 2022 and

---

[78]    Advance Stores Company, Incorporated, Notice of Data Breach (July 10, 2024), https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/AdvanceStoresCompanyInc.pdf ("Advance Auto Notice").

[79]    Ticketmaster Data Security Incident, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident.

[80]    Letter to Attorney General Brenna Bird, Iowa Office of the Attorney General (June 26, 2024), https://www.iowaattorneygeneral.gov/media/cms/6262024_Ticketmaster_LLC_A91448C1685FD.pdf.

[81]    Lawrence Abrams, *Ticketmaster confirms massive breach after stolen data for sale online*, Bleeping Computer (May 31, 2024), https://www.bleepingcomputer.com/news/security/ticketmaster-confirms-massive-breach-after-stolen-data-for-sale-online/.

[82]    QuoteWizard Notice of Data Breach (July 30, 2024) ("QuoteWizard Notice"), https://ago.vermont.gov/sites/ago/files/documents/2024-08-09%20QuoteWizard%20Data%20Breach%20Notice%20to%20Consumers.pdf.

October 31, 2022. The information also contains records from January 2, 2023, for a small number of customers.[83]

- **LAUSD:** Based upon information and belief, neither LAUSD nor its vendors, including Innive, have disclosed the specific LAUSD Personal Information that was exposed in the Data Breach to individuals whose information was exposed. Upon information and belief, the exposed and exfiltrated data includes: student names, addresses, and dates of birth; academic records; discipline histories; disability and health-related records; and parent and guardian contact details; as well as family financial, demographic, and citizenship or immigration information.[84]

203.    The Personal Information exposed is extremely valuable and can be used for a number of nefarious purposes.

---

[83]    AT&T Addresses Illegal Download of Customer Data, AT&T (July 12, 2024) ("AT&T Notice"), https://about.att.com/story/2024/addressing-illegal-download.html.

[84]    Los Angeles Unified Confirms Student Data Stolen in Snowflake Account Hack, Bleeping Computer (June 6, 2024), https://www.bleepingcomputer.com/news/security/los-angeles-unified-confirms-student-data-stolen-in-snowflake-account-hack/; Shane Snider, *Snowflake-Linked Breach Strikes Los Angeles School District*, Information Week (June 24, 2024), https://www.informationweek.com/cyber-resilience/snowflake-linked-breach-strikes-los-angeles-school-district.

### A. Snowflake information was sold on the dark web and to other criminals.

204.    First, cybercriminals have already confirmed the stolen Personal Information's value by selling the data on the dark web and to other cybercriminals.

205.    Some dark web sites are simply places for people who wish to avoid tracking while browsing the internet.[85] However, the anonymity of the dark web has led to the creation of a number of markets and forums which traffic in illegal merchandise and content, including stolen Personal Information.[86]

206.    The dark web is a heavily cloaked part of the internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and Personal Information. Websites appear and disappear quickly, making it a dynamic environment.

---

[85]    Thomas J. Holt, *Open, Deep, and Dark: Differentiating the Parts of the Internet Used For Cybercrime*, Mich. State Univ., https://cj.msu.edu/_assets/pdfs/cina/CINA-White_Papers-Holt_Open_Deep_Dark.PDF (last visited Nov. 26, 2024).

[86]    *Crime and the Deep Web*, Stevenson Univ., https://www.stevenson.edu/online/about-us/news/crime-deep-web/ (last visited Nov. 26, 2024); *Defending Against Malicious Cyber Activity Originating from Tor*, CISA, https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-183a (last updated Aug. 2, 2021).

207.    Once stolen Personal Information is posted on the dark web, it will most likely be distributed or sold to multiple different groups and individuals, each of which can use that information for fraud and identity theft.[87]

208.    When data is stolen, it can appear on the dark web across the world. In 2015, researchers created a list of 1,568 phony names, Social Security numbers, credit card numbers, addresses, and phone numbers, rolled them in an Excel spreadsheet, and then "watermarked" it with their code that silently tracks any access to the file.[88] The data was quickly spread across five continents: North America, Asia, Europe, Africa, and South America. In the end, it was downloaded by 47 different parties. It was mainly downloaded by users in Nigeria, Russia, and

---

[87]    *The Dark Web and Cybercrime*, HHS (July 23, 2020), https://www.hhs.gov/sites/default/files/dark-web-and-cybercrime.pdf; Lawrence Abrams, *Scam PSA: Ransomware gangs don't always delete stolen data when paid*, BleepingComputer (Nov. 4, 2020), https://www.bleepingcomputer.com/news/security/scam-psa-ransomware-gangs-dont-always-delete-stolen-data-when-paid/.

[88]    Kelly Jackson Higgins, *What Happens When Personal Information Hits The Dark Web*, DARKREADING (Apr. 7, 2015), https://www.darkreading.com/cyberattacks-data-breaches/what-happens-when-personal-information-hits-the-dark-web; Kristin Finklea, *Dark Web*, Nat'l Sec. Archive (July 7, 2015), https://nsarchive.gwu.edu/media/21394/ocr; *Dark Web*, Congressional Research Service, https://crsreports.congress.gov/product/pdf/R/R44101 (last updated Mar. 10, 2017).

Brazil, with the most activity coming from Nigeria and Russia.[89] This experiment demonstrated that data released on the dark web will quickly spread around the world.

209.    Information from this Data Breach has already been found in several places on the dark web—even reappearing after law enforcement agencies shut down certain websites offering information for sale.[90]

210.    In a hub-and-spoke breach such as this one, when information from one "spoke" defendant appears on the dark web, it is likely that information from other defendants is likely to follow or has already been sold.

211.    The information found for sale on the dark web is just the tip of the iceberg. The dark web poses significant challenges to cyber security professionals and law enforcement agencies. The dark web is legal to access and operate, and it has some legitimate applications and sites. But its hidden nature and its employment

---

[89]    Pierluigi Paganini, *HOW FAR DO STOLEN DATA GET IN THE DEEP WEB AFTER A BREACH?*, Security Affairs (Apr. 12, 2015), https://securityaffairs.com/35902/cyber-crime/propagation-data-deep-web.html.

[90]    *See, e.g.*, Ionut Arghire, *Hackers Boast Ticketmaster Breach on Relaunched BreachForums*, SecurityWeek (May 31, 2024), https://www.securityweek.com/hackers-boast-ticketmaster-breach-on-relaunched-breachforums/; Sergiu Gatlan, *Advance Auto Parts stolen data for sale after Snowflake attack*, Bleeping Computer (June 5, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-stolen-data-for-sale-after-snowflake-attack/.

of multi-level encryption make detecting and monitoring illegal activity difficult. Unlike the clear web, dark web sites do not advertise their existence.

**B.    There are long-lasting impacts of the Data Breach.**

212.   The U.S. Government Accountability Office (GAO) released a report in 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[91]

213.   The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name." The GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[92]

---

[91]   Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf.

[92]   *Id.*

214.    Identity thieves use Personal Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[93] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[94]

215.    With access to an individual's Personal Information, criminals can commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; filing a

---

[93]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[94]    *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

fraudulent tax return using the victim's information; or committing healthcare fraud using an individual's identification. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[95]

216.  Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[96]

217.  Theft of Social Security numbers creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the harm has already been suffered by the victim.

218.  Because of the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other data (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Data security researcher Tom Stickley, who is employed by companies to

---

[95]  *Id.*

[96]  *Id.*

find flaws in their computer systems, stated: "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[97]

219.   A Data Breach does not need to expose Social Security numbers in order to expose victims to actual or concrete harm. For example, there have been numerous examples of victims of "SIM swap" fraud, where criminals essentially "take over" a victim's cell phone number in order to obtain that victim's text messages, break into the victim's accounts, and empty their life's savings. Some criminals have been able to successfully commit a SIM swap with only a victim's name and cellular number. Cellular companies do not necessarily put extra precautions in place to protect individuals from SIM-swap attacks—requiring consumers to understand the risk that such leaked information causes and request a

---

[97]    Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, Time (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

special passcode on their accounts for additional protection.[98]

220.    Beyond SIM-swap scams, hackers can sell call log information for individuals, exposing sensitive information related to who they have called and when. Indeed, hackers attempted to post call log information from the Data Breach for President Donald Trump and Vice President Kamala Harris.[99] Exposed call records can expose individuals to harassment, identity theft, and other fraud.[100]

221.    Recent reports suggest that detailed call logs can also be used to more effectively train malicious artificial intelligence (AI) models to help these models learn specific patterns of communication and movement. By analyzing

---

[98]    Donie O' Sullivan, *One man lost his life savings in a SIM hack. Here's how you can try to protect yourself*, CNN (Mar. 13, 2020), https://www.cnn.com/2020/03/13/tech/sim-hack-million-dollars/index.html; *FBI warns of growing SIM-swapping threat*, Honolulu Star-Advertiser (Feb. 9, 2022), https://www.yahoo.com/news/fbi-warns-growing-sim-swapping-061700104.html; *UPDATE: Secure Your Number to Reduce SIM Swap Scams*, AT&T, https://www.research.att.com/sites/cyberaware/ni/blog/sim_swap.html (last visited Jan. 14, 2024); TJ Porter, *Why Sim Swapping Scams Are On The Rise And How You Can Stay Safe*, Investopedia (Dec. 16, 2024), https://www.investopedia.com/protect-yourself-from-sim-swapping-8756219; Dean Reilly, *A Deep Dive into the Tactics Used by Fraudsters*, Hacker Desk (Aug. 4, 2023), https://hackerdesk.com/unmasking-the-sim-swap-scam-a-deep-dive-into-the-tactics-used-by-fraudsters.

[99]    Jessica Lyons, *US Army soldier who allegedly stole Trump's AT&T call logs arrested*, The Register (Jan. 1, 2025), https://www.msn.com/en-us/news/crime/us-army-soldier-who-allegedly-stole-trumps-at-t-call-logs-arrested/ar-AA1wNlhv.

[100]    Amanda Hetler, *AT&T data breach: What's next for affected customers?*, TechTarget (Jul. 24, 2024), https://www.techtarget.com/WhatIs/feature/ATT-data-breach-Whats-next-for-affected-customers.

communication patterns, this AI can craft highly personalized phishing messages that are more likely to succeed, especially if it can identify the parties involved and the nature of the relationship.[101]

222.    Hackers can also use information related to a customer's prior purchase history to perpetrate phishing attacks and scams by sending existing customers fake order confirmations to steal additional personal and financial information.[102]

223.    Exposed driver's license numbers are sold on the dark web because they can be used to create counterfeit licenses, open financial accounts, cash counterfeit checks, and even obtain medical care using someone's identity.[103]

---

[101]    David Michael Berry, *How Data Breaches Empower Malicious AI: The AT&T Case Study*, Berry Networks (July 16, 2024), https://berry-networks.com/2024/07/16/how-data-breaches-empower-malicious-ai-the-att-case-study/.

[102]    *See, e.g.*, *How to avoid scams impersonating Amazon this holiday season*, Amazon (Nov. 17, 2022), https://www.aboutamazon.in/news/amazon-india-news/how-to-avoid-scams-impersonating-amazon-this-holiday-season; *How to Recognize and Avoid Phishing Scams*, FTC (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams.

[103]    *How driver's licenses exposed in data breaches increase your risk of identity fraud*, IDX (May 6, 2021), https://www.idx.us/knowledge-center/how-drivers-licenses-exposed-in-data-breaches-increase-your-risk-of-identity-fraud; John Egan, *What Should I Do if My Driver's License Number Is Stolen*, Experian (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

224.   Exposed gift cards can result in their balances being reduced to nothing—a real and serious loss of monetary value.[104] Individuals may also experience theft of their event tickets.[105]

225.   Stolen student health and mental health records are highly valuable to hackers because they contain sensitive, long-lasting data that cannot be changed—such as diagnoses, treatment histories, disabilities, and counseling notes—which can be sold on the dark web for use in blackmail, social engineering, or fraudulent medical billing schemes. For victims, the exposure of this deeply personal information can lead to stigma, emotional distress, denial of educational

---

[104]   Jackie Callaway, *Beware: Hackers can steal money off gift cards before you have a chance to use them*, ABC News Tampa Bay (Dec. 29, 2020), https://www.abcactionnews.com/money/consumer/taking-action-for-you/beware-hackers-can-steal-money-off-gift-cards-before-you-have-a-chance-to-use-them.

[105]   Taylor O'Bier, *Hackers allegedly leak tickets from Ticketmaster to Talyor Swift tour and more*, Scripps (Jul. 10, 2024), https://www.scrippsnews.com/science-and-tech/data-privacy-and-cybersecurity/hackers-allegedly-leak-tickets-from-ticketmaster-to-taylor-swift-tour-and-more ("Sp1d3rHunters hit back, stating in another forum post that the ticket information they allegedly stole was for physical ticket types and therefore they can't be refreshed. If this is true, Ticketmaster would have to void and reissue all the stolen tickets.").

opportunities, and long-term reputational harm, particularly for minors whose records may follow them into adulthood.[106]

226.    Stolen family demographic, immigration, and citizenship information is especially valuable to hackers because it can be used to exploit victims who may fear contact with government agencies or legal systems, making them more vulnerable to extortion, scams, and identity theft. For victims, the exposure of such information can lead to lasting harm, including fear of deportation, loss of public benefits, discrimination, and psychological distress—particularly in mixed-status households or immigrant communities where trust in institutions is already fragile.[107]

227.    Each additional piece of Personal Information exposed in a data breach increases an individual's risk of identity fraud and exposure to scams. Information from one breach may be combined with information from other breaches to create "fullz"—or complete information about an individual sufficient to facilitate identity

---

[106]    Why Are Healthcare Breaches Increasing and How Can They Be Prevented?, *SecureOps* (Aug. 5, 2020), https://www.secureops.com/blog/healthcare-breaches/; Why Do Criminals Target Medical Records?, HIPAA J. (Dec. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/.

[107]    *Brilliance Security Magazine* (July 6, 2023), https://brilliancesecuritymagazine.com/cybersecurity/cyberattacks-are-targeting-immigrants/.

theft, allow for the purchase of goods and services on the internet, and enable criminals to open new accounts in a victim's name.[108]

228.  Data breaches also have a deep, psychological impact on their victims. A cyberattack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyberattack. While expected, these emotions can paralyze the victim and prolong or worsen the consequences of a cyberattack.[109]

229.  The information exposed in this Data Breach will result in actual and imminent harm for Plaintiffs and Class Members for years to come.

---

[108]  Robert Lemos, *All about your 'fullz' and how hackers turn your personal data into dollars*, PCWorld (June 2, 2016), https://www.pcworld.com/article/414992/all-about-your-fullz-and-how-hackers-turn-your-personal-data-into-dollars.html; Paige Tester, *What are Fullz? How Hackers & Fraudsters Obtain & Use Fullz*, DataDome (Mar. 3, 2023), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[109]  Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks. *See also* Christina Ianzito, *Identity Fraud Cost Americans $43 Billion in 2023*, AARP (Apr. 10, 2024) ("[I]n 2023, 16 percent of identity fraud victims said they'd thought about ending their lives.").

**C.    The Data Breach forces Plaintiffs and Class Members to take additional steps to mitigate harm.**

230.    In addition to all the other immediate consequences of the Data Breach, Plaintiffs and Class Members face a substantially increased risk of identity theft and fraud.

231.    The FTC recommends that identity theft victims take several steps to protect their Personal Information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[110]

232.    As discussed above, cybercriminals use stolen Personal Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

233.    Studies by the Identity Theft Resource Center (ITRC) show the multitude of harms caused by fraudulent use of personal and financial information, including needing to request government assistance, borrowing money, using savings to pay for expenses, being unable to qualify for home loans, losing a home

---

[110]    *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Nov. 26, 2024).

or place of residence, being unable to care for one's family, losing an employment opportunity, missing time from work, and needing to take time off of school.[111]

234.    Moreover, the harms of identity theft are not limited to the affected individual and may adversely impact other associated persons and support systems, including government assistance programs. In the ITRC study, nearly a quarter of survey respondents had to request government assistance because of identity theft, such as welfare, EBT, food stamps, or similar support systems.[112] The ITRC study concludes that identity theft victimization has an extreme and adverse effect on each individual as well as on all the support systems and people associated with the individual.[113]

---

[111]    Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (June 11, 2021), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/; *see also* Identity Theft Resource Center 2023 Consumer Impact Report (Aug. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf.

[112]    *Id.*

[113]    *Id.*

235.    Personal Information is such an inherently valuable[114] commodity to identity thieves that, once it is compromised, criminals often trade the information on the cyber black-market for years.

236.    Accordingly, there may also be a substantial lag time between when harm occurs versus when it is discovered, and also between when Personal Information is stolen and when it is used. According to the GAO Report: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[115]

237.    Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (e.g., purchase history or call log history), directly and materially increase the chance that a potential victim is targeted by a

---

[114]    *See, e.g.*, John T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 1, 2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.").

[115]    Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf.

spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[116]

238.   It would be unreasonable for individuals to wait to experience fraud or identity theft before they take steps to protect themselves from fraud or identity theft because of Defendants' negligence or recklessness. Of course, for individuals who have not received any notice that their Personal Information has been exposed in this Data Breach, Defendants have placed such individuals in precisely that position.

239.   Either way, the intent of hackers is clear when they hack systems, such as the Defendants': they are attempting to access consumers' Personal Information for malicious purposes, such as selling it for a profit.

---

[116]   *See* Leo Kelion & Joe Tidy, *National Trust joins victims of Blackbaud hack*, BBC News (July 30, 2020), https://www.bbc.com/news/technology-53567699 (concluding that personal information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

240.   On average, it takes approximately three months for a consumer to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[117]

241.   In addition, there is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the dark web in a coherent, organized fashion, meaning Plaintiffs and Class Members will remain at an increased risk of fraud and identity theft for many years into the future. Plaintiffs and Class Members must vigilantly monitor their financial accounts, online presence, profiles, and other places where their Personal Information may appear for many years to come.

242.   Purchasing monitoring products or spending additional time to monitor their Personal Information is a reasonable step to mitigate the risk of harm that Plaintiffs and Class Members face.

### D.    Defendants failed to protect consumers or compensate victims appropriately.

243.   The Defendants in this action did not take sufficient steps to protect their customers, and have not done nearly enough to compensate the victims of the Data Breach, who will suffer real harm for years to come.

---

[117]    John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

244.   As an initial matter, and as discussed herein, Defendants did not implement the most basic of cybersecurity policies that would have prevented the Data Breach. This Data Breach was preventable.[118] Indeed, this is made clear by the number of Snowflake customers who implemented these policies, and did not have their data taken by cybercriminals.

245.   The industries that Defendants serve have seen a substantial increase in cyberattacks and data breaches such that they were reckless in not implementing basic cybersecurity practices to protect customer information. Indeed, many of the Defendants have already experienced significant data breaches in recent years such that they could foresee that the Data Breach that is the subject of this action would occur.

246.   Cyberattacks have become so notorious that the FBI and Secret Service issued a warning in 2019 to potential targets so that they were made aware of, and could prepare for, a potential attack.[119]

---

[118]    Lucy L. Thomson, Data Breach and Encryption Handbook (Am. Bar Assoc. 2011) ("In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions.").

[119]    Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www. law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

247.    There were plenty of technologies and processes readily available that Defendants could have utilized to prevent the Data Breach. Defendants failed to do so. The problem caused by Defendants' unwillingness to take proper data security precautions will only get worse: a study published in May 2022 by the International Data Corporation projects that the amount of new data created, captured, replicated, and consumed is expected to double in size by 2026.[120]

248.    The Defendants were on notice of the risks of a data security incident or breach and knew there were steps they could take to secure their systems and protect the Personal Information of their customers; they simply chose not to take them.

249.    Additionally, Defendants' actions after the Data Breach have been insufficient, as the Defendants have not offered monitoring tools that would adequately protect victims, nor have they compensated victims for their injuries. In the case of Innive and the Doe Defendants, they have not even notified the LAUSD victims about the Breach and their exposed Personal Information.

---

[120]    *See* John Rydning, *Worldwide IDC Global DataSphere Forecast, 2022–2026: Enterprise Organizations Driving Most of the Data Growth*, IDC (Nov. 2022), https://www.linkedin.com/embeds/publishingEmbed.html?articleId=7080078918768595657.

**E.    Damages can compensate victims for the harm caused by the attack.**

250.    While several Defendants have offered victims of the Data Breach credit monitoring services, these services alone are not enough: a year or two of credit monitoring will not un-ring the bell of the release of the Personal Information of Plaintiffs and Class Members, which will circulate through the various levels (clear, dark, and deep) of the internet for years and years, if not in perpetuity. Identity theft and credit monitoring services are insufficient to protect consumers from certain scams, phishing attempts, malware, and additional extortion that they will likely face and have already faced as a result of the breach. Data Breach victims will need to safeguard their information and accounts for years to come—and these services are typically accounted for in settlements and judgments involving data breaches.[121]

251.    The Personal Information exposed in the Data Breach has real value, as explained above. Plaintiffs and the Class Members have therefore been deprived

---

[121]    For instance, in July 2019, the CFPB, FTC and States announced a settlement with Equifax over the 2017 Equifax data breach, which included up to ten years of credit monitoring and identity restoration services. *See CFPB, FTC and States Announce Settlement with Equifax Over 2017 Data Breach*, CFPB (July 22, 2019), https://www.consumerfinance.gov/about-us/newsroom/cfpb-ftc-states-announce-settlement-with-equifax-over-2017-data-breach/.

of their rights to the control of that property and have lost the value they might otherwise have incurred from that data.[122]

252.   Plaintiffs and the Class Members have spent significant time, and will spend more, monitoring their accounts, changing login credentials, and recovering from the inevitable fraud and identity theft which will occur, which deserves to be compensated: Defendants have not made apportionment for this very real injury.[123]

253.   Similarly, Defendants have offered no compensation for the aggravation, agitation, anxiety, anguish, loss of dignity, intrinsic harm, and emotional distress that Plaintiffs and the Class Members have suffered, and will continue to suffer, as a result of the Data Breach: the knowledge that their information is out in the open, available for sale and exploitation at any time in the future is a real harm that also deserves compensation.

254.   Plaintiffs and Class Members were also deprived of the benefit of their bargain when they interacted with Defendants: each Defendant had a duty to take reasonable steps to protect the Personal Information of its customers. This duty was

---

[122]   Ravi Sen, *Here's how much your personal information is worth to cybercriminals – and what they do with it*, PBS (May 14, 2021, 12:04 PM), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.

[123]   Time spent monitoring accounts is another common and cognizable, compensated harm in data breach cases. *See Equifax Data Breach Settlement*, FTC, https://www.ftc.gov/enforcement/refunds/equifax-data-breach-settlement (last visited Nov. 26, 2024).

inherent in the relationships among Plaintiffs and Class Members and Defendants, whether through express contractual terms, implied contractual terms, or statutory or implied duties of good faith and fair dealing.

255.   Defendants have not taken sufficient steps or even attempted to make their customers, the real victims of this Data Breach, whole. In the case of the Doe Defendants and Innive, they have not even notified the LAUSD victims that their Personal Information has been exposed. Together, Defendants have failed in their duty to protect Plaintiffs' and Class Members' Personal Information and have failed in their duty to help these consumers protect themselves in the future.

256.   Plaintiffs who have filed suit in this multidistrict litigation have suffered injuries in numerous ways, including:

- Loss of benefit of their bargain, for individuals who provided compensation to entities to, among other things, safely store their data;

- Loss of economic value of their Personal Information, in that it has been misused for purposes to which they did not consent, and they have not been properly compensated for this misuse;

- Loss of the privacy of their Personal Information, including personal health and disability information, which has been stolen by cybercriminals and therefore already exposed to the eyes of unauthorized third parties without Plaintiffs' authorization or consent;

- Loss of the intrinsic value of their Personal Information, including personal health and disability information, and the accompanying aggravation, agitation, anxiety, anguish, loss of dignity, and emotional distress;

- Actual or attempted fraud, misuse, or identity theft caused by the Data Breach, including, but not limited to, their information being published to the clear, deep, and dark web; as well as

- Time and expenses that were reasonably spent to mitigate the impact of the Breach.

257. Several Plaintiffs have already experienced actual or attempted fraud, which is reasonably related to the Data Breach, and which demonstrates that the Data Breach has put them at immediate risk for additional harm.

258. The fraud and attempted fraud that certain Plaintiffs have suffered is sufficiently related to the Data Breach because of the time frame in which it occurred (after the Data Breach), and because the same information that was exposed in the Data Breach would have been used to effectuate the fraud and identity theft.

259. The harm already suffered by Plaintiffs demonstrates that the risk of harm is ongoing for all Plaintiffs and all Class Members.

## IV.    Alternative forms of dispute resolution that would delay resolution of cases which Defendants sought to consolidate are unconscionable and unenforceable.

260. Consumers are bombarded with legalese in multiple, overlapping documents throughout the course of interacting with Snowflake and the Spoke Defendants. Based upon leading research, the average consumer reads documents

like terms and service and privacy policies at *approximately* 250 words per minute.[124]

261. The privacy policies for each Defendant are lengthy:

- Snowflake Privacy Policy: 4,358 words.[125]

- Ticketmaster Privacy Policy: 4,030 words.[126]

- Advance Auto Privacy Policy: 5,610 words.[127]

- LendingTree Privacy Policy: 4,000 words.[128]

- AT&T Privacy Policy: 8,346 words.[129]

---

[124]    *See* Aleecia M. McDonald and Lorrie Faith Carnor, *The Cost of Reading Privacy Policies*, J. of Law and Pol'y for the Info. Soc. (2008), *available via* http://www.is-journal.org; *see also* Marc Brysbaert, *How many words do we read per minute? A review and meta-analysis of reading rate*, J. or Memory and Language (Dec. 2019) ("Based on the analysis of 190 studies (18,573 participants), we estimate that the average silent reading rate for adults in English is 238 words per minute (wpm) for non-fiction and 260 wpm for fiction."). Privacy policy and terms of service word counts determined using Microsoft Word's "word count" function.

[125]    *Available at* https://www.snowflake.com/en/legal/privacy-policy/ (last accessed Mar. 21, 2025).

[126]    *Available at* https://privacy.ticketmaster.com/privacy-policy (last visited Mar. 21, 2025).

[127]    *Available at* https://shop.advanceautoparts.com/o/privacy-notice (last visited Mar. 21, 2025).

[128]    *Available at* https://www.lendingtree.com/legal/privacy-policy/ (last visited Mar. 21, 2025).

[129]    *Available at* https://about.att.com/ecms/dam/csr/privacy-redesign/2212-ATT-Privacy-Policy-Full.pdf (last visited Mar. 21, 2025).

Innive Privacy Policy: 4,184 words.[130]

262.   On top of the privacy policies, each Spoke Defendant has terms of service:

- Ticketmaster Terms of Use: 7,750 words.[131]

- Advance Auto Terms and Conditions for Job Seekers: 4,242 words.[132]

- QuoteWizard Terms and Conditions: 3,797 words.[133]

- AT&T Terms of Service: 22,732 words.[134]

- Innive: 5,121 words.[135]

---

[130]    *Available at* https://www.k12360.com/legal/privacy-policy (last visited June 24, 2025).

[131]    *Available at* https://help.ticketmaster.com/hc/en-us/articles/10468830739345-Terms-of-Use (last visited Mar. 21, 2025).

[132]    The current website, https://www.advanceautoparts.jobs/terms-and-conditions, will not load. An archived version is *available at* https://web.archive.org/web/20230306211540/https://www.advanceautoparts.jobs/terms-and-conditions.

[133]    *Available at* https://agents.quotewizard.com/corp/terms-of-use-agreement (last visited Mar. 21, 2025).

[134]    *Available at* https://www.att.com/legal/terms.consumerServiceAgreement.html (sections 1 through 3) (last visited Mar. 21, 2025).

[135]    *Available at* https://www.k12360.com/legal/innive-terms-of-service (last visited June 24, 2025).

263.    In total, Class Members would need to spend at least ***nearly five hours*** of uninterrupted time (at 250 words per minute) merely to *read* the Defendants' policies (not counting the policies of the Doe Defendants). But rarely do companies—if ever—provide individuals with sufficient time to read or comprehend their terms and conditions or privacy policies before paying for goods or services or applying for employment.[136]

264.    Further, significant research has been done concerning the deliberately confusing language in terms of service and privacy policy agreements—such that consumers often do not understand or comprehend the policies.[137]

---

[136]    A 2008 study estimated that it would take *244 hours a year* for the typical American internet user to read the privacy policies of all websites he or she visits. Florian Schaub, *Why privacy policies are falling short*, Meta Trust, Transparency & Control Labs, https://www.ttclabs.net/news/why_privacy_policies_are_falling_short.

[137]    Jonathan Yerby and Ian Vaughn, *Deliberately confusing language in terms of service and privacy policy agreements*, Issues in Information Sys. (2022), https://iacis.org/iis/2022/2_iis_2022_138-149.pdf (revealing that "[a]n experimental study found that 97% and 93% of 543 participants agreed to the terms of service and a privacy policy of a social networking site that declared it would share all your information with the NSA and that users must give their first-born child as payment."); *Do we actually agree to these terms and conditions?*, Berkeley iSchool Blog (July 9, 2021), https://blogs.ischool.berkeley.edu/w231/2021/07/09/do-we-actually-agree-to-these-terms-and-conditions.

265.    Beyond the significant time it would take for consumers to review the policies which Defendants may argue apply to these disputes, dark patterns are often employed to ensure that consumers do not actually read such policies.[138]

266.    Alternative forms of dispute resolution, such as mandatory binding arbitration or class action waivers, combined with prohibitions against class actions, are thus unconscionable and unenforceable against Plaintiffs and Class Members related to the Data Breach.

267.    To require all individuals with claims against certain Spoke Defendants to arbitrate their claims, or bring those claims in small claims court, would overwhelm those venues and prevent individuals from having their claims heard for several years.

268.    Additionally, certain provisions of such clauses are unconscionable and unenforceable as consumers were unable to negotiate the provisions of their agreements; they were presented on a take-it-or-leave-it basis, and terms were often updated without providing notice to consumers.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[138]    *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers*, FTC (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

## PART TWO: SNOWFLAKE

269.   All Plaintiffs named in this Representative Complaint pursue claims against Snowflake.

270.   Snowflake is aware and understands that data security is a key feature of the data storage services that it provides to its customers. The following examples illustrate how Snowflake's marketing highlights the strength of its data security practices as a selling point to its customers:

- Snowflake maintains a "Security Hub" webpage that centralizes updates relating to data security. The header of the Security Hub website provides: "Security has been foundational to the Snowflake platform since the very beginning. Our robust security features help you protect your data so you can achieve the results you need."[139]

- The Security Hub website also includes the following quote from Brad Jones, Snowflake's Chief Information Security Officer ("CISO"), emphasizing Snowflake's "industry-leading" data security policies: "Since our founding in 2012, the security of our customers' data has been our highest priority. This unwavering commitment is why we're continuously strengthening our industry-leading, built-in security policies to deliver a trusted experience for our customers. To foster ongoing transparency, we will regularly update this page with the latest security information."[140]

- Snowflake also maintains a "Securing Snowflake" website that provides customers with data security guidance. The website

---

[139]   Snowflake, *Snowflake Security Hub*, https://www.snowflake.com/en/resources/learn/snowflake-security-hub/ (last visited Jan. 6, 2025).

[140]   *Id.*

110

represents, "Snowflake provides industry-leading features that ensure the highest levels of security for your account and users, as well as all the data you store in Snowflake."[141]

271.    Snowflake is also well aware of industry guidance and regulations that set standards for effective data security practices. Snowflake's marketing repeatedly advertises that its "industry-leading" data security practices enable companies comply with relevant data security standards and regulations.

272.    For example, on a webpage titled "Data Security Compliance: Protecting Sensitive Data" (the "Data Security Compliance website"), Snowflake represents: "Snowflake helps organizations streamline security compliance, providing the tools and support required to meet regulatory compliance standards. With industry-leading data security and governance features, organizations can shift their focus from protecting their data to analyzing it."[142]

273.    On the Data Security Compliance website, Snowflake further represents how its services enable customers to comply with relevant industry standards and regulations, touting that its services afford customers "[b]aked-in government and industry data security compliance" and allow for "comprehensive

---

[141]    Snowflake, *Securing Snowflake*, https://docs.snowflake.com/en/guides-overview-secure (last visited Jan. 6, 2025).

[142]    Snowflake, *Data Security Compliance: Protecting Sensitive Data*, https://www.snowflake.com/trending/data-security-compliance/ (last visited Jan. 6, 2025).

compliance, security and privacy controls that are universally enforced." For

example, in a section titled, "How Snowflake Supports Security Compliance,"

Snowflake represents the following[143]:

- "**Baked-in government and industry data security compliance.** Snowflake has achieved numerous government and industry data security compliance credentials, validating the high level of security required by industries, as well as state and federal governments. Snowflake's government deployments have achieved Federal Risk and Authorization Management Program (FedRAMP) Authorization to Operate (ATO) at the Moderate level along, and support a range of compliance standards: International Traffic in Arms Regulations (ITAR), System and Organization Controls 2 (SOC 2) Type II, PCI DSS and Health Information Trust Alliance (HITRUST)."

- "**Universal governance.** Inconsistent governance policies across systems and users can introduce security risk to your data. Snowflake's single governance model provides comprehensive compliance, security and privacy controls that are universally enforced. Snowflake Horizon unifies and extends data governance resources. With Snowflake Horizon, data teams, data governors and data stewards can leverage a built-in, unified set of compliance, security, privacy, interoperability and access capabilities in the AI Data Cloud. Snowflake Horizon provides the toolkit required to protect and audit data, apps and models with data quality monitoring and lineage. And advanced privacy policies and data clean rooms allow organizations to tap into the full value of their most sensitive data."

274.    As one of the nation's largest cloud storage data providers,

Snowflake knew or should have known about the importance of implementing

---

143     *Id.*

effective data security practices to protect Personal Information stored on the Data Cloud, particularly because it held itself out as doing exactly that.

275.    Indeed, cloud storage databases are prime targets for cybercriminals due to the sheer volume of valuable and sensitive data they house. One recent report has highlighted the risks presented by cloud storage as follows[144]:

> It is estimated that more than 60% of the world's corporate data is stored in the cloud. That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud. That is not just because the cloud is an attractive target. In many cases, it is also an easy target due to cloud misconfiguration – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups

276.    Snowflake knows that it is a high-value target for cybercriminals. In March 2023, the FTC sought comments from Computing Providers (like Snowflake) and their impact on end users, customers, companies, and other businesses across the economy (like Spoke Defendants) on the business practices

---

[144]    Stuart Madnick, *Why Data Breaches Spiked in 2023*, Harv. Bus. Rev. (Feb. 19, 2024), https://hbr.org/2024/02/why-data-breaches-spiked-in-2023.

of cloud computing providers including issues related to the market power of these companies, impact on competition, and potential security risks.[145]

## I.    Snowflake had a duty to safeguard Plaintiffs' and Class Members' information.

277.    Snowflake exists because companies need a company to safeguard their information. The Personal Information of Plaintiffs and Class Members was stored on Snowflake's Data Cloud at the time of the Data Breach by one of the Spoke Defendants herein, with whom Snowflake maintained a business relationship to provide data cloud storage services.

278.    Snowflake owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in Snowflake's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

279.    Given that Snowflake's business is to provide secure cloud data services and store massive amounts of data, including Plaintiffs' and Class Members' Personal Information, reasonable care is necessarily a very high standard

---

[145]    Press Release, Fed. Trade Comm'n, *FTC Seeks Comment on Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security* (March 22, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data.

because of the highly sensitive and confidential nature of the information it is hired to protect.

280.    Snowflake had a duty to exercise that high standard for what is reasonable care in safeguarding Plaintiffs' and Class Members' Personal Information because it was reasonably foreseeable that the failure to do so would cause them significant injury.

281.    Snowflake's duty of reasonable care is also set forth in governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms.

282.    That Snowflake's duty of reasonable care is a very high standard is established by its own marketing statements, which hold out its cloud services as providing "built-in," "baked-in," "industry leading and otherwise turnkey data and state-of-the-art security compliance systems."

## II.    Snowflake's own actions were a substantial factor in the Data Breach.

283.    After the massive breach was made public, Snowflake denied that it had any responsibility. For example, Snowflake's Chief Information Security Officer (CISO) Brad Jones stated: "We have not identified evidence suggesting

this activity was caused by a vulnerability, misconfiguration, or breach of Snowflake's platform" after reviewing threat activity going back to mid-April.[146]

284.   Snowflake's hired cybersecurity investigator Mandiant further downplayed Snowflake's role in the Data Breach by placing sole and complete blame on Snowflake's customers. Its Chief Technology Officer (CTO) Charles Carmakal claimed: "Based on our investigations to date, a threat actor likely obtained access to multiple organizations' Snowflake tenants by using credentials stolen by infostealing malware."[147]

285.   Snowflake foisted the blame and responsibility onto the Spoke Defendants to "query for unusual activity and conduct further analysis to prevent unauthorized user access."[148]

286.   Despite failing to implement many basic cybersecurity measures, which could have prevented the Data Breach, and despite adopting a "shared responsibility" model, Snowflake insisted that it was not responsible. Snowflake's CEO Sridhar Ramaswamy made such representations to investors:

---

[146]    *Snowflake customers caught in identity-based attack spree*, Cybersecurity Dive (June 3, 2024), https://www.cybersecuritydive.com/news/snowflake-customer-databases-breached/717801/

[147]    *Id*.

[148]    Alert, *Snowflake Recommends Customers Take Steps to Prevent Unauthorized Access*, CISA (June 3, 2024), https://www.cisa.gov/news-events/alerts/2024/06/03/snowflake-recommends-customers-take-steps-prevent-unauthorized-access.

We obviously had some rough headlines in the quarter as some of our customers dealt with cybersecurity threat. As extensively reported, the issue wasn't on the Snowflake site. After multiple investigations by internal and external cybersecurity experts, we found no evidence that our platform was breached or compromised. However, we understand that when it comes to cybersecurity, we are all in it together.

My one ask of all businesses around the world, whether they are a Snowflake customer or not, is to enable and enforce multi-factor authentication in your organization and ensure that you have network policies that are as strong as possible. Two things we at Snowflake have supported since 2016.

287.   But Snowflake's conduct is a cause of Plaintiffs' and class members' injuries because it is a substantial factor in bringing those injuries about. Under Snowflake's "shared responsibility" model and on its watch, criminals exfiltrated millions of class members' personal information from a small group of Snowflake's most vulnerable accounts. Either Snowflake should have spotted and stopped them as the threat actors sought access to potentially thousands of Snowflake customer accounts, or the threat actors knew which accounts to target. Snowflake cannot evade responsibility based upon either cause.

288.   Many of Snowflake's customers are protected by MFA. But in the Data Breach, the threat actors were quickly able to access and exfiltrate mass amounts of personal information from Snowflake accounts *without* MFA, and did so in a concentrated period of time.

289.   If the threat actor did not have visibility into which Snowflake customers to attack (i.e., those lacking MFA), the threat actors would have

employed a "trial and error" approach to accessing Snowflake customers' accounts. The threat actors would have to attempt to log in to potentially thousands of different Snowflake customer accounts (using stolen, stale, or purchased credentials for each) before randomly, but successfully, accessing the vulnerable customers that are Spoke Defendants in this case. Not all stolen credentials would necessarily allow access to customer accounts—they could have been changed, cycled, or simply be incorrect—further increasing the number of necessary login attempts to locate the vulnerable customers who were breached, and further raising the visibility of the threat actors' campaign. In this scenario, Snowflake should have detected and stopped the threat actors during their potentially thousands of attempts to gain access across different customers.

290.    In Mandiant's report on the breach, it described receiving threat intelligence on database records exfiltrated from one of Snowflake's tenants using stolen credentials in mid-April 2024. On May 22, 2024, Mandiant obtained additional intelligence of a much broader campaign that Snowflake had not recognized. Mandiant notified Snowflake and they began investigating the scope of the breach campaign. As a result of Snowflake's negligent failure to monitor suspicious activity and the more than a month delay in responding, the threat actor

successfully targeted as many as 165 cloud tenants including the Spoke Defendants here, and exfiltrated the massive amount of data now at issue.[149]

291.  Alternatively, the threat actors knew which accounts to target. This is consistent with Snowflake's own public statements which, while disavowing that compromises in its system or personnel were responsible for the breach, nonetheless state that the Data Breach "appears to be a targeted campaign directed at users with single-factor authentication."[150]

292.  All of the hacked accounts are tied together by a common element: they are Snowflake accounts and are among the very few not protected by MFA (which Snowflake could have implemented). Thus, a vulnerability giving the threat actors insight into which customers' accounts are vulnerable is a *Snowflake* vulnerability—Snowflake and the lack of MFA are the common links between the Spoke Defendants.

293.  Snowflake itself acknowledges that a threat actor or cybercriminal was able to log into a Snowflake demo account, though it states that particular access did not allow threat actors to access sensitive data.[151]

---

[149]   *Mandiant Report, supra* n. 25

[150]   Matt Kapko, *Snowflake customers caught in identity-based attack spree*, CyberSecurity Dive, June 3, 2025, available at https://www.cybersecuritydive.com/news/snowflake-customer-databases-breached/717801/.

[151]   *Id.*

294.    Under either scenario—whether the threat actors had targeting information, or simply tried with stolen credentials until they randomly accessed the Spoke Defendants' Snowflake accounts—Snowflake's responsibility for the Data Breach is compounded by its failure to adequately monitor and prevent individuals from using stolen Snowflake account credentials on the dark web. Each of the successful breaches occurred using stolen credentials, which Snowflake should have previously sought out, identified, and prevented from their ultimate use in the Data Breach.

## III.    Snowflake's negligence as a sophisticated cloud-storage services provider.

295.    As a major cloud storage services provider, Snowflake has a duty to implement adequate data security systems, protocols, and practices to protect the Personal Information it contracts to store from known vulnerabilities and maintain a security system consistent with relevant industry standards.

296.    Snowflake is thus responsible for significant violations of the standard of care for data protection by cloud storage entities. These include, but are not limited to:

    a. Failing to mandate that its clients enable MFA. Its security model placed the burden on Snowflake's clients to enable MFA, but did not enforce it, leaving accounts vulnerable.

b.  Failing to proactively monitor for credential abuse. Mandiant reports that 79.7% of affected accounts had previously exposed credentials.

c.  Failing to require that its clients regularly rotate their passwords.

d.  Failing to monitor for leaked credentials of its own employees and its clients' employees on the dark web.

e.  Failing to require its clients restrict access to trusted IP addresses.

f.  Failing to require that its clients disable inactive accounts to reduce risk.

g.  Failing to prevent threat actors from determining which Snowflake customer accounts are vulnerable/not protected by MFA, or, alternatively, failing to detect a large-scale campaign to login to a variety of Snowflake customer accounts seeking to determine which were vulnerable.

297.  Snowflake's negligent failures were substantial factors contributing to this massive breach. Snowflake and each of the Spoke Defendants are therefore jointly and severally liable for causing injury to the members of the putative classes.

## IV.    Snowflake breached its duty and engaged in unfair trade practices.

298.    Snowflake breached its duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Personal Information by failing to implement adequate data security practices, which caused the Data Breach.

299.    Despite industry guidance at the time of the Data Breach, while Snowflake permitted customers to use MFA, it required customers to opt in. It did not require MFA, including for specific users in customer environments. Additionally, Snowflake did not provide customers with the ability to enforce MFA on its users—i.e., require users to use MFA.

300.    A prominent cybersecurity firm executive described the practical failings of Snowflake's MFA configuration as follows[152]:

> MFA is a critical component in protecting against identity theft, and specifically against attacks related to the successful theft of passwords through phishing, malware (infostealers), or leakage of reused passwords from compromised sites.
>
> While Snowflake offers users the ability to turn on MFA, this is a feature that is not enabled on users by default and … it cannot be enforced on users by the admin of the tenant. This means Snowflake leaves it up to every user to decide whether they

---

[152]    Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say*, Information Week (June 5, 2024), https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say.

want to enroll with MFA or not. This naturally leads to many Snowflake users not having MFA turned on.

Most SaaS vendors, once deployed as an enterprise solution, allow administrators to enforce MFA … they require every user to enroll in MFA when they first login and make it no longer possible for users to work without it.

301.    It was feasible at the time of the Data Breach for Snowflake to allow customers to enforce MFA across their userbase. Indeed, on July 9, 2024—less than a month after disclosing the Data Breach—Snowflake rolled out a "new option" to "help admins enforce usage of MFA" by "requir[ing] MFA for all users in an account." In the announcement, Snowflake touted the enforcement of MFA as a "[b]est practice[]."[153]

302.    It was also feasible at the time of the Data Breach for Snowflake to turn on MFA by default, instead of having it turned off. On September 13, 2024—just three months after disclosing the Data Breach—Snowflake rolled out another new policy enforcing MFA by default on accounts created as of October 2024.[154]

303.    In addition, many of the compromised credentials used by the threat actor were old and had been acquired from malware campaigns dating back to 2020.

---

[153]    Brad Jones and Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Snowflake (Jul. 9, 2024), https://www.snowflake.com/en/blog/snowflake-admins-enforce-mandatory-mfa/.

[154]    Anoosh Saboori & Brad Jones, *Snowflake Strengthens Security with Default Multi-Factor Authentication and Stronger Password Policies*, Snowflake (Sept. 13, 2024), https://www.snowflake.com/en/blog/multi-factor-identification-default/.

Snowflake could have closed off this vulnerability by requiring customers to regularly update their credentials, notifying customers to rotate their credentials accordingly, or monitoring info stealer marketplaces for compromised credentials and blocking access by those credentials (something Snowflake now does).

304. Snowflake also could have prevented the Data Breach by maintaining intrusion detection and prevention systems that notify customers of unusual network traffic, such as a login made by a suspicious credential that could be identified by its last login date. Such a system would be consistent with the PCI Cloud Computing Guidelines, which provides, "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[155]

305. Snowflake, through these data security failings, was negligent and breached its duty to Plaintiffs and Class Members to protect their Personal Information—information which it knew was sensitive—stored on Snowflake's Data Cloud.

306. Snowflake's breach of its duty was a substantial factor in causing the Data Breach. Had Snowflake maintained adequate data security practices (such as

---

[155]     *PCI SSC Cloud Computing Guidelines*, *supra n.* 65, at 63.

requiring or allowing customers to require MFA, credential rotation, or intrusion detection), the Data Breach would have been prevented.

307.   Snowflake's data security failings also constitute an unfair trade practice because of its failure to maintain reasonable and appropriate data security.

308.   Rather than take responsibility for its actions, Snowflake foisted the blame and responsibility onto the Spoke Defendants to "query for unusual activity and conduct further analysis to prevent unauthorized user access."[156]

309.   Even after the Data Breach, Snowflake insists that it was not breached. Despite failing to implement many basic cybersecurity measures, which could have prevented the Data Breach, and despite adopted a "shared responsibility" model, Snowflake insisted that it was not responsible. Snowflake's CEO Sridhar Ramaswamy's representation to its investors was, "[a]s extensively reported, the issue wasn't on the Snowflake side. . . . After multiple investigations by internal and external cybersecurity experts, we found no evidence that our platform was breached or compromised."[157]

---

[156]   Alert, *Snowflake Recommends Customers Take Steps to Prevent Unauthorized Access*, CISA (June 3, 2024), https://www.cisa.gov/news-events/alerts/2024/06/03/snowflake-recommends-customers-take-steps-prevent-unauthorized-access.

[157]   Matt Kapko, *After a wave of attacks, Snowflake insists security burden rests with customers*, CybersecurityDive (Aug. 22, 2024), https://www.cybersecuritydive.com/news/snowflake-security-responsibility-customers/724994/.

310.  Snowflake refuses to take responsibility for its failure to implement basic cybersecurity policies and protocols which would have prevented the Data Breach, even though it has implemented several of those policies since the breach occurred.

311.  It was reported that the threat actor was able to exfiltrate massive amounts of data from Snowflake corresponding to hundreds of companies.[158]

## V.    Snowflake's actions injured Plaintiffs and Class Members.

312.  Snowflake's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiff and Class Members, as discussed herein.

313.  Snowflake is liable for the injuries suffered by each Plaintiff and Class Member by virtue of its role as a data storage provider that stored, and failed to protect, the data of all the Spoke Defendants.

314.  To avoid duplication and for organizational purposes, this section incorporates by reference the following sections that allege in detail the injuries suffered by Plaintiffs and Class Members: Part One, Section III; Part Three, Section VII; Part Four, Section V; Part Five, Section V; Part Six, Section IV; and Part Seven, Part IX.

---

[158]    *Id.*

## VI.    Class action allegations as to Snowflake.

315.    Plaintiffs bring this action on their own behalf, and on behalf of the following Class and Subclasses (referred to collectively as the "Snowflake Classes"):

- **Nationwide Snowflake Class.** All individuals residing in the United States whose Personal Information was identified as compromised in the Data Breach involving one or more Spoke Defendants.

- **State-Specific Subclasses.** As described in this Section below, all individuals residing in a specific state whose Personal Information was identified as compromised in the Data Breach involving one or more Spoke Defendants.

- **California CCPA Snowflake Subclass.** All individuals residing in California whose nonencrypted and nonredacted personal information, as defined in Cal. Civ. Code § 1798.150(a), was identified as compromised in the Data Breach involving one or more Spoke Defendants.

316.    Plaintiffs' proposed class definitions against Snowflake are inclusive of proposed national and state class definitions against the Spoke Defendants.

317.    Excluded from the Snowflake Classes are Snowflake's officers and directors, any entity in which Snowflake has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Snowflake. Excluded also from the Snowflake Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

318.    Plaintiffs reserve the right to amend or modify the definition of the Snowflake Classes or create additional subclasses as this case progresses.

127

319.    **Numerosity.** The members of the Snowflake Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that there are hundreds of millions of individuals whose Personal Information was stored on Snowflake's Data Cloud and exfiltrated in the Data Breach.

320.    **Commonality.** There are questions of fact and law common to the Snowflake Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether Snowflake had a duty to protect the Personal Information of Plaintiffs and Snowflake Class Members, and whether it breached that duty.

- Whether Snowflake knew or should have known that its data security practices were deficient.

- Whether Snowflake's data security systems were consistent with industry standards prior to the Data Breach.

- Whether Snowflake's failure to require customers to implement MFA, employ credential rotation, and employ other industry standard data security measures violated a standard of care or laws.

- Whether Plaintiffs and Snowflake Class members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, general damages, and/or injunctive relief.

321.    **Typicality.** Plaintiffs' claims are typical of those of other Snowflake Class members because the Plaintiffs' Personal Information, like that of every other Snowflake Class Member, was compromised in the Data Breach

322.   **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interest of the Snowflake Class members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

323.   **Predominance.** Snowflake engaged in a common course of conduct toward the Plaintiffs and Snowflake Class members, in that their data was stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from Snowflake's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

324.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Snowflake Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Snowflake Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Snowflake Class members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Snowflake. In contrast, conducting this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Snowflake Class Member.

325. **Injunctive Relief.** Snowflake has acted on grounds that apply generally to the Snowflake Classes as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

326. **Issue Certification.** Likewise, certain issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such issues include, but are not limited to:

- Whether Snowflake owed a legal duty to Plaintiffs and Snowflake Class members to protect their Personal Information.

- Whether Snowflake's data security measures were inadequate in light of applicable regulations and industry standards.

- Whether Snowflake's data security measures were negligent or reckless

- Whether Snowflake's negligence or recklessness were a substantial factor leading to the data breach.

327. **Identification of Class Members via Objective Criteria.** Finally, all members of the proposed Snowflake Classes are readily identifiable using objective criteria. Both Snowflake and the Spoke Defendants have access to the names and contact information of Snowflake Class members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by the Spoke Defendants, except for the LAUSD Class Members for whom such a notice was not sent.

VII.    **Causes of action as to Snowflake.**

**FIRST CLAIM FOR RELIEF**
**Negligence**
*On behalf of All Plaintiffs and the Nationwide Snowflake Class*

328.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Two, as set forth fully herein.

329.    As it pertains to the LAUSD Plaintiffs, Plaintiffs incorporate Part Seven as set forth fully herein.

330.    Snowflake owed a duty under common law to Plaintiffs and Nationwide Snowflake Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information in its possession from being compromised, stolen, or misused by unauthorized persons.

331.    Snowflake owed this duty because, as a sophisticated cloud-services storage provider, it was aware of the damage which data breaches can cause individuals when their information is exposed due to a company's negligence. Further, Snowflake understands that security protocols such as MFA can protect data from unwanted exposure and exfiltration to unauthorized third parties; indeed, Snowflake touted the importance of MFA to its customers.

332.    Specifically, Snowflake's duty included, among other things: (a) implementing industry standard data security safeguards to protect the Personal Information of Plaintiffs and Nationwide Snowflake Class members relating to

131

MFA, rotating credentials, and restricting access privileges; (b) maintaining, testing, and monitoring Snowflake's security systems to ensure that Personal Information was adequately secured and protected; and (c) implementing intrusion detection systems and notifying customers of suspicious intrusions.

333.    Snowflake's duty to use reasonable care arose from several sources, as described herein, including that Snowflake knew or should have known that the information it stored for the Spoke Defendants was sensitive, and that failing to take adequate steps to secure and protect the data would foreseeably lead to a Data Breach which could injure individual consumers.

334.    Snowflake had a common law duty to prevent foreseeable harm to others. This duty existed because Snowflake stored valuable Personal Information that is routinely targeted by cyber criminals. Plaintiffs and Nationwide Snowflake Class members were the foreseeable and probably victims of any compromise to inadequate data security practices maintained by Snowflake.

335.    Snowflake further assumed a duty of reasonable care in making representations in marketing materials that their data storage services were secure and offered "built-in" and turnkey solutions for data security compliance.

336.    Snowflake breached its duty owed to the Plaintiffs and Nationwide Snowflake Class members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

337.   But for Snowflake's negligence, the Personal Information of the Plaintiffs and Nationwide Snowflake Class members would not have been stolen by cybercriminals in the Data Breach.

338.   As a direct and proximate result of Snowflake's breach of its duties, Plaintiffs and Nationwide Snowflake Class members have suffered injuries as detailed herein.

339.   As a direct and proximate result of Snowflake's negligence, Plaintiffs and Nationwide Snowflake Class members are entitled to damages, including compensatory, punitive, nominal damages, and/or general damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Violation of the Montana Unfair Trade Practices & Consumer Protection Act**
**(Mont. Code Ann. § 30-14-101, *et seq.*) ("MUTPCPA")**
*On behalf of All Plaintiffs and the Nationwide Snowflake Class*
*In the alternative, on behalf of Plaintiffs Madden and Murphy*
*and a Snowflake Subclass of Montana Residents*

340.   Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Two, as set forth fully herein.

341.   As it pertains to the LAUSD Plaintiffs, Plaintiffs incorporate Part Seven as set forth fully herein.

342.   Plaintiffs and Nationwide Snowflake Class members are "consumers" under the MUTPCPA because they used Spoke Defendants' services for personal, family, or household purposes. Mont. Code Ann. § 30-14-102(1). Their information

133

was stored with Snowflake through each of the Spoke Defendants, and therefore they had a relationship with Snowflake as a result of Snowflake maintaining their most sensitive information.

343.   Snowflake is a "person[]" under the MUTPCPA, which is defined to mean "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mont. Code Ann. § 30-14-102(6).

344.   Snowflake engaged in "trade" and "commerce" as defined by the MUTPCPA because it operates its data cloud services and makes decisions regarding data security from its Montana headquarters. Mont. Code Ann. § 30-14-102(8)(a) (defining "trade" and "commerce" to mean the "sale, or distribution of any services . . . tangible or intangible . . . wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state"). The State of Montana has a compelling interest in ensuring that companies within its jurisdiction follow its laws.

345.   Snowflake engaged in unfair trade practices prohibited by the MUTPCPA. Mont. Code Ann. § 30-14-103.

346.   Snowflake makes certain representations concerning data security to its customers—here, the Spoke Defendants.

347.    Snowflake's website has a number of cybersecurity representations from its executives and from the company. For example:

> "Since our founding in 2012, the security of our customers' data has been our highest priority. This unwavering commitment is why we're continuously strengthening our industry-leading, built-in security policies to deliver a trusted experience for our customers. To foster ongoing transparency, we will regularly update this page with the latest security information." - Brad Jones, CISO, VP of Information Security

> "Snowflake provides industry-leading features that ensure the highest levels of security for your account and users, as well as all the data you store in Snowflake."

348.    Based upon these representations, the Spoke Defendants made promises to Plaintiffs and class members about the security of their data; the promises which Snowflake made to its customers became part of the bargain that Spoke Defendants made to Plaintiffs and class members. At the core of those promises was data security: one of the primary purposes of Snowflake's business. And if Snowflake could not ensure security, then the Spoke Defendants could not ensure security.

349.    Snowflake engaged in unfair trade practices when it failed to maintain reasonable data security practices to safeguard the Personal Information of Plaintiffs and Snowflake Class members, as described herein.

350.    Snowflake's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

Snowflake's negligence or recklessness either resulted in the threat actor being able not only to gather intelligence about Snowflake's customers, but also then target Spoke Defendants based upon the intelligence gathered directly from Snowflake; and/or Snowflake did not have adequate practices in place to detect the large-scale breach in order to quickly stop it.

351.    Montana has the most significant relationship with Snowflake's unfair trade practices alleged herein such that it is proper to apply the MUTPCPA to the Nationwide Snowflake Class. Snowflake is headquartered in Montana. As Snowflake made decisions regarding the data security policies and practices that are challenged in this action from its Montana headquarters, the conduct causing Plaintiffs' and Class members' injury occurred in Montana. Finally, Montana has a strong interest in regulating the trade practices of companies headquartered within its borders.

352.    Plaintiffs and Snowflake Class members have suffered injury as a result of Snowflake's unfair trade practices, as described herein.

353.    As a direct and proximate result of Snowflake's unfair trade practices, Plaintiffs and Snowflake Class members are entitled to injunctive relief, damages, including actual damages in an amount to be proven at trial or statutory damages of $500, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees. Mont. Code Ann. § 30-14-133.

**THIRD CLAIM FOR RELIEF**
**Violation of California Consumer Privacy Act**
**("CCPA") (Cal. Civ. Code § 1798.100),** *as amended*
*On behalf of Plaintiffs Swain, Xian, Rundle and Z.R., Singer and G.M., Harrison*
*and T.T. (F) and T.T. (M), and Price and E.J., B.J., M.C., and E.C.*
*and the California CCPA Snowflake Subclass*

354.   Plaintiffs Swain, Xian, Rundle and Z.R., Singer and G.M., Harrison and T.T. (F) and T.T. (M), and Price and E.J., B.J., M.C., and E.C. (collectively, the "California Plaintiffs") repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Two, as set forth fully herein.

355.   As it pertains to Plaintiffs Rundle and Z.R., Singer and G.M., Harrison and T.T. (F) and T.T. (M), and Price and E.J., B.J., M.C., and E.C., Plaintiffs incorporate Part Seven as set forth fully herein.

356.   Cal. Civ. Code § 1798.150(a) of the CCPA provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action" for statutory damages, actual damages, injunctive relief, declaratory relief and any other relief the court deems proper.

357.   Snowflake violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Personal Information of the California Plaintiffs and the Snowflake California Subclass Members. Snowflake's actions were reckless. As a direct and proximate result of these security failures, California Plaintiffs and Snowflake California Subclass Members' Personal Information was subject to unauthorized access and exfiltration, theft, or disclosure.

358.   Snowflake is a "business" under the meaning of Cal. Civil Code § 1798.140 because it is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Cal. Civil Code § 1798.140(d).

359.   California Plaintiffs and Snowflake California Subclass Members are "consumers" as defined by Cal. Civ. Code § 1798.140(g) because they are natural persons who reside in California.

360.   The information exposed in the Data Breach constitutes "personal information" as defined in Cal. Civ. Code § 1798.81.5, *et seq.*

138

361.    California Plaintiffs and Snowflake California Subclass Members seek injunctive or other equitable relief to ensure Snowflake hereinafter adequately safeguard their Personal Information by implementing reasonable security procedures and practices. Such relief is particularly important because Snowflake continues to hold Personal Information, including that of California Plaintiffs and Snowflake California Subclass Members.

362.    California Plaintiffs and Snowflake California Subclass Members have an interest in ensuring that their Personal Information is reasonably protected, and Snowflake has demonstrated a pattern of failing to adequately safeguard this information.

363.    Notice related to Plaintiffs' intention to bring claims pursuant to the CCPA was sent to Snowflake on December 27, 2024, and also provided previously by other plaintiffs and their counsel. Despite receipt of the letter, Snowflake has refused to cure its violations as demanded by Plaintiffs.

364.    The Data Breach was caused, in substantial part, by Snowflake's actions, as described herein.

365.    Snowflake failed to take sufficient and reasonable measures to safeguard its data security systems and protect California Plaintiffs and Snowflake California Subclass Members' Personal Information from unauthorized access. Snowflake's failure to maintain adequate data protections subjected California

139

Plaintiffs and Snowflake California Subclass Members' Personal Information to exfiltration and disclosure by malevolent actors.

366. The unauthorized access, exfiltration, theft, and disclosure of California Plaintiffs and Snowflake California Subclass Members' Personal Information was a result of Snowflake's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Personal Information.

367. Snowflake's unreasonable security practices include, but are not limited to: (a) failing to implement industry standard data security safeguards to protect the Personal Information of California Plaintiffs and Class Members relating to MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor Snowflake security systems to ensure that Personal Information was adequately secured and protected; (c) failing to implement intrusion detection systems and notifying customers of suspicious intrusions.

368. California Plaintiffs and Snowflake California Subclass Members have suffered actual injury as detailed herein, and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

369. Snowflake's violations of Cal. Civ. Code § 1798.150(a) are a direct and proximate cause of the Data Breach.

370.    California Plaintiffs and Snowflake California Subclass Members seek all monetary and non-monetary relief allowed by law, including actual, general, or nominal damages; declaratory and injunctive relief, including an injunction barring Snowflake from disclosing their Personal Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

371.    California Plaintiffs and Snowflake California Subclass Members are further entitled to the greater of statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident, or actual damages, whichever is greater. See Cal. Civ. Code § 1798.150(b).

372.    As a result of Snowflake's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, California Plaintiffs and Snowflake California Subclass Members seek actual damages, statutory damages, injunctive relief (including public injunctive relief), and declaratory relief, and any other relief as deemed appropriate by the Court.

**FOURTH CLAIM FOR RELIEF**
**Violation of Massachusetts General Law Chapter 93A**
**("MGL Chapter 93A")**
*On behalf of Plaintiff O'Hara and a Snowflake Subclass of*
*Massachusetts Residents*

373.   Plaintiff O'Hara repeats and re-alleges the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Two, as set forth fully herein.

374.   Plaintiff O'Hara and Massachusetts Snowflake Subclass Members are "persons" under MGL Chapter 93A because they are natural persons. Mass. Gen. L. Ch 93A § 1(a).

375.   Snowflake is a "person[]" under MGL Chapter 93A because it is a corporation. Mass. Gen. L. Ch 93A § 1(a).

376.   Snowflake engaged in "trade" and "commerce" as defined by MGL Chapter 93A because in the course of selling its data cloud services, it hosts the Personal Information of Massachusetts residents on its Data Cloud, including Plaintiff O'Hara and Massachusetts Snowflake Subclass Members. Mass. Gen. L. Ch. 93A § 1(b).

377.   Snowflake engaged in unfair trade practices prohibited by MGL Chapter 93A. Mass. Gen. L. Ch. 93A § 2(a), and regulations promulgated thereunder, including but not limited to 201 CMR 17.00.

378.   Snowflake makes certain representations concerning data security to its customers—here, the Spoke Defendants.

379.   Snowflake's website has a number of cybersecurity representations from its executives and from the company. For example:

> "Since our founding in 2012, the security of our customers' data has been our highest priority. This unwavering commitment is why we're continuously strengthening our industry-leading, built-in security policies to deliver a trusted experience for our customers. To foster ongoing transparency, we will regularly update this page with the latest security information." - Brad Jones, CISO, VP of Information Security

> "Snowflake provides industry-leading features that ensure the highest levels of security for your account and users, as well as all the data you store in Snowflake."

380.   Based upon these representations, the Spoke Defendants made promises to Plaintiffs and class members about the security of their data; the promises which Snowflake made to its customers became part of the bargain that Spoke Defendants made to Plaintiffs and class members. At the core of those promises was data security: one of the primary purposes of Snowflake's business. And if Snowflake could not ensure security, then the Spoke Defendants could not ensure security.

381.   Snowflake engaged in unfair trade practices when it failed to maintain reasonable data security practices to safeguard the Personal Information of Plaintiff O'Hara and Massachusetts Snowflake Subclass Members, including: (a) failing to

implement industry standard data security safeguards to protect the Personal Information of Plaintiff O'Hara and Massachusetts Snowflake Subclass Members relating to MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor Snowflake's security systems to ensure that Personal Information was adequately secured and protected; and (c) failing to implement intrusion detection systems and notifying customers of suspicious intrusions.

382.    Snowflake's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

383.    Plaintiff and Snowflake Class members have suffered injury as a result of Snowflake's unfair trade practices, as described herein. For purposes of this cause of action, Plaintiff O'Hara and the Massachusetts Snowflake Subclass Members' injuries were felt within the Commonwealth of Massachusetts.

384.    Notice related to Plaintiff O'Hara and the Massachusetts Snowflake Subclass Members' intention to bring claims pursuant to the MGL was sent to Snowflake on December 27, 2024. Despite receipt of the letter, Snowflake has refused to cure its violations as demanded by Plaintiff O'Hara and the Massachusetts Snowflake Subclass' Members.

385.    As a direct and proximate result of Snowflake's unfair trade practices, as described herein, Plaintiff O'Hara and Massachusetts Snowflake Subclass Members are entitled to injunctive relief, damages, including actual damages in an

amount to be proven at trial or statutory damages of $25, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees. Mass. Gen. L. Ch. 93A § 9(3).

## FIFTH CLAIM FOR RELIEF
### Invasion of Privacy (Public Disclosure of Private Facts)
*On behalf of the AT&T Plaintiffs and the Nationwide AT&T Class (defined infra)*

386.   The AT&T Plaintiffs ("Plaintiffs" for purposes of this Claim) repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One, Part Two, and Part Six, as set forth fully herein.

387.   The Plaintiffs' Personal Information described in Part One, Section III, and Part Six, Section III-IV, are of a private, secluded, and highly personal nature, the disclosure of which would be highly offensive to a reasonable person and is not a matter of legitimate public concern.

388.   Snowflake, in failing to implement reasonable cyber security policies and practices, disclosed Plaintiffs' Personal Information to cybercriminals and nefarious third parties, who in turn further disclosed Plaintiffs' Personal Information on the dark web by advertising and selling the stolen Personal Information. These disclosures gave publicity to Plaintiffs' Personal Information.

389.   Snowflake's actions were egregious. Snowflake failed to take actions to protect and secure sensitive information, despite touting its capabilities in cybersecurity and the importance of MFA. In *not* enacting MFA, Snowflake was

145

reckless, and the results were foreseeable. Snowflake intended that necessary security features were not enacted.

390.  Snowflake's actions, as described herein, were a significant cause of the release and disclosure of Plaintiffs' and class members' Personal Information.

391.  Snowflake had no legitimate basis to disclose Plaintiffs' Personal Information to cybercriminals or nefarious third parties.

392.  Plaintiffs' and class members' Personal Information is intended to be private. The disclosure of the type of information which Spoke Defendants stored with Snowflake would enable fraud, identity theft, or other types of misuse, and— therefore—the data has significant, marketable value. Part of the data's marketable value is derived from the fact that the data is kept private and, to the extent any of it is publicly available, it is not assembled, fully, in one place, which would make it relatively easy for cybercriminals to exploit and misuse. The disclosure of the Personal Information caused significant harm to Plaintiffs and class members due to the data's value, as well as the data's disclosure in one location.

393.  It was entirely foreseeable that this information would be disclosed to nefarious third parties if reasonable cybersecurity measures were not taken. The failure to implement MFA, along with the other cybersecurity failings as described herein, has resulted in data breaches in the past, and not implementing reasonable

146

cybersecurity measures meant that it was foreseeable that highly personal and sensitive information would be exposed in a data breach.

394.  Snowflake was reckless in failing to implement reasonable cybersecurity measures.

395.  Plaintiffs have suffered injury as a result of Snowflake's public disclosure of their private facts, as described herein.

396.  Plaintiffs seek all monetary and non-monetary relief allowed by law, including actual, nominal, or general damages; declaratory and injunctive relief, including an injunction barring Snowflake from disclosing their Personal Information without their consent; and any other relief that is just and proper.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PART THREE: TICKETMASTER AND LIVE NATION

398.   Plaintiffs Eric Anderson, Charles Fitzgerald, Susie Garcia-Nixon, Valerie Lozoya, LaVonne Madden, Jolinda Murphy, Lauren Neve, Molly O'Hara, Dekima Thomas, and Christina Xian (collectively, the "Ticketmaster Plaintiffs") are named in this Representative Complaint to pursue claims against Ticketmaster.[159]

## I.   Ticketmaster's business and data security promises.

399.   Consumers are largely unable to purchase concert tickets or enjoy concerts without working through Live Nation, and its wholly owned subsidiary Ticketmaster.

400.   Live Nation and Ticketmaster control approximately 70% of the American market for live event ticketing, selling hundreds of millions of tickets per year.[160] Live Nation reported a quarterly revenue of $7.7 billion in November 2024.[161] Live Nation considers itself the world's leading live entertainment

---

[159]   Ticketmaster and Live Nation are collectively referred to herein, except as expressly delineated, as "Ticketmaster" or the "Ticketmaster Defendants."

[160]   Daniel Allen, *Does Live Nation Own Ticketmaster? The Complete Story Behind Entertainment's Biggest Merger*, The Ticket Lover (Oct. 28, 2024), https://theticketlover.com/does-live-nation-own-ticketmaster/).

[161]   Live Nation, *LIVE NATION ENTERTAINMENT REPORTS THIRD QUARTER 2024 RESULTS* (Nov. 11, 2024), https://www.livenationentertainment.com/2024/11/live-nation-entertainment-reports-third-quarter-2024-results/.

ticketing sales and marketing company based on the number of tickets sold. In 2023, Ticketmaster distributed over 620 million tickets through www.ticketmaster.com, www.livenation.com, the companies' mobile apps, and other websites and retail outlets. The same year, Live Nation connected over 765 million individuals to live events.[162] Live Nation and Ticketmaster are highly integrated with respect to collecting customer Personal Information, sharing customer Personal Information, and developing and implementing privacy policies. To provide several examples, near the time of the Data Breach:

- When a consumer purchases tickets through Live Nation, they are often informed the purchase is "powered by Ticketmaster" or redirected to a Ticketmaster purchasing portal.

- Live Nation and Ticketmaster maintain similar privacy policies that list the following identical Live Nation point of contact for consumers with privacy inquiries: Attention: Privacy Officer, Legal, Live Nation Entertainment, Inc., 9348 Civic Center Drive, Beverly Hills, CA 90210.[163]

---

[162]    Live Nation, 2024 Annual Report (Form 10-K) at 2 (Feb. 22, 2024), https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-24-000017/0001335258-24-000017.pdf.

[163]    *Compare* Live Nation Entertainment, *Privacy Policy* ("Live Nation, *Privacy Policy*"), https://web.archive.org/web/20240222185813/https://help.livenation.com/hc/en-us/articles/10464047306641-Live-Nation-Entertainment-Privacy-Policy (archived Feb. 22, 2024), *with* Ticketmaster, *PRIVACY POLICY* ("Ticketmaster, *Privacy Policy*")*, Contact Us*, https://web.archive.org/web/20240226041015/https://privacy.ticketmaster.com/privacy-policy#contact-us (archived Feb. 26, 2024).

149

- Live Nation's Privacy Policy discloses: "We will share information within the Live Nation family of companies. This may include Ticketmaster and Live Nation-owned or operated venues, for example."[164]

- Ticketmaster's Privacy Policy likewise discloses that customer data will be shared "[w]ithin the Ticketmaster group" and directs consumers to write to Live Nation's corporate address with privacy inquiries.[165]

401. Ticketmaster requires consumers who purchase tickets on their platform to provide their Personal Information to Ticketmaster, both to facilitate the ticket sales and for Ticketmaster's own business purposes. Ticketmaster promises to keep consumers' Personal Information secure, charges consumers a substantial fee for a "safe and secure transaction," and does not allow consumers to opt out of sharing their Personal Information.

402. Ticketmaster made express commitments to protecting consumer Personal Information in its Privacy Policy, assuring consumers in a caption titled, *Looking After Your Information*, "We have security measures in place to protect your information."[166]

---

[164] Live Nation, *Privacy Policy*, *supra* n. 164.

[165] Ticketmaster, *Privacy Policy*, *supra* n. 164.

[166] Ticketmaster, *Privacy Policy*, *supra* n. 164.

403.    Ticketmaster publicly represented that data security forms a crucial aspect of its business model. For instance, on a segment of Ticketmaster LLC's website, the company stated:

> "Our goal is to maintain your trust and confidence by handling your personal information with respect and putting you in control."[167]

> "As a global company, our fans are located all over the world, depending on your market there are specific laws and regulations around privacy rights such as the GDPR in Europe, LGPD in Brazil and CCPA in United States."[168]

> "We have security measures in place to protect your information."[169]

404.    Live Nation also maintained a privacy policy section, affirming its adherence to various state and federal laws.[170]

405.    Ticketmaster's Privacy Policy includes specific commitments relating to "Data Transfers," which provides as follows[171]:

> When transferring information, there are strict rules in place to ensure your data is still protected to the highest standard. Where we do this, we will ensure that appropriate safeguards are put in place. Where your information is transferred outside of your local market, we use contractual measures and internal mechanisms requiring the recipient to comply with the privacy standards of the exporter[.]

---

[167]    Ticketmaster, *Privacy* Policy, *supra* n. 164.

[168]     Ticketmaster, *Privacy* Policy, *supra* n. 164.

[169]    *Id.*

[170]    Live Nation, *Privacy* Policy, *supra* n. 164.

[171]    *Id.*

406.    Ticketmaster maintains a website captioned, *Our Commitments*, which make the following representations concerning privacy (the "Privacy Commitments")[172]:

- **Fair & Lawful**. We comply with all applicable data protection laws and listen to your expectations when it comes to how your information is handled.

- **Security & Confidentiality.** The security of our fans' information is a priority for us. We take all necessary security measures to protect personal information that's shared and stored with us.

- **Third Parties & Partners.** We work with our partners to put on amazing live events and provide additional services that we think you'll love. We always ask them to maintain the same standards of privacy.

- **Privacy By Design.** We embed privacy in the development of our products and services to ensure that we always respect your personal information.

- **Storage & Retention**. We store and use your data only as long as we need to, from complying with our legal obligations to making sure you know when your favorite artist is on tour.

407.    Ticketmaster represented on a separate FAQ website that it complies with the PCI DSS and that it "take[s] compliance very seriously."[173]

---

[172]    Ticketmaster, *Our Commitments,* https://web.archive.org/web/20230517182539/https://privacy.ticketmaster.com/our-commitments (archived May 17, 2023) ("Privacy Commitments").

[173]    Ticketmaster Business, *Define the Future of Live with Us,* https://web.archive.org/web/20240319080146/https://business.ticketmaster.com/web/20240319080146/https://business.ticketmaster.com/web/20240319080146/https://business.ticketmaster.com/ (archived Mar. 19, 2024).

408.   Ticketmaster relies on multiple third-party service providers to carry out key business functions including payment processing, marketing, customer service, and data storage.[174]

409.   At the same time, Ticketmaster states that it is "committed to being the safest, most reliable ticket marketplace in the world."[175]   Ticketmaster recommended to consumers that they could take several steps to secure their online accounts:

- "Make sure you're using a strong password for your account. Your password should be unique to your Ticketmaster account, and therefore not used for any other accounts (banking, retail sites, email, etc). You can easily reset your password if you need to."[176]

- "Another good way to protect your tickets is to make sure the phone number associated with your Ticketmaster account is up to date. For extra security during a ticket purchase, you may also be asked to authenticate your account by inputting a code sent to your phone number."[177]

- "Just like you want to make sure your Ticketmaster password is unique, you should do the same for your personal email. Make

---

[174]    Ticketmaster, *Privacy Policy: Who We Share Your Data With & Why*, https://web.archive.org/web/20240219050226/https://privacy.ticketmaster.com/privacy-policy#who-we-share-your-data-with-&-why (archived Feb. 19, 2024).

[175]    Ticketmaster, *How to Secure Your Account and Protect Your Tickets* (Apr. 12, 2024), https://web.archive.org/web/20240426053554/https://blog.ticketmaster.com/account-security-tips-password-protect-tickets/.

[176]    *Id.*

[177]    *Id.* In other words, Ticketmaster suggested to consumers that they could keep their account safe by enabling MFA.

sure you're using a strong, unique password there, too. If your email gets hacked, which unfortunately does happen, it could allow bad actors to use it to try to gain access to your Ticketmaster account."[178]

- But be aware of scammers sharing fake information about Ticketmaster, including fake customer service phone numbers that appear in search engines.[179]

410. While Ticketmaster told consumers that *they* should take multiple steps to keep their Personal Information secure, because Ticketmaster used third-party service providers to maintain Personal Information (and to employ the same data privacy standards as those employed by Ticketmaster),[180] Ticketmaster's customers actually had no way to keep their information safe—even following the steps above—if Ticketmaster and its service providers were not taking the most basic steps to secure consumer information.

411. Ticketmaster is a Snowflake customer. Ticketmaster stores the Personal Information of its consumers on Snowflake's Data Cloud services, which include customers' names, addresses, contact information (email and phone numbers), and payment card information. Ticketmaster has represented that

---

[178]    *Id.*

[179]    *Id.* In other words, Ticketmaster warned consumers that they could fall prey to phishing schemes.

[180]    Ticketmaster, *Our Commitments*, https://web.archive.org/web/20230517182539/https://privacy.ticketmaster.com/our-commitments (archived May 17, 2023).

passport numbers may have been impacted for some individuals, and public reports suggest that transaction information and details were among the information involved in the Data Breach.

412. Ticketmaster did not employ rudimentary security measures that were available to it through Snowflake, including implementing a policy mandating that its users employ MFA on their accounts.

## II. Ticketmaster employs its significant market power to deprive consumers of meaningful choice.

413. Because Ticketmaster and Live Nation control a significant portion of the market, consumers have no choice but to use their services to buy live music tickets.

414. Accordingly, consumers have no choice about which company to provide their Personal Information to, nor do they have any ability to negotiate the terms and conditions which govern their relationship with Ticketmaster.

415. Without actual competition in the marketplace, consumers are left with "take-it-or-leave-it" policies concerning data protection and even dispute resolution.

416. In maintaining its monopoly power, Ticketmaster provides consumers with no real, meaningful choice to determine how to dispute the claims they have against Ticketmaster.

417.   If Ticketmaster required all of the individuals who were impacted by the Data Breach to resolve their claims individually, that process would take a significant amount of time—with many claims taking years to commence before a dispute resolution forum. The inability for consumers to have their claims determined for many years deprives consumers of due process.

418.   Ticketmaster's terms and conditions contain a number of unfair provisions related to dispute resolution.

419.   First, Ticketmaster's customer agreements provided that it could change terms and conditions online, with changes taking effect immediately upon posting when the customer next visits the website, without adequate notice.

420.   Second, Ticketmaster's customer agreement was changed to provide that a term concerning dispute resolution applied retroactively to past disputes.

421.   Third, Ticketmaster's terms are excessively one-sided, allowing exceptions for litigation on intellectual property disputes and limits on liability and indemnity clauses—provisions which only benefitted Ticketmaster. Beyond that, Ticketmaster's terms provided the ability to appeal decisions by an arbitrator in court only in ways that benefitted Ticketmaster.

422.   Fourth, although Ticketmaster's prior arbitration agreement ("JAMS agreement") designates JAMS, an established arbitration forum, as the dispute resolution forum, the new agreement ("New Era agreement"), which is Section 17

156

of Ticketmaster's Terms of Use, designates New Era ADR as the dispute resolution forum.[181] New Era ADR was launched in April 2021 with the mission of "helping businesses settle legal disputes" by creating rules that "make[] sense for businesses" and that also benefit "law firms, who are able to provide an improved client experience" to businesses "and handle a higher volume of cases" that are filed by consumers.[182] New Era ADR advertises having launched "with around 10 clients," i.e., businesses, who have designated New Era ADR as the forum "in nearly 700 contracts," which New Era ADR expected "will provide a pipeline of potential clients," i.e., additional businesses, "down the road."[183] New Era ADR adopted unconscionable and unenforceable rules concerning the ability to participate in arbitration, such as lack of or limited discovery, procedural limitations, the one-sided selection of arbitrators, and a limited right to appeal.

423.    Ticketmaster's market power prevented consumers from making a meaningful choice in purchasing concert tickets, providing Personal Information to companies, or engaging in dispute-resolution procedures.

---

[181]    Ticketmaster, *Terms of Use*, https://help.ticketmaster.com/hc/en-us/articles/10468830739345-Terms-of-Use (last updated July 2, 2021).

[182]    Jim Dallke*, This startup is helping businesses settle legal disputes completely online*, Chicago Inno (May 3, 2021), https://www.bizjournals.com/chicago/inno/stories/profiles/2021/05/03/onlinearbitration-mediation-startup-new-era-adr.html (last visited November 1, 2024).

[183]    *Id.*

424.    In *Heckman v. Live Nation Entertainment, Inc.,* 120 F.4th 670 (9th Cir. 2024), the U.S. Court of Appeals for the Ninth Circuit affirmed the district court's ruling that the arbitration agreement in Ticketmaster's Terms of Use was void for being unconscionable. The Ninth Circuit held that New Era ADR's arbitration rules made it "impossible for plaintiffs to present claims on equal footing to Live Nation."

425.    The Terms of Use are substantively unconscionable for all the same reasons explained in *Heckman* and are procedurally unconscionable because of the coercive tactics used to force consumers to accept Ticketmaster's contract of adhesion.

## III.    Ticketmaster makes billions of dollars every year off of junk fees.

426.    Live Nation brags that its Ticketmaster business "finish[ed] the year with a record Q4," bringing in "full year revenue of $3 billion."[184] The Ticketmaster revenue from ticket sales represents 13% of Live Nation's total revenues from 2024, which, as Live Nation explains, "excludes the face value of tickets sold and is net of the fees paid to our ticketing clients."[185]

---

[184]    *Live Nation Entertainment Reports Full Year and Fourth Quarter 2024 Results*, Live Nation (Feb. 20, 2025), https://www.livenationentertainment.com/2025/02/live-nation-entertainment-reports-full-year-and-fourth-quarter-2024-results/.

[185]    Live Nation Entertainment, Inc., Annual Report (Form 10-K) (Feb. 20, 2025) ("Live Nation 2024 10-K"), https://www.sec.gov/Archives/edgar/data/1335258/000133525825000028/lyv-20241231.htm.

427.    Through the ticketing process, Ticketmaster sold "approximately 331 million tickets in 2024 on which we were paid fees for our services. In addition, approximately 307 million tickets were sold, for which we did not receive a fee, using our Ticketmaster systems, including season seat packages, our venue clients' box offices, and other channels."[186] Accordingly, Ticketmaster is able to identify which specific ticket sales included service fees, and which did not.

428.    Ticketmaster's fees vary widely depending on the event. On average, Ticketmaster fees can add approximately 28% to the face value of a ticket.[187] For example, two tickets priced at $100 each could end up costing around $256 after fees. Ticketmaster explains that its substantial fee "covers the costs of the technology, people, and resources needed to provide a safe and secure ticket-buying experience."[188]

---

[186]    *Id.*

[187]    Question of the Day, Next Gen Personal Finance (Oct. 27, 2024), https://www.ngpf.org/blog/question-of-the-day/question-of-the-day-what-percent-of-the-total-price-paid-for-concert-tickets-on-ticketmaster-is-made-up-of-fees/?utm_source.

[188]    *Buy Tickets*, Ticketmaster, https://help.ticketmaster.com/hc/en-us/articles/9663528775313-How-are-ticket-prices-and-fees-determined (last accessed May 8, 2025).

429.    Ticketmaster has a dedicated website which explains to consumers how "ticket prices and fees [are] determined."[189] Ticketmaster explains that a "service fee is charged once per ticket" and that Ticketmaster's portion of the ticket covers technology.[190] Specifically:

> As a ticketing vendor selected by the venue, Ticketmaster's portion covers the costs of the technology, people, and resources needed to provide a safe and secure ticket-buying experience.[191]

430.    Despite charging fees to cover "the costs of the technology, people, and resources needed to provide a safe and secure ticket-buying experience," Ticketmaster did not provide those services. Instead, Ticketmaster decided on a cut-rate security without MFA to store Plaintiffs' and Class members' sensitive Personal Information on Snowflake's system, and further—as explained below—did not encrypt the sensitive information so that, if it were accessed by unauthorized parties, it could not be used.

431.    Based upon information and belief, and to be confirmed by discovery, Ticketmaster charged fees in excess of what would be required "to provide a safe

---

[189]    *Buy Tickets*, Ticketmaster, https://help.ticketmaster.com/hc/en-us/articles/9663528775313-How-are-ticket-prices-and-fees-determined (last accessed May 8, 2025).

[190]    *Id.*

[191]    *Id.*

and secure ticket-buying experience" and otherwise failed to provide Plaintiffs and Class members with services that they paid for through the transaction fees.

432.   Had Plaintiffs and Class members known that Ticketmaster would release their Personal Information or otherwise fail to provide a safe and secure ticket-buying experience and safeguard their Personal Information, Plaintiffs and Class members would have sought to purchase tickets elsewhere or otherwise avoided purchasing tickets altogether.

## IV.   Ticketmaster owed a duty of care to Plaintiffs and Class Members.

433.   Because Ticketmaster deprived Plaintiffs of meaningful choice in the selection of a ticket provider, and also charged Plaintiffs fees "to provide a safe and secure ticket-buying experience," then at the very least it could have protected Personal Information to ensure that the data was not misused. Instead, Ticketmaster did not even employ the bare minimum of security measures on its Snowflake accounts.

434.   As a condition of purchasing a ticket from Ticketmaster, consumers, including the Ticketmaster Plaintiffs, provide their Personal Information to Ticketmaster, including their names, contact information, and payment card information such as payment card number and expiration date. As part of the transaction, Ticketmaster also collected transaction information from Plaintiffs,

including information related to the ticket sales, event information, and order details.

435.    Ticketmaster, in collecting such sensitive Personal Information from consumers, owed a duty of care to consumers, including the Ticketmaster Plaintiffs, to exercise reasonable care in maintaining, protecting, and securing their Personal Information.

436.    Ticketmaster also charges fees to consumers for the purpose of paying for security systems to keep their information safe.

437.    Ticketmaster, by mandating the receipt of sensitive Personal Information from consumers as a condition of purchase, implied its assent to consumers to protect their Personal Information. Consumers expected Ticketmaster to protect their Personal Information when they provided it as a condition of purchase.

438.    Ticketmaster owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in Snowflake's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

439.   Ticketmaster owed a common law duty to Plaintiffs and Class Members to supervise Snowflake in the collection, storage, and security of Plaintiffs' and Class Members' Personal Information.

440.   Ticketmaster further owed Plaintiffs and Class Members a duty of care to employ reasonable security safeguards to ensure that information is protected in the event of a data security incident—including, for example, encrypting sensitive information.

441.   Ticketmaster's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms, as described herein.

442.   Ticketmaster owed a statutorily imposed duty to Plaintiffs and Class Members to refrain from unfair and deceptive practices.

443.   Ticketmaster and Live Nation understood that they owed a duty of care to Plaintiffs and Class Members to keep their information safe and secure; they acknowledged that data breaches could cause substantial harm to individuals, and were foreseeable. This duty extended to Ticketmaster's oversight of any third-parties or vendors in which it entrusted its customers' Personal Information. On

February 22, 2024, Live Nation, in its SEC Annual Report, explicitly identified data security as a risk facing the business, and stated as follows[192]:

> Due to the nature of our business, we process, store, use, transfer and disclose certain personal or sensitive information about our customers and employees. Penetration of our network or other misappropriation or misuse of personal or sensitive information and data, including credit card information and other personally identifiable information, could cause interruptions in our operations and subject us to increased costs, litigation, inquiries and actions from governmental authorities, and financial or other liabilities. In addition, security breaches, incidents or the inability to protect information could lead to increased incidents of ticketing fraud and counterfeit tickets.
>
> . . . .
>
> We also face risks associated with security breaches and incidents affecting third parties with which we are affiliated or with which we otherwise conduct business. In particular, hardware, software or applications we develop or procure from third parties may contain, and have contained, defects in design or manufacture and/or may pose a security risk that could unexpectedly compromise information security, but none of which have been material to date.

444. Consumers, including the Ticketmaster Plaintiffs, relied upon or would be reasonable in relying upon Ticketmaster's express and implied commitments to protect the privacy of their Personal Information when they decided to utilize Ticketmaster's services.

---

[192]     Live Nation, 2024 Annual Report (Form 10-K) at 17-18 (Feb. 22, 2024), https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-24-000017/0001335258-24-000017.pdf.

445.   In paying service fees for Ticketmaster services, Plaintiffs entered into an agreement whereby Ticketmaster would keep their information safe and secure.

446.   Ticketmaster knew or should have known of the importance of oversight related to third-party providers. In 2018, Ticketmaster announced a data breach incident of a provider of AI-powered live chat widgets, which Ticketmaster was deploying on localized sites across the world.[193] That data breach also involved stolen payment card information and resulted from Ticketmaster's failure to comply with basic standards, including PCI-DSS.[194] This Data Breach was thus foreseeable because Ticketmaster dealt with a data breach involving a third-party provider in the past which did or reasonably should have put Ticketmaster on notice of its duty in reasonably selecting and overseeing third-party vendors it entrusted with customers' Personal Information.

---

[193]    Catalin Cimpanu, *Ticketmaster Announces Data Breach Affecting 5% of All Users*, BleepingComputer (June 17, 2018), https://www.bleepingcomputer.com/news/security/ticketmaster-announces-data-breach-affecting-5-percent-of-all-users/.

[194]    *See* [United Kingdom] Information Commissioner's Office, Penalty Notice Section 155, Data protection Act 2018, Case Reference: COM0759008; Organisation name and address: Ticketmaster UK Limited, 30 St. John Street, London, EC1M 4-AY (13 Nov. 2020), pp. 24-27, available at https://web.archive.org/web/20211114024955/https://ico.org.uk/media/action-weve-taken/mpns/2618599/ticketmaster-uk-limited-mpn.pdf.

## V. The Ticketmaster Defendants breached their duty to protect Personal Information and engaged in unfair trade practices.

447. Despite Ticketmaster's explicit assurances that it would employ reasonable measures to safeguard its customers' sensitive Personal Information, and only share that information with expressly authorized individuals, an "unauthorized" person or persons accessed Ticketmaster's network servers and reportedly stole the Personal Information they found.

448. Live Nation played a primary role investigating the Data Breach, disclosing in a Form 8-K filing to the U.S. Securities and Exchange Commission filed on May 31, 2024:

> On May 20, 2024, Live Nation Entertainment, Inc. (the "Company" or "we") identified unauthorized activity within a third-party cloud database environment containing Company data (primarily from its Ticketmaster L.L.C. subsidiary) and launched an investigation with industry-leading forensic investigators to understand what happened. On May 27, 2024, a criminal threat actor offered what it alleged to be Company user data for sale via the dark web. We are working to mitigate risk to our users and the Company, and have notified and are cooperating with law enforcement. As appropriate, we are also notifying regulatory authorities and users with respect to unauthorized access to personal information."[195]

---

[195] Live Nation Entertainment, Inc., Current Report (Form 8-K) (May 20, 2024), https://www.sec.gov/Archives/edgar/data/ 1335258/000133525824000081/lyv-20240520.htm.

449.   Several months after the breach, on July 8, 2024, Ticketmaster disclosed the Data Breach to consumers in a notice (the "Ticketmaster Notice"), which the Ticketmaster Plaintiffs received.[196]

450.   In the Ticketmaster Notice, Ticketmaster represented the Data Breach occurred between April 2, 2024, and May 18, 2024, and that Ticketmaster had determined Personal Information was affected on May 23, 2024.

451.   In Ticketmaster's public statements concerning the Data Breach, it represented to consumers that the following information was exposed:

> The database contained limited personal information of some customers who bought tickets to events in North America (U.S., Canada and/or Mexico).
>
> This may include email, phone number, **encrypted credit card information as well as some other personal information provided to us**.[197]

452.   In the Ticketmaster Notice, Ticketmaster also recommended that recipients, including the Ticketmaster Plaintiffs, "take steps to protect against identity theft and fraud," offered 1 year of free credit monitoring services, and made numerous additional recommendations to guard against identity fraud including:

---

[196]   Ticketmaster Notice of Data Breach, *available at* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/0d26b6dd-b466-4f2a-bec0-ec2ad0738583.html (last visited May 13, 2025).

[197]   Ticketmaster Data Security Incident, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident (last visited May 8, 2025) (emphasis added).

[W]e recommend you remain vigilant and take steps to protect against identity theft and fraud, including monitoring your accounts, account statements, and free credit reports for signs of suspicious activity. To further protect your identity and as a precaution, we are also offering you identity monitoring with TransUnion at no cost to you. Identity monitoring will look out for your personal data on the dark web and provide you with alerts for 1 year from the date of enrollment if your personally identifiable information is found online. . . .

We recommend that you regularly review statements from your accounts and periodically obtain your credit report from one or more of the national credit reporting companies. . . .

You should remain vigilant for incidents of fraud or identity theft by reviewing account statements and monitoring free credit reports. When you receive your credit reports, review them carefully. Look for accounts or creditor inquiries that you did not initiate or do not recognize. Look for information, such as home address and Social Security number, that is not accurate. If you see anything you do not understand, call the credit reporting agency at the telephone number on the report. You should also call your local police department and file a report of identity theft. Finally, you should make sure to keep a copy of the police report in case you need to provide it to creditors or credit reporting agencies when accessing or disputing inaccurate information. . . .

You have the right to put a security freeze, also known as a credit freeze, on your credit file, so that no new credit can be opened in your name without the use of a Personal Identification Number (PIN) that is issued to you when you initiate a freeze.[198]

453.  In the Ticketmaster Notice, Ticketmaster provided the following instructions to Plaintiffs on what they can do in response to the Data Breach:

---

[198]    Ticketmaster Notice of Data Breach, *available at* https://www.maine.gov/ agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/0d26b6dd-b466-4f2a-bec0-ec2ad0738583.html (last visited May 13, 2025).

As described in the enclosed document titled "Additional Resources,'' we recommend you remain vigilant and take steps to protect against identity theft and fraud, including monitoring your accounts, account statements, and free credit reports for signs of suspicious activity. To further protect your identity and as a precaution, we are also providing you with access to Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score services at no charge. These services provide you with alerts for twelve (12) months from the date of enrollment when changes occur to your credit file. This notification is sent to you the same day that the change or update takes place with the bureau. Finally, we are providing you with proactive fraud assistance to help with any questions that you might have or in event that you become a victim of fraud. These services will be provided by Cyberscout, a TransUnion company specializing in fraud assistance and remediation services.[199]

454. The Ticketmaster Notice included an "Additional Resources" document, which provided the following information for Plaintiffs to monitor their accounts:

We recommend that you regularly review statements from your accounts and periodically obtain your credit report from one or more of the national credit reporting companies. You may obtain a free copy of your credit report online at www.annualcreditreport.com, by calling toll-free 1-877-322-8228, or by mailing an Annual Credit Report Request Form (available at wvw.annualcreditreport.com) to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281. You may also purchase a copy of your credit report for a fee by contacting one or more of the three national credit reporting agencies (see the "Important Contacts" section for contact details).

You should remain vigilant for incidents of fraud or identity theft by reviewing account statements and monitoring free credit reports. When you receive your credit reports, review them carefully. Look for accounts or creditor inquiries that you did not initiate or do not recognize. Look for information, such as home address and Social

---

[199]    *Id.*

Security number, that is not accurate. If you see anything you do not understand, call the credit reporting agency at the telephone number on the report. You should also call your local police department and file a report of identity theft. Finally, you should make sure to keep a copy of the police report in case you need to provide it to creditors or credit reporting agencies when accessing or disputing inaccurate information.[200]

455. However, Ticketmaster was vague as to the types of Personal Information compromised in the Data Breach and the number of affected consumers. The "Ticketmaster Data Security Incident" webpage describing the breach disclosed that it discovered "unauthorized activity on an isolated cloud database hosted by a third-party data services provider" and that the "database contained limited personal information of some customers who bought tickets to events in North America . . . . [which] may include email, phone number, encrypted credit card information as well as some other personal information provided to us."[201] Neither the Ticketmaster Notice nor Ticketmaster Data Security Incident webpage included any additional detail on the types of credit card information taken, nor did they include detail as to the number of total affected customers. And the Ticketmaster Notice was untimely, coming several months after the Breach itself.

---

[200] *Id.*

[201] Ticketmaster, *Ticketmaster Data Security Incident*, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident (last visited Jan. 10, 2025).

456.    At the time of the Data Breach, Ticketmaster failed to maintain reasonable data security measures and comply with FTC guidance, the PCI DSS, and other relevant industry standards summarized above. These data security failings included:

- Ticketmaster did not enforce MFA for its Snowflake accounts. Indeed, Ticketmaster chose to use Snowflake to store the Personal Information of millions of its customers despite knowing that Snowflake did not allow customers to enforce MFA.

- Ticketmaster did not rotate or disable the credentials of old Snowflake accounts.

- Ticketmaster did not implement network allow lists that restricted Snowflake account access to certain locations or trusted users.

457.    Beyond the above, it is also likely that Ticketmaster did not actually encrypt the payment card information or other personal information (like some passport information) that it claims was exposed in the Data Breach. As Ticketmaster informed the Iowa Office of the Attorney General:

> Ticketmaster continues to investigate but anticipates that depending on the individual, the information subject to unauthorized access may include names and contact information. ***Payment card information such as hashed and/or masked card numbers***, the terminal digits of card numbers, card type and, in some cases, expiration date may also have been impacted. Additionally, passport numbers may have been impacted for a limited number of individuals. Ticketmaster's

investigation is ongoing and it is not yet clear the extent to which there is actual risk of harm to individuals.[202]

458.  Hashed information is not the same as encrypted information. Hash functions are designed to ensure the integrity and authenticity of data. A valid hash has two criteria: (a) it should not be reversible (meaning the hash only works in one direction); and (b) it should be unique and computationally infeasible to generate the same has output from two different inputs.

459.  Hashing is used to validate the uniqueness and integrity of data, whereas encrypting data is done to keep it confidential and secure, accessible only to people with the encryption key.

460.  Hashing instead of encrypting payment card information is riskier because hashing is susceptible to attacks if a cybercriminal knows that his or her credit card number is within the data set. Given the sheer amount of data exposed in the Data Breach, it would not be difficult for a carder to find a hash match in the stolen data, uncovering the payment card information for millions of individuals. Payment card information exposed in Data Breaches like this one, even if hashed,

---

[202]    Letter to Attorney General Brenna Bird, Iowa Office of the Attorney General (June 26, 2024), https://www.iowaattorneygeneral.gov/media/cms/6262024_Ticketmaster_LLC_A 91448C1685FD.pdf (emphasis added).

is thus susceptible to attacks and even "carding," where card numbers are authenticated *en masse* to perpetrate wide-spread fraud.[203]

461. Numerous entities note that the storing of credit cards by hashing is unsecure. As Integrigy reveals:

> The bottom-line is that storing of credit card numbers by simply hashing only the card number is unacceptable and can be easily compromised by brute force methods. An attacker who is able to compromise the application or database can obtain many card numbers in a trivial amount of time –
>
> - If only the hashed card number is available, it is actually practical to obtain all 14 and 15 digital card number hashes in less than thirteen days.
> - If only the hashed card number is stored, an attacker can potentially obtain 30-70% of all card numbers within a matter of hours by intelligently focusing on the most popular card brands and issuing banks.
> - If the Prefix 6 + Last 4 digits are known, all card numbers can be obtained in less than 2 hours.[204]

462. Ticketmaster failed to take actions to protect customer data despite its parent company, Live Nation, explicitly reporting that it faced data security risks just two months prior.

---

[203]    *Carding: what it is and how to prevent it*, Human, https://www.humansecurity.com/learn/topics/what-is-carding/ (last accessed May 8, 2025).

[204]    Hashing Credit Card Numbers: Unsafe Application Practices, Integrigy (Mar. 1, 2025), https://www.integrigy.com/hashing-credit-card-numbers-unsafe-application-practices.

463.   Ticketmaster further failed to properly investigate, retain, oversee and audit a competent cloud-based data storage provider, because Snowflake similarly had numerous data security failings, as described herein.

464.   Ticketmaster's data security failings enabled the Data Breach. Without these basic protections, UNC5537 was able to exfiltrate the Personal Information of millions of Ticketmaster consumers with nothing more than stolen Ticketmaster Snowflake credentials obtained through malware campaigns—and traffic the data to other cybercriminals.

465.   Ticketmaster's failings were particularly egregious given the enormous amount of Personal Information it stored on Snowflake's servers. Tasked with handling the data of hundreds of millions of consumers, Ticketmaster's failure to implement basic data security measures is all the more inexplicable and reckless.

466.   Indeed, each of these basic protections could have prevented the Data Breach. For example:

- Had Ticketmaster implemented MFA, UNC5537 would not have been able to access Ticketmaster's data with just stolen credentials. MFA would have required an additional layer of authentication (i.e., a code sent via text message or email) that UNC5537 would not have had access to.

- Ticketmaster could have also prevented the Data Breach by maintaining a policy of rotating or disabling credentials that were either old or compromised in other data breaches. As the Mandiant Report found that a "majority of the credentials used by UNC5537" were available from historic malware campaigns dating back to 2020, a policy that disabled previously-

compromised credentials could have prevented the Data Breach.[205]

- Ticketmaster could have also prevented the Data Breach by maintaining stricter network allow lists that restricted access to customer Personal Information to certain locations or trusted user accounts that were not previously compromised.

467. In addition, Ticketmaster shirked the FTC Response Guidance by failing to give affected consumers sufficient information regarding the scale of the attack and the types of information taken in the Ticketmaster Notice.[206]

468. This failure is particularly egregious and misleading because Ticketmaster incorrectly informed customers that payment card data was "encrypted," when—based upon representations Ticketmaster made to the Iowa Attorney General—it was not. Ticketmaster's misrepresentations lulled Plaintiffs and Class Members into believing that their compromised data could not be misused.

469. Ticketmaster, through these basic data security failings, breached its express representations in its Privacy Policy and Commitments. These representations included, but are not limited to, statements that Ticketmaster had implemented "security measures in place to protect [consumers'] information," would "ensure [consumers'] data was protected to the highest standard," and would

---

[205]    *Mandiant Report*, *supra* n. 25.

[206]    FTC Response Guidance, *supra* n. 57.

"take all necessary security measures to protect personal information that's shared and stored with us."

470.   In the alternative, Ticketmaster breached implied commitments to protect consumer Personal Information made to consumers, including the Ticketmaster Plaintiffs, by virtue of mandating that consumers provide their sensitive Personal Information as a condition of purchase.

471.   Ticketmaster's basic data security failings also breached its duty of care to protect the Personal Information of consumers, which include the Ticketmaster Plaintiffs.

## VI.   Personal Information stolen about Ticketmaster Plaintiffs and Class Members.

472.   At a minimum, the stolen Personal Information about Ticketmaster customers included the identifiers disclosed in the Ticketmaster Notice, which informed customers that the information exposed in the Data Breach "may include email, phone number, [hashed] credit card information as well as some other personal information provided to us."[207]

473.   The stolen Personal Information also included names, addresses, emails, and phone numbers of Ticketmaster customers, as well as information

---

[207]   Ticketmaster, *Ticketmaster Data Security Incident*, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident (last visited Jan. 10, 2025)

regarding tickets they purchased through Ticketmaster, order confirmation details, and credit card information such as the last four digits of their payment cards and expiration dates. On May 28, 2024, around the time of the Data Breach, this very information was advertised for sale on a dark web forum post by a cybercriminal group by the name of "ShinyHunters" that claimed the information was stolen in the Snowflake Data Breach. A screenshot of this post is provided below.[208]



---

[208]    Lawrence Abrams, *Ticketmaster confirms massive breach after stolen data for sale online*, Bleeping Computer (May 31, 2024), https://www.bleepingcomputer.com/news/security/ticketmaster-confirms-massive-breach-after-stolen-data-for-sale-online/.

474.   As explained above, while Ticketmaster represented in its Notice that the stolen credit card information was "encrypted," developments following the Data Breach call the veracity of Ticketmaster's statements into question.

475.   For example, in December 2024, Visa issued over a hundred Compromised Account Management System ("CAMS") alerts to several credit unions. The CAMS alerts linked to a Ticketmaster press release and indicated that the breach compromised unique payment card numbers, along with data related to the payment card issuer and the cardholder account. In all, the CAMS alerts identified over a thousand payment cards compromised by the Data Breach. These CAMS alerts, together with Plaintiffs' allegations of attempted fraud and payment card misuse, demonstrate that Ticketmaster's representations concerning the Data Breach may very well be confusing, incorrect, or blatantly misleading.[209]

476.   In addition, the Data Breach compromised information relating to tickets purchased through Ticketmaster, which can also be used to perpetrate identity fraud. For example, as a threat, the cybercriminals leaked data for upcoming

---

[209]    To the extent that Plaintiffs discover that Ticketmaster's representations were inaccurate through discovery, they will respectfully seek leave to amend their complaint.

popular concerts and events that allowed fraudsters to effectively steal the ticket from a paying customer.[210]

477.   In addition, Ticketmaster did not disclose that transaction information related to ticket sales, event information, and order details were involved in the Data Breach. This type of transactional information holds independent commercial value as companies purchase and sell this information for advertising, personalized marketing, and to develop consumer profiles, which can be sold or licensed to third parties. Live Nation's CEO has explained that this information is critical to the company's value: "No one has 80 million customers segmented in a database as rich as ours . . . that audience and that platform is really the key, unique part of our business."

478.   Based on information and belief, Ticketmaster utilized and otherwise profited from collecting its customers' transactional information. Plaintiffs are entitled to compensation for, and any profits derived from, this information. Plaintiffs would not have purchased tickets through Ticketmaster had they known

---

[210]   Lawrence Abrams, *Hackers leak 39,000 print-at-home Ticketmaster tickets for 154 events*, Bleeping Computer (July 8, 2024), https://www.bleepingcomputer.com/news/security/hackers-leak-39-000-print-at-home-ticketmaster-tickets-for-154-events/; Jonathan Limehouse, *Scammers are accessing Ticketmaster users' email accounts, stealing tickets, company says*, USA Today (Oct. 1, 2024), https://www.usatoday.com/story/entertainment/music/2024/10/01/ticketmaster-scammers-disappearing-tickets/75470713007/.

that Ticketmaster would not safeguard this information. Ticketmaster should be ordered to disgorge the value of this information and any revenues and profits it derived from the transactional information it collected and disclosed as part of the Data Breach.

## VII. Ticketmaster Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

479.   As described herein, exposure of their Personal Information in the Data Breach caused injury to the Ticketmaster Plaintiffs and Class Members.

480.   First, the Data Breach subjected the Ticketmaster Plaintiffs and Class Members to a substantial risk of identity theft, which is demonstrated by facts including, but not limited to, incidences of fraud and attempted fraud suffered by the Plaintiffs; the posting of Ticketmaster Plaintiffs' and Class Members' Personal Information on the dark web; the inadequate vagueness of Ticketmaster's Notice as to Personal Information taken when compared against the specificity of Personal Information advertised for sale on the dark web; the sensitivity of Personal Information related to payment card data; CAMS alerts received by credit unions; and Ticketmaster's own Notice that expressly instructed affected customers to "take steps to protect against identity theft" and recommended that customers register for identity theft monitoring services. As a result of this substantial risk, Ticketmaster Plaintiffs and Class Members reasonably suffered injury in the form of lost time

and resources mitigating against the risk of identity theft and emotional distress arising from the risk of identity theft.

481. Second, Ticketmaster made specific data security promises to Ticketmaster Plaintiffs and Class Members. Especially considering the high cost of tickets, a portion of the ticket price that Plaintiffs and Class Members paid to Ticketmaster would cover cybersecurity and protection of Personal Information. By exposing Personal Information to unauthorized third parties, Ticketmaster Plaintiffs and Class Members did not receive the benefit of their bargain. Additionally, Ticketmaster Plaintiffs and Class Members are entitled to damages for Ticketmaster's violation of contractual promises to them.

482. Third, Ticketmaster Plaintiffs and Class Members paid fees to Ticketmaster to provide "a safe and secure ticket-buying experience"; however, it is clear Ticketmaster did not provide either safety or security by its actions and inactions. Plaintiffs and Class Members therefore did not get the benefit of the bargain of the "junk fees" which they paid to Ticketmaster in connection with their ticket purchases.

483. Fourth, Personal Information has inherent value, and the exposure of that information makes consumers susceptible to fraud and scams for years into the future. Not only should consumers be compensated for the value of their Personal

Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

484. Fifth, the Personal Information involved in the Data Breach included Plaintiffs' and Class Members' transactional information, which has independent value and can be used for advertising, personalized marketing, and to develop consumer profiles. Based on information and belief, Ticketmaster utilizes this information and otherwise derives a profit from this information, and it has therefore been unjustly enriched. Not only should consumers be compensated for the value of the transactional details and information, but Ticketmaster should be ordered to disgorge any revenues and profits it received from this information.

## VIII.    Class action allegations as to the Ticketmaster Defendants.

485. The Ticketmaster Plaintiffs brings this action on their own behalf, and on behalf the following Ticketmaster Class and Subclasses (the "Ticketmaster Classes").

- **Nationwide Ticketmaster Class.** All individuals residing in the United States who Ticketmaster and/or Live Nation identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "Ticketmaster Class").

- **State-Specific Subclasses.** As described in this Section below, all individuals residing in a specific state who Ticketmaster and/or Live Nation identified as being among those individuals whose Personal Information was compromised in the Data Breach ("Ticketmaster Subclass").

486.    Excluded from the Ticketmaster Classes are the Ticketmaster Defendants' officers and directors, any entity in which the Ticketmaster Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of the Ticketmaster Defendants. Excluded also from the Ticketmaster Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

487.    The Ticketmaster Plaintiffs reserve the right to amend or modify the definition of the Ticketmaster Classes or create additional subclasses as this case progresses.

488.    **Numerosity.** The members of the Ticketmaster Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that over 560 million Ticketmaster customers were affected by the Data Breach.

489.    **Commonality.** There are questions of fact and law common to the Ticketmaster Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether the Ticketmaster Defendants had a duty to protect the Personal Information of Ticketmaster Plaintiffs and Class Members.

- Whether the Ticketmaster Defendants breached express or implied commitments to protect the Personal Information of Ticketmaster Plaintiffs and Class Members.

- Whether the Ticketmaster Defendants knew or should have known that their data security practices were deficient.

- Whether the Ticketmaster Defendants' data security systems were consistent with industry standards prior to the Data Breach.

- Whether the Ticketmaster Defendants adequately disclosed details regarding the Data Breach to affected consumers.

- Whether the Ticketmaster Defendants unlawfully utilized, retained, misplaced, or exposed Plaintiffs' and the Class Members' Personal Information.

- Whether Ticketmaster Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, general damages, nominal damages, and/or injunctive relief.

490. **Typicality.** The Ticketmaster Plaintiffs' claims are typical of those of other Class Members because the Ticketmaster Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach

491. **Adequacy of Representation.** The Ticketmaster Plaintiffs will fairly and adequately represent and protect the interest of the Ticketmaster Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

492. **Predominance.** The Ticketmaster Defendants have engaged in a common course of conduct toward the Ticketmaster Plaintiffs and Class Members, in that all the data of Plaintiff and Class Members were stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from the Ticketmaster Defendants' conduct affecting Class

Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

493. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Ticketmaster Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Ticketmaster Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Ticketmaster Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for the Ticketmaster Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Ticketmaster Class Member.

494. **Injunctive Relief.** The Ticketmaster Defendants have acted on grounds that apply generally to the Ticketmaster Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

495. **Issue Certification.** Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such issues include, but are not limited to:

- Whether the Ticketmaster Defendants owed a legal duty to the Ticketmaster Plaintiffs and Class Members to protect their Personal Information.

- Whether the Ticketmaster Defendants' data security measures were inadequate in light of applicable regulations and industry standards.

- Whether the fees Ticketmaster charged to customers to provide "a safe and secure ticket-buying experience" were actually used to provide such a safe experience, or were actually "junk fees" that were not used for that purpose.

- Whether Plaintiffs and Class Members received the benefit of their bargain with Ticketmaster.

- Whether the Ticketmaster Defendants' data security measures were negligent.

- Whether the Ticketmaster Defendants breached express or implied representations to the Ticketmaster Plaintiffs and Class Members regarding the protection of their Personal Information.

- Whether Ticketmaster was unjustly enriched by receiving and using the Personal Information, including the transactional information, it received and collected from Plaintiffs and Class Members.

496. **Identification of Class Members Using Objective Criteria.** Finally, all members of the proposed Ticketmaster Classes are readily identifiable using objective criteria. The Ticketmaster Defendants have access to the names and contact information of Class Members affected by the Data Breach. Class Members

have already been preliminarily identified and sent notice of the Data Breach by the Ticketmaster Defendants. Ticketmaster also collects transactional information that can be utilized to identify each Plaintiff's and Class Member's transactions and the transaction fees paid associated with each transaction.

## IX.    Causes of action as to the Ticketmaster Defendants.

### FIRST CLAIM FOR RELIEF
### Breach of Contract
*On behalf of the Ticketmaster Plaintiffs and the Ticketmaster Class*

497.    The Ticketmaster Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

498.    The Ticketmaster Defendants entered into a valid and enforceable contract with the Ticketmaster Plaintiffs and Ticketmaster Class Members.

499.    The contract required Plaintiffs to pay money and Ticketmaster, in exchange, to provide "a safe and secure transaction."

500.    Before making that representation, Ticketmaster made materially similar representations that it had security measures in place to protect consumer information.

501.    The contract required the Ticketmaster Plaintiffs and Ticketmaster Class Members to provide their Personal Information in exchange for ticketing services.

502.   To the extent not contained in the contract itself, Ticketmaster's representation on its website that it would provide a "safe and secure transaction" in exchange for fees paid created an enforceable implied contract.

503.   Ticketmaster also impliedly made promises to consumers when collecting their information that it would be kept safe and secure, and would not be disclosed to unauthorized third parties.

504.   For example, when consumers visited Ticketmaster's website to make a purchase, they would be informed that the website was secure.

505.   While any contract was solely obtained because of the Ticketmaster Defendants' monopoly, promises that the Ticketmaster Defendants made to consumers are enforceable, even if unconscionable provisions are not. That contract included promises by the Ticketmaster Defendants to secure and safeguard the Ticketmaster Plaintiffs' and Ticketmaster Class Members' Personal Information.

506.   The Ticketmaster Defendants' Privacy Policy and Privacy Commitments memorialized the obligations that the Ticketmaster Defendants had to protect the Ticketmaster Plaintiffs' and Ticketmaster Class Members' Personal Information.

507.   The Ticketmaster Plaintiffs and Ticketmaster Class Members fully performed their obligations under their contracts with the Ticketmaster Defendants.

508. Ticketmaster Defendants failed to secure and safeguard their Personal Information, thus breaching contractual obligations—expressly and/or impliedly.

509. Any limitations on remedies or damages to which consumers are allowed pursuant to the terms of their agreements with Ticketmaster are unenforceable, as—among other reasons—Ticketmaster has significant monopoly power over the ticketing and events markets, the agreements are presented on a take-it-or-leave-it basis, and consumers have no ability to negotiate the agreements that they have with Ticketmaster.

510. The Ticketmaster Defendants' failure to secure and safeguard the Ticketmaster Plaintiffs' and Ticketmaster Class Members' Personal Information resulted in services that were of a diminished value and in breach of contractual obligations to the Ticketmaster Plaintiffs and Ticketmaster Class Members.

511. As a direct and proximate result of the Ticketmaster Defendants' breach of contract, the Ticketmaster Defendants have been unjustly enriched by receiving fees for "safe and secure transactions" which were not actually provided, and the Ticketmaster Plaintiffs and Ticketmaster Class Members were injured as detailed above. Ticketmaster Defendants have further been unjustly enriched by receiving, collecting, and profiting off Plaintiffs' and Class Members' transaction information in the manner described above.

512.   As a direct and proximate result of the Ticketmaster Defendants' breach of contract, the Ticketmaster Plaintiffs and Ticketmaster Class Members are entitled to damages, including compensatory damages, general damages, nominal damages, and/or punitive damages, as well as equitable relief including restitution and/or disgorgement of profits wrongfully obtained, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
**Violation of the Montana Unfair Trade Practices & Consumer Protection Act**
**(Mont. Code Ann. § 30-14-101, *et seq.*) ("MUTPCPA")**
*On behalf of Plaintiffs Madden and Murphy*
*and the Montana Ticketmaster Subclass*

513.   Plaintiffs Madden and Murphy repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

514.   Plaintiffs Madden, Murphy, and Montana Ticketmaster Subclass Members are "consumers" under the MUTPCPA because they purchased ticketing services for personal, family, or household purposes. Mont. Code Ann. § 30-14-102(1).

515.   The Ticketmaster Defendants are "persons" under the MUTPCPA, which are defined to mean "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mont. Code Ann. § 30-14-102(6).

516.    The Ticketmaster Defendants engaged in "trade" and "commerce" as defined by the MUTPCPA because their ticketing services were advertised and sold to Montana residents, including Plaintiff Maddens, Murphy, and Montana Ticketmaster Subclass Members. Mont. Code Ann. § 30-14-102(8)(a).

517.    The Ticketmaster Defendants engaged in unfair and deceptive practices prohibited by the MUTPCPA. Mont. Code Ann. § 30-14-103.

518.    Ticketmaster made promises to Plaintiffs and Class Members about the security of their data. Ticketmaster engaged in unfair trade practices when it charged Plaintiffs fees to provide a "safe and secure transaction" or made promises to keep their data secure and yet failed to maintain reasonable data security practices to safeguard the Personal Information of Plaintiffs and Class Members, as described herein.

519.    Ticketmaster engaged in unfair and deceptive trade practices when it informed Ticketmaster Plaintiffs and Class Members that certain information exposed in the Data Breach was encrypted when it was not.

520.    The Ticketmaster Defendants engaged in unfair trade practices when it failed to maintain reasonable data security practices to safeguard the Personal Information of Plaintiffs Madden, Murphy, and the Montana Ticketmaster Subclass, including: (a) failing to implement industry standard data security safeguards to protect consumer Personal Information such as MFA, rotating

191

credentials, restricting access privileges, and using encryption to protect sensitive information; (b) failing to maintain, test, and monitor the Ticketmaster Defendants security systems to ensure that Personal Information was adequately secured and protected; (c) failing to timely act upon warnings and alerts to respond to intrusions; and (d) failing to adequately notify consumers about the types of data that were compromised in the Data Breach.

521.    The Ticketmaster Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

522.    The Ticketmaster Defendants' conduct was also an unlawful deceptive trade practice because they represented to Plaintiffs Madden, Murphy, and the Montana Ticketmaster Subclass in their Privacy Policy and Privacy Commitments that consumer Personal Information mandated as a condition of purchase would be safeguarded and secured.

523.    These representations were deceptive because, in fact, the Ticketmaster Defendants failed to maintain reasonable data security practices, which is demonstrated by failures including, but not limited to: (a) failing to implement industry standard data security safeguards to protect consumer Personal Information such as MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor the Ticketmaster Defendants' security systems

to ensure that Personal Information was adequately secured and protected; (c) failing to timely act upon warnings and alerts to respond to intrusions; and (d) failing to adequately notifying consumers about the types of data that were compromised in the Data Breach.

524.    Plaintiffs Madden, Murphy, and Montana Ticketmaster Subclass Members have suffered injury as a result of the Ticketmaster Defendants' unfair and deceptive trade practices, as described herein.

525.    As a direct and proximate result of the Ticketmaster Defendants' deceptive acts, Plaintiffs Madden, Murphy, and the Montana Ticketmaster Subclass Members are entitled to injunctive relief, damages, including actual damages in an amount to be proven at trial or statutory damages of $500, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees. Mont. Code Ann. § 30-14-133.

**THIRD CLAIM FOR RELIEF**
**Violation of New York General Business Law § 349 ("NYGBL § 349")**
*On behalf of Plaintiffs Anderson and Fitzgerald*
*and the New York Ticketmaster Subclass*

526.    Plaintiffs Anderson and Fitzgerald repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

527.    The Ticketmaster Defendants engaged in deceptive practices by representing to Plaintiffs Anderson, Fitzgerald, and the New York Ticketmaster

Subclass in its Privacy Policy and Privacy Commitments that consumer Personal Information mandated as a condition of use would be safeguarded and secured.

528.    Ticketmaster also represented to Plaintiffs that it was charging certain service fees for the purpose of keeping information secure.

529.    These representations were deceptive because, in fact, the Ticketmaster Defendants failed to maintain reasonable data security practices, which is demonstrated by failures including, but not limited to: (a) failing to implement industry standard data security safeguards to protect consumer Personal Information such as MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor the Ticketmaster Defendants' security systems to ensure that Personal Information was adequately secured and protected; (c) failing to timely act upon warnings and alerts to respond to intrusions; and (d) failing to adequately notifying consumers about the types of data that were compromised in the Data Breach.

530.    Ticketmaster has suffered at least one other large data breach and failed to exercise sufficient oversight over a third-party data provider. Based upon the prior breach, another potential data breach was foreseeable or Ticketmaster was reckless in not foreseeing another potential data breach.

531.    The Ticketmaster Defendants engaged in these deceptive acts in the conduct of business, trade, or commerce, and the furnishing of ticketing service in

New York to New York consumers, which include Plaintiffs Anderson, Fitzgerald, and the New York Ticketmaster Subclass.

532.    Ticketmaster made promises to Plaintiffs and Class Members about the security of their data. Ticketmaster engaged in deceptive trade practices when charged Plaintiffs fees to provide a "safe and secure transaction" or otherwise promised their information would be safe and secure and yet failed to maintain reasonable data security practices to safeguard the Personal Information of Plaintiffs and Class Members, as described herein.

533.    Plaintiffs Anderson, Fitzgerald, and the New York Ticketmaster Subclass have suffered injury as a result of the Ticketmaster Defendants' deceptive acts in the manners described above.

534.    As a direct and proximate result of the Ticketmaster Defendants' deceptive acts, Plaintiffs Anderson, Fitzgerald, and the New York Ticketmaster Subclass are entitled to injunctive relief, damages, including actual damages in an amount to be proven at trial or statutory damages of $50, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
*On behalf of the Ticketmaster Plaintiffs and the Ticketmaster Class; alternatively,*
*on behalf of the Plaintiffs Garcia-Nixon, Lozoya, Neve, and Xian, and the*
*California Ticketmaster Subclass*

535. Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

536. Plaintiffs bring this cause of action on behalf of the Ticketmaster Class. Alternatively, Plaintiffs Garcia-Nixon, Lozoya, Neve, and Xian bring this cause of action on behalf of the California Ticketmaster Subclass.

537. By committing the acts and practices alleged herein, Ticketmaster has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-10, as to the California Class as a whole. The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

538. By reason of Ticketmaster's' above-described wrongful actions, inactions, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs' and Class Members' Personal Information, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

539. Ticketmaster has violated the UCL's proscription against engaging in unlawful conduct as alleged in the First through Fourth and Sixth Claims for Relief in this Part.

540. Defendants also engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members'

Personal Information with knowledge that the information would not be adequately protected; by violating the California Consumer Privacy Act, Cal. Civ. Code § 1798.000; by violating the other statutes described above; and by violating Ticketmaster's own privacy policy and commitments because Ticketmaster failed to take reasonable measures to protect Plaintiffs' and Class Members' Personal Information and failed to take remedial measures such as notifying its customers when it first discovery that their Personal Information may have been compromised or otherwise failing to provide accurate information as to the information involved.

541. Ticketmaster's acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

542. Plaintiffs and the Class members suffered a substantial injury by virtue of buying tickets that they would not have purchased or paying more for tickets than they otherwise would have absent Ticketmaster's unlawful, fraudulent, and unfair representations concerning the use of service fees to pay for a safe and secure ticketing environment.

543. There is no benefit to consumers or competition from such deception, other than to increase Ticketmaster's own profits

544. The gravity of the consequences of Ticketmaster's conduct as described above outweighs any justification, motive, or reason therefore,

particularly considering the available legal alternatives which exist in the marketplace.

545.   Ticketmaster's business practices are also unfair as they offend established public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, in that the private and confidential Personal Information of consumers has been compromised for all to see, use, or otherwise exploit.

546.   Ticketmaster's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and Class Members' Personal Information also constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200, *et seq.*, in that Ticketmaster's conduct was substantially injurious to Plaintiffs and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct.

547.   Ticketmaster's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

548.   The representations and omissions constitute "fraudulent" business acts and practices because they are false and misleading to Plaintiff and the Class members.

549.   Ticketmaster's representations and omissions deceived Plaintiffs and the Class Members.

550.   Ticketmaster knew or reasonably should have known that its statements and omissions were likely to deceive consumers.

551.   Plaintiff and the Class Members suffered a substantial injury by virtue of buying tickets that they would not have purchased or paying more for tickets than they would have absent Ticketmaster's unlawful, fraudulent, and unfair misrepresentations or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly priced products.

552.   But for Ticketmaster's misrepresentations and omissions, Plaintiffs and Class Members would not have provided their Personal Information to Ticketmaster or would have insisted that their Private Information be more securely protected.

553.   These above-described misrepresentations and omissions emanated from Ticketmaster's conduct in California, where Ticketmaster maintains its principal place of business, including the design and dissemination of its marketing, Privacy Policy, Privacy Commitments, and other representations concerning data security. The unlawful, unfair, and fraudulent business practices alleged herein occurred, originated, and were directed from California, and California has a substantial interest in regulating the conduct of corporations headquartered within

199

its borders, deterring fraud, and protecting consumers—including non-residents—from deceptive business practices emanating from California. Thus, application of the UCL to a nationwide class is appropriate where the wrongful conduct originated in California and no other state has an identifiable interest in denying their residents full recovery under the UCL.

554.    Plaintiffs and the Class Members had no way of reasonably knowing that the tickets they purchased were not as marketed or advertised and/or the true price of tickets. As a result of Ticketmaster's misrepresentations and high-pressure sales tactics, they could not have reasonably avoided the injury each of them suffered.

555.    Ticketmaster's violations of the UCL continue to this day. Pursuant to California Business and Professional Code § 17203, Plaintiffs and the Class Members seek an order of this Court that includes, but is not limited to, an order requiring Defendants to cease and desist the unlawful practices described herein.

556.    Plaintiffs also seek restitution on behalf of Plaintiffs and Class Members and disgorgement of all revenues and profits obtained as a result of the violations of the UCL. This includes, but is not limited to, the fees paid by Plaintiffs and Class Members to Ticketmaster for data security, the value of Plaintiffs' Personal Information, including transaction information, and any revenues and

profits Ticketmaster obtained from Plaintiffs' Personal Information and transaction information.

557. As a direct and proximate result of Defendants' above-described wrongful actions, inactions, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs and Class Members' Personal Information, they have been injured by, inter alia: (1) not receiving the benefit of the bargain of the "junk fees" which they paid to Ticketmaster in connection with their ticket purchases; (2) unjustly enriching Ticketmaster with their Personal Information, including transaction information; (3) the loss of the opportunity to control how their Personal Information is used; (4) the diminution in the value and/or use of their Personal Information entrusted to Defendants; (5) the compromise, publication, and/or theft of their Personal Information; and (6) costs associated with monitoring their Personal Information, amongst other things.

558. Plaintiffs further seek an award of attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**Violation of California Consumer Privacy Act**
**("CCPA") (Cal. Civ. Code § 1798.100), *as amended***
*On behalf of the Plaintiffs Garcia-Nixon, Lozoya, Neve, and Xian, and the*
*California Ticketmaster Subclass*

559. Plaintiffs Garcia-Nixon, Lozoya, Neve, and Xian (collectively, the "California Plaintiffs") repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

560.   Cal. Civ. Code § 1798.150(a) of the CCPA provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action" for statutory damages, actual damages, injunctive relief, declaratory relief and any other relief the court deems proper.

561.   Ticketmaster violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Personal Information of the California Plaintiffs and the California Subclass Members whose unencrypted and unredacted personal information, as that information is defined in Section 1798.81.5, was exposed. At a minimum, Ticketmaster has represented that passport numbers for a certain number of Class Members have been exposed. In addition, Ticketmaster's disclosure of the Data Breach has been insufficient—as is demonstrated by their misrepresentation that payment card information was encrypted. The California Plaintiffs accordingly bring this claim to the extent their

nonencrypted and nonredacted personal information was exposed, in violation of the CCPA.

562.   Ticketmaster's actions were reckless. As a direct and proximate result of its security failures, as defined herein, California Plaintiffs and California Subclass Members' Personal Information was subject to unauthorized access and exfiltration, theft, or disclosure.

563.   Ticketmaster is a "business" under the meaning of Cal. Civil Code § 1798.140 because it is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Cal. Civ. Code § 1798.140(d).

564. California Plaintiffs and California Subclass Members are "consumers" as defined by Cal. Civ. Code § 1798.140(g) because they are natural persons who reside in California.

565. California Plaintiffs and California Subclass members provided Defendants with their nonencrypted and nonredacted personal information as defined in § 1798.81.5 in the form of their Personal Information. The information Plaintiffs and California Subclass members provided to Defendants included their

first name or first initial and their last name, in combination with their account number or credit or debit card number, and passport information for certain California Subclass members.

566.    California Plaintiffs and California Subclass Members seek injunctive or other equitable relief to ensure Ticketmaster hereinafter adequately safeguards their Personal Information by implementing reasonable security procedures and practices. Such relief is particularly important because Ticketmaster continues to hold Personal Information, including that of California Plaintiffs and California Subclass Members.

567.    California Plaintiffs and California Subclass Members have an interest in ensuring that their Personal Information is reasonably protected, and Ticketmaster has demonstrated a pattern of failing to adequately safeguard this information.

568.    Notice related to the intention to bring claims pursuant to the CCPA was sent to Ticketmaster on numerous occasions, including by Plaintiff Xian on June 6, 2024, and Plaintiffs Neve's and Garcia-Nixon's counsel on December 27, 2024, and also provided previously by other plaintiffs and their counsel. Despite receipt of the letters, Ticketmaster has refused to cure its violations as demanded by Plaintiffs.

569. The Data Breach was caused, in substantial part, by Ticketmaster's actions, as described herein.

570. Ticketmaster's failed to take sufficient and reasonable measures to safeguard its data security systems and protect California Plaintiffs and California Subclass Members' Personal Information from unauthorized access. Ticketmaster's failure to maintain adequate data protections subjected California Plaintiffs and California Subclass Members' Personal Information to exfiltration and disclosure by malevolent actors.

571. The unauthorized access, exfiltration, theft, and disclosure of California Plaintiffs and California Subclass Members' Personal Information was a result of Ticketmaster's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Personal Information.

572. Ticketmaster's unreasonable security practices include, but are not limited to: (a) failing to implement industry standard data security safeguards to protect the Personal Information of California Plaintiffs and Class Members relating to MFA, rotating credentials, restricting access privileges, and encrypting information; (b) failing to maintain, test, and monitor security systems to ensure that Personal Information was adequately secured and protected; (c) failing to

implement intrusion detection systems and notifying customers of suspicious intrusions.

573.   California Plaintiffs and California Subclass Members have suffered actual injury as detailed herein, and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

574.   Ticketmaster's violations of Cal. Civ. Code § 1798.150(a) are a direct and proximate cause of the Data Breach.

575.   California Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed by law, including actual, general, or nominal damages; declaratory and injunctive relief, including an injunction barring Ticketmaster from disclosing their Personal Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

576.   California Plaintiffs and California Subclass Members are further entitled to the greater of statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident, or actual damages, whichever is greater. *See* Cal. Civ. Code § 1798.150(b).

577.   As a result of Ticketmaster's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, California Plaintiffs and Ticketmaster California Subclass Members seek actual

damages, statutory damages, injunctive relief (including public injunctive relief), and declaratory relief, and any other relief as deemed appropriate by the Court.

## SIXTH CLAIM FOR RELIEF
### Negligence
*On behalf of the Ticketmaster Plaintiffs and the Ticketmaster Class*

578.   The Ticketmaster Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Three, as set forth fully herein.

579.   The Ticketmaster Defendants owed a duty under common law to the Ticketmaster Plaintiffs and Ticketmaster Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information in its possession from being compromised, stolen, or misused by unauthorized persons.

580.   Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the Personal Information of Ticketmaster Plaintiffs and Ticketmaster Class Members such as MFA, rotating credentials, restricting access privileges, and encrypting information; (b) maintaining, testing, and monitoring Ticketmaster's security systems to ensure that Personal Information was adequately secured and protected; (c) timely acting upon warnings and alerts to respond to intrusions; and (d) adequately notifying the

Ticketmaster Plaintiffs and Ticketmaster Class Members about the types of data that were compromised in the Data Breach.

581.   The Ticketmaster Defendants' duty to use reasonable care arose from several sources, including those set out below.

582.   The Ticketmaster Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because the Ticketmaster Defendants collected and stored valuable Personal Information that is routinely targeted by cyber criminals, and Ticketmaster had already experienced a data breach before. The Ticketmaster Plaintiffs and Ticketmaster Class Members were the foreseeable and probable victims of any compromise to inadequate data security practices maintained by Ticketmaster.

583.   The Ticketmaster Defendants further assumed a duty of reasonable care in promulgating their Privacy Policy and Privacy Commitments which assured the Ticketmaster Plaintiffs and Ticketmaster Class Members that their Personal Information would be adequately secured.

584.   The Ticketmaster Defendants breached their duties owed to the Ticketmaster Plaintiffs and Ticketmaster Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

585.    The Ticketmaster Defendants breached their duties owed to Ticketmaster Plaintiffs and Ticketmaster Class Members by failing to exercise reasonable oversight in the selection of Snowflake to store Personal Information. Such reasonable oversight would have revealed that Snowflake's cloud services lacked industry standard data security safeguards necessary to adequately protect Personal Information.

586.    The Data Breach was entirely foreseeable. Not only did industry experience show that a failure to adopt the security standards as described herein would result in data breaches, but the Ticketmaster Defendants, themselves, previously experienced a prior breach of a third-party provider by not exercising sufficient oversight over that entity.

587.    Consumers spend significant amounts of money on tickets to events purchased through Ticketmaster. Cybercriminals know the value of the tickets purchased through Ticketmaster. It is foreseeable that consumers would experience significant losses if that information were exposed to third parties, allowing them to either steal the purchased tickets, or scam consumers out of significant amounts of money to protect their purchases of those tickets.

588.    But for Ticketmaster's negligence, the Personal Information of the Ticketmaster Plaintiffs and Ticketmaster Class Members would not have been stolen by cybercriminals in the Data Breach.

589.   As a direct and proximate result of the Ticketmaster Defendants' breach of duties, the Ticketmaster Plaintiffs and Ticketmaster Class Members have suffered injuries detailed above.

Plaintiffs and Ticketmaster Class Members are entitled to damages, including compensatory, general, nominal, and/or punitive damages, in an amount to be proven at trial.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PART FOUR: ADVANCE AUTO PARTS
## AND ADVANCE STORES COMPANY

590.   Plaintiffs Emmanuel Chaidez, Stefondra Monroe, Raymond Moule, Raven Richardson, Don Smith, and Raymond Swain (collectively, the "Advance Auto Plaintiffs") are named in this Representative Complaint to pursue claims against Advance Auto.[211]

## I.    The Advance Auto Defendants collect and store Personal Information of job applicants.

591.   Advance Auto Parts, Inc. is a provider of automotive aftermarket parts. Advance Stores Company is a wholly owned subsidiary of Advance Auto.[212]

592.   As of October 5, 2024, Advance Auto operated 4,781 stores primarily within the United States, with additional locations in Canada, Puerto Rico and the U.S. Virgin Islands.[213]

593.   In the ordinary course of its business practices, Advance Auto collects, stores, and uses Plaintiffs' and Class Members' Personal Information.

---

[211]    Advance Auto Parts, Inc. and Advance Stores Company, Inc. are collectively referred to herein, except as expressly delineated, as "Advance Auto" or the "Advance Auto Defendants."

[212]    Advance Auto 2023 10-K, https://www.sec.gov/ix?doc=/Archives/edgar/data/1158449/000115844924000128/aap-20231230.htm.

[213]    Advance Auto Parts, *The Advance Auto Parts Story,* https://corp.advanceautoparts.com/our-story/default.aspx (last visited Jan. 17, 2025).

594.   Advance Auto collects Personal Information as part of its job application process, which include applicants' Social Security numbers, names, and dates of birth.[214]

595.   Advance Auto maintains a privacy policy website, which states, "We need to collect Personal Information to provide the requested Services to you. If you do not provide the information requested, we may not be able to provide the Services."[215]

596.   Advance Auto gains access to job applicant and employee Personal Information through various means, including its websites, its software applications, phone calls, and in-person business interactions at their stores.[216]

597.   Advance Auto was a Snowflake customer. Snowflake was Advance Auto's cloud storage and data warehousing vendor.

598.   Advance Auto stored consumer, applicant, and employee Personal Information on the Data Cloud.

599.   As part of their processing for collecting Personal Information, Advance Auto may require individuals to agree to alternative dispute resolution.

---

[214]   Advance Auto Parts, *Privacy Policy (Updated)* (Dec. 31, 2023) ("Advance Auto, *Privacy Policy*"), https://shop.advanceautoparts.com/o/privacy-notice?msockid=38767612e55363b5170c62f2e4e6626f.

[215]   *Id.*

[216]   *Id.*

That process, however, is unenforceable. The terms of Advance Auto's dispute resolution process are ambiguous or not provided, individuals are uncertain that they are bound by the terms, or individuals do not agree to the terms as part of providing their Personal Information to Advance Auto.

## II.    The Advance Auto Defendants owed a duty of care to Plaintiffs and Class Members.

600.    Advance Auto also had obligations created by industry standards, common law, statutory law, and its own assurances and representations to keep Personal Information of Plaintiffs and the Class confidential and to protect such Personal Information from unauthorized access.

601.    Advance Auto, in collecting Personal Information from job applicants, including the Advance Auto Plaintiffs, owed a duty to exercise reasonable care in maintaining, protecting, and securing their Personal Information. This duty arose under both federal and state law, as discussed herein, but also based upon industry standards.

602.    Advance Auto collected sensitive Personal Information from its employees and job applicants as a condition of their application for employment with the company, and it was reasonably foreseeable that a data breach would subject those individuals to significant harm, given the sensitivity of the information collected. Accordingly, Advance Auto owed a duty to employees and applicants to adopt reasonable cybersecurity measures to keep their information secure, design

systems and cloud-based computing applications that would keep information secure, monitor for known cybersecurity risks and threats, implement safeguards to protect systems from cybersecurity threats, engage in appropriate data management and hygiene, and take all other measures to safeguard employee and applicant information.

603.    Advance Auto owed a duty to Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Personal Information from theft because such an inadequacy would be a material fact in the decision to entrust Personal Information with Advance Auto. Further, Advance Auto owed a duty to Plaintiffs and the Class to disclose in a timely and accurate manner when data breaches occurred.

604.    Advance Auto itself suffered a prior data breach of sensitive employee information in 2016 and was therefore well aware of the security risks that maintaining such information posed. It should have taken basic cybersecurity steps to protect such information. As a result of that prior data breach, Advance Auto entered into a class action settlement agreement, where it agreed to a battery of "data security practices" with no sunset provision. *See Whitehead v. Advance Stores Company Inc.,* No. 5:16-cv-250-RBD-PRL (M.D. Fla.) (Doc. No. 40-1) (granted final approval on May 24, 2017).

605.   Advance Auto should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Personal Information that it collected and maintained.

606.   Advance Auto was on notice of the importance of data encryption of Personal Information. Advance Auto knew it kept Personal Information of consumers, applicants, and employees in its systems, but did not encrypt these systems or the information contained within them.

607.   Advance Auto affirmatively represented to consumers and job applicants, "We seek to use reasonable organizational, technical, and administrative measures to protect Personal Information within our organization."[217]

608.   In its Annual Report dated March 12, 2024, Advance Auto recognized data privacy among the risks facing the company. It stated[218]:

> The nature of our business requires us to receive, retain and transmit certain personally identifiable information about our customers, suppliers and team members, some of which is entrusted to third-party service providers. … Additionally, since we do not control our third-party service providers and our ability to monitor their data security is limited, we cannot ensure the security measures they take will be sufficient to protect our data. A weakness or failure or a breach of a third-party provider's software or systems or controls could result in the compromise of the confidentiality, integrity or availability of our systems or the data housed in our third-party solutions.

---

[217]   *Id.*

[218]   Advance Auto 2023 10-K, https://www.sec.gov/ix?doc=/Archives/edgar/data/1158449/000115844924000128/aap-20231230.htm.

Despite our efforts, our security measures may be breached in the future due to a cyber attack, computer malware viruses, exploitation of hardware and software vulnerabilities, team member error, malfeasance, fraudulent inducement (including so-called "social engineering" attacks and "phishing" scams) or other acts. While we have experienced threats to our data and systems, including phishing attacks, to date we are not aware that we have experienced a material cyber-security incident.

609.   Prospective employees, including the Advance Auto Plaintiffs, relied upon Advance Auto's express and implied commitments to protect the privacy of their Personal Information when they decided to use Advance Auto's goods and services.

610.   It was reasonably foreseeable to Advance Auto that failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class Members' Personal Information—by not designing, adopting, implementing, controlling, directing, overseeing, managing, monitoring, and auditing appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems—would result in the release, disclosure, and dissemination of Plaintiffs' and the Class Members' Personal Information to unauthorized individuals.

## III.    The Advance Auto Defendants breached their duty to protect Plaintiffs' and Class Members' Personal Information.

611.   On May 23, 2024, Advance Auto detected suspicious activity on its computer network, indicating a data breach.

612.   Based on a subsequent forensic investigation, Advance Auto determined that cybercriminals infiltrated its inadequately secured computer systems and thereby gained access to its data files.

613.   In a July 10, 2024, breach notification letter, Advance Auto stated, "an unauthorized third party accessed or copied certain information maintained by Advance Auto Parts from April 14, 2024, to May 24, 2024."[219]

614.   According to information Advance Auto provided to the Maine Office of the Attorney General, cybercriminals potentially accessed and acquired files containing the sensitive personal information of 2,316,591 individuals through this infiltration.[220]

615.   The personal information accessed by cybercriminals involved a wide variety of Personal Information, including names, dates of birth, Social Security numbers, driver's license numbers, and government identification numbers.

616.   Advance Auto failed to spend sufficient resources on preventing external access to this highly sensitive information, failed to develop systems to

---

[219]   Advance Auto Notice, *supra* n. 78.

[220]   *Data Breach Notifications, Advance Stores Company, Inc.*, Me. Att'y Gen. Off., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a6279ea-12a4-47c8-855e-9ce509f5a2b2.html (last visited Jan. 17, 2025).

detect outside infiltration, and further inadequately trained its employees to identify malware threats and defend against them.

617. At the time of the Data Breach, Advance Auto failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards summarized above. These data security failings included:

- Advance Auto did not enforce MFA for its Snowflake accounts.

- Advance Auto did not rotate or disable the credentials of old Snowflake accounts.

- Advance Auto did not implement network allow lists that restricted Snowflake account access to certain locations or trusted users.

618. Advance Auto failed to take these measures despite being under constant and attempted attacks from threat actors.

619. Advance Auto failed to properly investigate, retain, oversee and audit a competent cloud-based data storage provider, because Snowflake similarly had numerous data security failings, as described herein.

620. Advance Auto's data security failings enabled the Data Breach. Without these basic protections, the threat actor was able to exfiltrate the Personal Information of millions of applicants and employees with nothing more than stolen Advance Auto or Snowflake credentials.

621. Indeed, each of these basic protections could have prevented the Data Breach. For example:

- Had Advance Auto implemented MFA, the threat actor would not have been able to access Advance Auto data with compromised or outdated credentials.

- Advance Auto could have also prevented the Data Breach by maintaining a policy of rotating or disabling credentials that were either old or compromised in other data breaches. As the Mandiant Report found that a "majority of the credentials used by UNC5537" were available from historic malware campaigns dating back to 2020, a policy that disabled previously compromised credentials could have prevented the Data Breach.[221]

- Advance Auto could have also prevented the Data Breach by maintaining stricter network allow lists that restricted access to customer Personal Information to certain locations or trusted user accounts that were not previously compromised.

## IV. Personal Information stolen about Advance Auto Plaintiffs and Class Members.

622. On or around July 10, 2024, Advance Auto provided individuals affected by the Data Breach with a Notice (the "Advance Auto Notice") that was printed on Advance Auto Parts letterhead. The letter defined the corporate entities "Advance Stores Company" and "Advance Auto Parts" interchangeably as follows: "Advance Stores Company, Incorporated ("Advance Auto Parts") writes to inform you of an incident that involves your personal information."[222]

---

[221]    *Mandiant Report*, *supra* n. 25.

[222]    Advance Auto Notice, *supra* n. 78.

623.    The Notice disclosed, "an unauthorized third party gained access to certain information maintained by Advance Auto Parts within Snowflake, our cloud storage and data warehousing vendor." The Notice informed the recipient: "The personal information about you involved in this incident may include your name and the following: Social Security number, driver's license or other government issued identification number, and date of birth. This information was collected as part of the Advance Auto Parts job application process."[223]

624.    The Notice offered affected individuals 12 months of free credit monitoring and identity restoration services and instructed individuals to "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors over the next twelve (12) to twenty-four (24) months."[224]

625.    This information regarding Advance Auto job applicants was packaged for sale on the dark web, together with information related to Advance Auto consumers.[225] On June 5, 2024, a cybercriminal group by the name of "Sp1d3r" advertised for sale a package of Advance Auto data linked with the

---

[223]    Advance Auto Notice, *supra* n. 78.

[224]    *Id.*

[225]    Lawrence Abrams, *Advance Auto Parts confirms data breach exposed employee information*, Bleeping Computer (June 19, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-confirms-data-breach-exposed-employee-information/.

Snowflake Data Breach, which included the Personal Information of employees and consumers. A screenshot of this post is provided below.[226]



626.    Plaintiffs and Class Members have a privacy interest in the non-disclosure of their Social Security and driver's license numbers, as they are static identifiers that can be used to perpetrate identity fraud. This is especially the case where, as here, the Social Security and driver's license numbers are disclosed alongside other identifiers, including names, addresses, and contact information.

## V.    Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

627.    As described herein, the Personal Information exposed in the Data Breach caused injury to Advance Auto Plaintiffs and Class Members.

---

[226]    *Id.*

628.   First, the Data Breach subjected Plaintiffs and Class Members to a substantial risk of identity theft, which is demonstrated by facts including, but not limited to, incidences of identity fraud suffered by the Advance Auto Plaintiffs, the posting of Advance Auto Plaintiffs' and Class Members' Personal Information on the dark web, the inadequate vagueness of Advance Auto's Notice as to Personal Information taken when compared against the specificity of Personal Information advertised for sale on the dark web, the sensitivity of Personal Information related to Social Security numbers, driver's numbers, and other personal identifiers, and Advance Auto's own Notice that expressly instructed affected customers to "remain vigilant . . . by reviewing account statements and monitoring your free credit reports for suspicious activity" and recommending that customers register for credit monitoring services. As a result of this substantial risk, Advance Auto Plaintiffs and Class Members reasonably suffered injury in the form of lost time and resources mitigating against the risk of identity theft and emotional distress arising from the risk of identity theft.

629.   Second, Advance Auto made specific express and implied data security representations to Advance Auto Plaintiffs and Class Members in the course of mandating receipt of applicants', employees', and consumers' Personal Information. By exposing Personal Information to unauthorized third parties in a manner inconsistent with these commitments and representations, Advance Auto

Plaintiffs and Class Members did not receive the benefit of their bargain when they provided their Personal Information in exchange for employment or the purchase of goods.

630.   Third, Personal Information has inherent value, and the exposure of that information makes employees and consumers susceptible to fraud and scams for years into the future. Not only should applicants, employees, and consumers be compensated for the value of their Personal Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

631.   Fourth, the disclosure of Advance Auto Plaintiffs' and Class Members' private and sensitive nature of the Personal Information to cybercriminals who in turn advertised and sold the Personal Information on the dark web, constitutes a privacy injury.

## VI.   Class action allegations as to the Advance Auto Defendants.

632.   The Advance Auto Plaintiffs bring this action on their own behalf, and on behalf the following Advance Auto Class and Subclasses (the "Advance Auto Classes").

- **Nationwide Advance Auto Class.** All Advance Auto employees and employee applicants residing in the United States who Advance Auto identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "Advance Auto Class").

- **State-Specific Subclasses.** As described in this Section below, all Advance Auto employees and employee applicants residing in a specific state who Advance Auto identified as being among those individuals whose Personal Information was compromised in the Data Breach ("Advance Auto Subclass").

- **California CCPA Subclass.** All individuals whose nonencrypted and nonredacted personal information, as defined in Cal. Civ. Code § 1798.150(a), was identified as compromised in the Data Breach by Advance Auto ("Advance Auto CCPA Subclass").

633. Excluded from the Advanced Auto Classes are Advance Auto's officers and directors, any entity in which Advance Auto has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Advance Auto. Excluded also from the Advance Auto are members of the judiciary to whom this case is assigned, their families and members of their staff.

634. The Advance Auto Plaintiffs reserve the right to amend or modify the definition of the Advance Auto Classes or create additional subclasses as this case progresses.

635. The proposed Classes meet the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

636. **Numerosity.** The members of the Advance Auto Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that over 560 million Advance Auto customers were affected by the Data Breach.

637. **Commonality.** There are questions of fact and law common to the Advance Auto Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether Advance Auto had a duty to protect the Personal Information of Advance Auto Plaintiffs and Class Members.

- Whether Advance Auto breached express or implied commitments to protect the Personal Information of Advance Auto Plaintiffs and Class Members.

- Whether Advance Auto knew or should have known that their data security practices were deficient.

- Whether Advance Auto's data security systems were consistent with industry standards prior to the Data Breach.

- Whether Advance Auto adequately disclosed details regarding the Data Breach to affected consumers.

- Whether Advance Auto unlawfully utilized, retained, misplaced, or exposed Plaintiffs' and the Class Members' Personal Information.

- Whether Advance Auto Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, general damages, nominal damages, and/or injunctive relief.

638. **Typicality.** The Advance Auto Plaintiffs' claims are typical of those of other Class Members because the Advance Auto Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach

639.   **Adequacy of Representation.** The Advance Auto Plaintiffs will fairly and adequately represent and protect the interest of the Advance Auto Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

640.   **Predominance.** Advance Auto have engaged in a common course of conduct toward the Advance Auto Plaintiffs and Class Members, in that all the data of Plaintiff and Class Members were stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from Advance Auto's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

641.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Advance Auto Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Advance Auto Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Advance Auto Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Advance Auto. In

contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Advance Auto Class Member.

642. **Injunctive Relief.** Advance Auto has acted on grounds that apply generally to the Advance Auto Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

643. **Issue Certification.** Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether Advance Auto owed a legal duty to the Advance Auto Plaintiffs and Class Members to protect their Personal Information.

- Whether Advance Auto's data security measures were inadequate in light of applicable regulations and industry standards.

- Whether Advance Auto's data security measures were negligent.

- Whether Advance Auto breached express or implied representations to the Advance Auto Plaintiffs and Class Members regarding the protection of their Personal Information.

644. **Identification of Class Members Using Objective Criteria.** Finally, all members of the proposed Advance Auto Classes are readily identifiable using objective criteria. Advance Auto have access to the names and contact information

227

of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Advance Auto.

645. **Numerosity**: The proposed Class is believed to be so numerous that joinder of all members is impracticable. The proposed Subclass is also believed to be so numerous that joinder of all members would be impractical.

646. **Typicality**: Plaintiff's claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Defendants' uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiffs and each member of the Class had their sensitive Personal Information compromised in the same way by the same conduct of Defendants.

647. **Adequacy**: Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the Class and proposed Subclass that they seek to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

648. **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class member is relatively small in comparison to the

228

burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Advance Auto's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

649. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

- Whether Advance Auto engaged in the wrongful conduct alleged herein;

- Whether Advance Auto failed to adequately safeguard Plaintiffs' and the Class's Personal Information;

- Whether Advance Auto's data security practices used to protect Plaintiffs' and Class Members' Personal Information violated the FTC Act, and/or state laws and/or Advance Auto's other duties discussed herein;

- Whether Advance Auto owed a duty to Plaintiffs and the Class to adequately protect their Personal Information, and whether it breached this duty;

- Whether Advance Auto knew or should have known that its computer and network security systems were vulnerable to a data breach;

- Whether Advance Auto breached contractual duties owed to Plaintiffs and the Class to use reasonable care in protecting their Personal Information;

- Whether Advance Auto failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class; and

- Whether Advance Auto continues to breach its duties to Plaintiffs and the Class.

## VII.  Causes of action as to the Advance Auto Defendants.

### FIRST CLAIM FOR RELIEF
### Negligence
*On behalf of the Advance Auto Plaintiffs and the Advance Auto Class*

650.  The Advance Auto Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Four, as set forth fully herein.

651.  The Advance Auto Defendants owed a duty under common law to the Advance Auto Plaintiffs and Advance Auto Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information

230

in its possession from being compromised, stolen, or misused by unauthorized persons.

652.   The Advance Auto Defendants had a duty to implement industry standard data security safeguards to protect the Personal Information of Auto Plaintiffs and Advance Auto Class, such as MFA, rotating credentials, and restricting access privileges.

653.   The Advance Auto Defendants had a duty to maintain, test, and monitor their security systems to ensure that Personal Information was adequately secured and protected.

654.   The Advance Auto Defendants had a duty to timely act upon warnings and alerts to respond to intrusions.

655.   The Advance Auto Defendants had a duty to adequately notify the Advance Auto Plaintiffs and Advance Auto Class about the types of data that were compromised in the Data Breach.

656.   The Advance Auto Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because the Advance Auto Defendants collected and stored valuable Personal Information that is routinely targeted by cybercriminals. The Advance Auto Plaintiffs and Advance Auto Class Members were the foreseeable and probable victims of any compromise to inadequate data security practices maintained by the Advance Auto Defendants.

657.    Advance Auto Plaintiffs and Advance Auto Class Members were the foreseeable victims of any inadequate safety and security practices on the part of the Advance Auto Defendants. Advance Auto Plaintiffs and Advance Auto Class Members had no ability to protect their Personal Information that was in Advance Auto Defendants' possession.

658.    The Advance Auto Defendants further assumed a duty of reasonable care in promulgating their Privacy Policy which assured the Advance Auto Plaintiffs and Advance Auto Class Members that their Personal Information would be adequately secured.

659.    The Advance Auto Defendants breached their duties owed to the Advance Auto Plaintiffs and Advance Auto Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

660.    The Advance Auto Defendants breached their duties owed to Advance Auto Plaintiffs and Class Members by failing to exercise reasonable oversight in the selection of Snowflake to store Personal Information. Such reasonable oversight would have revealed that Snowflake's cloud services lacked industry standard data security safeguards necessary to adequately protect Personal Information.

661.    But for the Advance Auto Defendants' negligence, the Personal Information of the Advance Auto Plaintiffs and Advance Auto Class Members would not have been stolen by cybercriminals in the Data Breach.

662.    As a direct and proximate result of the Advance Auto Defendants' negligence, the Advance Auto Plaintiffs and Advance Auto Class Members have suffered injuries detailed above.

663.    As a direct and proximate result of the Advance Auto Defendants' negligence, the Advance Auto Plaintiffs and Advance Auto Class Members are entitled to damages, including compensatory, general, nominal, and/or punitive damages, in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
### Breach of Implied Contract
*On Behalf of the Advance Auto Plaintiffs and the Advance Auto Class*

664.    The Advance Auto Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Four, as set forth fully herein.

665.    The Advance Auto Defendants required Advance Auto Plaintiffs and Advance Auto Class Members to provide their Personal Information as a condition of employment and/or applying for employment.

666.    In mandating the Advance Auto Plaintiffs and Advance Auto Class Members to provide their Personal Information as a condition of employment

and/or applying for employment, the Advance Auto Defendants implied an assent to safeguard and protect their Personal Information.

667.   The Advance Auto Plaintiffs and Advance Auto Class would not have provided their Personal Information to Advance Auto if they had known that it would not safeguard their Personal Information.

668.   The Advance Auto Plaintiffs and Advance Auto Class fully performed their obligations under the implied contracts with Advance Auto.

669.   The Advance Auto Defendants breached their implied contracts with the Advance Auto Plaintiffs and Advance Auto Class by failing to safeguard their Personal Information.

670.   The Advance Auto Defendants breached their implied contracts with the Advance Auto Plaintiffs and Advance Auto Class by failing to oversee its data storage vendor, Snowflake.

671.   As a direct and proximate result of the Advance Auto Defendants' breach of implied contract, the Advance Auto Plaintiffs and Advance Auto Class Members suffered injuries detailed above.

672.   As a direct and proximate result of the Advance Auto Defendants' breach of express contract, the Advance Auto Plaintiffs and Advance Auto Class are entitled to damages, including compensatory damages, general damages, nominal damages, and/or punitive damages, in an amount to proven at trial.

## THIRD CLAIM FOR RELIEF
### Violation of California Consumer Privacy Act
### ("CCPA") (Cal. Civ. Code § 1798.100)
*On behalf of Plaintiff Swain and the Advance Auto CCPA Subclass*

673.  Plaintiff Swain repeats and re-alleges the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Four, as set forth fully herein.

674.  Cal. Civ. Code § 1798.150(a) of the CCPA provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action" for statutory damages, actual damages, injunctive relief, declaratory relief and any other relief the court deems proper.

675.  The Advance Auto Defendants solicited, gathered, and stored the Personal Information of Plaintiff Swain and the Advance Auto CCPA Subclass as part of the operation of its business.

676.  The Advance Auto Defendants violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the

Personal Information of California Plaintiffs and Advance Auto California Subclass Members. As a direct and proximate result of these security failures, Plaintiff Swain and the Advance Auto CCPA Subclass Members' Personal Information was subject to unauthorized access and exfiltration, theft, or disclosure. This Personal Information included at least names, addresses, Social Security numbers, and driver's license numbers.

677. The Advance Auto Defendants are a "business" under the meaning of Cal. Civil Code § 1798.140 because they are a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Cal. Civil Code § 1798.140(d).

678. Plaintiff Swain and Advance Auto CCPA Subclass Members are "consumers" as defined by Cal. Civ. Code § 1798.140(g) because they are natural persons who reside in California.

679. Plaintiff Swain and Advance Auto CCPA Subclass Members seek injunctive or other equitable relief to ensure Advance Auto hereinafter adequately safeguard their Personal Information by implementing reasonable security procedures and practices. Such relief is particularly important because the Advance

Auto Defendants continue to hold Personal Information, including that of Plaintiff Swain and Advance Auto CCPA Subclass Members.

680.   Plaintiff Swain and Advance Auto CCPA Subclass Members have an interest in ensuring that their Personal Information is reasonably protected, and Advance Auto has demonstrated a pattern of failing to adequately safeguard this information.

681.   Notice related to Plaintiffs' intention to bring claims pursuant to the CCPA was sent to the Advance Auto Defendants on December 27, 2024. Despite receipt of the letter, the Advance Auto Defendants have refused to cure their violations as demanded by Plaintiffs.

682.   The Advance Auto Defendants failed to take sufficient and reasonable measures to safeguard its data security systems and protect Plaintiff Swain and Advance Auto CCPA Subclass Members' Personal Information from unauthorized access. The Advance Auto Defendants' failure to maintain adequate data protections subjected Plaintiff Swain and Advance Auto CCPA Subclass Members' Personal Information to exfiltration and disclosure by malevolent actors.

683.   The unauthorized access, exfiltration, theft, and disclosure of Plaintiff Swain and Advance Auto CCPA Subclass Members' Personal Information was a result of the Advance Auto Defendants' violation of its duty to implement and

maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.

684. The Advance Auto Defendants' unreasonable security practices include, but are not limited to: (a) failing to implement industry standard data security safeguards to protect the Personal Information of Advance Auto Plaintiffs and Class Members relating to MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor Snowflake security systems to ensure that Personal Information was adequately secured and protected; (c) failing to implement intrusion detection systems and notifying customers of suspicious intrusions.

685. Plaintiff Swain and Advance Auto CCPA Subclass Members have suffered actual injury as detailed above, and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

686. The Advance Auto Defendants' violations of Cal. Civ. Code § 1798.150(a) are a direct and proximate cause of the Data Breach.

687. Plaintiff Swain and Advance Auto CCPA Subclass Members seek all monetary and non-monetary relief allowed by law, including actual, general, or nominal damages; declaratory and injunctive relief, including an injunction barring

Advance Auto from disclosing their Personal Information without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

688.  Plaintiff Swain and Advance Auto CCPA Subclass Members are further entitled to statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident, or actual damages, whichever is greater. *See* Cal. Civ. Code § 1798.150(b).

689.  As a result of the Advance Auto Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff Swain and Advance Auto CCPA Subclass Members seek actual damages, injunctive relief, including public injunctive relief, and declaratory relief, and any other relief as deemed appropriate by the Court.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PART FIVE: LENDINGTREE AND QUOTEWIZARD

690.   Plaintiffs Aaron Macom, Antoun Nader, Linda Pierce, and Nathan Thomas (collectively, the "LendingTree Plaintiffs") are named in this Representative Complaint to pursue claims against LendingTree.[227]

I.   **The LendingTree Defendants' business and data security promises.**

691.   LendingTree is an online marketplace that aggregates terms for financial products, such as loans, credit cards, and insurance.

692.   LendingTree acquired QuoteWizard in October 2018 for $370.2 million.[228]

693.   QuoteWizard is a wholly owned subsidiary of LendingTree, and is an online insurance marketplace that helps consumers compare quotes from agents and carriers for various insurance products. Consumers can use QuoteWizard to compare quotes for auto, home, renters, and health insurance. In providing such comparisons, QuoteWizard provides consumers with links to shop for insurance with various insurance companies.

---

[227]   LendingTree, LLC and Quotewizard.com, LLC are collectively referred to herein, except as expressly delineated, as "LendingTree" or the "LendingTree Defendants."

[228]   Unaudited Pro Forma Condensed Combined Statement of Operations, https://www.sec.gov/Archives/edgar/data/1434621/000143462119000053/ex992.htm; *LendingTree (TREE) Acquires QuoteWizard.com for $370.2M*, Yahoo! Finance (Nov. 1, 2018), https://finance.yahoo.com/news/lendingtree-tree-acquires-quotewizard-com-121912273.html.

694.   To obtain an insurance comparison from QuoteWizard, consumers are required to provide QuoteWizard with highly sensitive personal information, including their full name, address, email address and phone number, date of birth, and motor vehicle information.

695.   LendingTree describes itself as a "two-sided marketplace." As its Chief Product and Technology Officer Scott Totman described:

> LendingTree, just as a snapshot, is a two-sided marketplace. The easiest way to think about it is that one side of the marketplace is the product for the other side of the marketplace. So, consumers come in looking for a financial product we're trying to provide, and our lender partners are looking for quality consumers. We're trying to give each side of the marketplace the best version of the other.[229]

696.   LendingTree describes itself as "the nation's leading online loan marketplace[.]"[230]

697.   QuoteWizard compliments LendingTree because it provides leads to insurance agents from customers who are actively shopping for insurance.[231]

---

[229]   Transcript, BlueCloud and LendingTree Live with Snowflake, https://www.blue.cloud/blog-posts/bluecloud-and-lendingtree-live-with-snowflake (last visited Mar. 21, 2025).

[230]   *Our Brands*, LendingTree, https://press.lendingtree.com/about/our-brands (last visited Jan. 17, 2025).

[231]   QuoteWizard by LendingTree, Frequently Asked Questions, https://agents.quotewizard.com/faq (last visited Mar. 21, 2025).

698.   QuoteWizard and LendingTree are highly integrated with respect to collecting customer Personal Information, sharing customer Personal Information and developing and implementing privacy policies. To provide several examples:

- When a consumer visits the QuoteWizard webpage, the prominently displayed QuoteWizard logo informs consumers that the company is called: "QuoteWizard by LendingTree."

- LendingTree and QuoteWizard maintain identical privacy policies that inform consumers that: "LendingTree, LLC, and its subsidiaries and affiliates (collectively, "LendingTree," "we," "our," or "us") are committed to maintaining your confidence and trust as it relates to the privacy and security of your personal information."[232]

- The privacy policies maintained by LendingTree and QuoteWizard list the identical LendingTree point of contact for consumers with privacy inquiries[233]:

- The identical privacy policies of both QuoteWizard and LendingTree explain: "We disclose your personal information to other entities within our family of brands to fulfill any purpose described in this Privacy Policy" and QuoteWizard is listed as part of that "family."[234]

---

[232]   Privacy Policy, QuoteWizard by LendingTree, https://quotewizard.com/corp/privacy-policy (last updated Apr. 2, 2024) ("QuoteWizard, *Privacy Policy*").

[233]   *Id.*

[234]   *Id.*; Privacy Policy, LendingTree, https://www.lendingtree.com/legal/privacy-policy/ (last updated Apr. 2, 2024) ("Lending Tree, *Privacy Policy*"); *see also* Our Brands, LendingTree: Newsroom, https://press.lendingtree.com/about/our-brands (last visited Dec. 20, 2024) (listing LendingTree and QuoteWizard).

699.   The reason for this high level of integration has to do with the way LendingTree acquires, stores, and processes information. LendingTree acquired QuoteWizard as part of a plan to "diversify" its technology portfolio.[235] With that diversification came a large amount of "technical debt," which required LendingTree to look to cloud-storage options to "reduce [its] technical footprint," "modernize [its] tech stack," and "future-proof it."[236]

700.   Reducing a company's "tech stack," like LendingTree did, typically requires integration of different databases where customer information is kept. Moving to a cloud-based provider like Snowflake allows for integration of many different customer databases. As a result, as LendingTree's own company representatives have stated, all of the data is "in Snowflake":

> Our transactional databases on the left still capture form submissions in real time. But in parallel, it's all streaming in Snowflake. So, *if anyone in the company asks, "Where's my data?" The answer is, 'It's in Snowflake, and it's in one place*.'"[237]

701.   QuoteWizard and LendingTree, LLC were and are thus highly integrated in their policies and practices relating to data security and collection. As

---

[235]   Transcript, BlueCloud and LendingTree Live with Snowflake, *supra* n. 228; *LendingTree, Inc. Completes Acquisition of QuoteWizard.com, LLC; Announces Amendment of Revolving Credit Facility* (Oct. 31, 2018), https://investors.lendingtree.com/node/15471/pdf.

[236]   Transcript, BlueCloud and LendingTree Live with Snowflake, *supra* n. 228 (emphasis added).

[237]   *Id.*

a result, both QuoteWizard and LendingTree, LLC were responsible for the data security failings alleged herein and both defendants are referred to herein as "LendingTree" or the "LendingTree Defendants," unless specific allegations against QuoteWizard are made.

702.   In the ordinary course of its business, LendingTree collects, stores, and uses Plaintiffs' and Class Members' Personal Information.

703.   LendingTree collects consumers' Personal Information as a condition of accessing its services.

704.   LendingTree collects consumers' Personal Information, including names, addresses, telephone numbers, email addresses, account names, Social Security numbers, and dates of birth.[238]

705.   LendingTree maintained a Privacy Policy which stated that it discloses consumers' personal information to "third parties that provide business, professional, or technical support services to us and/or administer activities on our behalf," but it did not identify these "Service Providers." [239]

706.   LendingTree was a Snowflake customer. Snowflake was LendingTree's cloud storage and data warehousing vendor.

---

[238]    Lending Tree, *Privacy Policy*.

[239]    *Id.*

707.   LendingTree stored consumers' Personal Information on the Data Cloud.

708.   LendingTree represented in its Privacy Policy that it had several measures in place to safeguard consumers' Personal Information: "We maintain physical, electronic, and procedural measures designed to safeguard your personal information from unauthorized access and disclosure."[240]

709.   LendingTree maintained a Security Policy on its website, in which it represented that it encrypted and protected consumers' information from third party interception[241]:

> **Security**
>
> While no data transmission over the Internet or information storage technology can be guaranteed to be 100% secure, LendingTree understands your concerns with the safety of your personal information. . . .
>
> **Secure Web Pages and Encryption**
>
> Transmissions between LendingTree, banks, lenders, loan brokers and real estate professionals (and affiliates) are encrypted using public key cryptography algorithms with a minimum key size of 128 bits.
>
> SSL secures and prevents third parties from intercepting and reading your personal information; only we can decode the encryption. . . .

---

[240]    *Id.*

[241]    Lending Tree, *Security Policy*, https://web.archive.org/web/20240405224851/https://www.lendingtree.com/legal/security/ (archived Apr. 5, 2024).

Our website will log you out after a specified period of inactivity. This ensures your account security if you forget to logout from our website.

710.   LendingTree further represented in its Security Policy that its firewalls protected consumer data from "external threats"[242]:

**Firewall Protection**

Firewalls are special purpose devices that protect and screen-out malicious attempts to access information and networks. LendingTree deploys Next Generation Firewalls to protect our resources and consumer data from internal and external threats.

711.   When customers sought to learn more information about QuoteWizard's Privacy Policy, they were directed to a website maintained by LendingTree, with LendingTree's Privacy Policy.[243]

712.   QuoteWizard's Privacy Policy (which is actually LendingTree's Privacy Policy), states that it will combine personal information it receives from other entities to build profiles of customers:

**Combination of information**

We may combine personal information that we receive from and about you, including information you provide to us, information we automatically collect through the Digital Properties, and information we receive from third-party sources. Where applicable, we will use,

---

[242]    *Id.*

[243]    QuoteWizard, *Privacy Policy*, https://web.archive.org/web/20240421182101/https://quotewizard.com/corp/privacy-policy (last updated Apr. 2, 2024).

disclose, and protect the combined information for the purposes described in this Privacy Policy.[244]

713.   LendingTree's "Digital Properties" are www.lendingtree.com "and any other websites or mobile apps where this Privacy Policy is posted or linked"— including QuoteWizard.[245]

714.   For such a combination of information to occur, it is necessary for LendingTree to have access to QuoteWizard's customer databases (and vice versa).

715.   LendingTree's use of Personal Information goes beyond merely collecting it to provide offers from qualified financial and insurance institutions. LendingTree also monetizes the information by providing it to third parties, or "retarget [its consumers] with advertisements based on what you have viewed or engaged with on [LendingTree's] Digital Properties while [consumers] are using platforms provided by Google, Meta, or TikTok and to measure when [the consumer] have clicked through to [LendingTree's] Digital Properties after seeing an advertisement on those or other platforms."[246] LendingTree customers *cannot*

---

[244]    *Id.*

[245]    *Id.*

[246]    *Id.*

opt-out of LendingTree's sharing of personal information with "financial companies" for "marketing purposes."[247]

716.  Consumers rarely understand the above, however, as LendingTree and QuoteWizard's Privacy Policy and Terms of Use are buried in a link in fine print, and consumers do not need to read either to obtain a quote on insurance or other financial instrument after entering their name, email address, date of birth, home address, make and model of vehicle, or other sensitive information.

717.  As customers are not required to review LendingTree's terms before using its services, it would be unconscionable to apply such terms to its customers, especially if those terms seek to limit their ability to seek relief from a court of law for the unlawful, deceptive, unconscionable, negligent, and reckless actions described herein.

## II. The LendingTree Defendants owed a duty of care to Plaintiffs and Class Members.

718.  LendingTree provides services on which consumers rely for the most important purchases they make during their lifetimes. QuoteWizard is a service used to facilitate insurance for large purchases—*e.g.*, new vehicles. As part of that, consumers place a great deal of trust in LendingTree entities (like QuoteWizard) by

---

[247] *What Does LendingTree Do With Your Personal Information* (Nov. 2023), https://web.archive.org/web/20240117183423mp_/https://www.lendingtree.com/content/uploads/2023/11/consumer-privacy.pdf.

providing some of their most sensitive information in exchange for obtaining LendingTree entities' services.

719.  Similarly, QuoteWizard provides services for consumers to obtain necessary insurance to drive and protect their automobiles and themselves.

720.  LendingTree had obligations created by industry standards, common law, statutory law, and its own assurances and representations that it would keep Plaintiffs' and the Class's Personal Information confidential and that it would protect such Personal Information from unauthorized access.

721.  LendingTree, in collecting such sensitive Personal Information from consumers, owed a duty of care to consumers, including the LendingTree Plaintiffs, to exercise reasonable care in maintaining, protecting, and securing their Personal Information.

722.  By mandating the receipt of sensitive Personal Information from consumers as a condition of providing insurance quote services, LendingTree implied its assent to consumers to protect their Personal Information. Consumers expected LendingTree to protect their Personal Information when they provided it as a condition of purchase.

723.  LendingTree owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing,

safeguarding, deleting, and protecting the Personal Information in its possession from being compromised, accessed, stolen, or misused by unauthorized parties.

724.   The disclosure of Personal Information to unauthorized third parties would result in foreseeable harm—and, based upon the information collected by LendingTree entities (including QuoteWizard), and the fact that LendingTree entities collected it, cybercriminals are now aware that Plaintiffs and Class Members are investigating financial and insurance options for a large, important purchase (or protecting a large, important purchase or protecting existing assets—e.g., insurance) in their lives. This places Plaintiffs and Class Members at a great and susceptible risk of harm in the form of phishing, text and email scams, and other forms of fraud and attempted fraud related to financial and insurance instruments.

725.   LendingTree owed a duty to Plaintiffs and Class Members to supervise Snowflake in the collection, storage, and security of Plaintiffs' and Class Members' Personal Information.

726.   LendingTree's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms, as described herein.

727.   LendingTree owed a statutorily imposed duty to Plaintiffs and Class Members to refrain from unfair and deceptive practices.

728.    LendingTree understood that it owed a duty of care to Plaintiffs and Class Members to keep their information safe and secure; they acknowledged that data breaches could cause substantial harm to individuals and were foreseeable. Shortly before the Breach, on February 29, 2024, in its SEC Annual Report, LendingTree explicitly identified data security as a risk facing the business, and stated as follows[248]:

> In the processing of consumer transactions, our businesses collect, use, store, disclose, transfer, and otherwise process a large volume of personal information and other confidential, proprietary and sensitive data. Breaches or failures of security involving our systems or website or those of any of our affiliates, Network Partners or external service providers have occurred in the past and may occur in the future, and have in the past resulted in, and could in the future result in, the theft, unauthorized access, acquisition, use, disclosure, modification or misappropriation of personal information of our consumers, employees or third parties with whom we conduct business, or other confidential, proprietary and sensitive data, fraudulent activity, or system disruptions or shutdowns.
>
> …
>
> [W]e may be held responsible for any breach, failure or fraudulent activity attributed to our affiliates, Network Partners or external service providers as they relate to the information we share with them. In addition, because we do not control our Network Partners or external service providers and our ability to monitor their data security is limited, we cannot ensure the security measures they take will be sufficient to protect our information.

729.    Consumers, including the LendingTree Plaintiffs, relied upon or would be reasonable in relying upon LendingTree's express and implied commitments to

---

[248]    LendingTree, Inc. Form 10-K at 18-19 (Feb. 29, 2024), https://investors.lendingtree.com/node/20321/html.

protect the privacy of their Personal Information when they decided to utilize LendingTree's services.

730.    LendingTree knew or should have known of the importance of oversight related to third-party providers. LendingTree has announced compromised consumer data in two prior data breach incidents, in 2008 and 2022.[249] This Data Breach was foreseeable because LendingTree has dealt with data breaches in the past.

## III.    The LendingTree Defendants breached their duty to protect Personal Information and engaged in unfair trade practices.

731.    At the time of the Data Breach, LendingTree failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards summarized herein. These data security failings included:

- LendingTree did not enforce MFA for its Snowflake accounts. Indeed, QuoteWizard chose to use Snowflake to store the Personal Information of millions of its customers despite knowing that Snowflake did not allow customers to enforce MFA.

- LendingTree did not rotate or disable the credentials of old Snowflake accounts.

---

[249]    Alex Lekander, *Hacker Leaks Database Claiming to be from LendingTree*, CyberInsider (June 21, 2022), https://cyberinsider.com/lendingtree-data-breach-2022/.

- LendingTree did not implement network allow lists that Snowflake account access to certain locations or trusted users.

732. LendingTree further failed to properly investigate, retain, oversee and audit a competent cloud-based data storage provider, because Snowflake similarly had numerous data security failings, as described herein.

733. LendingTree's data security failings enabled the Data Breach. Without these basic protections, UNC5537 was able to exfiltrate the Personal Information of over 190 million LendingTree consumers with nothing more than stolen Snowflake credentials obtained through malware campaigns—and traffic the data to other cybercriminals.

734. LendingTree's failings were particularly egregious given the enormous amount of Personal Information it stored on Snowflake's servers. Tasked with handling the data of over 190 million consumers, LendingTree's failure to implement these basic data security measures is all the more inexplicable and reckless.

735. Indeed, each of these basic protections could have prevented the Data Breach. For example:

- Had LendingTree implemented MFA, UNC5537 would not have been able to access QuoteWizard data with just stolen credentials. MFA would have required an additional layer of authentication (i.e., a code sent via text message or email) that UNC5537 would not have had access to.

- LendingTree could have also prevented the Data Breach by maintaining stricter network allow lists that restricted access to customer Personal Information to certain locations or trusted user accounts that were not previously compromised. [250]

736. In addition, LendingTree violated the FTC Response Guidance by failing to give affected consumers sufficient information regarding the scale of the attack and the types of information taken in the Notice that consumers were ultimately provided.

737. LendingTree, through these basic data security failings, breached its express representations in its Privacy Policy and Security Policy. These representations included, but are not limited to, statements that LendingTree had implemented measures to "monitor and maintain the security of our systems and networks and to detect, prevent, investigate, and protect you, our business, and others from fraud, unauthorized transactions, and other unlawful or unsafe activity"[251] and that QuoteWizard and LendingTree were "committed to maintaining [consumers'] confidence and trust as it relates to the privacy and security of [consumers'] personal information."[252]

738. In the alternative, LendingTree breached implied commitments to consumers to protect their Personal Information, including the LendingTree

---

[250]   *E.g.*, *Mandiant Report*, *supra* n. 25.

[251]   QuoteWizard, *Privacy Policy, supra* n. 231.

[252]   *Id.*

Plaintiffs, by virtue of mandating that consumers provide their sensitive Personal Information as a condition of using their services.

739. LendingTree's basic data security failings also breached its duty of care to protect the Personal Information of consumers, which include the LendingTree Plaintiffs.

## IV. Personal Information stolen about LendingTree Customers.

740. In late July 2024, LendingTree provided consumers affected by the Data Breach with a Notice that disclosed, "[W]e concluded that the [Data Breach] incident likely resulted in the unauthorized access to our disclosure of consumers' names, residential addresses, and driver's license numbers."[253] The Notice was provided on letterhead that read, "QuoteWizard by LendingTree," instructed consumers to "remain vigilant by reviewing account statements and monitoring credit reports," and encouraged consumers to enroll in free credit monitoring services provided by LendingTree.

741. The attackers claimed that the Personal Information also included partial credit card numbers, automobile history, driving records, personal background information needed for insurance quotes, and tracking pixel data

---

[253]    *Notice of Data Incident*, QuoteWizard by LendingTree (July 30, 2024), https://ago.vermont.gov/sites/ago/files/documents/2024-08-09%20QuoteWizard%20Data%20Breach%20Notice%20to%20Consumers.pdf.

related to consumers' internet activity. The LendingTree Defendants dispute this, particularly regarding consumer credit card data. On June 1, 2024, around the time of the Data Breach, this very information was advertised for sale on a dark web forum post by a cybercriminal group by the name of "Sp1d3r." A screenshot of this post is provided below.[254]



---

[254]    Ashish Khaitan, *Dark Web Actor Claims to Pilfer 2TB of Compressed Data from QuoteWizard*, The Cyber Express (June 3, 2024), https://thecyberexpress.com/alleged-quotewizard-data-breach-claims/; *see also* Matt Burgess*, The Snowflake Attack May Be Turning Into One of the Largest Data Breaches Ever*, Wired (June 6, 2024), https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree/ (reporting that Sp1d3r claimed data posted on dark web forum was "related to the Snowflake incident").

742.    The sale of this information reached a fever pitch, when "several listings of data" stolen from LendingTree were found on cybercriminal focus for sale to the "highest bidder."[255]

743.    Plaintiffs and Class Members have a privacy interest in the non-disclosure of their driver's license numbers, as they are a static identifier that can be used to perpetrate identity fraud. This is especially the case where, as here, a driver's license number is disclosed alongside other identifiers, including names, addresses, driving records, and tracking pixel data.

## V.    Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

744.    As described herein, the Personal Information exposed in the Data Breach caused injury to LendingTree Plaintiffs and Class Members.

745.    First, the Data Breach subjected LendingTree Plaintiffs and Class Members to a substantial risk of identity theft, which is demonstrated by facts including, but not limited to: incidences of identity fraud suffered by the Plaintiffs; the posting of LendingTree Plaintiffs' and Class Members' Personal Information on the dark web; the inadequate vagueness of LendingTree's Notice as to Personal Information taken when compared against the specificity of Personal Information

---

[255]    Charles Gorrivan, *Hackers Auction Off Stolen LendingTree Consumers' Data*, Bloomberg (June 21, 2024), https://www.bloomberg.com/news/articles/2024-06-20/hackers-auction-off-stolen-lendingtree-consumers-information.

advertised for sale on the dark web; the sensitivity of Personal Information related to payment card data and driver's license numbers; and LendingTree's own Notice that expressly instructed affected customers to "remain vigilant by reviewing account statements and monitoring credit reports" and recommending that customers register for credit monitoring services. As a result of this substantial risk they face, LendingTree Plaintiffs and Class Members reasonably suffered injury in the form of lost time and resources mitigating against the risk of identity theft and emotional distress arising from the risk of identity theft.

746.    Second, LendingTree made specific data security representations to LendingTree Plaintiffs and Class Members while soliciting Personal Information to provide insurance quotes. By exposing Personal Information to unauthorized third parties in a manner inconsistent with these representations, LendingTree Plaintiffs and Class Members did not receive the benefit of their bargain when they provided their Personal Information in exchange for insurance quotes.

747.    Third, Personal Information has inherent value, and the exposure of that information makes consumers susceptible to fraud and scams for years into the future. Not only should consumers be compensated for the value of their Personal Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

748.   Fourth, the disclosure of LendingTree Plaintiffs' and Class Members' private and sensitive nature of the Personal Information to cybercriminals who in turn advertised and sold the Personal Information on the dark web, constitutes a privacy injury.

## VI.   Class action allegations as to the LendingTree Defendants.

749.   The LendingTree Plaintiffs brings this action on their own behalf, and on behalf the following LendingTree Class and Subclasses (the "LendingTree Classes").

- **Nationwide LendingTree Class.** All individuals residing in the United States who QuoteWizard and/or LendingTree identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "LendingTree Class").

- **State-Specific Subclasses.** As described in this Section below, all individuals residing in a specific state who QuoteWizard and/or LendingTree identified as being among those individuals whose Personal Information was compromised in the Data Breach ("LendingTree Subclass").

750.   Excluded from the LendingTree Classes are the LendingTree Defendants' officers and directors, any entity in which the LendingTree Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of the LendingTree Defendants. Excluded also from the LendingTree Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

751.   The LendingTree Plaintiffs reserve the right to amend or modify the definition of the LendingTree Classes or create additional subclasses as this case progresses.

752.   **Numerosity.** The members of the LendingTree Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that over 190 million LendingTree customers were affected by the Data Breach.

753.   **Commonality.** There are questions of fact and law common to the LendingTree Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether the LendingTree Defendants had a duty to protect the Personal Information of LendingTree Plaintiffs and Class Members.

- Whether the LendingTree Defendants breached express or implied commitments to protect the Personal Information of LendingTree Plaintiffs and Class Members.

- Whether the LendingTree Defendants knew or should have known that their data security practices were deficient.

- Whether the LendingTree Defendants knew or should have known that their vendor's data security practices were deficient.

- Whether the LendingTree Defendants' data security systems were consistent with industry standards prior to the Data Breach.

- Whether the LendingTree Defendants adequately disclosed details regarding the Data Breach to affected consumers.

- • Whether LendingTree Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, general damages, nominal damages, and/or injunctive relief.

754. **Typicality.** The LendingTree Plaintiffs' claims are typical of those of other Class Members because the LendingTree Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach

755. **Adequacy of Representation.** The LendingTree Plaintiffs will fairly and adequately represent and protect the interest of the LendingTree Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

756. **Predominance.** The LendingTree Defendants have engaged in a common course of conduct toward the LendingTree Plaintiffs and Class Members, in that all the data of LendingTree Plaintiff and Class Members were stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from the LendingTree Defendants' conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

757. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the LendingTree Classes. Class treatment of common questions of law and fact is superior to multiple individual

actions or piecemeal litigation. Absent a class action, most LendingTree Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual LendingTree Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for QuoteWizard and LendingTree. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each LendingTree Class Member.

758. LendingTree and LendingTree have acted on grounds that apply generally to the LendingTree Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

759. Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether the LendingTree Defendants owed a legal duty to the LendingTree Plaintiffs and Class Members to protect their Personal Information.

- Whether the LendingTree Defendants' data security measures were inadequate in light of applicable regulations and industry standards.

- Whether the LendingTree Defendants' data security measures were negligent.

- Whether the LendingTree Defendants' oversight over vendors' data security measures was negligent.

- Whether the LendingTree Defendants breached express or implied representations to the LendingTree Plaintiffs and Class Members regarding the protection of their Personal Information.

760. Finally, all members of the proposed LendingTree Classes are readily ascertainable. The LendingTree Defendants have access to the names and contact information of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by QuoteWizard and LendingTree.

## VII.    Causes of action as to the LendingTree Defendants.

### FIRST CLAIM FOR RELIEF
### Negligence
*On behalf of the LendingTree Plaintiffs and the LendingTree Class*

761. The LendingTree Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Five, as set forth fully herein.

762. The LendingTree Defendants owed a duty under common law to the LendingTree Plaintiffs and LendingTree Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information in its possession from being compromised, stolen, or misused by unauthorized persons.

763.    Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the Personal Information of LendingTree Plaintiffs and LendingTree Class Members such as MFA, rotating credentials, and restricting access privileges; (b) maintaining, testing, and monitoring the LendingTree Defendants' security systems to ensure that Personal Information was adequately secured and protected; (c) overseeing and monitoring vendor Snowflake to ensure adequate standards were in place for the security of consumer Personal information; (d) timely acting upon warnings and alerts to respond to intrusions; and (e) adequately notifying the LendingTree Plaintiffs and Class Members about the types of data that were compromised in the Data Breach.

764.    The LendingTree Defendants' duty to use reasonable care in protecting the Personal Information they collected arose from several sources, including those set out below.

765.    The LendingTree Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because the LendingTree Defendants collected and stored valuable Personal Information that is routinely targeted by cyber criminals. The LendingTree Plaintiffs and LendingTree Class Members were the foreseeable and probable victims of any compromise to inadequate data security practices maintained by the LendingTree Defendants.

264

766.    The LendingTree Defendants further assumed a duty of reasonable care in promulgating their Privacy and Security Policies, which assured the LendingTree Plaintiffs and LendingTree Class Members that their Personal Information would be adequately secured.

767.    The LendingTree Defendants also owed duties based upon statutory law, as described herein, to Plaintiffs and the Class Members.

768.    The LendingTree Defendants breached their duties owed to the LendingTree Plaintiffs and LendingTree Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

769.    The LendingTree Defendants breached their duties owed to LendingTree Plaintiffs and Class Members by failing to exercise reasonable oversight in the selection of Snowflake to store Personal Information. Such reasonable oversight would have revealed that Snowflake's cloud services lacked industry standard data security safeguards necessary to adequately protect Personal Information.

770.    It is entirely foreseeable for Plaintiffs and Class Members to experience fraud, attempted fraud, and other financial scams as a result of the information collected by the LendingTree Defendants being exposed to unauthorized third parties, especially when those unauthorized third parties

understand that Plaintiffs and Class Members are investigating financial instruments to finance large purchases.

771. But for the LendingTree Defendants' negligence, the Personal Information of the LendingTree Plaintiffs and LendingTree Class Members would not have been stolen by cybercriminals in the Data Breach.

772. As a direct and proximate result of the LendingTree Defendants' breach of duties, the LendingTree Plaintiffs and LendingTree Class Members have suffered injuries detailed above.

773. As a direct and proximate result of the LendingTree Defendants' negligence, the LendingTree Plaintiffs and LendingTree Class Members are entitled to damages, including compensatory, general, nominal, and/or punitive damages, in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Violation of Washington Consumer Protection Act ("WPCA")**
**(Wash. Rev. Code An. §§ 19.86.020, et seq.)**
*On behalf of Plaintiffs Macom, Nader, and N. Thomas and a*
*LendingTree Subclass of Washington Residents*

774. Plaintiffs Macom, Nader, and N. Thomas (together, the "Washington Plaintiffs") repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Five, as set forth fully herein.

775.    The Washington Plaintiffs and Washington LendingTree Subclass Members are "persons" under the WPCA because they are natural persons. Wash. Rev. Code Ann. § 19.86.010(1).

776.    The LendingTree Defendants are "persons" under the WPCA because they are corporations. Wash. Rev. Code Ann. § 19.86.010(1).

777.    The LendingTree Defendants engaged in "trade" and "commerce" as defined by the WPCA because they provided insurance quote comparison services, which offers the sale of insurance products, to Washington consumers. Wash. Rev. Code Ann. § 19.86.010(2).

778.    The LendingTree Defendants engaged in unfair trade practices prohibited by the WPCA. Wash. Rev. Code Ann. § 19.86.020.

779.    The LendingTree Defendants engaged in unfair trade practices when they failed to maintain reasonable data security practices to safeguard the Personal Information of the Washington Plaintiffs and Washington LendingTree Subclass Members, including: (a) failing to implement industry standard data security safeguards to protect the Personal Information of Washington Plaintiffs and Washington LendingTree Subclass Members relating to MFA, rotating credentials, and restricting access privileges; (b) failing to maintain, test, and monitor Snowflake's security systems to ensure that Personal Information was adequately

secured and protected; and (c) failing to implement intrusion detection systems and notifying customers of suspicious intrusions.

780.    The privacy of individuals seeking financial and insurance instruments to make large purchases or insurance for those purchases is paramount, as they are often the most vulnerable individuals to attempted fraud and scams from cybercriminals posing as financial or insurance institutions. Cybercriminals understanding that Plaintiffs and Class Members are searching for financing or insurance options can easily commit fraud based upon the Personal Information exposed in the Data Breach. Public policy dictates that Personal Information from these consumers should not be disclosed to unauthorized third parties given the extremely sensitive nature of the information *and* their interaction with LendingTree.

781.    Individuals who share Personal Information with a trusted source for the purpose of receiving financial or insurance services do so with the expectation that the information will be secured. For the financial and insurance services industries to function online, this trust and security must be maintained.

782.    The LendingTree Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

783.   The LendingTree Defendants' conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020 and/or has the capacity to injure persons, including the many Washington consumers affected by the Data Breach.

784.   As a direct and proximate result of the LendingTree Defendants' unfair trade practices, the Washington Plaintiffs and Washington LendingTree Subclass members have suffered injuries as described above.

785.   The Washington Plaintiffs and Washington Subclass Members thus seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, including actual damages in an amount to be proven at trial, treble damages of actual damages, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
*On behalf of the LendingTree Plaintiffs and the LendingTree Class*

786.   The LendingTree Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Five, as set forth fully herein.

787.   LendingTree's Product and Privacy Policy states that it may use collected information to communicate products and services that might be of interest to customers and potential customers, create anonymized or aggregated

data, or deliver products or services to customize a customer or potential customer's user experience.

788. Further, LendingTree states that it may share information it collects on customers and potential customers with third parties, including affiliates, network and product partners, financial companies, business partners, and others, who use this information for marketing purposes.

789. LendingTree uses the information it collects on consumers for targeted advertising and marketing purposes, and consumers cannot opt out.

790. LendingTree earns referral commissions from its partners when borrowers (such as Plaintiffs and Class Members) are matched and proceed with a loan offer.

791. LendingTree sells the information it gathers to lenders, who then can solicit consumers with calls, emails, and other correspondence to advertise their financial and insurance instruments to consumers.

792. The information LendingTree gathers is therefore monetized by LendingTree for commercial purposes.

793. LendingTree collected sensitive Personal Information without taking measures to protect that information.

794. LendingTree monetized Personal Information and did not take reasonable data security measures to protect that information.

795.   LendingTree was able to gain a commercial advantage and make a profit from Personal Information because it did not invest in reasonable data security to protect that information.

796.   It would be unjust for LendingTree to retain the benefit it realized from collecting Personal Information and not investing reasonable time, effort, and resources to protect that information.

797.   LendingTree has been unjustly enriched by its collection of Plaintiffs' and Class Members' Personal Information because it did not invest reasonable time, effort, and resources to protect that information.

798.   Plaintiffs and Class Members have been injured by LendingTree's unjust enrichment related to the collection of their Personal Information without paying to protect that information. Accordingly, Plaintiffs and Class Members are entitled to damages including, but not limited to, disgorgement.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## PART SIX: AT&T DEFENDANTS

799.   Plaintiffs Latosha Austin, Gilbert Criswell, David Hornthal, Traci Lively, Natasha McIntosh and Debby Worley (collectively, the "AT&T Plaintiffs") are named in this Representative Complaint to pursue claims against AT&T.[256]

## I.    The AT&T Defendants' business and data security promises.

800.   AT&T "provides more than 100 million U.S. consumers with communications experiences across mobile and broadband."[257]

801.   AT&T admits that it has a "duty under federal law to protect the confidentiality of" the call records information AT&T collects, including Personal Information.[258] This is true: 47 U.S.C. § 222 (Privacy of customer information) imposes a duty on AT&T to protect the confidentiality of customer proprietary network information and is prohibited from disclosure, except as required by law or with the customer's permission.

802.   AT&T claims it maintains "a network and information security program that is reasonably designed to protect our information, and that of our

---

[256]    AT&T, Inc. and AT&T Mobility, LLC are collectively referred to herein as "AT&T" or the "AT&T Defendants" except as expressly delineated.

[257]    AT&T, Investor Profile, https://investors.att.com/investor-profile (last visited Aug. 19, 2024).

[258]    AT&T Privacy Notice (effective date December 11, 2023 through July 16, 2024), https://web.archive.org/web/20231212012645/https://about.att.com/privacy/privacy-notice.html.

customers, from unauthorized risks to their confidentiality, integrity, or availability."[259]

803.   When disclosing the Data Breach, AT&T reaffirmed its promises that: "We hold ourselves to a high standard and commit to delivering the experience that you deserve. We constantly evaluate and enhance our security to address changing cybersecurity threats and work to create a secure environment for you. We invest in our network's security using a broad array of resources including people, capital, and innovative technology advancements."[260]

804.   AT&T owed a duty of care to Plaintiffs and Class Members. As a condition of providing telecommunication services, including allowing its customers to call and text non-AT&T customers, and allowing non-AT&T customers to call and text AT&T customers, AT&T collected, stored, shared, and maintained Plaintiffs' and Class Members' Personal Information, including on the Snowflake cloud-based data storage systems involved in the Data Breach.

805.   AT&T shared Plaintiffs' and Class members' Personal Information with Snowflake in the course of using services provided by Snowflake.

---

[259]    AT&T Inc., 2023 Annual Report, https://investors.att.com/financial-reports/annual-reports/2023 (last visited Aug. 20, 2024).

[260] *Unlawful access of customer data*, AT&T (July 24, 2024), https://www.att.com/support/article/myaccount/000102979?source=EPcc000000000000U (last visited Aug. 19, 2024).

806.  AT&T, in collecting such sensitive Personal Information from consumers, owed a duty of care to consumers, including the AT&T Plaintiffs, to exercise reasonable care in maintaining, protecting, and securing their Personal Information. AT&T**,** by mandating the collection of sensitive Personal Information from consumers as a condition of purchasing goods and services, implied its assent to consumers to protect their Personal Information. Consumers expected AT&T to protect their Personal Information when they provided it as a condition to procure goods and services. AT&T owed a common law duty to the AT&T Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in Snowflake's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

807.  AT&T owed a common law duty to Plaintiffs and Class Members to supervise Snowflake in the collection, storage, and security of the AT&T Plaintiffs' and Class Members' Personal Information.

808.  AT&T's duty of reasonable care is established by federal statute, governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms, as described herein.

809.   AT&T also owed a statutorily imposed duty to the AT&T Plaintiffs and Class Members to refrain from unfair and deceptive practices.

810.   AT&T owed a statutorily imposed duty, pursuant to 47 U.S.C § 222, to safeguard customer information against unauthorized disclosure—such as the Data Breach.

811.   AT&T knew of the importance of implementing basic cybersecurity, as well as exercising oversight over third-party providers for a number of reasons.

812.   First, AT&T is credited as having invented MFA three decades ago, holding a patent for a "transaction authorization and alert system" that allowed customers to authorize transactions through the use of a messaging or alert system.[261]

813.   Second, AT&T advertises MFA products to its business clients for purchase, noting that using MFA could stave off data breaches. "The majority of data breaches are caused by brute force attacks on credentials. . . . AT&T Multi-Factor Authenticator (AT&T MFA) uses next generation security protocols

---

[261]    AT&T Corp., Transaction authorization and alert system, P0745961 (A2), https://worldwide.espacenet.com/publicationDetails/biblio?DB=worldwide.espacenet.com&II=0&ND=3&adjacent=true&locale=en_EP&FT=D&date=19961204&CC=EP&NR=0745961A2&KC=A2; Jon Brodkin, *Kim Dotcom claims he invented two-factor authentication—but he wasn't the first*, ArsTechnica (May 23, 2013), https://arstechnica.com/information-technology/2013/05/kim-dotcom-claims-he-invented-two-factor-authentication-but-he-wasnt-first/.

available to protect your network and devices from breaches related to identity. Cybercriminals use automated code breaking brute force attacks to infiltrate a network, steal passwords, and steal or ransom your data or your customers' data. It's more difficult and costly to clean up after an attack than to prevent it in the first place. To stay ahead on security, it's a smart move to invest in a virtually unphishable credential authentication system."[262]

814.   Third, AT&T has suffered a number of data breaches, demonstrating to the company that a failure to implement and follow cybersecurity guidelines can result in the exposure of customer data.[263]

815.   The Data Breach is the second breach of AT&T customer data last year. Earlier last year, data of over 70 million AT&T customers—including encrypted passcodes for accessing AT&T customer accounts—was published on a cybercrime forum. AT&T confirmed the data was authentic, but does not know

---

[262]   *Secure access to your corporate network and prevent identity fraud with AT&T Multi-Factor Authenticator* (2022), https://cdn-cybersecurity.att.com/docs/product-briefs/att-multi-factor-authenticator.pdf.

[263]   Catherine Reed, *AT&T Data Breaches: Full Timeline Through 2023*, Firewall Times (Oct. 5, 2023), https://firewalltimes.com/att-data-breaches/.

whether the data originated from AT&T or one of its vendors.[264] The breached data includes names, phone numbers, postal addresses, and Social Security numbers.[265] Based on AT&T's preliminary analysis, the data appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.[266] AT&T claims there is no evidence this was the result of unauthorized access to its systems.[267]

816.    In the last ten years, AT&T was also the subject of several additional data breaches involving customer data in 2014, 2020, 2022, and 2023.[268]

817.    A company with such extensive experience in prior breaches should understand and appreciate the significant risk of harm that breaches expose customers to. AT&T knew or was reckless in not knowing that substandard data

---

[264]    Becky Bracken, *AT&T Confirms 73M Customers Affected in Data Leak*, DarkReading (Apr. 1, 2024), https://www.darkreading.com/remote-workforce/att-confirms-73m-customers-affected-data-leak; AT&T Inc., *AT&T Addresses Recent Data Set Released on the Dark Web* (Mar. 30, 2024), https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last visited Aug. 20, 2024).

[265]    *Id*.

[266]    *Id*.

[267]    *Id*.

[268] Catherine Reed, *AT&T Data Breaches: Full Timeline Through 2023*, Firewall Times (Oct. 5, 2023), https://firewalltimes.com/att-data-breaches/ (last visited Aug. 20, 2024).

security practices or ineffective monitoring of third-party providers could—and often do—lead to data breaches.

818.   This Data Breach was foreseeable because AT&T has dealt with data breaches involving third-party vendors in the past.

## II.   The AT&T Defendants breached their duty to protect Personal Information and engaged in unfair trade practices.

819.   Despite AT&T's explicit assurances that it would safeguard its customers' sensitive Personal Information, AT&T notified customers that customer information was "illegally downloaded" from their Snowflake cloud platforms.

820.   Information exposed in the Data Breach not only consisted of sensitive call logs for AT&T consumers, but it also disclosed with whom those customers interacted (regardless of service provider), call logs for individuals whose numbers are on customer accounts, and former customers.

821.   The Data Breach accordingly exposed the Personal Information of nearly every person in the United States with a cell phone number.

822.   The compromised information is uniquely sensitive. For example, cell site identification numbers can be used to determine the approximate location of where a call was made or text message sent. Cybercriminals can also now identify relationships among phone numbers, allowing hackers to make scams more believable. With the compromised Personal Information, hackers can determine which banks, medical providers, schools, charities, stores, and other individuals a

person is in contact with, further expanding the range and effectiveness of phishing and other attempts to trick impacted individuals into giving up yet more personal or financial information.[269]

823.   AT&T's announcements of the Data Breach did not include a critical piece of information: hackers could not have "illegally downloaded" information about customers had AT&T deployed basic cybersecurity measures to protect their Snowflake accounts.

824.   Additionally shocking is that, although AT&T learned of the Data Breach on April 19, 2024, hackers were still able to continue exfiltrating data on their customers until April 25, 2024.[270]

825.   At the time of the Data Breach, AT&T failed to maintain reasonable data security measures and comply with FTC guidance, the PCI DSS, and other relevant industry standards summarized above. These data security failings included:

- AT&T did not enforce MFA for its Snowflake accounts.

---

[269]   Ramishah Maruf, *How AT&T customers can protect themselves in the latest data breach*, CNN (July 12, 2024), https://www.cnn.com/2024/07/12/business/att-customers-data-breach-protection/index.html.

[270]   Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, Wired (Jul. 12, 2024), https://www.wired.com/story/att-phone-records-breach-110-million/.

- AT&T did not rotate or disable the credentials of old Snowflake accounts.

- AT&T did not implement network allow lists that restricted Snowflake account access to certain locations or trusted users.

826.  AT&T failed to take these measures despite being under constant attacks and attempted attacks from threat actors.

827.  AT&T's data security failings enabled the Data Breach. Without these basic protections, UNC5537 was able to exfiltrate the Personal Information of millions of consumers with nothing more than stolen AT&T or Snowflake credentials.

828.  Indeed, each of these basic protections could have prevented the Data Breach. For example:

- Had AT&T implemented MFA, UNC5537 would not have been able to access AT&T data with stolen or outdated credentials. MFA would have required an additional layer of authentication (i.e., a code sent via text message or email) that UNC5537 would not have had access to.

- AT&T could have also prevented the Data Breach by maintaining a policy of rotating or disabling credentials that were either old or compromised in other data breaches. As the Mandiant Report found that a "majority of the credentials used by UNC5537" were available from historic malware campaigns dating back to 2020, a policy that disabled previously-compromised credentials could have prevented the Data Breach.[271]

---

[271]  *Mandiant Report, supra* n. 25.

- AT&T could have also prevented the Data Breach by maintaining stricter network allow lists that restricted access to customer Personal Information to certain locations or trusted user accounts that were not previously compromised.

829. AT&T, through these basic data security failings, breached express representations to consumers regarding protecting Personal Information and implementing cybersecurity policies. In the alternative, AT&T breached implied commitments to protect consumer Personal Information made to consumers by virtue of having access to some of the most sensitive data available to hackers and opting to simply not protect it.

830. AT&T's basic data security failings also breached its duty of care to protect the Personal Information of consumers.

## III.    Personal Information stolen about AT&T Plaintiffs and Class Members.

831. In a July 12, 2024 press release, AT&T acknowledged that "customer data was illegally downloaded from our workspace on a third-party cloud platform." The press release, excerpted at greater length below, disclosed that the stolen data included "AT&T records of calls and texts of nearly all of AT&T's cellular customers . . . between May 1, 2022 – October 31, 2022" and also included for a subset of stolen records, "one or more cell site identification number(s) associated with the [telecommunications] interaction." [272]

---

[272]    *AT&T Addresses Illegal Download of Customer Data*, AT&T (July 12, 2024), https://about.att.com/story/2024/addressing-illegal-download.html.

Based on our investigation, the compromised data includes files containing **AT&T records of calls and texts of nearly all of AT&T's cellular customers**, customers of mobile virtual network operators (MVNOs) using AT&T's wireless network, as well as AT&T's landline customers who interacted with those cellular numbers between May 1, 2022 - October 31, 2022. The compromised data also includes records from January 2, 2023, for a very small number of customers. The records identify the telephone numbers an AT&T or MVNO cellular number interacted with during these periods. For a subset of records, one or more cell site identification number(s) associated with the interactions are also included.

832.    The scale of this breach is enormous. Based on AT&T's annual report of its total customers in 2022 and its disclosure that "nearly all" were affected, the Data Breach impacted over 100 million customers.[273]

833.    An individual's call and text logs are private and sensitive information. Indeed, Congress made these precise findings when it passed the Telephone Records and Privacy Protection Act of 2006 ("TRPPA"), which criminalized the unauthorized disclosure of phone records.[274] In passing the TRPPA, Congress made express findings that "telephone records can be of great use to criminals because the information contained in call logs may include a wealth of personal data"; that "call logs may reveal the names of telephone users' doctors, public and private

---

[273]    Matt Kapko, *Massive Snowflake-linked attack exposes data on nearly 110M AT&T customers*, Cybersecurity Dive (July 12, 2024), https://www.cybersecuritydive.com/news/att-cyberattack-snowflake-environment/721235/.

[274]    Telephone Records and Privacy Protection Act of 2006, 18 U.S.C. § 1039.

relationships, business associates, and more" and that "the unauthorized disclosure of telephone records not only assaults individual privacy but, in some instances, may further acts of domestic violence or stalking, compromise the personal safety of law enforcement officers, their families, victims of crime, witnesses, or confidential informants, and undermine the integrity of law enforcement investigations."[275]

834.    Further demonstrating how an individual's call logs can disclose private relationships and connections, after the Data Breach, FBI officials warned its agents that their call logs were presumed stolen and that the identity of confidential informants could be compromised. The FBI urged agents to take action to limit the fallout given the possibility of hackers publicly disclosing the stolen call logs.[276]

835.    Industry experts have highlighted additional serious privacy and fraud concerns associated with the theft of call logs and cell cite identification numbers:

> There are many effects of this breach. If someone gets their hands on this much info, they could use it in a lot of bad ways. This information could be used by cybercriminals to target phishing attacks, steal your name, or even demand money. Cybercriminals can make more effective phishing schemes if they know specific details about people, like their

---

[275]    18 U.S.C. § 1039, Notes 1-2, 5.

[276]    Jake Bleiberg and Margi Murphy, *FBI Warned Agents It Believes Phone Logs Hacked Last Year*, Bloomberg (Jan. 16, 2025), https://www.bloomberg.com/news/articles/2025-01-16/fbi-has-warned-agents-it-believes-hackers-stole-their-call-logs/.

phone numbers and how often they call. The data could also be used to figure out personal things about people, like their relationships, health, or finances, which could then be used for bad things.[277]

836.   Security experts warn that the information can expose consumers to significant harm and fraud.

"Yeah, this is really bad," says Jake Williams, vice president of research and development at the cybersecurity consultancy Hunter Strategy. "What the threat actors stole here are essentially call data records. These are a gold mine in intelligence analysis because they allow someone to understand networks—who is talking to whom and when. And threat actors have data from previous compromises to map phone numbers to identities. But even without identifying data for a phone number, closed networks—where numbers *only* communicate with others in the same network—are almost always interesting."[278]

837.   Contrary to guidance from the FBI, AT&T paid a hacker approximately $370,000 to delete the data.[279] But that payment does not guarantee that the information was destroyed. Indeed, the phone record data stolen from the breach has sprung up for sale in other forums, demonstrating that the information was likely transferred to other threat actors before it was "deleted."

---

[277]   Elena Thomas, *Exposed in Massive Cyber Attack*, Cyber Defense Magazine (Jan. 8, 2025), https://www.cyberdefensemagazine.com/att-breach-2024-customer-data-exposed-in-massive-cyber-attack/.

[278]   Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, Wired (Jul. 12, 2024), https://www.wired.com/story/att-phone-records-breach-110-million/.

[279]   *AT&T Data Breach: Nearly ALL Customers Have Phone Records Stolen*, Trend (Jul. 15, 2024), https://news.trendmicro.com/2024/07/15/att-data-breach-110-million/.

838.    A former counterintelligence officer for the FBI seems to have no confidence that the data stolen was actually deleted, either:

> Darren Mott, who oversaw counterintelligence investigations in the FBI's Huntsville, Alabama, office, said the bureau and other law enforcement and intelligence agencies have likely moved to protect sources based on the assumption that this data will eventually get out.[280]

839.    AT&T's conduct has created a substantial risk of identity theft, fraud, or other forms of exploitation. The data acquired in the Data Breach included unencrypted phone numbers and cell site identification numbers, which can be used to perpetuate fraud, identity theft, and other types of exploitation. For example, this data can be used in SIM swapping scams, port-out fraud,[281] and Smishing attacks.[282]

840.    Telephone numbers also carry a "treasure trove of information that can be harnessed for various purposes."[283] Even "imprecise and sparse telephone metadata" could allow a cybercriminal to infer a person's home location.[284]

---

[280]    Jake Bleiberg and Margi Murphy, *FBI Warned Agents It Believes Phone Logs Hacked Last Year*, Bloomberg (Jan. 16, 2025), https://uk.news.yahoo.com/fbi-warned-agents-believes-hackers-185420839.html.

[281]    Andrew Regitsky, *FCC Will Update CPNI Rules to Stop Data Breaches*, CCMI, https://www.ccmi.com/fcc-will-update-cpni-rules-to-stop-data-breaches/ (last visited Aug. 20, 2024).

[282]    Fed. Commc'n Comm., Avoid the Temptation of Smishing Scams (Feb. 1, 2024), https://www.fcc.gov/avoid-temptation-smishing-scams (last visited Aug. 20, 2024).

[283]    Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).

[284]    *Id*.

841.    While the Personal Information stolen in the Data Breach does not include customer names, AT&T itself admitted, in disclosing the Data Breach, that "there are often ways, using publicly available online tools, to find the name associated with a specific telephone number."[285] According to Information Security experts, once you have a name, the stolen data can then be used to learn more about people: "who they talk to, where they go, where they socialize" and such information "is a treasure trove for people who ultimately would want to do harm."[286]

842.    Telephone numbers, even when anonymized, are "trivially reidentifiable" through methods such as basic web searches.[287]

843.    Telephone metadata such as that involved in the Data Breach also enables cybercriminals to determine sensitive traits and characteristics of Plaintiff and Class members, such as potential medical conditions, relationship status, religious affiliation, or firearm ownership.[288]

---

[285]    AT&T, Form 8-K (July 12, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/00007327172400 0046/t-0240506.htm.

[286]    Hank Sanders, *Are You an AT&T Customer? Here's What to Know About the Data Breach*, New York Times (July 12, 2024), https://www.nytimes.com/2024/07/12/us/phone-data-breach.html/.

[287]    Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).

[288]    *Id*. at 5539-40.

844. The potential exposure of this information is particularly alarming, according to Secure Cyber Defense CEO Shawn Waldman, because this type of data allows hackers to pinpoint locations based on phone numbers.[289] Jake Williams, a former hacker for the National Security Agency, said call data records "are a gold mine in intelligence analysis because they can be used to understand who is talking to who—and when."[290] This type of information can be used to craft highly sophisticated attacks through phishing or hacking.[291]

845. The potential for triangulation of customers' locations from compromised cell site identification numbers further "adds a physical dimension to the already extensive privacy violation and could expose individuals to highly

---

[289]    Stephanie Schappert, *AT&T reports arrest made in April hack, updates affected customers*, cybernews (July 18, 2024), https://cybernews.com/news/att-breach-hack-reports-arrest-made/ (last visited Aug. 20, 2024).

[290]    Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[291]    Hank Sanders, *Are You an AT&T Customer? Here's What to Know About the Data Breach*, New York Times (July 12, 2024), https://www.nytimes.com/2024/07/12/us/phone-data-breach.html#:~:text=In%20addition%20to%20the%20personal,through%20phishing%20or%20hacking%2C%20Mr.

targeted and convincing social engineering attacks, not to mention compromising [their] physical security…."[292]

846.    Thus, even without contents of communications, the compromised metadata has "major implications for people's privacy and security."[293]

847.    Exacerbating the risk of identity theft to Plaintiffs and Class Members, cybercriminals connected with the Data Breach have advertised and sold the stolen Personal Information on dark web forums.[294]

## IV.    Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

848.    As described herein, the Personal Information exposed in the Data Breach caused injury to Plaintiffs and Class Members.

849.    First, the Data Breach subjected Plaintiffs and Class Members to a substantial risk of identity theft as demonstrated by facts including, but not limited to: incidences of identity fraud suffered by the AT&T Plaintiffs; the posting of

---

[292]    Nate Nelson, *AT&T Breach May Also Impact Millions of Boost, Cricket, H2O Customers*, DarkReading (July 12, 2024), https://www.darkreading.com/cyberattacks-data-breaches/att-breach-may-also-impact-millions-of-boost-cricket-h2o-customers (last visited Aug. 21, 2024).

[293]    Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[294]    Jessica Lyons, *US Army soldier who allegedly stole Trump's AT&T call logs arrested*, The Register (Jan. 1, 2025), https://www.msn.com/en-us/news/crime/us-army-soldier-who-allegedly-stole-trumps-at-t-call-logs-arrested/ar-AA1wNlhv.

AT&T Plaintiffs' and Class Members' Personal Information on the dark web; the sensitivity of Personal Information related to call log and location data; and AT&T's own Notice that directs customers to a website called CyberAware for customers to "[f]ind more tips and info" about how to protect themselves after the Data Breach, which includes tutorials for customers to protect against identity theft, phishing, and other fraudulent schemes.[295] As a result of this substantial risk, AT&T Plaintiffs and Class Members reasonably suffered injury in the form of lost time and resources mitigating against the risk of identity theft and emotional distress arising from the risk of identity theft.

850.    Second, AT&T made specific data security representations to AT&T Plaintiffs and Class Members. A portion of the price that AT&T Plaintiffs and Class Members pay to AT&T would cover cybersecurity and protection of Personal Information. By exposing Personal Information to unauthorized third parties, Plaintiffs and Class Members did not receive the benefit of their bargain.

851.    Third, Personal Information has inherent value, and the exposure of that information makes consumers susceptible to fraud and scams for years into the future. Not only should consumers be compensated for the value of their Personal

---

[295]    *Unlawful access of customer data*, AT&T, https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U; *CyberAware*, https://about.att.com/pages/cyberaware (last visited Jan. 17, 2025).

Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

852.    Fourth, the disclosure of AT&T Plaintiffs' and Class Members' private and sensitive Personal Information to cybercriminals, who in turn advertised and sold that Personal Information on the dark web, constitutes a privacy injury.

## V.    Class action allegations as to the AT&T Defendants.

853.    The AT&T Plaintiffs bring this action on their own behalf, and on behalf the following AT&T Class and Subclasses (the "AT&T Classes"):

> **Nationwide AT&T Class.** All individuals residing in the United States who either (a) AT&T identified as being among those individuals whose Personal Information was compromised in the Data Breach; (b) Cricket Wireless or an AT&T MVNO, including but not limited to Consumer Cellular or Boost Mobile, identified as being among those individuals whose Personal Information was compromised in the Data Breach; or (c) whose Personal Information was compromised because they used an authorized line during the relevant time period on the account of someone AT&T, Cricket Wireless or an MVNO identified as being among those individuals whose Personal Information was compromised in the Data Breach (the "AT&T Class").

> **State-Specific Subclasses.** As described in this Section below, all individuals residing in a specific state who AT&T, Cricket Wireless and/or MVNOs identified as being among those individuals whose Personal Information was compromised in the Data Breach or whose Personal Information was compromised because they used an authorized line during the relevant time period on the account of someone AT&T, Cricket Wireless or an MVNO identified as being among those individuals whose Personal Information was compromised in the Data Breach ("AT&T Subclass").

854.   Excluded from the AT&T Classes are AT&T and impacted MVNO officers and directors, any entity in which AT&T or impacted MVNOs have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of AT&T or impacted MVNOs. Excluded also from the AT&T Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

855.   The AT&T Plaintiffs reserve the right to amend or modify the definition of the AT&T Classes or create additional subclasses as this case progresses.

856.   **Numerosity.** The members of the AT&T Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that over hundreds of millions of individuals were affected by the Data Breach.

857.   **Commonality.** There are questions of fact and law common to the AT&T Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether AT&T had a duty to protect the Personal Information of AT&T Plaintiffs and Class Members.

- Whether AT&T breached express or implied commitments to protect the Personal Information of AT&T Plaintiffs and Class Members.

- Whether AT&T knew or should have known that its data security practices were deficient.

- Whether AT&T's data security systems were consistent with industry standards prior to the Data Breach.

- Whether AT&T adequately disclosed details regarding the Data Breach to affected consumers.

- Whether AT&T unlawfully utilized, retained, misplaced, or exposed Plaintiffs' and the Class Members' Personal Information.

- Whether AT&T Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, general damages, nominal damages, and/or injunctive relief.

858. **Typicality.** The AT&T Plaintiffs' claims are typical of those of other Class Members because the AT&T Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach

859. **Adequacy of Representation.** The AT&T Plaintiffs will fairly and adequately represent and protect the interest of the AT&T Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

860. **Predominance.** AT&T has engaged in a common course of conduct toward the AT&T Plaintiffs and Class Members, in that all the data of Plaintiff and Class Members were stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from AT&T's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

861.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the AT&T Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most AT&T Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual AT&T Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for AT&T. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each AT&T Class Member.

862.    **Injunctive Relief.** AT&T has acted on grounds that apply generally to the AT&T Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

863.    **Issue Certification.** Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether AT&T owed a legal duty to the AT&T Plaintiffs and Class Members to protect their Personal Information.

- Whether AT&T's data security measures were inadequate in light of applicable regulations and industry standards.

- Whether AT&T's data security measures were negligent.

- Whether AT&T breached express or implied representations to the AT&T Plaintiffs and Class Members regarding the protection of their Personal Information.

864. **Identification of Class Members Using Objective Criteria.** Finally, all members of the proposed AT&T Classes are readily identifiable using objective criteria. AT&T has access to the names and contact information of Class Members affected by the Data Breach. Adequate notice can be given to Class members directly using information maintained in Defendants' records.

## VI.    Causes of action against the AT&T Defendants.

### FIRST CLAIM FOR RELIEF
### Negligence
*On behalf of the AT&T Plaintiffs and the Nationwide AT&T Class*

865. The AT&T Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Six, as set forth fully herein.

866. The AT&T Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information in its possession from being compromised, stolen, or misused by unauthorized persons.

867. As described herein, the AT&T Defendants had a duty to: (a) implement industry standard data security safeguards to protect the Personal

Information of AT&T Plaintiffs and Class Members such as MFA, rotating credentials, and restricting access privileges; (b) maintain, test, and monitor the AT&T Defendants' security systems to ensure that Personal Information was adequately secured and protected; (c) timely act upon warnings and alerts to respond to intrusions; and (d) adequately notify the AT&T Plaintiffs and Class Members about the types of data that were compromised in the Data Breach.

868.  The AT&T Defendants' duty to use reasonable care arose from several sources, including those set out below.

869.  The AT&T Defendants had a common law duty to prevent foreseeable harm to others. The harm was foreseeable because the AT&T Defendants had and continued to sustain a number of data breaches, exposing sensitive information. The AT&T Defendants understand that the exposure of Personal Information can affect individuals' lives for years.

870.  This duty existed because the AT&T Defendants collected and stored valuable Personal Information that is routinely targeted by cyber criminals without putting adequate safeguards into place.

871.  The AT&T Defendants breached their duties owed to the Plaintiffs and Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

872.  The AT&T Defendants breached their duties owed to AT&T Plaintiffs and Class Members by failing to exercise reasonable oversight in the selection of Snowflake to store Personal Information. Such reasonable oversight would have revealed that Snowflake's cloud services lacked industry standard data security safeguards necessary to adequately protect Personal Information.

873.  The Data Breach was entirely foreseeable. Not only did industry experience show that a failure to adopt the security standards as described herein would result in data breaches, but the AT&T Defendants, themselves, previously experienced a prior breach of a third-party provider by not exercising sufficient oversight over that entity

874.  But for the AT&T Defendants negligence, the Personal Information of the AT&T Plaintiffs and Class Members would not have been stolen by cybercriminals in the Data Breach.

875.  As a direct and proximate result of the AT&T Defendants' breach of duties, the AT&T Plaintiffs and Class Members have suffered injuries detailed herein.

876.  As a direct and proximate result of the AT&T Defendants' negligence, the AT&T Plaintiffs and Class Members are entitled to damages, including compensatory, general, nominal, and/or punitive damages, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Negligence Per Se
*On behalf of the AT&T Plaintiffs and the Nationwide AT&T Class*

877.    The AT&T Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well Part One and Part Six, as set forth fully herein.

878.    The AT&T Defendants had a duty to AT&T Plaintiffs and the Class under the FTC Act as well as statutory provisions concerning the protection of customer information by wireless providers including but not limited to TRPPA and 47 U.S.C. § 222.

879.    The FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC.

880.    Pursuant to the FTC Act (15 U.S.C. § 45), TRPPA, and 47 U.S.C. § 222, Defendants had a duty to provide fair and adequate data security practices to safeguard the AT&T Plaintiffs' and Class members' Personal Information.

881.    FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

882.    The AT&T Plaintiffs and AT&T Class members were within the class of persons the Federal Trade Commission Act, TRPPA, and 47 U.S.C. § 222 were intended to protect.

883.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act, TRPPA, and 47 U.S.C. § 222 was intended to guard against. The

FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by the AT&T Plaintiffs and AT&T Class members.

884.    The AT&T Defendants have admitted that the Personal Information of the AT&T Plaintiffs and AT&T Class Members was wrongfully lost and disclosed to unauthorized third persons, and released on the dark web, as a result of the Data Breach.

885.    The AT&T Plaintiffs further believe their Personal Information and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

886.    The AT&T Defendants therefore breached their duty to the AT&T Plaintiff and AT&T Class members by violating Section 5 of the FTC Act, TRPPA, and 47 U.S.C. § 222 by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards, as described in detail herein.

887.    The AT&T Defendants acted with wanton disregard for the security of the AT&T Plaintiffs' and AT&T Class members' Personal Information. The AT&T Defendants knew or reasonably should have known that they had inadequate data

security practices to safeguard such information, and the AT&T Defendants knew or should have known that data thieves were attempting to access databases containing Personal Information such as that entrusted to the AT&T Defendants.

888.   The AT&T Plaintiffs' and AT&T Class members' Personal Information would not have been compromised but for the AT&T Defendants wrongful and negligent breach of their duties.

889.   But for the AT&T Defendants' wrongful and negligent breaches of the duties owed to AT&T Plaintiffs and AT&T Class Members, AT&T Plaintiffs and AT&T Class members would not have been injured.

890.   The AT&T Defendants' failure to take proper security measures to protect the Personal Information of AT&T Plaintiffs and Class Members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of Personal Information by unauthorized third parties. Given that companies such as the AT&T Defendants are prime targets for hackers, AT&T Plaintiffs and Class Members are part of a foreseeable, discernible group that was at high risk of having their Personal Information misused or disclosed if not adequately protected by the AT&T Defendants. Because AT&T violated the FTC Act, TRPPA, 47 U.S.C. § 222, and other provisions of the law, it is liable to the AT&T Plaintiffs and Class Members as committing negligence per se.

**THIRD CLAIM FOR RELIEF**
**Invasion of Privacy (Public Disclosure of Private Facts)**
*On behalf of the AT&T Plaintiffs and the Nationwide AT&T Class*

891.   The AT&T Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Six, as set forth fully herein.

892.   The AT&T Plaintiffs' Personal Information relating to call and text logs, as well as cell site ID numbers associated with their calls and texts, are of a private, secluded, and highly personal nature, the disclosure of which would be highly offensive to a reasonable person and is not a matter of legitimate public concern.

893.   Call and text logs, when combined with cell site identification numbers, can be used to engineer the identity of a customer, as well as their geolocation coordinates, revealing some of the most intimate details of an individual's life.

894.   The AT&T Defendants, in failing to implement reasonable cyber security policies and practices, disclosed the AT&T Plaintiffs' and Class Members' Personal Information to cybercriminals and nefarious third-parties, who in turn further disclosed that Personal Information on the dark web by advertising and selling the stolen Personal Information. These disclosures gave publicity to the AT&T Plaintiffs' and Class Members' Personal Information and caused injury.

895.   The AT&T Defendants had no legitimate basis to disclose AT&T Plaintiffs' and Class Members' Personal Information to cybercriminals or nefarious third parties.

896.   The AT&T Plaintiffs seek all monetary and non-monetary relief allowed by law, including actual, nominal, or general damages; declaratory and injunctive relief, including an injunction barring the AT&T Defendants from disclosing their Personal Information without their consent; and any other relief that is just and proper.

## FOURTH CLAIM FOR RELIEF
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, *et seq.* ("ICFA")
*On behalf of Plaintiff Hornthal and*
*the Illinois AT&T Subclass*

897.   Plaintiff Hornthal repeats and re-alleges the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Six, as set forth fully herein.

898.   Plaintiff Hornthal brings this claim on behalf of himself and all members of the Illinois AT&T Subclass.

899.   Plaintiff Hornthal and Illinois Subclass members transacted for and received telecommunication services from the AT&T Defendants for personal, family, or household services.

900.   The AT&T Defendants engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security

measures to protect and secure Plaintiff's and Illinois AT&T Subclass members' Personal Information in a manner that complied with applicable laws, regulations, and industry standards.

901.   The AT&T Defendants makes explicit promises that they will ensure personal information used on its networks will remain private.

902.   Due to the Data Breach, Plaintiff and Illinois Subclass members have lost property and the value of that property in the form of their Personal Information. Further, the AT&T Defendants' failure to adopt reasonable practices in protecting and safeguarding their customer's Personal Information will force Plaintiff and Illinois Subclass members to spend time or money to protect against identity theft. Plaintiff and Illinois AT&T Subclass members are now at a higher risk of identity theft and other crimes.

903.   The AT&T Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. The harm done sufficiently outweighs any justifications or motives for the AT&T Defendants' practice of collecting and storing Personal Information without appropriate and reasonable safeguards to protect such information in place.

904.   As a result of the AT&T Defendants' violations of the ICFA, Plaintiff and Illinois AT&T Subclass members have suffered and will suffer injury, as described above.

905.   Plaintiff and Illinois AT&T Subclass members thus seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, including actual damages in an amount to be proven at trial, treble damages of actual damages, and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### Violations of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* ("D.C. CPPA")
*On behalf of Plaintiff Lively and the Washington D.C. AT&T Subclass*

906.   Plaintiff Lively repeats and re-alleges the allegations contained in Paragraphs 1 through 268, as well as Part One and Part Six, as set forth fully herein.

907.   Plaintiff Lively and D.C. AT&T Subclass Members are "consumers" under the D.C. CPPA because they received consumer services. D.C. Code § 28-3901(a)(2).

908.   The AT&T Defendants are "merchant[s]" under the D.C. CPPA because they "supply the goods or services which are . . . the subject of a trade practice." D.C. Code § 28-3901(a)(3).

909.   The AT&T Defendants' telecommunication services and related data collection and storage practices are "trade practices" because they are acts that "directly or indirectly . . . effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code § 28-3901(a)(6).

910.   The AT&T Defendants engaged in deceptive, unfair, and unlawful trade practices prohibited by the D.C. CPPA. D.C. Code §§ 28-3904; 3905(k)(1)

911.   The AT&T Defendants engaged in deceptive conduct because, among other reasons, it explicitly and implicitly promises that it will ensure personal information used on its networks will remain private.

912.   The AT&T Defendants engaged in unlawful conduct by violating the FTC Act, TRPPA, 47 U.S.C. § 222, and other provisions of federal and D.C. law, including the D.C. Security Breach Protection Amendment Act of 2020 ("D.C. SBPAA"), which provides: "To protect personal information from unauthorized access, use, modification, disclosure, or a reasonably anticipated hazard or threat, a person or entity that owns, licenses, maintains, handles, or otherwise possesses personal information of an individual residing in the District shall implement and maintain reasonable security safeguards, including procedures and practices that are appropriate to the nature of the personal information and the nature and size of the entity or operation." D.C. Code § 28-3852.01.

913.   A violation of the D.C. SBPAA, including D.C. Code § 28-3852.01, constitutes a per se unfair or deceptive trade practice under the D.C. CPPA. *See* D.C. Code § 28-3853.

914.   The AT&T Defendants violated the D.C. SBPAA, and therefore the D.C. CPPA, by failing to maintain reasonable data security practices to safeguard the Personal Information of Plaintiff Lively and D.C. AT&T Subclass Members, including: (a) failing to implement industry standard data security safeguards to

304

protect the Personal Information of Plaintiff Lively and D.C. AT&T Subclass Members; and (b) failing to maintain, test, and monitor its security systems to ensure that Personal Information was adequately secured and protected.

915.   In addition to its per se violation of the D.C. CPPA, the AT&T Defendants engaged in unfair trade practices prohibited by the D.C. CPPA by failing to maintain reasonable data security practices. D.C. Code § 28-3904.

916.   The AT&T Defendants' actions were reckless. As a direct and proximate result of its security failures, Plaintiff Lively and the Subclass Members' Personal Information was subject to unauthorized access and exfiltration, theft, and/or disclosure.

917.   The AT&T Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. The harm done sufficiently outweighs any justifications or motives for the AT&T Defendants' practice of collecting and storing Personal Information without appropriate and reasonable safeguards to protect such information in place. Consumers could not have reasonably avoided the harm inflicted by AT&T.

918.   As a result of the AT&T Defendants' violations of D.C. CPPA, Plaintiff and D.C. AT&T Subclass members have suffered and will suffer injury, as described above.

919.   As a direct and proximate result of the AT&T Defendants' deceptive, unlawful, and unfair trade practices, Plaintiff Lively and D.C. AT&T Subclass Members are entitled to injunctive relief, damages, including actual damages in an amount to be proven at trial or statutory damages of $1,500, whichever is greater, treble damages of actual damages, and reasonable attorneys' fees. D.C. Code § 28-3905(k)(1)(A), (k)(2).

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## PART SEVEN: LOS ANGELES UNIFIED SCHOOL DISTRICT VENDOR DEFENDANTS

Plaintiffs Rundle and Z.R., Singer and G.M., Harrison and T.T. (F) and T.T. (M), and Price and E.J., B.J., M.C., and E.C. (collectively, the "LAUSD Vendor Plaintiffs") are named in this Representative Complaint to pursue claims against Innive and Doe Defendants 1-50.

## I.    LAUSD collects, manages, and stores massive amounts of Personal Information to serve half a million students.

920.    Los Angeles Unified School District (LAUSD) has more than 1,000 schools and 540,000 students. It is the second-largest public school district (by student population) in the United States and second-largest employer in Los Angeles County.[296]

921.    As such, LAUSD collects, processes, and holds massive amounts of sensitive, private Personal Information and data for teachers, faculty, staff, parents, and importantly, children. These records include each student's legal name, date and place of birth, sex, and method of birth verification. LAUSD also maintains detailed attendance records and academic transcripts, which document grades and credits earned, as well as the date of high school graduation or its equivalent. In addition, the district keeps health records, including immunization histories and

---

[296]    *Los Angeles Unified Fingertip Facts*, LAUSD, https://www.lausd.org/cms/lib/CA01000043/Centricity/Domain/468/2022-2023%20TDemo.pdf (last accessed June 24, 2025).

health screenings, and stores standardized test results and language proficiency assessments. For students receiving special education services, records include Individualized Education Programs (IEPs) and 504 Plans. Disciplinary actions and significant information related to the student's family background and home environment are also maintained. Permitted records include teacher evaluations and observations, psychological test results, behavioral reports, participation in extracurricular activities, and recognition through awards or honors.[297] The district also collects personal and contact information about parents and guardians, including names, addresses, telephone numbers, and sometimes citizenship or immigration status where relevant to enrollment or program eligibility.[298]

922.    Cloud-based data storage platforms play a crucial role in enabling LAUSD to maintain and access the immense volumes of data it collects and generates. LAUSD works with one or more vendors to collect, process, and make

---

[297]    *Cumulative Record Handbook for Secondary Schools*, Los Angeles Unified School District (2017), https://www.lausd.org/cms/lib08/CA01000043/Centricity/Domain/173/Cumulative%20Record%20Handbook.pdf.

[298]    *Title III Immigrant Education Program Identification Procedures for Eligible Students*, Los Angeles Unified School District (2018), https://www.lausd.org/cms/lib/CA01000043/Centricity/domain/22/policies/REF-062703-Title%20III%20Immigrant%20Education%20Program%20Identification%20Procedures%20for%20Eligible%20Students.pdf.

accessible the Personal Information of its students, faculty, and staff.[299] In fact, LAUSD manages so much data that it contracts with a vendor whose sole purpose is to help maintain the accuracy of the data.[300] LAUSD also contracts with many vendors who provide supplemental digital instruction tools.[301]

## II. The amount of data and the extreme sensitivity of children's Personal Information that LAUSD and its vendors collect, manage, and store on the Snowflake cloud make them a prime and lucrative target for threat actors.

923. LAUSD contracts with numerous software and information technology vendors to collect, maintain, and access the Personal Information of its hundreds of thousands of students. These vendors include but are not limited to the Doe Defendants 1-50 and Defendant Innive. On information and belief the Snowflake cloud platform is a repository for a vast amount of that LAUSD student data.

924. Plaintiffs provided their and their children's Personal Information to LAUSD as a condition of securing educational services for their children, with the

---

[299]    *My Integrated Student Information System (MiSiS)*, L.A. Unified Sch. Dist., https://www.lausd.org/misis (last visited May 14, 2025).

[300]    *Elevate Data Quality*, L.A. Unified Sch. Dist., https://www.lausd.org/sis (last visited May 14, 2025).

[301]    *Instructional Online Content: Supplemental Digital Instructional Tools 2024–2025*, L.A. Unified Sch. Dist. (July 26, 2024), https://www.lausd.org/cms/lib/CA01000043/Centricity/Domain/21/IOC_%20Supplemental%20Digital%20Instructional%20Tools%2024-25.pdf.

understanding implied in that requirement that the Personal Information would be protected by LAUSD and any other entity working with LAUSD or on their behalf. Plaintiffs had no opportunity to negotiate or withhold Personal Information if they wished to secure educational services for their children. Plaintiffs reasonably expected LAUSD—and any vendors it engaged—to safeguard that information as required by state and federal law. That expectation was not met, resulting in a loss of privacy and exposure to risk without any corresponding benefit.

925. Given the vast amount of extremely valuable and sensitive Personal Information stored in that Snowflake repository, it is a prime and potentially lucrative target for threat actors.[302]

926. Cybersecurity experts have been warning for years that "vendors and partners are the most frequent cause of school district data breaches."[303]

927. Emsisoft, a cybersecurity firm that tracks cyberattacks in education and other sectors, reported 88 educational organizations were cyberattack victims

---

[302] Emily Wilson, *The Worrying Trend of Children's Data Being Sold on the Dark Web*, TNW (Feb. 23, 2019), https://thenextweb.com/contributors/2019/02/23/children-data-sold-the-dark-web/.

[303] *See, e.g.,* Mark Keierleber, *74 Interview: Cybersecurity Expert Levin on the Harms of Student Data Hacks*, The74 (May 31, 2022), https://www.the74million.org/article/74-interview-cybersecurity-expert-levin-on-the-harms-of-student-data-hacks/.

in 2021.[304] A threat actor organization responsible for a 2022 LAUSD data breach targeted eight educational institutions in 2022, with one of these attacks causing a school to shut down.[305] In 2023, 108 U.S. K-12 school districts were targeted by ransomware attacks. The impacted districts included 1,899 schools and at least 77 districts had data stolen during the attacks.[306]

928.    In 2022, LAUSD had two breaches of stored Personal Information but, despite the obvious vulnerabilities of its data security, failed to prevent this third breach.[307] In the 2024 breach at issue, neither LAUSD nor any of its vendors identified as Doe Defendants 1-50 and Defendant Innive sent data breach notifications generally required under California law to individuals whose Personal Information was exposed or stolen.

---

[304]    Emsisoft Malware Lab, *The State of Ransomware in the US: Report and Statistics 2021*, EMSISOFT (Aug. 24, 2022), https://www.emsisoft.com/en/blog/40813/the-state-of-ransomware-in-the-us-report.and-statistics-2021.

[305]    Carly Page, *Hackers Leak 500GB Trove of Data Stolen During LAUSD Ransomware Attack*, TechCrunch (Oct. 3, 2022), https://techcrunch.com/2022/10/03/hackers-leak-lausd-data-ransomware/ (last visited Jan. 23, 2024).

[306]    The State of Ransomware in the U.S.: Report and Statistics 2023, EMSISOFT (Jan. 2, 2024), https://www.emsisoft.com/en/blog/44987/the-state-of-ransomware-in-the-u-s-report-and-statistics-2023/.

[307]    Mark Keuerlaber, *Kept in the Dark: Inside a Trio of Los Angeles School Cyber Attacks,* (Feb. 10, 2025), https://www.the74million.org/article/kept-in-the-dark-inside-a-trio-of-los-angeles-school-cyberattacks/.

929.   In addition to the Personal Information expected to be held by any large organization, LAUSD provides medical services to students and receives and retains HIPAA-protected records of health care services provided to students. These services are provided in seventeen school-based Health Centers which offer medical services as varied as physical examinations, immunizations, oral health assessments, vision screenings, nutrition assessments, and TB testing to students.[308] Certain LAUSD Health Centers also provide reproductive healthcare services, such as STD testing, birth control, and pregnancy testing.[309]

930.   LAUSD provides mental health services through Mental Health Clinics for individual and family therapy for LAUSD students as well as a virtual Telemental health program where students can access mental health services. Services include a range of prevention, early intervention and acute mental health assessment and treatments. [310]

---

[308]    *LAUSD School-Based Health Centers and Services*, LAUSD, https://www.lausd.org/Page/12532.

[309]    *Id.*

[310]    *Id.*

931.   Moreover, LAUSD maintains deeply sensitive records of students' Individualized Education Programs, 504 Plans, family financial and household information, and immigration status.[311]

932.   Under these circumstances, breach and exfiltration of LAUSD sensitive data and Personal Information stored on the Snowflake cloud and collected and managed by Innive and the Doe Defendants is particularly dangerous.

### III.   The sensitivity of school children's Personal Information requires heightened vigilance and use of comprehensive security measures.

933.   When a victim's data is compromised in a breach, the victim is exposed to serious ramifications, including but not limited to identity theft, fraud, decline in credit, inability to access healthcare, as well as legal consequences.[312]

---

[311]   *Cumulative Record Handbook for Secondary Schools*, Los Angeles Unified School District (2017), https://www.lausd.org/cms/lib08/CA01000043/Centricity/Domain/173/Cumulativ e%20Record%20Handbook.pdf; *Title III Immigrant Education Program Identification Procedures for Eligible Students*, Los Angeles Unified School District (2018), https://www.lausd.org/cms/lib/CA01000043/Centricity/domain/22/policies/REF-062703-Title%20III%20Immigrant%20Education%20Program%20Identification%20Proc edures%20for%20Eligible%20Students.pdf.

[312]   *Identity Theft Resource Center 2017 Annual Data Breach Year-End Review*, Identity Theft Res. Ctr. (Jan. 22, 2018), https://www.idtheftcenter.org/wp-content/uploads/images/breach/2017Breaches/2017AnnualDataBreachYearEndRe view.pdf.

934.    Data regarding minor children are especially sensitive and increasingly targeted for their value to threat actors. In 2022 roughly 1.7 million children were victims of a data breach, meaning 1 in every 43 school age children had personal information exposed or compromised.[313] In 2022, 26 U.S. school districts including Los Angeles and colleges and universities were hit by ransomware.

935.    Education technology platforms are popular targets for cyberattacks and require top-tier security measures to protect Personal Information because these planforms collect and store the Personal Information of minors. The Personal Information of children is particularly valuable to criminals because fraudulent use of their data may remain undetected for years. Criminals make use of minors' Personal Information to open accounts or new lines of credit, to create false identities, to obtain credit cards, to rent property, and to access government benefits, healthcare, or employment, using a combination of real and fictitious information which the minor may not realize was stolen. School children whose Personal Information has been breached must live their entire lives knowing private, sensitive information about their personal, school and medical records is subject to public exposure at any time.

---

[313]    *Protecting Our Kids' Data Privacy Is Paramount*, Nat'l Cybersecurity All. (Jan. 5, 2024), https://staysafeonline.org/resources/protecting-our-kids-data-privacy-isparamount/.

936. Malicious use of sensitive student data can also result in social engineering, bullying, tracking, identity theft, or other means for targeting children.[314] These harms were recognized in a Report years ago by the United States Government Accountability Office ("GAO") on Data Security entitled *Recent K-12 Data Breaches Show That Students Are Vulnerable to Harm*[315]:

> Access to or disclosure of some of the types of data collected by K-12 institutions can harm students, including their financial well-being. … Data breaches can also cause students physical and emotional harm… For example, for students with an Individualized Education Program (IEP), disclosure of special education status, annual goals, or medical diagnoses contained in these records could lead to embarrassment or stigmatization.

The data breach ramifications that minors experience are thus unique, severe, and exceptionally damaging.

**IV.    Defendant Vendor Innive Promoted its Expertise to Protect the Highly Sensitive Personal Information of School Children and Their Parents.**

---

[314]    *Education Technologies: Data Collection and Unsecured Systems Could Pose Risks to Students*, *FBI Alert No. I-091318-PSA*, FBI (Sept. 13, 2018),  https://www.ic3.gov/media/2018/180913.aspx.

[315]    *See* Jacqueline M. Nowicki, *Data Security: Recent K-12 Data Breaches Show That Students Are Vulnerable to Harm.  Report to Republican Leader, Committee on Education and Labor, House of Representatives.  GAO-20-644*, U.S. Government Accountability Office (Sept. 2020),  https://eric.ed.gov/?id=ED609671.

937.   Innive contracts with school districts to provide a software platform named K12 360° Data as a Service (or, "DaaS"). As described by Innive, the "K12 360° team is a group of passionate educators, technologists, and data scientists dedicated to helping school districts harness the power of data to help their students and staff thrive."[316]

938.   Innive offers a number of products and services, including but not limited to, self-service analytics implementation for K12 organizations, Ed-Fi/Interoperability services, and K12 cybersecurity services.[317]

939.   Innive promotes K12 360°:

… as a full end-to-end managed service to modernize your data practices while ensuring your district doesn't have to do the heavy lifting. We work with you to set up processes and technologies to help your school district **manage data ingestion, integration, security, storage, and analysis.** Sign up for K12 360˚ DaaS today to **reduce the**

---

[316]   *About Our Company*, Innive Inc., https://www.k12360.com/about-us (last visited June 24, 2025). A pre-breach archived version of the website contains the same language.  *See* https://web.archive.org/web/20240305043045/https://www.k12360.com/about-us (archived Mar. 5, 2024).

[317]   *Services*, Innive Inc., https://www.k12360.com (last visited June 24, 2025). A pre-breach archived version of the website is consistent.  *See* https://web.archive.org/web/20240305050622/https://www.k12360.com/ (archived Mar. 5, 2024).

**complexities of data interoperability and increase actionable
insights while keeping student data confidential and secure.**[318]

940.   On that same promotional page, Innive notes that a customer can

"[s]tore data in your district's analytic database of choice (**Snowflake**, Google Big

Query, or others)."[319]

941.   On its website, Innive emphasizes the importance of cybersecurity

for school districts, as Innive itself offers K12 cybersecurity services.[320] Innive

recognizes "Cybersecurity is a Top Priority in K12 Education" and it believes

"[d]istricts and other K12 organization need to know they can rely on systems that

are secure from threats and interruptions to instruction."[321] On its website blog,

Innive recognizes that "[m]any school districts rely on third-party vendors for

student information systems, learning management tools, and other educational

---

[318]   *How it Works*, Innive Inc., https://www.k12360.com/data-as-a-service#how-it-works (emphasis added).  A pre-breach archived version of the website is consistent.  *See* https://web.archive.org/web/20240305031208/https://www.k12360.com/data-as-a-service (archived Mar. 5, 2024).

[319]   *Id*. (emphasis added).

[320]   *K12 Cybersecurity*, Innive Inc., https://www.k12360.com/k12-education-cybersecurity#cybersecurity (last visited June 24, 2025). An archived, pre-breach version of the website is consistent.  *See* https://web.archive.org/web/20240305044427/https://www.k12360.com/k12-education-cybersecurity (archived Mar. 5, 2024).

[321]   *Id*.

317

software. When these vendors fail to uphold cybersecurity best practices, student and staff data is exposed."[322]

942.   In marketing its services, Innive states that many "K12 school districts are rapidly transforming their networks to implement eLearning and other digital programs to enhance student learning across distributed campuses... there are large amounts of personally identifiable information (PII) and financial data that must be protected...**cybersecurity for K12 is often overlooked, making schools prime targets for cybercriminals.**"[323]

943.   Prior to the Data Breach, Innive issued a "Call to Action for School Districts" concerning K-12 cybersecurity, noting:

> Cybersecurity threats in K-12 education have become increasingly prevalent, with schools facing data breaches, ransomware attacks, and other cybercrimes. These incidents not only disrupt school operations but can also compromise the privacy and safety of students, staff, and families. It's time for school districts to take action and prioritize cybersecurity, ensuring a safe and secure digital environment for all. . .
>
> School districts should adopt, implement, and enforce a national cybersecurity framework, such as the NIST Cybersecurity Framework.

---

[322]   Tom Ryan, Ph.D. and Lenny Schad, *The Urgent Need for Cybersecurity in K-12 Education* (Mar. 17, 2025), *available at* https://www.k12360.com/blog/the-urgent-need-for-cybersecurity-in-k-12-education-blog-1-of-3-in-series.

[323]   Innive K12 Cybersecurity Services, https://www.k12360.com/k12-education-cybersecurity#cybersecurity (emphasis added).  The website was the same in relevant part prior to the Data Breach.  *See* https://web.archive.org/web/20240305044427/https://www.k12360.com/k12-education-cybersecurity#cybersecurity (archived Mar. 5, 2024).

This framework provides guidelines, best practices, and standards to manage and reduce cybersecurity risks. Following a standardized framework ensures that all schools are taking the necessary steps to protect their digital infrastructure, data, and users. . .

Education is a critical component of any cybersecurity strategy. Developing a comprehensive cybersecurity awareness and training program for staff, students, and families will help build a culture of security. This program should include regular training sessions, workshops, and resources that cover various cybersecurity topics, such as phishing, password security, and safe internet practices. . .

Having a dedicated team focused solely on cybersecurity is essential for effectively managing and mitigating cyber risks. They would be responsible for overseeing the development and execution of cybersecurity strategies and policies, as well as ensuring the ongoing monitoring, assessment, and response to cybersecurity threats and incidents. . .

A comprehensive cybersecurity policy is essential for guiding the district's approach to managing and mitigating cyber risks. This policy should cover areas such as access control, data protection, incident response, and risk management.[324]

944.    Innive also touted on its website its deep understanding of and ability to respond adequately to cyberattacks:

The ability of the organization to identify and respond to cybersecurity incidents with effective security controls could mean the difference between a minor disruption and a potential disaster or catastrophic event. Our cybersecurity services provide comprehensive and resilient cybersecurity services and solutions customized to meet your

---

[324]    Tom Ryan, Ph.D., *Strengthening K-12 Cybersecurity: A Call to Action for School Districts* (Jun. 6, 2023), *available at* https://www.k12360.com/blog/strengthening-k-12-cybersecurity-a-call-to-action-for-school-districts.

requirements. We help your K12 organization to keep pace with new attacks, advances in security technologies, and compliance.[325]

945.   Innive recognizes the importance of cybersecurity for school districts and despite this, failed to adequately protect the data LAUSD entrusted to it, by, among other things, failing to ensure that LAUSD's data hosted through Snowflake and integrated into Innive's products and services was secure and that end-users and integrated data systems were using appropriate safeguards, such as MFA.

946.   Innive acknowledges that technology in education introduces new risks and challenges, including:

- **Vendor security failures** – Weak security policies and inadequate data protections.

- **Delayed incident responses** – Lack of timely breach notifications.

- **Poor communication** – Districts and families left in the dark about breaches.

- **Weak internal safeguards** – Insufficient policies for monitoring  and responding to threats.

- **Lack of vendor accountability** – No  standardized cybersecurity benchmarks.[326]

947.   Innive correctly identifies the major cybersecurity challenges for school districts and their vendors, including:

---

[325]    Innive K12 Cybersecurity Services, *supra* n. 323.

[326]     Tom Ryan, Ph.D. and Lenny Schad, *The Urgent Need for Cybersecurity in K-12 Education*, *supra* n. 322.

- Vendor Accountability – Many vendors fail to follow best cybersecurity practices.

- Data Retention Issues – Vendors retain data beyond contractual agreements.

- Incident Response Gaps – Breach notifications are delayed, and communication is poor.

- Internal Monitoring Weaknesses – Districts lack comprehensive security oversight.

948.    Absence of Benchmarking – No universal cybersecurity standards exist for vendors.[327] In order to address these challenges, Innive spells out a number of "Best Practices" to impose on vendors to strengthen vendor cybersecurity, including:

- Strengthening Internal Cybersecurity Practices by implementation of real-time network monitoring tools, intrusion detection systems. role-based access controls (RBAC) and multi-factor authentication (MFA).

- Implementation of Strong Data Governance Policies including policies for data retention, deletion, and minimization.[328]

949.    Innive clearly understands and acknowledges what the standard of care for school districts and their vendors requires to prevent breaches of school district repositories of highly sensitive Personal Information of parents and their children:

---

[327]    Tom Ryan, Ph.D. and Lenny Schad, *Strengthening School Cybersecurity – Best Practices for District Leaders* (Mar. 21, 2025), *available at* https://www.k12360.com/blog/strengthening-school-cybersecurity---best-practices-for-district-leaders-blog-2-of-3.

[328]    *Id.*

"By implementing these best practices, district leaders can **mitigate risks, strengthen vendor accountability, and ensure student data remains secure.**"[329]

950.    Despite its statements and knowledge about the importance of rigorous cybersecurity measures and the standard of care for vendors supplying digital services to school districts, Innive failed to meet these standards, and in particular the requirement to require MFA, in providing K12360 DaaS to LAUSD. Innive thereby violated the standard of care and applicable state and federal law.

## V.    Identity of Doe Defendants 1-50.

951.    Plaintiffs do not know the true names and capacities of the Defendants Does 1 through 50, inclusive, whether individual, corporate, associate, or otherwise, and therefore sue them by the foregoing names which are fictitious. Plaintiffs ask that when their true names and capacities are discovered, this Complaint may be amended by inserting their true names and capacities in lieu of said fictitious names, together with apt and proper words to charge them. All references to any named Defendants shall also refer to said Does. When the true names and capacities are ascertained, Plaintiffs will amend this Complaint accordingly. On information and belief, Plaintiffs allege that each of the fictitiously named Defendants was responsible in some manner for the acts and omissions alleged herein and are liable to Plaintiffs herein.

---

[329]    *Id.* **(**emphasis in original**).**

952.   Doe Defendants may include individuals, businesses, corporations, partnerships, associations, joint ventures, defendants that are government in nature, as well as product manufacturers, medical providers, professionals, contractors, estates, administrators of estates, trusts and/or all other types of entities and/or individuals as discovery in the matter may reveal. Regardless, Plaintiffs allege that each of the Defendants designated herein as Doe is legally responsible in some manner for the events and happenings herein referred to, and legally caused and was a substantial factor in the injury and damages caused to Plaintiffs.

## V.   Defendant Innive and Doe Defendants 1-50 owed a duty of care to LAUSD Vendor Plaintiffs and Class Members.

953.   Innive and the Doe Defendants' duty to use reasonable care arises from several sources, as described herein, including that Defendant Innive and Doe Defendants knew or should have known that the information it collected and managed was sensitive, and that failing to take adequate steps to secure and protect the data would foreseeably lead to a data breach which could injure individual LAUSD students and their parents.

954.   Defendant Innive and Doe Defendants owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in their possession from being compromised, accessed, stolen, or misused by unauthorized parties.

955.   Defendant Innive and Doe Defendants owed a duty to Plaintiffs and Class Members to supervise Snowflake in the collection, storage, and security of Plaintiffs' and Class Members' Personal Information.

956.   Defendant Innive and Doe Defendants' duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard Personal Information stored on cloud platforms, as described herein.

957.   Defendant Innive and Doe Defendants owed a statutorily imposed duty to Plaintiffs and Class Members to refrain from unfair and deceptive practices.

958.   The LAUSD Data Use Agreement (Attachment A-3 to Bulletin No. BUL-1077.2)[330] is a standard contract template that outlines the legal and procedural requirements for any external contractor, vendor, or partner who seeks access to student data or other confidential information maintained by the Los Angeles Unified School District, and such parties may be required to execute this agreement as a condition of providing services to the District.

959.   The Data Use Agreement "is meant to ensure that Contractor adheres to the requirements concerning the use of student information protected under the

---

[330]   *Information Protection Policy*, L.A. Unified Sch. Dist. (July 18, 2017), https://www.lausd.org/cms/lib/CA01000043/Centricity/domain/386/admin%20cer t%202017-2018/BUL-1077.2%20INFORMATION%20PROTECTION%20POLICY_2.pdf.

Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, 34

Code of Federal Regulations Part 99, and California Education Code sections

49060-49085," and it specifically references and incorporates SB 1177, the Student

Online Personal Information Protection Act (SOPIPA). Data Use Agmt at ¶¶ 2.2,

5.4.8.

960.   The Agreement highlights the sensitive data about students that

LAUSD receives and that vendors maintain, including HIPAA-protected

information like "student's past, present or future physical or mental health or

condition, or to the student's receipt of, or payment for, medical treatment or health

care services," and the information contained in students' education records,

protected under Family Educational Rights and Privacy Act. *See* Data Use Agmt,

Attachment B.

961.   Given the sensitivity of all this data, the Agreement requires vendors

like Defendant Innive and Doe Defendants to take all reasonable and industry

appropriate steps to keep that Protected Information secure, including requiring

vendors to:

> [S]tore and process District Data in accordance with commercial best
> practices, including appropriate administrative, physical, and technical
> safeguards, to secure such data from unauthorized access, disclosure,
> alteration, and use. Such measures will be no less protective than those
> used to secure Contractor's own data of a similar type, and in no event
> less than reasonable in view of the type and nature of the data involved.
> Without limiting the foregoing, Contractor warrants that all electronic
> District Data will be encrypted in transmission using SSL [(Secure

Sockets Layer)] [or insert other encrypting mechanism] (including via web interface) [and stored at no less than 128-bit level encryption]. "Encryption" means a technology or methodology that utilizes an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key, and such confidential process or key that might enable decryption has not been breached, and shall have the meaning given to such term under HIPAA and HIPAA Regulations, including 45 CFR §164.304.

Data Use Agmt at ¶ 5.2.2.

962.   Because of industry practice and the Data Use Agreement, Defendant Innive and Doe Defendants understood that security protocols such as encryption and MFA can protect data from unwanted exposure and exfiltration to unauthorized third parties. Data Use Agmt ¶ 5.5.5. As Vendors, they were aware of the damage which data breaches can cause individuals when their information is exposed due to a company's negligence.

963.   The Agreement requires vendors like Defendant Innive and Doe Defendants to "notify the District in writing as soon as possible, but in no event more than two business days, after Contractor becomes aware of any breach of or security Incident involving the District's Protected Information," to "identify as soon as practicable each individual whose unsecured Protected Information has been, or is reasonably believed by Contractor to have been, accessed, acquired, or disclosed during such breach or security incident," and to "take prompt corrective action to remedy any breach or security incident, mitigate, to the extent practicable,

any harmful effect of a use or disclosure of Protected Information, and take any other action required by applicable federal and state laws and regulations pertaining to such breach or security incident." Data Use Agmt ¶¶ 5.5.1 and 5.5.2.

964.    Defendant Innive and Doe Defendants, as vendors of digital services and software, were aware of the standards for cybersecurity recommended or required by the FTC and other agencies as described herein, *supra.* Indeed, the Data Use Agreement specifically requires all vendors like Defendant Innive and Doe Defendants who maintain sensitive LAUSD data to "take appropriate security measures to protect the confidentiality, integrity and availability of the District's Protected Information that it creates receives, maintains, or transmits on behalf of the District and to prevent any use or disclosure of the District's Information other than as provided by the Agreement. Appropriate security measures include the implementation of the best practices as specified by the ISO 27001/2, NIST, or similar security industry guidelines." Data Use Agmt. ¶ 5.5.5.

965.    Defendant Innive and Doe Defendants' duties included, among other things: (a) implementing industry standard data security safeguards (as specified by NIST and ISO 2700 cybersecurity standards among other guidelines) to protect the Personal Information of LAUSD Vendor Plaintiffs and Class members relating to Multifactor Authentication, rotating credentials regularly and monitoring for leaked credentials on the dark web, and restricting access privileges to trusted IP addresses;

(b) implementing account deactivation policies to disable inactive accounts; (c) encrypting data during transit and at rest; (d) maintaining, testing, and monitoring Innive and Doe Defendants' security systems to ensure that Personal Information was adequately secured and protected; and (e) implementing intrusion detection systems and notifying customers of suspicious intrusion.

## VI.    Defendant Innive and Doe Defendants breached their duty to protect Personal Information.

966.   Because the identity of the Doe Defendants is currently unknown, Plaintiffs cannot allege with specificity what data security failings each of them committed. However, Defendant Innive and all Doe Defendants violated the FTC Response Guidance by failing to give affected consumers Notice of the Data Breach or sufficient information regarding the scale of the attack and the types of information taken.

967.   Defendant Innive and Doe Defendants knew or should have known that they would be targeted for a cyberattack given that vendors of school districts have increasingly been targeted by threat actors.

968.   Defendant Innive and Doe Defendants likely maintained privacy use and data security policies of their own, which may also have been breached by their data security failings.

969.   Defendant Innive and Doe Defendants further failed to properly investigate, retain, oversee and audit a competent cloud-based data storage

provider, because Snowflake similarly had numerous data security failings, as described herein.

970.  Defendant Innive and Doe Defendants' data security failings enabled the Data Breach. Based upon information publicly available, these security failings were basic and likely included failing to require MFA, rotate passwords regularly, monitor for leaked credentials on the dark web, restrict access to trusted IP addresses, disable inactive accounts, and encrypt data at rest and in transit.

971.  Defendant Innive and Doe Defendants' failings were particularly egregious given the enormous amount of Personal Information they stored on Snowflake's servers. Tasked with handling the data of potentially as many as 500,000 LAUSD students, the Doe Defendants' failure to implement these basic data security measures is all the more inexplicable and reckless.

972.  In the alternative, Defendant Innive and Doe Defendants breached implied commitments to LAUSD to protect the Personal Information it was entrusted by parents, students, faculty, and staff to safeguard, including that of the LAUSD Vendor Plaintiffs, by virtue of mandating that LAUSD provides the sensitive Personal Information that is entrusted to it as a condition of using Doe Defendants' services and/or by signing the same or similar Data Use Agreement described above.

## VII.    Personal Information stolen about LAUSD students and families.

973.   Unlike the other Spoke Defendants in this Complaint, Defendant Innive and the Doe Defendants did not provide notice to LAUSD Vendor Plaintiffs or Class Members about the nature or extent of the Personal Information that was stolen. Nor did the Defendant Innive and Doe Defendants give the LAUSD Vendor Plaintiffs or Class Members any information about how to protect themselves and their children from the potential misuse of the stolen Personal Information

974.   Based upon the investigation of Plaintiffs' counsel, the stolen Personal Information included 11 GB of data with files containing millions of rows with headers for student and parent names, addresses, phone numbers, dates of birth, email addresses, ethnicity, citizenship, financial information, medical and disability information, academic and discipline records, as well as fields for poverty, homeless, disability, foster, migrant, and more. The stolen Personal Information also included LAUSD staff and teacher names, address, date of birth, email address, ethnicity, rate of pay, and more.

975.   On June 1, 2024, around the time of the Data Breach, this very information was advertised for sale on a dark web forum post by a cybercriminal

330

group by the name of "Sp1d3r." A screenshot of this post is provided below.[331] Of particular note is that in advertising the "4M" of K-12 Student data, the threat actor expressly named as a source of the data Defendant Innive's software platform K12360.com.



976.   Significantly, students and their families were required to disclose their Private Information as a condition of obtaining an education, distinguishing this matter from (non-monopolistic) commercial settings involving adult

---

[331]   Lawrence Abrams, *Los Angeles Unified Confirms Student Data Stolen in Snowflake Account Hack*, BleepingComputer (June 21, 2024), https://www.bleepingcomputer.com/news/security/los-angeles-unified-confirms-student-data-stolen-in-snowflake-account-hack/.

consumers, where alternative avenues for obtaining goods or services may be available.

977. The stolen Personal Information implicates a profound privacy interest, as it exposes highly sensitive and deeply personal details about students and their families—including their identities, contact information, medical and disability status, immigration background, financial hardship, and academic and disciplinary histories—the disclosure of which can cause stigma, discrimination, and long-term harm, particularly for vulnerable groups such as undocumented families, foster youth, and children with disabilities. Moreover, the theft of names, dates of birth, and other identifying information creates an ongoing risk of identity fraud as described herein, which can follow victims for years and compromise their financial and personal security.

## VIII. The LAUSD Vendor Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

978. As described herein, the Personal Information exposed in the Data Breach caused injury to LAUSD Vendor Plaintiffs and Class Members.

979. First, the Data Breach subjected LAUSD Vendor Plaintiffs and Class Members to a substantial risk of identity theft, which is demonstrated by facts including, but not limited to: the posting of LAUSD Vendor Plaintiffs' and Class Members' Personal Information on the dark web; the complete failure to provide LAUSD Vendor Plaintiffs and Class Members with notice of the Data Breach; and

the inclusion of contact information and dates of birth among the stolen Personal Information. As a result of this substantial risk they face, LAUSD Vendor Plaintiffs and Class Members reasonably suffered injury in the form of lost time and resources mitigating against the risk of identity theft and educating other LAUSD families about this risk, and emotional distress arising from the risk of identity theft for themselves and their minor children.

980.   Second, Personal Information has inherent value, and the exposure of that information makes individuals susceptible to fraud and scams for years into the future. Not only should individuals be compensated for the value of their Personal Information, but they should also be provided with monitoring services to ensure that their data is not misused in the future.

981.   Third, the disclosure of LAUSD Vendor Plaintiffs' and Class Members' Personal Information to cybercriminals who in turn advertised and sold the Personal Information on the dark web, constitutes a privacy injury, especially considering the extremely sensitive and private nature of the Personal Information LAUSD gathered and maintained about its students.

## IX.    Class action allegations as to Defendant Innive and the Doe Defendants

982.   LAUSD Vendor Plaintiffs bring this action on their own behalf, and on behalf the following LAUSD Vendor Class and Subclass (the "LAUSD Vendor Classes"):

**LAUSD Vendor Class.** All individuals residing in the United States whose Personal Information was identified as compromised in the Data Breach involving one or more of Defendant Innive and the Doe Defendants.

**California LAUSD Vendor Statutory Violation Subclass.** All LAUSD Vendor Class members residing in California whose compromised information included nonencrypted or nonredacted Personal Information.

983.    Each of the LAUSD Vendor Classes also includes a subclass of minor children whose information was exposed as part of the Data Breach.

984.    Excluded from the LAUSD Vendor Classes are Defendant Innive and Doe Defendants' officers and directors, any entity in which Defendant Innive and Doe Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant Innive and Doe Defendants. Excluded also from the LAUSD Vendor Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

985.    Plaintiffs reserve the right to amend or modify the definition of the LAUSD Vendor Classes or create additional subclasses as this case progresses and as they identify the identities of the Doe Defendants.

986.    **Numerosity.** The members of the LASUD Vendor Classes are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that there are 500,000 students in the LAUSD, and many more parents, faculty, and staff whose Personal Information was stored on Defendant Innive and Doe Defendants' Data Cloud. The Personal Information advertised for sale on a

dark web forum post by the cybercriminal group "Sp1d3r" included 11 GB of data with files containing millions of rows with headers for LAUSD students and parents.

987.    **Commonality.** There are questions of fact and law common to the LAUSD Vendor Class, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether Defendant Innive and Doe Defendants had a duty to protect the Personal Information of LAUSD Vendor Plaintiffs and Class Members, and whether they breached that duty.

- Whether Defendant Innive and Doe Defendants knew or should have known that their data security practices were deficient.

- Whether Defendant Innive and Doe Defendants data security systems were consistent with industry standards prior to the Data Breach.

- Whether Defendant Innive and Doe Defendants' failure to require customers to implement MFA, employ credential rotation, and employ other industry standard data security measures violated a standard of care or laws.

- Whether Plaintiffs and LAUSD Vendor Class members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, general damages, and/or injunctive relief.

988.    **Typicality.** Plaintiffs' claims are typical of those of other LAUSD Vendor Class members because the Plaintiffs' Personal Information likely included the same categories of data that was compromised in the Data Breach.

989.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interest of the LASUD Vendor Class members. Plaintiffs' Counsel are competent and experienced in litigating class actions.

990.    **Predominance.** Defendant Innive and Doe Defendants engaged in a common course of conduct toward the LAUSD Vendor Plaintiffs and Class Members, in that their data was stored on the same Snowflake Data Cloud network and unlawfully accessed in the same manner. The common issues arising from Defendant Innive and Doe Defendants' conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

991.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the LAUSD Vendor Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most LAUSD Vendor Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual LAUSD Vendor Class Members

would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant Innive and Doe Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each LAUSD Vendor Class Member.

992. **Injunctive Relief.** Defendant Innive and Doe Defendants have acted on grounds that apply generally to the LAUSD Vendor Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

993. **Issue Certification.** Likewise, certain issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such issues include, but are not limited to:

- Whether Defendant Innive and Doe Defendants sowed a legal duty to LAUSD Vendor Plaintiffs and Class Members to protect their Personal Information.

- Whether Defendant Innive and Doe Defendants' data security measures were inadequate in light of applicable regulations and industry standards.

- Whether Defendant Innive and Doe Defendants' data security measures were negligent or reckless.

- Whether Defendant Innive and Doe Defendant's negligence or recklessness were a substantial factor leading to the Data Breach.

- Whether Defendant Innive and Doe Defendants violated their statutory duties under California law.

994.  **Identification of Class Members via Objective Criteria.** Finally, all members of the proposed LAUSD Vendor Classes are readily identifiable using objective criteria. Defendant Innive and Doe Defendants have access to the names and contact information of LAUSD Vendor Class Members affected by the Data Breach.

**X.    Causes of action as to the Defendant Innive and the Doe Defendants.**

**FIRST CLAIM FOR RELIEF**
**Negligence**
*On behalf of the LAUSD Vendor Plaintiffs and the LAUSD Vendor Classes*

995.  Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Parts One, Two, and Seven as if set forth fully herein against the Defendant Innive and the Doe Defendants.

996.  Defendant Innive and the Doe Defendants owed a duty under common law to LAUSD Vendor Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Personal Information

338

in its possession from being compromised, stolen, or misused by unauthorized persons.

997.   Defendant Innive and the Doe Defendants owed this duty because, as sophisticated data management and services providers, they were aware of the damage which data breaches can cause individuals when their information is exposed due to a company's negligence. Further, Defendant Innive and the Doe Defendants understand that security protocols such as MFA can protect data from unwanted exposure and exfiltration to unauthorized third parties.

998.   Defendant Innive and the Doe Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Defendant Innive and the Doe Defendants stored valuable Personal Information that is routinely targeted by cyber criminals. LAUSD Vendor Plaintiffs and Class Members were the foreseeable and probable victims of any compromise to inadequate data security practiced by Defendant Innive and the Doe Defendants.

999.   Defendant Innive and the Doe Defendants further assumed a duty of reasonable care in making representations to LAUSD that their data storage services were secure.

1000. Defendant Innive and the Doe Defendants also owed this duty pursuant to the Data Use Agreements they likely signed with LAUSD, described above.

1001. Defendant Innive and the Doe Defendants, as vendors of digital services and software, were aware of the standards for cybersecurity recommended or required by the FTC and other agencies as alleged *supra.* Indeed, the Data Use Agreement specifically requires all vendors like Defendant Innive and the Doe Defendants who maintain sensitive LAUSD data to "take appropriate security measures to protect the confidentiality, integrity and availability of the District's Protected Information that it creates receives, maintains, or transmits on behalf of the District and to prevent any use or disclosure of the District's Information other than as provided by the Agreement."

1002. Defendant Innive and the Doe Defendants' duties included, among other things: (a) implementing industry standard data security safeguards (as specified by NIST among other guidelines) to protect the Personal Information of LAUSD Vendor Plaintiffs and Class Members relating to Multifactor Authentication, rotating credentials, and restricting access privileges; (b) maintaining, testing, and monitoring Defendant Innive and the Doe Defendants' security systems to ensure that Personal Information was adequately secured and protected; and (c) implementing intrusion detection systems and notifying customers of suspicious intrusion.

1003. Defendant Innive and the Doe Defendants' duty to use reasonable care arose from several sources, as described herein, including that Defendant Innive

and the Doe Defendants knew or should have known that the information it collected and managed was sensitive, and that failing to take adequate steps to secure and protect the data would foreseeably lead to a data breach which could injure individual LAUSD students.

1004. Defendant Innive and the Doe Defendants breached their duty owed to the Plaintiffs and Class Members by failing to maintain adequate data security practices that conformed with industry standards and were therefore negligent.

1005. Defendant Innive and the Doe Defendants were further negligent in failing to properly investigate, retain, oversee and audit a competent cloud-based data storage provider, because Snowflake similarly had numerous data security failings, as described herein.

1006. Defendant Innive and the Doe Defendants' negligence was a substantial factor in the Data Breach and theft of the Personal Information of the Plaintiffs and Class Members.

1007. As a direct and proximate result of Defendant Innive and the Doe Defendants' breach of their duties, Plaintiffs and Class Members have suffered injuries as detailed herein.

1008. As a direct and proximate result of Defendant Innive and the Doe Defendants' negligence, Plaintiffs and Class Members are entitled to damages,

including compensatory, punitive, nominal damages, and/or general damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Violation of the California Unfair Competition Law
Cal. Bus. and Prof. Code §§ 17200, et. seq. ("UCL")*On behalf of the LAUSD Vendor Plaintiffs and the LAUSD Vendor Classes*

1009. Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Parts One, Two, and Seven, as if set forth fully herein against the Defendant Innive and the Doe Defendants.

1010. LAUSD Vendor Plaintiffs bring this claim on behalf of themselves and the LAUSD Classes.

1011. Defendant Innive and the Doe Defendants had contracts with LAUSD to provide services in California and the acts and practices of Defendant Innive and the Doe Defendants to which the Data Breach is directly traceable occurred within the State of California.

1012. The California Unfair Competition Law, Cal. Bus. And Prof. Code §§ 17200, *et. seq*. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business acts or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

1013. By reason of the Defendant Innive and the Doe Defendants' wrongful actions, inaction, and omissions, all of which occurred in California, the resulting Data Breach, and unauthorized disclosure of Plaintiffs' and the Class Members'

Personal Information, the Defendant Innive and the Doe Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

1014. The Defendant Innive and the Doe Defendants' business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the private and confidential Personal Information of the LAUSD Vendor Plaintiffs and Class Members has been compromised for all to see, use, or otherwise exploit.

1015. The Defendant Innive and the Doe Defendants' practices were unlawful and in violation of the CCPA (as alleged below) and the Defendant Innive and the Doe Defendants' contractual responsibilities to LAUSD because the Defendant Innive and the Doe Defendants failed to take reasonable and appropriate measures to protect Plaintiffs' and the Class Members' Personal Information.

1016. Plaintiffs and the Class Members suffered (and continue to suffer) injury in fact as a direct and proximate result of the Defendant Innive and the Doe Defendants' above-described wrongful actions, inaction, and omissions, including the unauthorized release and disclosure of their Personal Information.

1017. The Defendant Innive and the Doe Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and the Class Members' Personal

343

Information also constitute "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200 *et seq*., in that the Defendant Innive and the Doe Defendants' conduct was substantially injurious to Plaintiffs and the Class Members, offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and the gravity of the Defendant Innive and the Defendant Innive and the Doe Defendants' conduct outweighs any alleged benefits attributable to such conduct.

1018. But for the Defendant Innive and the Doe Defendants' conduct and omissions, Plaintiffs and the Class Members would not have provided their Personal Information to LAUSD for use or storage by the Defendant Innive and the Doe Defendants, or they would have insisted that their Personal Information be more securely protected.

1019. As a direct and proximate result of the Defendant Innive and the Doe Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and the Class Members' Personal Information, they have been injured as follows: (1) the loss of the opportunity to control how their Personal Information is used; (2) the diminution in the value and/or use of their Personal Information entrusted via LAUSD to the Defendant Innive and the Doe Defendants; (3) the increased, imminent risk of fraud and identity theft; (4) the compromise, publication and/or

theft of their Personal Information; and (5) the costs associated with monitoring their Personal Information, among other things.

### THIRD CLAIM FOR RELIEF
**Violation of the California Consumer Privacy Act of 2018,** *as amended*
**Cal. Civ. Code §§ 1798.100** *et seq.*
*On behalf of the LAUSD Vendor Plaintiffs and the LAUSD Vendor Classes*

1020. On behalf of the LAUSD Vendor Plaintiffs and the LAUSD Vendor Classes, LAUSD Vendor Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Parts One, Two, and Seven, as if set forth fully herein against the Doe Defendants. The claim is not presently brought against Innive. Plaintiffs are providing notice to Innive pursuant to Cal. Civ. Code § 1798.150(b)(1), identifying the specific provisions of the CCPA that Plaintiffs allege Innive has violated and are violating. Although Plaintiffs submit that a cure is not possible under the circumstances, they are affording Innive an opportunity to do so. If Innive is unable to cure or does not cure the violation within 30 days of the letter, Plaintiffs will amend this Complaint to pursue actual or statutory damages as permitted by Cal. Civ. Code § 1798.150(a)(1)(A).

1021. The acts and practices of the Doe Defendants to which the Data Breach is directly traceable occurred in California, as all of the LAUSD Vendors had contracts with LAUSD to provide services in California.

1022. As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has

decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access.

1023. As a result, in 2018, the California Legislature passed the CPPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

1024. The Doe Defendants are subject to the CCPA and failed to implement such procedures, resulting in the Data Breach.

1025. Section 1798.150(a)(1) of the CCPA provides: "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to unauthorized access and exfiltration, theft, or disclosure because of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

1026. Plaintiffs are "consumers" as defined by Cal. Civ Code § 1798.140(g) because they are natural persons residing in the state of California.

346

1027. The Doe Defendants are all "business[es]" as defined by Cal. Civ. Code 1798.140(c).

1028. The CCPA provides that "personal information" includes "[a]n individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted: social security number, driver's license number, California ID card number, tax ID number, passport number, or other unique ID number, medical information, health insurance information, unique biometric data, or genetic data."

1029. Plaintiffs' Personal Information compromised in the Data Breach constitutes "personal information" within the meaning of the CCPA.

1030. Through the Data Breach, Plaintiffs' Personal Information was accessed without authorization, exfiltrated, and stolen by criminals.

1031. When the Doe Defendants are fully identified, Plaintiffs will provide notice to the Doe Defendants pursuant to Cal. Civ. Code § 1798.150(b)(1), identifying the specific provisions of the CCPA that Plaintiffs allege the Doe Defendants have violated or are violating. Although a cure is not possible under the circumstances, if (as expected) the the Doe Defendants are unable to cure or do not cure the violation within 30 days, Plaintiffs will amend this Complaint to pursue actual or statutory damages as permitted by Cal. Civ. Code § 1798.150(a)(1)(A).

**FOURTH CLAIM FOR RELIEF**
**Violation of the Confidentiality of Medical Information Act**
**Cal. Civ. Code §§ 56,** *et seq.*
*On behalf of the LAUSD Vendor Plaintiffs and the LAUSD Vendor Classes*

1032. LAUSD Vendor Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 268, as well as Parts One, Two, and Seven, as if set forth fully herein against the Defendant Innive and the Doe Defendants.

1033. The Defendant Innive and the Doe Defendants, or some of them, are subject to the CMIA pursuant to California Civil Code § 56.10 because they are a "provider of health care" as defined by California Civil Code § 56.06(b). They maintain medical information, offer software to consumers designed to maintain medical information for the purposes of communications with doctors, receipt of diagnosis, treatment, or management of medical conditions.

1034. Section 56.10 states, in pertinent part, that "[n]o provider of health care . . . shall disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ."

1035. Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, medical information shall be subject to the remedies and penalties  [of the Act]. . ." Cal. Civ. Code §§ 56.10, 56.101.

348

1036. LAUSD Vendor Plaintiffs' and Class Members' Private Information constitutes "medical information" under the CMIA because it consists of individually identifiable information in possession of and derived from a provider of healthcare regarding LAUSD Vendor Plaintiffs' and Class Members' medical history, physical condition, and/or treatment.

1037. Plaintiffs and Class Members are "patients," as defined in CMIA, Cal. Civ. Code § 56.05(k) ("'Patient' means any natural person, whether or not still living, who received healthcare services from a provider of healthcare and to whom medical information pertains.").The Defendant Innive and the Doe Defendants violated Cal. Civ. Code § 56.10 because they failed to maintain the confidentiality of medical information entrusted to them, and instead "disclose[d] medical information regarding a patient of the provider of health care without first obtaining an authorization . . . ." Specifically, the Defendant Innive and the Doe Defendants negligently caused unauthorized access, theft, and disclosure of LAUSD Vendor Plaintiffs' and Class Members' medical information by threat actors on to the dark web, allowing criminals to misuse their extremely sensitive Private Information.

1038. The Defendant Innive and the Doe Defendants violated Cal. Civ. Code § 56.101 because they negligently failed to create, maintain, preserve, and store medical information in a manner that preserved its confidentiality and instead allowed it to be accessed, sold, disclosed, and otherwise available to criminals on the dark web.

1039. The Defendant Innive and the Doe Defendants violated Cal Civ. Code § 56.36(b) because they negligently caused the access and release of confidential health-related Personal Information to unauthorized third parties concerning LAUSD Vendor Plaintiffs and Class Members, in violation of their rights under the CMIA.

1040. As a direct and proximate result of the Defendant Innive and the Doe Defendants' negligent misconduct, LAUSD Vendor Plaintiffs and Class Members had their health-related Personal Information intercepted, accessed, disclosed, and used by third parties.

1041. The information was actually viewed by unauthorized third parties as the unauthorized third parties advertised the information contained in the information they stole.

1042. As a result of the Defendant Innive and the Doe Defendants' unlawful conduct causing the theft of health-related Personal Information, LAUSD Vendor Plaintiffs and Class Members suffered injuries, including violation of their rights of privacy, loss of the privacy of their Personal Information, loss of control over their sensitive Personal Information, and they suffered aggravation, inconvenience, and emotional distress, in particular, fear of future fraud and economic loss from misuse of the highly sensitive information.

1043. LAUSD Vendor Plaintiffs and Class Members are entitled to: (a) nominal damages of $1,000 per violation; (b) actual damages, in an amount to be determined at trial; (c) reasonable attorneys' fees, and costs.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes set forth herein, respectfully request the following relief:

A.     That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are the proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

B.     That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.     That the Court determine that any alleged agreements to arbitrate or not to participate in a class action are deemed unenforceable;

D.     That the Court award Plaintiffs and Class Members statutory, compensatory, consequential, general, and/or nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

E.     That the Court award punitive or exemplary damages, to the extent permitted by law;

F.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

G.    That Plaintiffs be granted the declaratory and injunctive relief to prevent further injuries from manifesting as alleged herein;

H.    That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

I.    That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

J.    Any other relief that the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial in the instant action.

Dated: July 9, 2025                        Respectfully submitted,

*/s/ Jason S. Rathod*
Jason S. Rathod
**Migliaccio & Rathod LLP**
412 H St NE, Suite 302
Washington DC 20002
Tel. 202.470.3520
jrathod@classlawdc.com

*/s/ Raphael Graybill*
Raphael Graybill
**Graybill Law Firm, PC**
300 4th Street North
Great Falls, MT 59401
Tel. 406.452.8566
raph@graybilllawfirm.com

*/s/ Amy Keller*
Amy Keller
**DiCello Levitt LLP**
Ten North Dearborn, Sixth Floor

353

Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com

*/s/ John Heenan*
John Heenan
**Heenan & Cook**
1631 Zimmerman Trail
Billings, MT 59102
Tel. 406.839.9091
john@lawmontana.com

*/s/ J. Devlan Geddes*
J. Devlan Geddes
**Goetz, Geddes & Gardner P.C.**
35 N. Grand Ave.
Bozeman, MT 59715
Tel. 406.587.0618
devlan@goetzlawfirm.com

*Co-Lead Counsel for Plaintiffs*

James J. Pizzirusso
**Hausfeld LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel. 202.540.7200
jpizzirusso@hausfeld.com

Jeff Ostrow
**Kopelowitz Ostrow P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel. 954.332.4200
ostrow@kolawyers.com

William A. Rossbach
**Rossbach Law, P.C.**
401 North Washington Street
P.O. Box 8988

Missoula, Montana 59807
Tel. 406.543.5156
bill@rossbachlaw.com

*Plaintiffs' Executive Committee and*
*Liaison Counsel*

Caitlin Boland Aarab
**Boland Aarab PLLP**
11 Fifth Street N., Suite 207
Great Falls, Montana 59401
Tel. 406.315.3737
cbaarab@bolandaarab.com

Jillian Dent
**Stueve Siegel Hanson LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
dent@stuevesiegel.com

Andrew Ferich
**Ahdoot & Wolfson, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Tel. 310.474.9111
aferich@ahdootwolfson.com

Gary Klinger
**Milberg Coleman Bryson Phillips**
**Grossman, PLLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
gklinger@milberg.com

David Paoli
**Paoli Law Firm, P.C.**
257 West Front St., Suite A
Missoula, Montana 59802
Tel. 406.542.3330

355

davidpaoli@paoli-law.com

Sean Petterson
**Lieff Cabraser Heimann &
Bernstein, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel. 212.355.9500
spetterson@lchb.com

Daniel Robinson
**Robinson Calcagnie, Inc.**
19 Corporate Plaza Dr.
Newport Beach, California 92660
Tel. 949.720.1288
drobinson@robinsonfirm.com

**Sabita J. Soneji**
Tycko & Zavareei LLP
1970 Broadway, Suite 1070
Oakland, California 94612
Tel. 510.254.6808
ssoneji@tzlegal.com

*Plaintiffs' Steering Committee[332]*

---

[332]    *Does not include additional counsel for the Financial Institutions Track,
who have filed a separate complaint.*