# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

| | |
|---|---|
| IN RE: SNOWFLAKE, INC., DATA SECURITY BREACH LITIGATION<br><br>    This Document Relates to Defendants: ADVANCE AUTO PARTS, INC. and ADVANCE STORES COMPANY, INCORPORATED | CASE No.: 2:24-MD-3126-BMM |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS, AND MEMORANDUM OF LAW**

Pursuant to Fed. R. Civ. P. 23, Plaintiffs,[1] on behalf of themselves and the Settlement Class, respectfully submit this Unopposed Motion for Final Approval of the Class Action Settlement and Application for Attorneys' Fees, Costs, and Service Awards, supported by the Joint Declaration of Class Counsel ("Joint Decl."), attached as **Exhibit B**, and Declaration of Scott Fenwick of Kroll Settlement Administration LLC in Connection with Final Approval of Settlement ("Admin. Decl."), attached as **Exhibit C**.

## I.    INTRODUCTION

On May 22, 2025, this Court preliminarily approved the Settlement, which provides for a non-reversionary, all cash $10,000,000.00 Settlement Fund. That fund will be used to pay Settlement Class Member Benefits, including: (1) a Documented Loss Cash Payment in a maximum amount of $5,000.00 per individual; and (2) an Alternative Cash Payment or two years of Credit Monitoring. Settlement Agreement, [Doc No. 415-1], ("SA") ¶ 77. As well as a Claim for a CCPA Cash Payment in the amount of $100 for California Settlement Class Members. *Id*. The Settlement Fund will also pay for the Settlement Administration Costs; and any Court-approved attorneys' fees and costs to Class Counsel, and Service Awards to the Class Representatives.

---

[1] All capitalized terms used herein shall have the same meanings as those defined in Section II of the Settlement Agreement, attached as **Exhibit A**.

1

The Settlement satisfies all criteria for Final Approval. Consistent with the requirements of this Court's Amended Preliminary Approval Order and the Settlement Agreement, Notice was properly effectuated to the Settlement Class in accordance with due process. Admin Decl. ¶¶ 10-16. As of September 4, 2025, there are no objections and only 59 Settlement Class members have opted-out out of the Settlement. *Id.* ¶ 21. This overwhelmingly positive response affirms the Court's initial conclusion that the Settlement is fair, reasonable, and adequate. [Doc. No. 434 at ¶ 7]. Class Counsel fully evaluated the strengths, weaknesses, and equities of the Parties' respective positions, as well as the risks involved with continued litigation, and believe the proposed Settlement reasonably resolves the Parties' differences. Joint Decl. ¶ 31.

Plaintiffs now move for Final Approval and apply for an award of attorneys' fees, costs, and Service Awards. The Court should find the Settlement is within the range of reasonableness necessary to grant Final Approval under Fed. R. Civ. P. 23(e) and enter an order: (1) granting Final Approval; (2) affirming certification of the Settlement Class for settlement purposes, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); (3) reappointing the Plaintiffs as Class Representatives; (4) reappointing Devlan Geddes, Raph Graybill, John Heenan, Amy Keller, and Jason Rathod as Class Counsel for the Settlement Class; (5) awarding Service Awards to the Class Representatives; (6) awarding attorneys' fees and costs to Class Counsel; (7)

affirming the appointment of Kroll Settlement Administration, LLC ("Kroll") as the Settlement Administrator and approving the payment of the remaining Settlement Administration Costs; (8) overruling timely and properly submitted objections, if any; and (9) entering final judgment dismissing the Action with prejudice and reserving jurisdiction over Settlement implementation. A proposed Final Approval Order is attached as ***Exhibit D***.

## II.    PROCEDURAL HISTORY

Defendants Advance Auto Parts, Inc. and Advance Stores Company, Incorporated (collectively, "Advance Auto" or "Defendant") are an automotive aftermarket parts provider that operates retail stores primarily in the United States. Joint Decl. ¶ 3. In the course of its business, Defendant stores Personal Information pertaining to employees and candidates for employment, including, but not limited to, names, email addresses, mailing addresses, dates of birth, driver's license numbers, Social Security numbers, demographic details, and more. *Id*. ¶ 4. On or about May 23, 2024, Defendant discovered an unauthorized party gained access to its Snowflake cloud data storage application. *Id*. ¶ 5.

Commencing on June 24, 2024, Defendant was named in the first of 11 putative class action lawsuits. *Id*. ¶ 6. The Related Actions were materially and substantively identical, had overlapping claims, sought to represent the same putative class members, and arose from the Data Incident. *Id*.

Before the cases were centralized in this Court, a number of cases were consolidated in the Eastern District of North Carolina with interim class counsel appointed. *Id*. ¶ 7. The parties in those actions began discussing settlement and scheduled a mediation with Bennett G. Picker, Esq., an experienced data breach mediator, on October 1, 2024. *Id*. ¶ 8. The Related Action plaintiffs propounded mediation discovery requests and received responses, learning a significant amount about the Data Incident to ensure that their negotiations were adequately informed. *Id*. Counsel in the Related Actions also exchanged mediation briefs outlining their positions with respect to liability, damages, and settlement-related issues. *Id*. After a full day of negotiations at mediation, the Parties made substantial progress but were unable to reach a Settlement. *Id*.

Thereafter, the Judicial Panel on Multidistrict Ligation centralized the Related Actions, along with other actions against Defendant and other actions against other defendants, under *In re Snowflake Inc. Data Security Breach Litigation*, No. 2:24 MD-3126-BMM. The Court selected Lead Counsel and an Executive Committee on November 19, 2024. *Id.* ¶ 9.

On February 3, 2025, Lead Counsel filed a Representative Class Action Complaint, asserting causes of action against Defendant for (1) negligence; (2) breach of implied contract; and (4) violations of the California Consumer Privacy Act ("CCPA") against Defendant. *See* Doc. No. 320. Counsel for Plaintiffs also

consulted with data experts to understand how the Data Incident occurred, the type of information involved, and whether the information was published on the Dark Web. *See* Joint Decl. ¶ 10.

Following the significant progress made before the creation of the MDL, the Parties continued to conduct extensive settlement discussions, culminating in a settlement in principle in early March 2025. *Id*. ¶ 11. Thereafter, on March 11, 2025, the Parties filed a Joint Notice of Settlement and Motion to Stay All Deadlines Pending Approval of Class Action Settlement. Doc. No. 368.

Over the next several weeks, the Parties continued to negotiate at arms'-length over the Settlement's terms. Joint Decl. ¶ 11. They also exchanged confirmatory discovery, interviewed potential administrators, and negotiated the Notice Program and Claims Process. *Id*. The Parties executed the Agreement in May 2025. *Id*.

On May 15, 2025, Plaintiffs filed their Motion for Preliminary Approval, which the Court granted on May 22, 2025. [Doc. No. 415, 434]. The Court amended the Preliminary Approval Order on May 22, 2025, as to the date of the Final Approval Hearing only. [Doc. No. 436].

Following Preliminary Approval, the Parties and the Settlement Administrator commenced the Notice Program. Joint Decl. ¶ 12. The Claims Process is ongoing and Settlement Class Members have until October 8, 2025, to file Claims. *Id*.

### III. MATERIAL TERMS OF THE SETTLEMENT

#### 1. Settlement Class

Plaintiffs seek Final Approval of the following Settlement Class:

> All persons in the United States whose Private Information was potentially compromised as a result of the Data Incident and who were sent notice of the Data Incident.

SA ¶ 67.

Plaintiffs also seek final approval of a California Settlement Subclass defined as:

> All Settlement Class Members who are residents of California.

*Id*. ¶ 21. Excluded from the Settlement Class are: (1) all persons who are governing board members of Defendant; (2) governmental entities; (3) the Court, the Court's immediate family, and Court staff; and (4) any Settlement Class Member who timely and validly requests to opt-out from the Settlement. *Id*. ¶ 67.

#### 2. Settlement Fund

The Settlement provides for a non-reversionary all cash $10,000,000.00 Settlement Fund used to pay: (1) Settlement Class Member Benefits to those Settlement Class Members who submit a Valid Claim; (2) any Service Awards awarded to Class Representatives; (3) any attorneys' fees and costs awarded to Class Counsel; and (4) all Settlement Administration Costs. SA ¶ 74. As required, Defendant fully funded the Escrow Account following Preliminary Approval. Joint Decl. ¶ 17.

### 3. Settlement Class Member Benefits

All eligible Settlement Class members may elect to receive Cash payments consisting of: (1) a Documented Loss Cash Payment in a maximum amount of $5,000.00 per individual; and (2) an Alternative Cash Payment or two years of Credit Monitoring. SA ¶ 77. In addition to electing a Documented Loss Cash Payment and a Credit and Identity Monitoring or an Alternative Cash Payment, California Settlement Class Members may also make a Claim for a CCPA Cash Payment in the amount of $100. SA ¶ 77. All Settlement Class Member Cash Payments may be subject to a pro rata increase or decrease, depending on the number of Valid Claims and the value of all Cash Payments claimed. SA ¶ 73. If a Settlement Class Member does not submit a Valid Claim, the Settlement Class Member will release his or her claims against without receiving a Settlement Class Member Benefit. SA ¶ 77.

### a. Documented Loss Cash Payment

All Settlement Class Members may submit a Claim Form for a Documented Loss Cash Payment for up to $5,000.00 upon presentment of documented losses related to the Data Incident and attest under penalty of perjury to incurring documented losses, supported by reasonable documentation. SA ¶ 77a.

### b.  Credit Monitoring or Alternative Cash Payment

In addition to claiming Documented Losses, all Settlement Class Members may also submit a claim for either: (a) two years of Kroll Essential Plus monitoring, which has a retail value, conservatively, of $108 per year per Settlement Class Member; or (b) an Alternative Cash Payment of up to $100, subject to pro rata adjustment depending upon the number of claims made. *See* Joint Decl. ¶ 15 (value of Kroll Essential Plus monitoring); SA ¶ 77.c.

### c.  CCPA Cash Payment

In addition to electing a Documented Loss Cash Payment and a Credit and Identity Monitoring or an Alternative Cash Payment, California Settlement Class Members may also make a Claim for a CCPA Cash Payment in the amount of $100, subject to pro rata adjustment, depending upon the number of claims paid. SA ¶ 77.b.

### d.  Business Practice Changes

As part of their settlement negotiations, and without admitting any wrongdoing, Defendant has and will undertake reasonable steps to further secure its systems and environments in conjunction with the specific concerns which Plaintiffs raises as part of this Action. Defendant has provided confidential discovery regarding the number of individuals in the Settlement Class broken down by state of residence, the facts and circumstances of the Data Incident and Defendant's response thereto, and the changes and improvements that have been made and will be

continued to be undertaken to protect class members' Private Information. SA ¶ 78.

### 4. Disposition of Residual Funds

The Settlement is designed to exhaust the Settlement Fund. *Id*. ¶ 113. However, in the event there are funds remaining in the Settlement Fund, including from uncashed checks, 20 days following the 90-day check negotiation period, all remaining funds shall be distributed to a mutually agreeable *cy pres* recipient to be approved by the Court. *Id*.

### 5. Release of Claims

Plaintiffs and Settlement Class Members who do not timely and validly opt-out of the Settlement Class will be bound by the Settlement terms, including the Releases discharging the Released Claims against the Released Parties. *Id*. § XIII. The Released Claims are narrowly tailored to only claims arising out of or relating to the Data Incident. Joint Decl. ¶ 23.

### 6. Service Awards

Class Counsel are seeking Service Awards in the amount of $2,500.00 for each Plaintiff. The Court must approve the amount and the Settlement is not contingent on approval of the Service Awards. SA. ¶¶ 110, 112. The Notices advised the Settlement Class that the Service Awards that will be sought. Admin Dec., at Ex. B, C, D. To date, no Settlement Class Member has objected to the request. *Id*. ¶ 21.

### 7. Attorneys' Fees and Costs

Counsel seek payment of attorneys' fees in the amount of 33.33% of the Settlement Fund, plus reimbursement of reasonable costs. *Id.* ¶ 111. The Court must approve the amount. The Settlement is not contingent on approval of the attorneys' fees and costs requested, and if the Court grants amounts other than what was requested, the remaining provisions of the Agreement shall remain in force. *Id.* ¶ 113. The Notices advises the Settlement Class of the amount of attorneys' fees Class Counsel is seeking. Admin. Dec., at Ex. B, C, D. To date, no Settlement Class Member has objected to the request. *Id.* ¶ 21.

## IV.   NOTICE PROGRAM, CLAIMS PROCESS, OBJECTIONS, AND OPT-OUTS

### 1. Notice Program

On June 2, 2025, pursuant to the Agreement and the Preliminary Approval Order, Defendant provided the Settlement Administrator with the Class List containing Settlement Class member contact information. Admin Decl. ¶ 5. The file contained 2,293,000 lines of data containing, names, physical mailing addresses, email addresses, and telephone numbers. *Id*. Kroll undertook several steps to reconcile and clean the data to compile the eventual Class List for the email and mailing of Notices, including the removal of 4,590 duplicate records, resulting in 2,288,410 unique records for Settlement Class Members. *Id*. Six (6) records did not contain an email address and 10,126 records did not contain either a physical mailing

address or an email address. *Id.*

Thereafter, the Settlement Administrator established the Settlement Website and commenced the Notice Program, which consisted of sending Email Notice to Settlement Class members for whom a valid email address was available and Postcard Notice to Settlement Class Members for whom email addresses were not available, as well as a follow-up Email to Settlement Class Members who were sent the original Email Notice and whose emails did not bounce back or get rejected. *Id.* ¶¶ 7-13. The detailed Long Form Notice was made available on the Settlement Website. *Id.* ¶ 7. Lastly, a Settlement telephone line was established for Settlement Class members to obtain answers to frequently asked questions and a postal mailing address was established to allow Settlement Class members the opportunity to request additional information or ask questions. *Id.* ¶¶ 8, 9.

On June 11, 2025, Kroll caused the Email Notice to be sent to the 2,278,278 email addresses on file for Settlement Class Members. *Id.* ¶ 11. On June 16, 2025, Kroll caused the mailing of six (6) Postcard Notices via first-class mail. *Id.* ¶ 10. Of the 2,278,278 emails attempted for delivery, 621,190 emails were rejected/bounced back as undeliverable. *Id.* ¶ 12. For any email rejection/bounce back without a physical address, Kroll ran an advanced address search to attempt to locate a mailing address. *Id.* On July 22, 2025, Kroll caused 610,063 Postcard Notices to be mailed via first-class mail to those Settlement Class Members for whom emails were

rejected/bounced back as undeliverable and a physical address was available. *Id*. On June 22, 2025, Kroll caused a follow-up Email Notice to be sent to the 1,657,088 Settlement class Members who were sent the original Email Notice and whose emails did not bounce back or were rejected. *Id*. ¶ 13. As of August 27, 2025, 2,020 Postcard Notices were returned by the USPS with a forwarding address. *Id*. ¶ 14. All 2,020 Postcard Notices were automatically re-mailed to the updated addresses provided by USPS. *Id*. As of August 27, 2025, 121,762 Postcard Notices were returned by the USPS as undeliverable as addressed, without a forwarding address. *Id*. ¶ 15. Kroll ran 121,762 undeliverable records through an advanced address search. *Id*. The advanced address search produced 88,802 updated addresses. Kroll will re-mail Notices to the 88,802 updated addresses obtained from the advanced address search on September 5, 2025. *Id*.

In summary, after all remailings, Kroll has reason to believe that direct Notice via email or first-class mail likely reached 2,234,197 of the 2,288,410 Settlement Class Members, which equates to a reach rate of the direct mail notice of approximately 97.63%. *Id*. ¶ 16.

A Settlement Website (www.aapdatasettlement.com) went live on June 11, 2025. Admin Decl. ¶ 7. It serves as a portal for Settlement Class Members to submit Claim Forms to the Settlement Administrator and contains detailed information about the Action, including important documents such as the Claim Form,

Complaint, Long Form Notice, Settlement Agreement, Motion for Preliminary Approval, Amended Preliminary Approval Order, and eventually the Motion for Final Approval and Application for Attorneys' Fees, Costs, and Service Awards and the Final Approval. Order. *Id.*

On May 26, 2025, the Settlement Administrator established a toll-free telephone number (833 420-3832) for Settlement Class members to call to obtain additional information regarding the Settlement through an Interactive Voice Response ("IVR") system and through speaking with a live operator. *Id.* ¶ 8.

### 2.  Claims Process

The Claims Process was structured to ensure that all Settlement Class members have adequate time to review the Settlement terms and decide if they want to submit a Claim Form, to compile documents supporting their Claim (if required), and to determine if they want to opt-out of or object to the Settlement. Joint Decl. ¶ 19. The Claim Form is easy to understand and the process to submit a Claim is clearly outlined in the Notices and on the Claim Form. *Id.*

As of September 4, 2025, Kroll has received 16,124 Claim Forms (15,948 online and 176 paper). Admin Decl. ¶ 18. These numbers are preliminary, but are representative of a Claims Process that is proceeding as planned.  Joint Decl. ¶ 20. Lead Counsel have been working closely with Kroll to provide additional notice, reminder notices, and encourage the filing of additional claims.  *Id.* Claim Forms are

still subject to final audits, including full assessment of each Claim's validity and a review for duplicate submissions. Settlement Class Members may continue to submit Claim Forms online or by mail prior to the October 8, 2025, Claim Form Deadline. Class Counsel anticipate the Claim number will continue to rise and are encouraged by the amount submitted to date. *Id*. Class Counsel will update the Court at the Final Approval Hearing as to the number of Claims.

### 3. Objections and Opt-Outs

The Objection and Opt-Out Periods end on September 23, 2025. *Id*. ¶ 20. As of September 4, 2025, there are no objections. *Id*. ¶ 21.  There are only 59 opt-out requests. *Id*. Plaintiffs will update the Court at the Final Approval Hearing if there are additional opt-outs and respond to any timely objections that may be filed.

### V.    ARGUMENT

### 1. The Settlement Class Should Be Certified, and the Appointments of Class Representatives, Class Counsel, and the Settlement Administrator Affirmed

The Motion for Preliminary Approval detailed the bases for certifying the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3). In compliance with Fed. R. Civ. P. 23(e), the Court's Preliminary Approval Order finds it would likely certify the Settlement Class at the Final Approval stage, finding the following requirements were all met: numerosity, commonality, typicality, adequacy of representation, predominance, and superiority. [Doc. No. 436 at ¶ 4]. Nothing has

changed since Preliminary Approval was granted and the Settlement Class provisionally certified. For brevity, Plaintiffs incorporate the Motion for Preliminary Approval by reference. [Doc. No. 415].

Plaintiffs' appointments as Class Representatives should be affirmed as they remain adequate. Joint Decl. ¶ 24. For the same reasons the Court appointed them as Lead Counsel in this MDL and thereafter found them adequate under Fed. R. Civ. P. 23(a)(4), the Court should also affirm the designation of Devlan Geddes, Raph Graybill, John Heenan, Amy Keller, and Jason Rathod as Class Counsel. Fed. R. Civ. P. 23(g)(1)(A)'s four factors for appointing class counsel are (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed. R. Civ. P. 23(g)(1)(B). Here, the Action is well into its second year, and the Court has observed Class Counsel's and Plaintiffs' counsels' qualifications, competence, and hard work in representing the Settlement Class in this MDL during the past year. Joint Decl. ¶ 26. Class Counsel has devoted substantial time and resources to this Action and will continue to do so. *Id*. Finally, Kroll's appointment as the Settlement Administrator should be

confirmed.

## 2. The Settlement Should Be Finally Approved

A class action may not be settled without the approval of the court. Fed. R. Civ. P. 23(e). Settlement approval "is committed to the sound discretion of the trial judge[.]" *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The Supreme Court has recognized the benefits of a proposed settlement of a class action can be realized only through settlement class certification. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

There is a "'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (citations omitted); *Burton v. Trinity Universal Ins. Co.*, No. CV 14-242-M-DWM, 2015 WL 11090362, at *2 (D. Mont. Nov. 17, 2015).[2] The Court must determine whether the settlement is "fair,

---

[2] Courts must give "proper deference to the private consensual decision of the parties," since "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 150 F.3d at 1027. Thus, in considering a potential settlement, the Court need not reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute and need not engage in a trial on the merits. *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied sub nom. Byrd v. Civil Serv. Comm'n*, 459 U.S. 1217 (1983).

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *Burton*, 2015 WL 11090362, at *2. At preliminary approval, the Court assessed whether a class exists, considered factors for approval under Rule 23(e)(2), and then directed notice to the Settlement Class and scheduled the Final Approval Hearing. *Burton*, 2015 WL 11090362, at *2. Now the Court is tasked with make final determinations for the approval of the Settlement.

The Preliminary Approval Order found the Court would likely finally approve the Settlement (Doc. No. 436 at ¶ 7), after considering and finding the Settlement is fair, adequate, and reasonable under Fed. R. Civ. P. 23(e)(2) and the "*Churchill*" factors.[3] Now, the Court should grant Final Approval considering those same factors, now being able to judge the Settlement Class's positive reaction to the Settlement with only one objector (albeit procedurally improper), only 59 opt-outs, and over 16,000 Claims as of September 4, 2025 (the Claim Form Deadline is not until October 8, 2025).

---

[3] Rule 23(e)(2) was amended in 2018 to include explicit class settlement approval factors. However, consistent with the Advisory Committee note to that rule amendment, courts in this Circuit have made clear the amendment does not entirely displace the traditional Ninth Circuit factors, which overlap with the express Rule 23(e)(2) factors. *See, e.g.*, *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 609 n.4 (9th Cir. 2024) (citing Fed. R. Civ. P. 23 Advisory Committee's note to the 2018 amendment). Thus, Plaintiffs address them all for the Court's benefit.

The Rule 23(e)(2) factors are:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arms' length;
(C) the relief provided for the class is adequate, taking into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

The *Churchill* factors are: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status through trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). The Settlement warrants Final Approval under Rule 23(e)(2) and *Churchill* factors.[4]

---

[4] The seventh factor is inapplicable.

### 3. Adequacy of Representation (Rule 23(e)(2)(A) and Churchill Factor 5)

Both Class Counsel and the Class Representatives have adequately represented the Settlement Class. Plaintiffs' counsel and Class Counsel investigated and litigated the facts and legal claims. Joint Decl. ¶ 27. Counsel's work with liability and damage experts, and their use of informal discovery to learn what occurred to cause the Data Incident and the Private Information impacted allowed for arm's-length and good-faith negotiations, without collusion. *Id.* ¶ 28. Counsel used their experience in complex class action litigation, including similar data breach actions, and devoted time and resources to the case. *Id.*

The Class Representatives also demonstrated their adequacy by: (i) having a genuine personal interest in the outcome of the case; (ii) selecting well-qualified Class Counsel; (iii) producing information and documents to Plaintiffs' counsel and Class Counsel to permit the initial investigation and development of the complaints; (iv) being available as needed; and (v) reviewing the terms of the Agreement. *Id*. ¶ 24. Plaintiffs' respective interests are coextensive and do not conflict with the interests of the Settlement Class. *Id.* ¶ 25. Plaintiffs have the same interest in the Settlement relief, and the absent Settlement Class members have no diverging interests. *Id.*

### 4. The Settlement Was Negotiated at Arm's Length (Rule 23(e)(2)(B) and Churchill Factor 6)

This Circuit puts "a good deal of stock in the product of arms-length, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (citing *Hanlon*, 150 F.3d at 1027; *Officers for Justice*, 688 F.2d at 625). "An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011), supplemented, No. C-06-05778 JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011); *see also Hageman v. AT&T Mobility LLC*, No. CV 13-50-BLG-RWA, 2015 WL 9855925, at *3 (D. Mont. Feb. 11, 2015) (finding no signs of collusion or other conflicts of interest).

The Settlement is the result of good-faith, informed, and arm's-length negotiations between experienced class action attorneys familiar with the legal and factual issues at stake. Joint Decl. ¶ 30. Class Counsel recommend approval of the Settlement after they thoroughly investigated the work performed by Plaintiffs' counsel; analyzed Plaintiffs' claims; reviewed the informal discovery produced by Defendant; and consulted with data security experts, enabling them to gain an understanding of the evidence related to central questions in the Action and preparing them for well-informed settlement negotiations. *Id. See also In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000) ("formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient

information"). For these reasons, and those discussed related to attorneys' fees below, there was no fraud or collusion in arriving at the Settlement.[5]

## 5. The Adequacy of the Settlement Relief (Rule 23(e)(2)(C) and Churchill Factors 1–4)

Although Plaintiffs believe their claims are meritorious and the Settlement Class would ultimately prevail at trial, continued litigation poses significant risks that make any recovery for the Settlement Class uncertain. Joint Decl. ¶ 29. In assessing the degree of risk of continued litigation, "the court evaluates the time and cost required." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 976 (E.D. Cal. 2012). "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.* "The parties . . . save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something that they might have won had they proceeded with litigation." *Officers for Justice*, 688 F.2d at 624 (citation omitted).

Should the case continue, the Parties will have to engage in costly discovery

---

[5] None of the so-called "*Bluetooth*" factors are of concern. *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011). First, Class Counsel will not receive a disproportionate distribution from the Settlement Fund. Second, there is no clear-sailing arrangement regarding the attorneys' fees Class Counsel seeks. SA ¶ 112. Third, there is no provision that unawarded attorneys' fees would revert to Defendant.

(including for expert witnesses), in addition to class certification briefing and dispositive motion practice. Each step carries risks. *See, e.g., Teeter v. Easterseals-Goodwill Northern Rocky Mountain, Inc.*, No. 4:22-cv-96, Doc. No. 52 at 6 (D. Mont.) (Morris, C. J.) (internal citation and quotation omitted) (noting risks in order granting final approval of settlement of data breach class action); *In re Fortra File Transfer Software Data Sec. Breach Litigation*, No. 24-MD-03090-RAR, 2025 WL 457896, at *9 (S.D. Fla. Feb. 11, 2025). The Settlement's fairness is underscored by consideration of the obstacles the Settlement Class would face in ultimately succeeding on the merits, as well as the expense and likely duration of the litigation. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021) ("Settlements also save the bench and bar time, money, and headaches"); *Teeter v. Easterseals-Goodwill N. Rocky Mt., Inc.*, CV-22-96-GF-BMM, 2023 WL 2330241, at *2 (D. Mont. Mar. 2, 2023) (Morris, C. J.) (denying motion to dismiss for lack of standing, but suggesting that defendant could later renew its challenge since parties had "different levels of access to information" at the pleading stage); *Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123 (4th Cir. 2025) (reversing reinstated class certification decision due to class waiver); *In re Vizio, Inc., Consumer Priv. Litig.*, 2019 WL 12966639 at *9 (C.D. Cal. Jan. 4, 2019) ("Even a 'small' risk that class certification is not achievable 'weigh(s) in favor of granting final approval, as the settlement would eliminate the risk.'" (citation omitted)).

Given the significant risks from further litigation, the Settlement provides meaningful Settlement Class Member Benefits, including Cash Payments and Credit Monitoring. In addition, the Claim Form submission process and distribution of Cash Payments and Credit Monitoring is fair, convenient, and effective. The Settlement Administrator is highly qualified to manage the entire process. *See generally* Admin Decl. Thus, the Settlement provides Plaintiffs and Settlement Class Members significant benefits without having to risk no relief.

Further, the attorneys' fees do not impact the other Settlement terms, as Class Counsel and Defendant negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material Settlement terms. Joint Decl. ¶ 41. The Settlement, including disbursing the Settlement Class Member Benefits, is also not contingent on the attorneys' fee and costs award or the Service Awards. SA ¶ 112. As the Application for Attorneys' Fees, Costs, and Service Awards details below, the 33.33% of the common Settlement Fund that will be sought is within the typical range of acceptable attorneys' fees in the Ninth Circuit. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). Finally, there are no separate agreements to disclose under Rule 23(e)(3) because all of the Parties' agreements are in the Agreement. Joint Decl. ¶ 13.

This Settlement compares very favorably to the following approved, common fund, data breach settlements from around the country in light of the class size and,

23

in particular, the data elements involved: *In re Yahoo! Inc. Customer Data Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 20, 2020) ($117,500,000 settlement for 194,000,000 people involving phone numbers, dates of birth, passwords and security question answers); *Adlouni v. UCLA Health Sys. Auxiliary, et al.*, No. BC589243 (Cal. Sup. Ct., Los Angeles Cnty. June 28, 2019) ($2,000,000 settlement for 4,500,000 people involving social security numbers and medical information); *In re Target Cop. Customer Data Sec. Litig.*, No. 0:14-md-02522, ECF No. 758 (D. Minn. May 12, 2016) (approving $10,000,000 settlement for 97,500,000 class members in breach involving credit card numbers). The Settlement also compares very favorably with *Teeter v. Easterseals-Goodwill Northern Rocky Mountain, Inc*., No. 4:22-cv-96, Doc. No. 52, at 6 (D. Mont.) (Morris, C. J.), since that settlement was on a claims-made basis, while this settlement establishes a non-reversionary common fund that provides a baseline of classwide relief. Thus, the fourth *Churchill* factor is also satisfied.

### 6. The Equitable Treatment of Settlement Class Members (Rule 23(e)(2)(D))

All Settlement Class Members are given an equal opportunity to claim Settlement Class Member Benefits, with the option to be reimbursed in cash for documented losses up to $5,000.00 and either two years of Kroll Essential Monitoring or an Alternative Cash Payment. Members of the California Settlement Subclass may also make a claim for an additional $100 in recognition of the

protections afforded by the CCPA. All Settlement Class Member Cash Payments may be subject to the same *pro rata* decrease, depending on the value of all Valid Claims. Thus, the benefits distribution method will be equitable and effective.

### 7.  The Reaction of the Settlement Class

As indicated above, as of September 4, 2025, there are no objections and only 59 opt-outs. Admin Decl. ¶ 21. There have been over 16,000 Claims submitted to date and that number is increasing each day. Joint Decl. ¶ 20. Thus,  the  Settlement Class has had an overwhelming positive response to the Settlement. *See Tanner v. Plavan Commer. Fueling, Inc.,* No. 3:24-cv-1341-BTM-JLB, 2025 WL 2231304 at *5 (S.D. Cal. Aug. 4, 2025) (absence of a large number of objections raises strong presumption settlement terms are favorable).

Thus, the Court should find the Settlement is fair, reasonable, and adequately protects the interests of the Settlement Class members and grant Final Approval.

### 8.  Notice Was Adequate and Satisfies Rule 23 and Due Process Requirements

The  Court-approved  Notice  Program  completed  by  the  Settlement Administrator conforms with the procedural and substantive requirements of due process clause of the United States Constitution and Rule 23. Admin Decl. ¶¶ 7-11; Joint Decl. ¶ 18. Settlement Class members received Notice of the Settlement and have the opportunity to be heard and participate in the Action. *See* Fed. R. Civ. P. 23(c)(2)(B). The  Court exercised its  discretion  to  approve  a  reasonable  Notice

Program. As the Court held when granting Preliminary Approval, the Notice is the best notice practicable under the circumstances and constitutes due and sufficient notice of the Settlement to all Class Members. [Doc. No. 436 at ¶¶ 13-14]. The best notice practicable is that which "is reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). *see also Churchill*, 361 F.3d at 575 ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"). The Notices included, *inter alia*: a description of the Settlement's material terms; how to submit a Claim Form; the Claim Form Deadline; the last day to opt-out of the Settlement Class; the last day to object to the Settlement and/or Application for Attorneys' fees, Costs, and Service Awards; the Final Approval Hearing date; and the Settlement Website address at which Settlement Class members may access the Agreement and other related documents and information. Admin Decl., Exhibits B, C, D. A toll-free number is also included for Settlement-related questions and the Settlement Website contains relevant Settlement information. *Id.* ¶ 8. Finally, the Notice Program satisfies Fed. R. Civ. P. 23(h)(1), by notifying the Settlement Class that Class Counsel may apply to the Court for an award of attorneys' fees of up to 33.33% of the Settlement Fund, plus reimbursement

of costs.

## VI.    APPLICATION FOR ATTORNEYS' FEES, COSTS, & SERVICE AWARDS

The Action was litigated well before the MDL was established and for some time thereafter. Joint Decl. ¶ 7. Plaintiffs' Counsel and Class Counsel have collectively expended a substantial amount of time on this Action and in the MDL overall to help achieve this Settlement which includes significant benefits available to every Settlement Class Member. *Id.* ¶ 26. The result is excellent when considering the type of data elements impacted and the size of the class, and that every Settlement Class Member with documented losses supporting their Claim can claim reimbursement for up to $5,000 of those losses and all can receive either two years of Kroll Essential Monitoring or an Alternative Cash Payment. As demonstrated above, it is favorable when compared to other data breach settlements involving large numbers of impacted people. *Id.* ¶ 33. Class Counsel and Plaintiffs' counsel have not been compensated for their time, nor reimbursed for the significant costs they have incurred. *Id.* ¶ 38. They undertook enormous risk, agreeing to represent Plaintiffs on a fully contingent basis, knowing there was no guarantee they would be reimbursed for their time and out of pocket costs. *Id.* Due to the uncertainty of the data breach litigation landscape and the mix of decisions in this Circuit and across the country, there was significant risk of nonpayment. *Id.*

As compensation for the skill, commitment, and time they dedicated to

litigating this challenging Action, consistent with the Agreement, the Notices, and recognized class action practice and procedure, Class Counsel now respectfully request an award of attorneys' fees of $3,333,000, which is equal to 33.33% of the $10,000,000 Settlement Fund they obtained for the Settlement Class. *Id.* ¶ 40. The requested attorneys' fee award is within the range of reason under the factors considered in the Ninth Circuit. Additionally, Class Counsel request $85,243.79 as reimbursement for their litigation costs necessarily incurred in representing the Plaintiffs and the Settlement Class in the Actions. *Id.* ¶ 53..

Lastly, in recognition for their efforts and the successful results they achieved for the Settlement Class, Class Counsel request $2,500.00 in Service Awards for each of the Class Representatives. Joint Decl. ¶ 26.

## 1. The Attorneys' Fees Requested Are Reasonable Under Ninth Circuit Precedent

### A. The Percentage of the Fund Method is Appropriate

Fed. R. Civ. P. 23(h) provides: "[i]n a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." The general rule in litigation is that each party must bear its own litigation costs. However, the common benefit doctrine is the exception. A common benefit is created when a private plaintiff and his or her lawyer create a claim to which others have a claim. When a party confers a substantial benefit upon a class, counsel is entitled to an attorneys' fees based on the benefit conferred.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). It removes a potential financial obstacle to a plaintiff's pursuit of a class claim and equitably distributes the fees and costs of successful litigation among all who gained from the plaintiff's efforts. The doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Id*. As a result, the Supreme Court and the Ninth Circuit have recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Staton v. Boeing*, 327 F.3d 938, 967 (9th Cir. 2003) (quoting *Boeing Co.*, 444 U.S. at 478).

When determining an attorneys' fees award for creating a common fund, the Ninth Circuit recognizes the "percentage-of-the-fund method" and the "lodestar method." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). The former awards a percentage of the common fund created by the lawyers, while the latter award is based upon the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation. *Id*. Although both methods have historically been approved and used, the percentage-of-the-fund method is the preferred method because it is simpler and closely aligns the interests of counsel and the class in that counsel directly benefits from increasing the size of the fund and

working in an efficient manner. *See Anderson v. Boyne USA, Inc.*, No. 2:21-cv-00095-BMM, 2025 WL 1755223, at *3 (D. Mont. June 25, 2025) (Morris, C. J.) (percentage-of-the-fund method approach preferable when there si a non-reversionary common fund (collecting authority, incuding *Vizcaino*, 290 F.3d at 1047)); *In re Bluetooth*, 654 F.3d at 935 (percentage method is easily quantifiable while lodestar methos is "time-consuming").[6] Hence, it is the most appropriate approach here because the benefit to the Settlement Class is easily quantified.

Under the percentage-of-the-fund method, the Court first calculates the value of the Settlement benefits to the Settlement Class and then selects a percentage of that value to award Class Counsel. Once the Court determines the value, the Court has the discretion to award a reasonable percentage. When determining a reasonable percentage, the Ninth Circuit recognizes 25% as a benchmark. However, that percentage is just for guidance and can be adjusted upward or downward based upon the circumstances of the case. *See Paul*, 886 F.2d at 272. The typical range of acceptable attorneys' fees is 20% to 33.33% of the total settlement. *Barbosa v.*

---

[6] The lodestar method has several drawbacks. "Among the drawbacks to the lodestar method . . . are that the lodestar method increases the amount of fee litigation; the lodestar method lacks objectivity; the lodestar method can result in churning, padding of hours, and inefficient use of resources; when the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours; and the lodestar method inadequately responds to the problem of risk." Lopez v. Youngblood, No. CV-F-07-0474 DLB, 2011 WL 10483569, at *4 (E.D. Cal. Sept. 2, 2011).

*Cargill Meat Sol. Corp.*, 297 F.R.D. 431, 448 (9th Cir. 2000); *Anderson*, 2025 WL 1755223 at *4. Moreover, "[w]here the underlying claims are principally rooted in state law, as here, state law generally also governs or may inform the award of fees including the appropriate fee calculation methodology." *Anderson*, 2025 WL 1755223 at *4.

For the reasons discussed below and in Class Counsel's Joint Declaration, they respectfully request the Court employ the percentage-of-the-fund method and award 33.33% of the common Settlement Fund. Examples of cases in which this Court has awarded one-third of a common fund include: *Anderson*, 2025 WL 1755223 at *4; *Beck v. City of Whitefish*, No. CV 22-44-M-KLD, 2024 WL 4894183, at *7 (D. Mont. Nov. 26, 2024).

## B. Class Counsel's Percentage of the Fund Fee Request is Reasonable

Class Counsel's attorneys' fee request is reasonable given their efforts and the excellent result they obtained for the Settlement Class. The fee is justified under the pertinent factors and when viewed in comparison to the empirical data and economics of class action litigation. When evaluating a fee award, the main inquiry is whether the end result is reasonable. *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000). When assessing whether the percentage requested is fair and reasonable, courts generally consider: "(a) the results achieved; (b) the risk of the litigation; (c) the skill required; (d) the quality of the work performed; (e) the contingent nature of

the fee and the financial burden; and (f) awards made in similar cases." *Vizcaino*, 290 F.3d at 1047-50. *See also Beck*, 2024 WL 4894183 at *3 (discussing *Vizcaino* factors).[7]

### C. Class Counsel's Efforts Resulted in Substantial Benefits

Without Plaintiffs' counsels' and Class Counsel's efforts to file and prosecute the Action, there would be no Settlement providing any benefits for the Settlement Class. Joint Decl. ¶ 42. When considering the issues Plaintiffs faced, including the type of information impacted in the Data Incident, a $10,000,000 Settlement Fund providing for meaningful cash recovery available for the entire Settlement Class is substantial. *Id.* Before the MDL transfer, the Parties began discussing settlement, and Plaintiffs propounded informal discovery requests to learn as much as possible about liability, the types of data at issue, the size of the breach, damages, and other settlement-related issues, and the Parties exchanged detailed mediation briefs. Then

---

[7] *Gendron v. Mont. Univ. Sys.*, 399Mont. 470, 478, 461 P.3d 115, 120-121 (Mont. 2020), sets forth the non-exclusive factors the Montana Supreme Court has articulated to be used to determine a reasonable fee award under the percentage of the recovery method: "(1) The novelty and difficulty of the legal and factual issues involved; (2) The time and labor required to perform the legal service properly; (3) The character and importance of the litigation; (4) The result secured by the attorney; (5) The experience, skill, and reputation of the attorney; (6) The fees customarily charged for similar legal services at the time and place where the services were rendered; (7) The ability of the client to pay for the legal services rendered; and (8) The risk of no recovery." These factors are similar to the factors identified in *Vizcaino* and are equally satisfied.

Plaintiffs filed a Consolidated Complaint. Some of Plaintiffs' counsel also prepared and filed the motion pursuant to 28 U.S.C. § 1407 seeking to establish the MDL and defended its creation over opposition in both briefing and oral argument to the Judicial Panel on Multidistrict Litigation. Plaintiffs' counsel was no doubt instrumental in the transfer and centralization of this sprawling MDL. The creation of the MDL, and transfer and centralization of the Related Actions, no doubt added additional leverage for Class Counsel to resolve the Action against Defendant. After MDL transfer, the Parties swiftly negotiated the Settlement.

Class Counsel's efforts resulted in an all-cash non-reversionary fund for Settlement Class Members to apply for (1) a Documented Loss Cash Payment in a maximum amount of $5,000.00 per individual; and (2) an Alternative Cash Payment or two years of Credit Monitoring. SA ¶ 77. In addition to electing a Documented Loss Cash Payment and a Credit and Identity Monitoring or an Alternative Cash Payment, California Settlement Class Members may also make a Claim for a CCPA Cash Payment in the amount of $100. SA ¶ 77. The retail cost of the Kroll Essential Plus Monitoring is conservatively valued at $108 per year per individual.    Joint Decl. ¶ 35. There are 2,288,410 Settlement Class members. Admin. Decl. ¶ 5. This means the actual cost of Credit Monitoring for all Settlement Class Members would be $494,296,560 if they purchased it individually on their own. *Id*. However, something which makes this Settlement exceptional is that Plaintiffs' Counsel and

Class Counsel were able to negotiate a fixed rate that would ensure every Settlement Class Member that elects it will have Credit Monitoring. Joint Decl. ¶ 35. The above staggering figure is the actual true value of the benefit. *Id.*[8]

The Settlement, which provides tangible benefits now (as opposed to years in the future, if at all) is the direct result of Class Counsel's and Plaintiffs' counsels' efforts. *Id.* ¶ 44. Defendant continues to maintain that Settlement Class members' data was not sensitive, is generally available to the public, and could not and did not result in any financial loss or other injury to the Settlement Class members. *Id.* In the face of these defenses, the Settlement benefits are valuable. *Id.* The Settlement is more than favorable when compared to other data breach settlements involving similar types of data and considering the entirety of the Data Incident. *Id.*

The business practice changes Defendant has taken to further secure its systems and environments to address the specific concerns which Plaintiffs raised in the Action also provide value to the Settlement Class. SA ¶ 78. Though that value is not specifically quantifiable to be include in the Rule 23(b)(3) Settlement Fund for

---

[8] Plaintiffs acknowledge some courts take a conservative approach and reduced the value ascribed to credit monitoring because a bulk discount was secured. *See, e.g., In re LoanDepot Data Breach Litig.,* No. 8:24-cv-00136-DOC-JDEx, 2025 U.S. Dist. LEXIS 167123, at *24-25 (C.D. Cal. Aug. 25, 2025) (counting credit monitoring value toward total settlement benefit amount but reducing it by 75 percent). However, even applying a comparable reduction here would still total $123,574,140 in value created above the cash component.

purposes of calculating the attorneys' fee award, the Court should find that it "nonetheless [is] a substantial benefit with real economic and noneconomic value which justifies the requested fee percentage." *Anderson*, 2025 WL 1755223 at *3 (citing *Staton*, 327 F.3d at 964 (9th Cir. 2003)).

### D. Plaintiffs Faced Significant Risks

Plaintiffs and the Settlement Class faced serious litigation risks and could have ended up with nothing if they did not settle at this stage. Joint Decl. ¶ 30; *see also supra,* V.B.3. (addressing risks). But for this settlement, in addition to certifying and maintaining a class, Plaintiffs would have to overcome a motion to dismiss, summary judgment, succeed at trial, and win on appeal to recover. Joint Decl. ¶ 30. To date, no data breach class action has been tried and so the outcome is even more uncertain. *Id; Hashemi v. Bosley, Inc.,* No. CV 21-946 PSG (RAOX), 2022 WL 2155117, at *7 (C.D. Cal. Feb. 22, 2022) (observing "data breach class actions are a relatively new type of litigation and that damages methodologies in data breach cases are largely untested and have yet to be presented to a jury."). Considering Defendant's compelling defenses, continuing to pursue the Action posed a significant risk for Plaintiffs and the Settlement Class. *Id.* ¶ 32. Thus, Class Counsel's risks weigh in favor of Class Counsel's requested fee.

### E. Counsel's Experience Benefited the Settlement Class

Class Counsel and the other Plaintiffs' counsel who the litigated the Action

are some of the most experienced data breach class action plaintiffs' firms and attorneys in the country.[9] Joint Decl. ¶ 45. This formidable team of attorneys used their years of experience of handling privacy class actions in federal and state courts throughout the country to litigate the Action here efficiently and to achieve a favorable resolution in the face of serious risks. *Id.*

Class Counsel and the other Plaintiffs' counsel who litigated the Action are responsible for shaping much of the data breach jurisprudence that courts rely on today. *Id.* ¶ 46. Their experience in developing the legal framework in this sector was invaluable in navigating through the complicated issues presented in the Action. *Id.*

Class Counsel and the other Plaintiffs' counsel who litigated the Action have led some of the most intricate multidistrict litigation privacy cases, and in so doing have worked with nearly every privacy expert, briefed and argued nearly every type of dispositive motion, argued for and obtained class certification, and settled some of the largest data breaches in history. *Id.* ¶ 47. Their history of negotiating hundreds of settlements was critical here. *Id.* At the end of the day, the Settlement Class greatly

---

[9] Class Counsel's resumes outlining the depth of their experience were considered when the Court appointed them Co-Lead Counsel. (ECF No. 248, 255). As the Court has also already considered them in conjunction with the appointment of Class Counsel at the preliminary approval stage, to avoid redundancy, Class Counsel does not attach them here.

benefited from Class Counsel's experience.

### F. Counsel Took the Case on a Contingency Assuming Financial Risks

Class Counsel and the other Plaintiffs' counsel who litigated the Action agreed to represent the Plaintiffs and the Settlement Class on a fully contingent basis, knowing they would have to advance time and out-of-pocket costs with no guarantee of recovery. *Id.* ¶ 39. In doing so, they forwent representing other clients in other cases so they could dedicate their resources to the Action. *Id.* The organization of counsel ensured work was coordinated to maximize efficiency and minimize duplication of effort. *Id*.

Before the MDL transfer, Plaintiffs' counsel devoted substantial time to investigating the claims. *Id.* ¶ 48. They also expended resources researching and developing the legal claims at issue. *Id.* They also propounded informal discovery requests on Defendant to learn as much as possible about liability, the types of data at issue, the size of the breach, damages, and other settlement-related issues. *Id*.

Class Counsel and the Plaintiffs' counsel who litigated the Action also spent substantial time in the proceedings before the MDL proceedings before this Court, which is work that benefited the Parties and the Settlement Class in this Action. *Id.*

After the Parties agreed to the material settlement terms, significant time was devoted to negotiating and drafting the Agreement, developing the Notice Program and Claims Process, the Preliminary Approval process, and to all actions required

thereafter pursuant to the Preliminary Approval Order. *Id.* ¶ 50. Class Counsel and the Plaintiffs' counsel who litigated the Action has also spent substantial time leading up to the filing of this Motion for Final Approval, addressing the implementation of the Notice Program, Claims Process, and preparing this Motion for Final Approval. *Id.* ¶ 51. Lead Counsel have been working closely with Kroll to provide additional notice, reminder notices, and encourage the filing of additional claims. *Id.* Time will also be spent preparing for and attending the Final Approval Hearing. *Id.*

Finally, Class Counsel and the Plaintiffs' counsel who litigated the Action will devote substantial time to Settlement administration should Final Approval be granted to ensure Valid Claims are paid and the Settlement if fully implemented. *Id.* The requested fee award is at the standard 33.33% contingent fee percentage seen in individual litigation, even with sophisticated clients. *Anderson*, 2025 WL 1755223 at *4.

### G. The Fee Request is Consistent with Fee Awards in Similar Cases

Given the facts and circumstances presented herein, the one-third fee award sought here is within the range of fees typically awarded in this Circuit and in data breach cases across the country. In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 33.3% of the settlement fund. *Barbosa v. Cargill Meat Sol. Corp.*, 297 F.R.D. 431, 448 (9th Cir. 2000); *Anderson*, 2025 WL 1755223, at *4

(awarding one-third of the settlement fund and noting such awards are customary in Montana for contingent fees cases); *Hageman*, 2015 WL 9855925, at \*4 (awarding attorneys' fees equal to one-third of \$45 million common fund). *See also In re MGM Int'l Resorts Data Breach Litig.*, Nos. 1:20-cv-090376, 2:23-cv-01480, ECF No. 262 (D. Nev. June 18, 2025) (approving 30% of \$45 million common fund). There are many examples of attorneys' fee awards of one-third or higher in data breach cases. *See*, *e.g.*, *Garza v. HealthAlliance, Inc.*, No. 72450/2023 (NY Sup. Ct., Weschester Cty.) (approving 35% of common fund); *Tafelski v. Johnson*, 417 Mont. 160, 168-174, 552 P.3d 40, 45-49 (Mont. 2024) (affirming award of one-third of common fund); *In re Planet Home Lending, LLC Data Breach*, No. 3:24-cv-127 (KAD) (D. Conn.), Doc. 48 (same); *In re CorrectCare Data Breach Litig.*, No. 5:22-319-DCR, 2024 WL 4211480, at \*4 (E.D. Ky. Sept. 14, 2024) (same); *Kondo, et al. v. Creative Services, Inc.,* No. 1:22-cv-10438-DJC, Doc. 39 (D. Mass. Sept. 7, 2023) (same); *In re Sovos Compliance Data Security Incident Litigation*, No. 1:23-cv-12100 (D. Mass.), Doc. 12 (same); *Alliance Ophthalmology, PLLC v. ECL Group, LLC*, Nos. 1:22-CV-296, 1:22-CV-468, 2024 WL 3203226, at \*14-16 (M.D.N.C. June 27, 2024); *Abrams, et al. v. The Savannah College of Art and Design Inc.*, No. 1:22-cv-04297-LMM, Doc. 29 (N.D. Ga. Sept. 23, 2023) (same); *Phelps, et al. v. Toyotetsu North America*, No. 6:22-cv-00106-CHB-HA, Doc. 47 (E.D. Ky. Oct. 25, 2023) (same); *In re: Forefront Data Breach Litigation*, No. 1:21-cv-000887-LA, 2023 WL

6215366, at *9 (E.D. Wis. Mar. 22, 2023) (same); and *Davidson v. Healthgrades Operating Company, Inc.*, No. 1:21-cv-01250-RBJ, Doc. 50 (D. Colo. Aug. 22, 2022) (same).

### H. No Lodestar Crosscheck is Required

As the Court noted in *Anderson*, it need not perform a lodestar crosscheck in evaluating the percentage of the fund to be awarded. 2025 WL 1755223, at *3. *See also In re Google Referrer Header Privacy Litig.*, 869 F.3d 737 (9th Cir. 2017) (district court did but was not required to do a lodestar cross-check); *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 547 (9th Cir. 2016) ("a cross-check is entirely discretionary"); *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020). The Montana Supreme Court agrees. *Gendron v. Mont. Univ. Sys.*, 399 Mont. 470, 478, 461 P.3d 115, 120-121 (Mont. 2020) ("court maintains broad discretion in its selection of the method of calculation and consideration of the guiding factors when awarding fees based on the competent evidence presented). As in *Anderson*, the Court should find "the percentage of recovery method to be to be appropriate, particularly given that the total amount of the settlement is a fixed amount without any reversionary payment to" Defendant without a cross-check. 2025 WL 1755223, at *3 (collecting cases).

Class Counsel and the Plaintiffs' counsel who litigated the Action operate under a time and expense protocol whereby they all submit their time and expenses

on a monthly basis. Joint Decl. ¶ 52. Before the MDL was created, the Plaintiffs'
counsel who filed the Action spent substantial time and incurred expenses, of which
they kept track. *Id*. Because this case involves multiple defendants, much of the work
in the creation and organization of the MDL is common benefit work and therefore
not easily ascribed to a particular defendant. *Id*.  Based upon the review of the time
submitted by counsel pursuant to the protocol from the inception of the Action
through the time of Settlement, the percentage of the Settlement Fund requested
would easily be supported by a lodestar crosscheck with a modest multiplier. *Id*. If
requested, Class Counsel will provide lodestar information to the Court. *Id*.

## I.    The Litigation Costs are Reasonable

Class Counsel additionally requests the Court grant its request for
reimbursement of $85,243.79 in litigation costs reasonably incurred in connection
with the prosecution of the Action. Class Counsel assumed the risk of advancing the
costs without knowing whether they would be reimbursed. Joint Decl. ¶ 53. These
costs set forth by category in the Joint Declaration, including filing fees, service fees,
expert fees, and travel and accommodations are reasonable, customary, and
reimbursable. *Id. See also Anderson*, 2025 WL 1755223 at *7; *Beck*, 2024 WL
4894183 at *6-7. *See also Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-
04062-LHK, 2017 WL 2423161, at *13 (N.D. Cal. June 5, 2017) ("In common fund
cases, the Ninth Circuit has stated that the reasonable expenses of acquiring the fund

can be reimbursed to counsel who has incurred the expense."). The Notices advised the Settlement Class that Class Counsel would be seeking cost reimbursement, and no Class Member has objected. Joint Decl. ¶ 53. As these costs were reasonably and necessarily incurred, the Court should approve reimbursement of the costs from the Settlement Fund.

### J.  The Service Awards Are Reasonable

Class Counsel request $2,500.00 Service Awards to each of the Class Representatives in recognition of their initiating the Related Actions and serving as Class Representatives on behalf of the Settlement Class. The Service Award amount was negotiated by the Parties after all material terms of the Settlement. Joint Decl. ¶ 54. The Notice advised the Settlement Class that Class Counsel intended on seeking these amounts and no Settlement Class Member has objected. *Id.*; Admin Decl., Attachments B, C, D.

The Ninth Circuit has "repeatedly held that reasonable incentive awards to class representatives are permitted." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785 (9th Cir. 2022) (quotation marks and citation omitted). Indeed, service awards are "fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563. F.3d 948 (9th Cir. 2009). Service Awards are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize

their willingness to act as a private attorney general. *Id*. at 958-59.

Here, the Class Representatives were essential in securing relief for the Settlement Class. Joint Decl. ¶ 55. They undertook personal risk to do so and worked closely with Class Counsel throughout the Action. *Id*. They assisted with responding producing personal information and were prepared to do whatever was reasonably necessary for the benefit of the Settlement Class. *Id*. All Class Representatives were instrumental in Class Counsel's investigation of the Data Incident, stayed in communication with Class Counsel, and remained involved in the entire process. *Id*. They each reviewed the Settlement Agreement and agreed to the terms of the Settlement. *Id*. The Class Representatives commitment to the Settlement Class's interests and desire to hold the Defendant accountable was essential to the successful prosecution of this class action and warrants the reasonable Service Awards requested here. *Id*.

Service awards for the requested amounts are routinely approved in this Circuit and in this Court. *See, e.g.*, *In re Mego Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (awarding $10,000 incentive awards to two named plaintiffs); *Beck*, 2024 WL 4894183 at *4, 7 (awarding $3,500.00 service awards); *Anderson*, 2025 WL 1755223 at *4 (awarding $10,000.00 service award). Consequently, for their service to the Settlement Class, Plaintiffs should be awarded $2,500.00 each.

## K. The Settlement Administration Costs Are Reasonable

In granting Final Approval to the Settlement, the Court should also approve paying the Settlement Administration Costs from the Settlement Fund. SA¶ 74. Kroll estimates that the total cost of Settlement Administration will be $672,208.03. Admin Decl. ¶ 22.[10]

## VII.   CONCLUSION

Plaintiffs respectfully request the Court: (1) preliminarily approve the Settlement; (2) provisionally certify the Settlement Class for settlement purposes; (3) appoint Plaintiffs as Class Representatives; (4) appoint Devlan Geddes, Raph Graybill, John Heenan, Amy Keller and Jason Rathod as Class Counsel; (5) approve the Notices and Notice Program, including the opt-out and objection procedures; (6) approve the Claim Form and Claims Process; (7) appoint Kroll as the Settlement Administrator; (8) schedule the Final Approval Hearing; and (9) enter the proposed Final Approval Order, attached as ***Exhibit D***.

---

[10] This estimate is subject to a potential increase of approximately $200,000 if Class Counsel determines it is in the best interest of the Class to make additional efforts to bolster the Notice reach. Class Counsel will provide the Court with an updated estimate of the final administration costs at the Final Approval Hearing. Joint Decl. ¶ 56.

Dated: September 8, 2025          Respectfully submitted,


                                  /s/ John Heenan
                                  John Heenan
                                  **Heenan & Cook, PLLC**
                                  1631 Zimmerman Trail
                                  Billings, MT 59102
                                  Tel. 406.839.9091
                                  john@lawmontana.com

                                  *Class Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with District of Montana Local Rule 7.1(d)(2), I certify that this brief has 10,523 words, excluding the caption, certification of compliance, and certificate of service. The Court granted Plaintiffs' motion to exceed the 6,500 word limit.

<u>/s/ John Heenan</u>
John Heenan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served via email via the CM/ECF system on all counsel of record on this 8th day of September, 2025.

/s/ John Heenan
John Heenan